**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.

NEIL PHILLIPS,

*Defendant*.

No. 1:22-cr-00138-RA

**ORAL ARGUMENT REQUESTED**

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT NEIL PHILLIPS' MOTION TO DISMISS**

Sean Hecker
Jenna M. Dabbs
David Gopstein
Alexandra Conlon
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
aconlon@kaplanhecker.com

April 28, 2023

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 3

    A.  The FX Spot Market ................................................................................. 3

    B.  The One-Touch Option Transaction ........................................................ 3

    C.  The December 26, 2017 Spot Trades ...................................................... 5

    D.  The Barrier Event Notifications ............................................................. 6

    E.  The Charges .............................................................................................. 6

ARGUMENT ................................................................................................................. 6

I.    THE CEA CHARGES ARE JURISDICTIONALLY DEFECTIVE ................................ 7

    A.  The Indictment Does Not Allege Fraudulent Conduct Involving a Transaction
Covered by the CEA.. .................................................................................... 7

        i   The CEA does not apply to FX spot trades. .......................................... 7

        ii.  The CEA does not apply to the Option because it lacks a "direct and significant
connection with activities in, or effect on, commerce of the United States." ............. 8

        iii.  The Indictment fails to allege fraud "in connection with" a commodity
transaction under Section 9(1) of the CEA. ................................................ 9

    B.  The Indictment Does Not Allege Conduct in the United States Necessary for
Jurisdiction Under the CEA. ....................................................................... 12

II.  THE INDICTMENT FAILS TO ALLEGE A SCHEME TO DEFRAUD BASED ON
MANIPULATIVE TRADING. ................................................................................ 15

    A.  Fraud Based on Market Manipulation Requires the Government to Prove that Phillips
Intended To and Did Cause an "Artificial Price." ......................................... 15

        i.  The trading described in the Indictment could not have caused an artificial
price ............................................................................................ 16

        ii.  Phillips' alleged subjective intent to affect the market does not change the
analysis ......................................................................................... 18

III.  THE INDICTMENT FAILS TO ALLEGE AN ACTIONABLE OMISSION. ............... 20

A.  Phillips Owed no Duty of Disclosure to Any Party to the One Touch Option........... 21

B.  The Indictment Fails to Allege a Material and Misleading Misrepresentation or Omission. ................................................................................................................. 23

    i.  The alleged omission was not misleading. .......................................................... 23

    ii. The alleged omission was not material. .............................................................. 24

IV.  THE INDICTMENT SHOULD BE DISMISSED BECAUSE APPLICATION OF THE CEA AND WIRE FRAUD STATUTES TO PHILLIPS' CONDUCT VIOLATES THE DUE PROCESS CLAUSE.............................................................................................................. 26

A.  Novel Construction.............................................................................................. 27

B.  Vagueness ............................................................................................................ 28

CONCLUSION ............................................................................................................... 29

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................. 16, 17

*BP Am., Inc. v. Fed. Energy Regul. Comm'n*,
   52 F.4th 204 (5th Cir. 2022) ....................................................................................... 10

*Chadbourne & Parke LLP v. Troice*,
   571 U.S. 377 (2014) ...................................................................................................... 11

*Chiarella v. United States*,
   445 U.S. 222 (1980) ...................................................................................................... 21

*Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*,
   554 F. Supp. 2d 523 (S.D.N.Y. 2008) ....................................................................... 18

*Commodity Futures Trading Comm'n v. Gorman*,
   587 F. Supp. 3d 24 (S.D.N.Y. 2022) ........................................................... 15, 18, 20

*Commodity Futures Trading Comm'n v. Gorman*,
   2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) ........................................ 8, 10, 14, 15

*Commodity Futures Trading Comm'n v. McDonnell*,
   332 F. Supp. 3d 641 (E.D.N.Y. 2018) ....................................................................... 11

*Commodity Futures Trading Comm'n v. Parnon Energy Inc.*,
   875 F. Supp. 2d 233 (S.D.N.Y. 2012) ....................................................................... 16

*Commodity Futures Trading Comm'n v. Wilson*,
   2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ............................................ 16, 18, 19

*Dunn v. Commodity Futures Trading Comm'n*,
   519 U.S. 465 (1997) ........................................................................................................ 7

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ................................................................................................. 16, 17

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ........................................................................................................ 1

*Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*,
   414 F.3d 325 (2d Cir. 2005) .......................................................................................... 4

*Hunter v. Fed. Energy Regul. Comm'n*,
    711 F.3d 155 (D.C. Cir. 2013) ................................................................. 10

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008) ........................................ 16, 18, 19

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ........................................... 7

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*,
    917 F.3d 85 (2d Cir. 2019) ....................................................................... 12

*In re Vivendi, S.A. Securities Litig.*,
    838 F.3d 223 (2d Cir. 2016) ............................................................... 23, 24

*Jing v. Sun*,
    2022 WL 1505950 (E.D.N.Y. Jan. 4, 2022) ............................................. 11

*Laydon v. Coöperatieve Rabobank U.A.*,
    55 F.4th 86 (2d Cir. 2022) ............................................ 12, 13, 14, 15

*McBoyle v. United States*,
    283 U.S. 25 (1931) ................................................................................... 26

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) ................................................................................. 13

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018) ...................................................... 25

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
    572 F. App'x 60 (2d Cir. 2014) ................................................................ 14

*Press v. Chem. Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999) ..................................................................... 11

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
    937 F.3d 94 (2d Cir. 2019) ................................................................. 12, 13

*(RC) 2 Pharma Connect, LLC v. Mission Pharmacal Co.*,
    2022 WL 2441046 (S.D.N.Y. July 5, 2022) ............................................. 22

*RJR Nabisco, Inc. v. Eur. Cmty.*,
    579 U.S. 325 (2016) ........................................................................... 12, 13

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977) ................................................................................. 17

*Sec. Exch. Comm'n v. Frohling*,
   851 F.3d 132 (2d Cir. 2016) ............................................................. 20

*Sec. Exch. Comm'n v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007) ................................................ 18

*Sec. Exch. Comm'n v. Zandford*,
   535 U.S. 813 (2002) .......................................................................... 11

*Sullivan & Long, Inc. v. Scattered Corp.*,
   47 F.3d 857 (7th Cir. 1995) .............................................................. 17

*United States v. Aleynikov*,
   676 F.3d 71 (2d Cir. 2012) ................................................................. 7

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000) ............................................................. 20

*United States v. Bank of New York Mellon*,
   941 F. Supp. 2d 438 (S.D.N.Y. 2013) ................................................ 21

*United States v. Benjamin*,
   2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) ................................ 9, 26

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015) ........................................................ 20, 24

*United States v. Bogucki*,
   2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ................................... 28

*United States v. Bryant*,
   556 F. Supp. 2d 378 (D.N.J. 2008) .............................................. 28, 29

*United States v. Connolly*,
   24 F.4th 821 (2d Cir. 2022) ............................................................. 23

*United States v. Dransfield*,
   913 F. Supp. 702 (E.D.N.Y. 1996) ..................................................... 9

*United States v. Gen. Dynamics Corp.*,
   644 F. Supp. 1497 (C.D. Cal. 1986) ............................................ 21, 28

*United States v. George*,
   223 F. Supp. 3d 159 (S.D.N.Y. 2016) .............................................. 21

*United States v. Gilbert*,
   668 F.2d 94 (2d Cir. 1981) ............................................................... 20

*United States v. Goodrich*,
   12 F.4th 219 (2d Cir. 2021) ............................................................................ 17

*United States v. Hawit*,
   2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) .................................................... 14

*United States v. Hayes*,
   118 F. Supp. 3d 620 (S.D.N.Y. 2015) ............................................................... 9

*United States v. Johnson*,
   945 F.3d 606 (2d Cir. 2019) ............................................................................ 20

*United States v. Lanier*,
   520 U.S. 259 (1997) .................................................................................. 26, 27

*United States v. Liberto*,
   2020 WL 5994959 (D. Md. Oct. 9, 2020) ........................................................ 21

*United States v. Minuse*,
   114 F.2d 36 (2d Cir. 1940) .............................................................................. 20

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991) ................................................................ 17, 20, 27

*United States v. Race*,
   632 F.2d 1114 (4th Cir. 1980) ............................................................ 21, 28, 29

*United States v. Radley*,
   632 F.3d 177 (5th Cir. 2011) ........................................................................ 9, 15

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008) ............................................................................ 19

*United States v. Russo*,
   74 F.3d 1383 (2d Cir. 1996) ............................................................................ 17

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) ...................................................................... 24, 25

*United States v. Sampson*,
   371 U.S. 75 (1962) ............................................................................................ 7

*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988) ............................................................................ 20

*United States v. Smith*,
   555 F. Supp. 3d 563 (N.D. Ill. 2021) ............................................................... 20

*United States v. Szur*,
    289 F.3d 200 (2d Cir. 2002) ............................................................ 21

*United States v. Weaver*,
    860 F.3d 90 (2d Cir. 2017) .............................................................. 24

*United States v. Williams*,
    553 U.S. 285 (2008) ........................................................................ 1

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016) ...................................................................... 24

*W.W.W. Associates, Inc. v. Giancontieri*,
    77 N.Y.2d 157 (N.Y. 1990) ............................................................ 22

*WesternGeco LLC v. ION Geophysical Corp.*,
    138 S.Ct. 2129 (2018).................................................................... 12

*Wu v. Bitfloor, Inc.*,
    460 F. Supp. 3d 418 (S.D.N.Y. 2020) ........................................... 13

## Statutes

7 U.S.C. § 2(c)(1)(A) ................................................................................. 7

7 U.S.C. § 2(i)(1) ...................................................................................... 8

7 U.S.C. § 9(1) ................................................................................... passim

7 U.S.C. § 9(2) ........................................................................................ 10

15 U.S.C. § 78i ........................................................................................ 17

15 U.S.C. § 78j ........................................................................................ 10

18 U.S.C. § 1343 ....................................................................................... 6

## Rules

Fed. R. Civ. P. 52(a) ................................................................................ 18

Fed. R. Crim. P. 12(b) ............................................................................... 9

Fed. R. Crim. P. 12(b)(3)(B)(v) ................................................................ 7

**Regulations**

Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap
 Regulations,
  78 Fed. Reg. 45292 (Jul. 26, 2013) ............................................................................. 8

17 C.F.R. § 180.1 ................................................................................................................ 11

**Other Authorities**

CFTC, *Anti-Manipulation and Anti-Fraud Final Rules,*
  https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/amaf_fa
  ctsheet_final.pdf ............................................................................................................... 11

## PRELIMINARY STATEMENT

The right to fair notice, guaranteed by the Due Process Clause of the Fifth Amendment, is deeply rooted in American law. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."); *United States v. Williams*, 553 U.S. 285, 304 (2008) (due process requires "fair notice of what is prohibited"). But if the indictment in this case is allowed to stand, Neil Phillips will face a criminal trial for making trades that violated no agreement, rule, regulation, or law, and for failing to disclose those trades when he had no obligation to do so. The trading activity alone cannot support a market manipulation claim. And the alleged omission alone does not support a fraud claim. The government's allegations fare no better when they are combined and cast as a "scheme to defraud."

All of the charges in this case depend on trades that Phillips made in the foreign exchange ("FX") spot market on December 26, 2017. The government alleges that Phillips made those trades in order to lower the United States Dollar to South African Rand ("USD/ZAR") exchange rate and thereby trigger a payment on an option that was tied to that exchange rate. The government alleges that Phillips then defrauded the counterparties to that option by not telling them about his spot market trades.

The trades on which the alleged scheme to defraud rests were lawful. The indictment alleges only legitimate transactions made on the open market—real trades with real counterparties and real risk. The indictment does not allege that Phillips' trades amounted to misrepresentations. Nor does it allege that Phillips' trades defrauded investors in the FX spot market by misleading them about the true USD/ZAR exchange rate. Instead, the indictment claims that Phillips' open-market trades were made with an intent to move the USD/ZAR exchange rate, and therefore that the subsequent movement in the USD/ZAR exchange rate was "artificial." The alleged victims of

the exchange rate movement were not the FX spot market participants, but rather the parties to the previously-entered option.

The government's manipulation theory is alarming for its novelty. Recognizing that the alleged open-market manipulation could not support a standalone commodities manipulation charge (because, among other reasons, the trading did not occur in a commodities market), the government charged this conduct as violative of the Commodity Exchange Act's ("CEA") prohibition on manipulation "in connection with" the option – *which was entered into two months before the allegedly manipulative trading*. In doing so, the government asks this court to extend the CEA to an FX market that Congress decided it should not reach, for trading activity no court has ever held to be a crime. And the government does so in a case where the alleged conduct happened entirely abroad, beyond the reach of the CEA, a statute with only limited application to foreign conduct under specific circumstances that are not present here.

The indictment fails not only because it depends on a flawed manipulation theory, but because Phillips had no obligation to disclose his trading activity. Recognizing that Phillips had no duty of disclosure to any party to the option, the indictment relies on boilerplate language in an agreement between Phillips' hedge fund and its broker, and suggests that that boilerplate language somehow created a duty to disclose his trades. But that agreement imposed no duty on Phillips to disclose his trades to anyone—let alone the counterparty to the option, a market participant whose identity Phillips did not even know—and the claim that it did is contradicted by provisions contained within the very same agreement. Indeed, the only omission charged in the indictment stems from a notification by Phillips' hedge fund that the option had been triggered. This notification—which was made neither *by* Phillips nor *to* the counterparty who sold the option— was not false, misleading, or material.

The conduct alleged in the indictment is neither commodities fraud nor wire fraud. And applying those statutes to this conduct would violate Phillips' fundamental due process right to fair warning of what conduct the criminal law prohibits. For these reasons, and as set forth below, the indictment should be dismissed in its entirety.

## STATEMENT OF FACTS

### A.  The FX Spot Market[1]

The FX spot market is a global market in which participants—the vast majority of whom are global financial institutions and other sophisticated institutional investors—trade currencies in pairs, with each currency valued as a ratio relative to the other. *See* Indictment ("Ind.") ¶ 5 (Dkt. 2). The ratio is then expressed as the "exchange rate." *Id*. There is no formal marketplace for FX transactions; rather, participants trade directly with FX dealer banks, many of whom are global banks able to exchange many of the world's currencies in large amounts upon customer request. *Id*. ¶ 7.

### B.  The One Touch Option Transaction

In 2015, Neil Phillips co-founded Glen Point Capital ("Glen Point" or "Hedge Fund-1"), a London-based hedge fund focused on macroeconomic trends and emerging markets. Ind. ¶ 4. One of the products that Glen Point used as part of its investment strategy was the "one touch" digital barrier option. *Id.* ¶ 10. In exchange for a paid premium, the counterparty to a one touch option agrees to pay a notional value if a particular currency pair reaches—or touches—a specified exchange rate, referred to as the "barrier," by a certain date. *Id.* ¶ 10–11.

On October 30, 2017, Glen Point purchased a one touch digital barrier option for the USD/ZAR currency pair with a notional value of $20 million, a barrier rate of 12.50, and an

---

[1] Phillips accepts the factual allegations from the Indictment as true solely for purposes of this motion.

expiration date of January 2, 2018 (the "One Touch Option" or the "Option"). *Id*. ¶ 10. The counterparty who sold the Option ("Bank-1"), was obligated to pay Glen Point the notional value if the USD/ZAR exchange rate reached the barrier rate (the "Barrier Event") before the Option expired. *Id.* ¶¶ 10–11. At the time Glen Point entered into the Option, the USD/ZAR exchange rate was over 14.00. *Id*. ¶ 14.

Glen Point entered into the Option through a financial services firm ("Intermediary Firm-1") that facilitated trades on behalf of clients who are not known to each other. *Id*. ¶ 11. Thus, neither Glen Point nor Bank-1 knew their counterparty's identity. Another financial institution ("Bank-2") acted as Glen Point's prime broker in connection with the transaction. *Id*. ¶ 13. After Glen Point entered into the One Touch Option, Bank-2 provided Glen Point with a letter agreement setting forth the terms and conditions of the transaction (the "Confirmation Agreement" or "Agreement," attached as Exhibit A). *Id*.

The Agreement provided that Glen Point would act as the "Calculation Agent"—that is, Glen Point would determine when the barrier rate had been reached—and would do so "in good faith and in a commercially reasonable manner." *Id*. The Agreement incorporated by reference the "2005 Barrier Option Supplement" published by the International Swaps and Derivatives Association, Inc. (the "ISDA Supplement"), a trade organization that publishes form documents that are the "industry standard" for swap transactions. *Id.*; *see Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 327–28 (2d Cir. 2005). The ISDA Supplement stated that the "Barrier Determination Agent" "determines whether or not [the] Barrier Event has occurred and provides notice if it determines that [the] Barrier Event has occurred." Ind. ¶ 13. Like the Agreement, the ISDA Supplement stated that the "occurrence of [the] Barrier Event shall be determined in good faith and in a commercially reasonable manner by the Barrier

Determination Agent." *Id.* Under the Supplement, the Barrier Determination Agent and Calculation Agent could be different parties but would be the same party "unless otherwise specified." *Id.* Bank-1—the counterparty who sold the One Touch Option—was not a party to the Agreement.

Subsequently, Glen Point allocated the notional value of the One Touch Option such that, if triggered, Hedge Fund-1 would receive $15,660,000, and one of its client funds ("Client Fund-1"), a third party for which Glen Point managed certain investments, would receive $4,340,000. *Id.* ¶ 12.

### C.  The December 26, 2017 Spot Trades

Between October 30 and December 15, 2017, the USD/ZAR rate "fluctuated between approximately 14.50 and approximately 13.15." *Id.* ¶ 14. Then, on December 18, 2017, it was announced that Cyril Ramaphosa was elected president of the African National Congress political party in South Africa. *Id.* ¶ 15. The USD/ZAR exchange rate then lowered to approximately 12.52 (just two cents from the 12.50 barrier at issue), meaning the Rand strengthened relative to the Dollar. *Id.*

On December 26, 2017, Phillips—sitting in South Africa—sold USD in exchange for ZAR in a series of spot trades executed by a Singapore-based employee of a foreign bank ("Bank-3"), effectively betting on a strengthening Rand. *Id.* ¶¶ 18–19. Phillips communicated with an employee of Bank-3 through the Bloomberg platform chat function, instructing him to make various trades and asking him for market color about the USD/ZAR exchange rate. *Id.* ¶¶ 18–21. According to the Indictment, Phillips stopped trading on December 26, 2017 after the USD/ZAR exchange rate fell below 12.50. *Id.* ¶ 18. Phillips later explained to Glen Point's investors that his goal was to purchase Rand before the market "[came] to terms with" the prospect of a "more positive policy dynamic than seen in South Africa for a long time." *Id.* ¶ 27.

### D. The Barrier Event Notifications

As noted above, Glen Point was the designated "Calculation Agent" under its agreement with its broker (Bank-2). Accordingly, on December 26, 2017, Phillips instructed a Glen Point employee to notify Intermediary Firm-1 that the Barrier Event—*i.e.*, the USD/ZAR falling below 12.50—had occurred. *Id.* ¶ 23. The following day, on December 27, 2017, a different Glen Point employee made the same notification to Bank-2. *Id.* ¶ 24. The Indictment alleges that the notification by Glen Point omitted that the Barrier Event had allegedly been triggered by Phillips' spot trades. *Id.* ¶ 23. The Indictment does not allege any communication by Phillips, Glen Point or anyone else to Bank-1 notifying it that the Option had been triggered. Later that day, Bank-1 wired the notional value of the Option to Intermediary Firm-1's broker. *Id.* ¶ 25. Those funds were subsequently transferred to Glen Point and to Client Fund-1. *Id.*

### E. The Charges

On March 3, 2022, the government obtained an Indictment charging Phillips with commodities fraud, in violation of 7 U.S.C. § 9(1); wire fraud, in violation 18 U.S.C. § 1343; and conspiracies to commit the same. All four counts are based on the same alleged scheme to defraud the counterparties to the Option in December 2017.

## ARGUMENT

The Indictment alleges that Phillips engaged in a scheme to defraud, in violation of the CEA and wire fraud statute, premised on (1) allegedly manipulating the exchange rate between the South African Rand and the U.S. Dollar by trading in the relevant spot market (the "Manipulation Theory") and (2) failing to disclose the alleged manipulation to the counterparty to the One Touch Option (the "Omission Theory"). Because the allegations in the Indictment, taken as true, cannot establish that Phillips committed or conspired to commit commodities fraud or wire fraud, the

Indictment must be dismissed. *See* Fed. R. Crim. P. 12(b)(3)(B)(v); *United States v. Sampson*, 371 U.S. 75, 78–79 (1962); *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012).

## I.   THE CEA CHARGES ARE JURISDICTIONALLY DEFECTIVE.

The Government alleges violations of the CEA based on a "scheme involving the intentional and artificial manipulation of the USD/ZAR exchange rate and other manipulative and deceptive devices and contrivances." Ind. ¶ 34. The conduct alleged in the Indictment is not covered by the CEA and thus, as a matter of law, cannot violate it.

### A.  The Indictment Does Not Allege Fraudulent Conduct Involving a Transaction Covered by the CEA.

The government alleges fraudulent conduct in connection with two types of transactions: foreign currency spot trades and the One Touch Option. Neither is covered by the CEA.

### i.      *The CEA does not apply to FX spot trades.*

As an initial matter, the CEA has never applied to any "agreement[s], contract[s], or transaction[s] in . . . foreign currency." 7 U.S.C. § 2(c)(1)(A). This includes spot foreign currency transactions, which the Supreme Court has stated are "free from supervision" under United States commodities laws. *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 473 (1997). Congress extended the CEA's jurisdiction when it passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank"), but only to reach retail customers in off-exchange foreign currency transactions. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *17 (S.D.N.Y. Sept. 20, 2016) (quoting *Dunn*, 519 U.S. at 473) (noting the "general exemption from CFTC regulation for sophisticated off-exchange foreign currency trading"). In

short, FX spot transactions are not covered by the CEA and do not, on their own, provide a basis for claims under the statute.[2]

      ii.      ***The CEA does not apply to the Option because it lacks a "direct and significant connection with activities in, or effect on, commerce of the United States."***

     The One Touch Option also does not provide a basis for a CEA claim because it lacks a "direct and significant connection" to the United States. Section 2(i) of the CEA states that provisions of the CEA relating to swaps shall not apply to activities outside of the United States *unless those activities "have a direct and significant connection with activities in, or effect on, commerce of the United States*." 7 U.S.C. § 2(i)(1) (emphasis added). The CFTC's interpretive guidance explains that Section 2(i)'s "direct and significant" threshold targets activities that create "systemic risks" to the United States financial system. *See* Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45292, 45299–300 (Jul. 26, 2013). As the guidance makes clear, §2(i) is meant to address "risks like those that occurred during the 2008 Financial Crisis, where foreign affiliates of U.S. institutions engaged in risky swap trades that 'result[ed] in or contribute[d] to substantial losses to U.S. persons and *threaten[ed] the financial stability of the entire financial U.S. system*.'" *Commodity Futures Trading Comm'n v. Gorman*, No. 21-Civ.-870 (VM), 2023 WL 2632111, at *9 n.9 (S.D.N.Y. Mar. 24, 2023) (*Gorman II*) (emphasis added) (quoting 78 Fed. Reg. at 45295). Accordingly, "cross-border application" of the CEA swaps provision "was thus geared towards protecting against the 'failures and near failures [that] revealed the vulnerability of the U.S. financial system and economy to *systemic risk*." *Id.* (emphasis in original) (quoting 78 Fed. Reg. at 45295).

---

[2] Presumably recognizing this jurisdictional limitation, the Commodities Fraud count in the Indictment does not allege fraud in connection with the FX trades, which are the trades the government contends artificially impacted the USD/ZAR exchange rate, but rather "in connection with the $20 Million One Touch Option." Ind. ¶ 34.

The Court "may properly decide [a] jurisdiction question on [a] pre-trial motion to dismiss pursuant to Rule 12(b)" where, as here, the question "goes to whether [the statute] applies to the Defendant['s] alleged criminal conduct, not to the issue of the Defendant['s] guilt or innocence." *United States v. Dransfield*, 913 F. Supp. 702, 707 (E.D.N.Y. 1996); *see also United States v. Hayes*, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) (analyzing on a motion to dismiss whether the Government sufficiently alleged domestic conduct). This is particularly true where "the indictment includes detailed factual allegations that "draw[] a clear picture of the Government's theory" and the Court therefore "need not look beyond the face of the indictment or take any inferential steps to conclude that the facts alleged in the indictment do not allege a violation of the given statutes." *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *13–15 (S.D.N.Y. Dec. 5, 2022) (dismissing indictment for failing to "explicitly allege" an "implicit element of [the] statute").

Here, the CEA claims rest entirely on the One Touch Option—a foreign swap that lacks a direct and significant connection with activities in, and effect on, U.S. commerce. The Indictment must be dismissed because it does not (and could not) allege that the Option meaningfully affected any aspect of the U.S. financial system or posed "systemic risks" that could justify the exceptional extraterritorial application of the CEA to a foreign swap.

### iii.   The Indictment fails to allege fraud "in connection with" a commodity transaction under Section 9(1) of the CEA.

The Indictment also fails to allege a claim under the CEA for an additional reason: it does not allege fraud "in connection with" the One Touch Option as required to state a § 9(1) violation. As explained above, the alleged non-retail spot transactions in South African Rand are outside the scope of the CEA and therefore cannot be the basis for a CEA charge. *See also United States v. Radley*, 632 F.3d 177 (5th Cir. 2011) (prosecution for CEA manipulation and related wire fraud

based on propane futures transactions dismissed because the alleged transactions were exempt from the CEA); *cf. BP Am., Inc. v. Fed. Energy Regul. Comm'n*, 52 F.4th 204, 210, 215 (5th Cir. 2022) (alleged fraudulent transactions outside the jurisdiction of a federal agency cannot be prosecuted by the agency on grounds that they were in connection with a jurisdictional transaction; *Hunter v. Fed. Energy Regul. Comm'n*, 711 F.3d 155 (D.C. Cir. 2013). Accordingly, there is no alleged violative conduct "in connection with" the One Touch Option.

In addition, § 9(1) of the CEA, by its terms, covers only fraud-based manipulations, *i.e.*, those effectuated using deceptive and fraudulent devices. *See Gorman II*, 2023 WL 2632111, at *4–5 (construing § 9(1) as reaching fraud-based manipulations with respect to commodities and §9(2) as reaching "non-fraud-based manipulation" of the price of a commodity, like the "aggregation and abuse of market power sufficient to move the market against the prevailing financial markets' tides"). The Indictment does not allege any misrepresentations, half-truths, fraudulent omissions, or deceptive conduct (*e.g.*, wash sales, fictitious trading) in the alleged spot market trading. Accordingly, for the reasons set forth in greater detail in Section III below, the Indictment fails to allege any fraud in connection with the One Touch Option.

Further, courts interpreting the "in connection with" requirement of the Securities Exchange Act of 1934 (the "1934 Act"), a provision nearly identical to the one at issue here, have limited its application to fraud claims where the manipulative device or contrivance induced the purchase or sale of a security. The 1934 Act prohibits the use or employment of "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." 15 U.S.C. § 78j; *compare with* 7 U.S.C. § 9(1) (prohibiting the use and employment of any "manipulative or deceptive device or contrivance" "in connection with any swap"). In interpreting the "in connection with" requirement of the CEA, courts generally look to interpretations of the

same phrase in Section 10(b) of the [1934 Act]." *Jing v. Sun*, No. 21-cv-2350 (GRB) (AYS), 2022 WL 1505950, at \*17 (E.D.N.Y. Jan. 4, 2022).[3] In the securities context, a "manipulative or deceptive device or contrivance" is only used "in connection with" the purchase or sale of a security where the device "somehow induced the purchaser to purchase the security at issue." *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999); *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a 'covered security'"). Even where courts have broadly construed the "in connection with" requirement under the CEA, they have done so only when the alleged manipulative or fraudulent device "coincide[d]" sufficiently with or was "contemporaneous with" the transactions at issue. *See Commodity Futures Trading Comm'n v. McDonnell*, 332 F. Supp. 3d 641, 722–23 (E.D.N.Y. 2018) (finding misrepresentations and omissions made throughout scheme to defraud to induce investors to invest, remain invested, and delay withdrawing funds were made "in connection with, and contemporaneous with" transactions covered by the CEA) (citing *Sec. Exch. Comm'n v. Zandford*, 535 U.S. 813, 820 (2002) (holding fraudulent device used "in connection" with securities sale where defendant's breaches of fiduciary duty "coincide[d]" with securities transactions)). Here, the Indictment alleges that Phillips engaged in a scheme to defraud in December 2017—two months after Glen Point purchased the One Touch Option from Bank-1. Ind. ¶¶ 1, 10. The Indictment alleges no statements to Bank-1 of any kind—let alone statements that were material to Bank-1's decision to enter into

---

[3]     *See also* CFTC, *Anti-Manipulation and Anti-Fraud Final Rules*, 1, https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/amaf_factsheet_final.pdf (noting Regulation 180.1, which addresses the prohibition on manipulative devices, "is modeled on Securities and Exchange Commission Rule 10b-5" and stating the Commission "intends to be guided by" precedent interpreting the words "in connection with" in the securities context).

the Option or to pay its notional value when triggered. To be sure, the One Touch Option and the open-market trades in the FX spot market both involved the USD/ZAR exchange rate. But the trades, which are outside the scope of the CEA, and which were made in a different market, with different parties, months later, were not "in connection with" the One Touch Option even in the broadest sense of that requirement as it has been construed under the applicable law, and therefore they cannot form the basis of a CEA claim.

### B. The Indictment Does Not Allege Conduct in the United States Necessary for Jurisdiction Under the CEA.

Counts One and Two should be dismissed for the additional reason that they do not allege a domestic application of the CEA.

The CEA is interpreted "in light of the presumption against extraterritoriality, a canon of statutory interpretation that is a 'basic premise of our legal system.'" *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 95 (2d Cir. 2022) (quoting *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 102 (2d Cir. 2019)). The presumption exists to help "'avoid the international discord that can result when U.S. law is applied to conduct in foreign countries' and 'reflects the commonsense notion that Congress generally legislates with domestic concerns in mind.'" *Id.* at 95–96 (quoting *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 95 (2d Cir. 2019)).

The Second Circuit uses a two-step framework to determine whether a statute covers foreign conduct. *Prime*, 937 F.3d at 102 (citing *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)). First, a court must look to the language of the statute to determine whether it contains "a clear indication of an extraterritorial application" to rebut the presumption against extraterritorial application. *Laydon*, 55 F.4th at 96 (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 138 S.Ct. 2129, 2136 (2018)). Absent such a "clear indication," the court must determine

whether "'the case involves a domestic application of the statute.'" *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337). Applying this two-step framework, the Second Circuit has already held that Section 9(1) "lacks . . . a clear statement of extraterritorial effect." *Prime*, 937 F.3d at 103 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010)). The CEA claims in the Indictment fare no better under the Second Circuit's "domestic application" test.

In order to determine whether the Indictment charges a "satisfactory domestic application," the Court must "discern the 'focus of congressional concern' in enacting" the CEA, in particular the "conduct" the statute aims to regulate and "the parties and interests it seeks to protect." *Id*. The CEA "serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Id.* at 101 (citation omitted); *see also Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d 418, 424 (S.D.N.Y. 2020) (same). The focus of Section 9(1) is, as the section's title suggests, to prohibit manipulative and deceptive conduct.

Under *Prime,* if "the conduct relevant to [(9)(1)'s] focus occurred abroad"—*i.e.*, if a defendant is alleged to have "engag[ed] in fraud" abroad—the CEA's anti-fraud provisions are inapplicable. 937 F.3d at 107–08 (finding the CEA's anti-fraud provisions inapplicable when defendants allegedly reported artificial transactions to a London-based rate reporting agency and thereby altered a futures index that settled oil trades on both London-and U.S. based exchanges). Here, the Indictment fails to allege a domestic application of the CEA for each component of the alleged fraud scheme—both the alleged omissions and the alleged manipulative trading.

First, the alleged omission was made by Glen Point employees located in London to a Swiss Entity (Intermediary Fund-1) and the London-based subsidiary of a bank headquartered in the U.S. (Bank-2)—all while Phillips was in South Africa. Ind. ¶¶ 19, 23–24. Looking at the

"alleged misleading statements alone," there is no "compelling impact they produced on the U.S. financial system," which the CEA aims to protect. *Gorman II*, 2023 WL 2632111, at *10 (dismissing CFTC's misrepresentation fraud theory where the defendant made the alleged misstatements while in Japan to Japanese counterparties in a transaction governed by Japanese law).

Second, the conduct underlying the alleged manipulative trading is equally removed from the United States. The Indictment alleges that Phillips made manipulative trades from South Africa via the Singapore trading desk of a foreign bank in a global market. Ind. ¶¶ 18–19. The Indictment points to wires that went through the U.S. to establish some U.S. link to the alleged fraudulent conduct abroad, but the wires alone do not establish a domestic application of the CEA. *See Laydon*, 55 F.4th at 96–98 (affirming dismissal of CEA fraud claims as impermissibly extraterritorial where touchpoints with U.S. included purchases on a U.S.-based exchange and communications made in furtherance of a conspiracy with a U.S.-based trader on U.S.-based servers); *Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (summary order) (affirming dismissal of RICO claims based on wire fraud where financing was obtained in U.S. and invoices were sent to and paid by a bank in the U.S. because "[t]he activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took place outside of the United States"); *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 663542, at *5 (E.D.N.Y. Feb. 17, 2017) ("[I]n a given case, a court must conduct a more holistic assessment of the conduct that constitutes the alleged fraud scheme, including consideration of whether the scheme involves only incidental or minimal use of U.S. wires").

Here, the alleged manipulative trading occurred in the USD/ZAR spot market, a market that is expressly exempt from CEA oversight, on "foreign trading desks" as part of "conduct

abroad." *See Laydon*, 55 F.4th at 97–98. Because the Indictment fails to allege that either the trading at issue or the alleged omissions were domestic, the CEA claims must be dismissed.

## II.     THE INDICTMENT FAILS TO ALLEGE A SCHEME TO DEFRAUD BASED ON MANIPULATIVE TRADING.

The government accuses Phillips of market manipulation by making open-market trades with a subjective intent to move the exchange rate. But the Indictment does not allege that Phillips' trades themselves constituted market manipulation of a commodity. Nor could it: as noted above, the CEA doesn't apply to the FX spot market.

Instead, the Indictment alleges that the trades were manipulative conduct "in connection with" the One Touch Option. Ind. ¶ 34. The government's theory represents a stark expansion of criminal market manipulation charges to open-market transactions in unregulated markets. This is especially so because even if the Indictment did allege criminal market manipulation of a commodity or security (and it does not), it would still fail as a matter of law for the reasons that follow.

### A.   Fraud Based on Market Manipulation Requires the Government to Prove that Phillips Intended to and Did Cause an "Artificial Price."

CEA §9(1) covers only fraud-based market manipulations—those caused by a "manipulative or deceptive device or contrivance." Where, as here, the government alleges a fraudulent omission that is based on a failure to disclose a *non-fraud-based manipulation*, it first must prove the four necessary elements of a non-fraud-based manipulation, two of which are that the defendant specifically intended to and did cause an artificial price to exist. *See Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 41 (S.D.N.Y. 2022) (*Gorman I*); *Gorman II*, 2023 WL 2632111, at *6.[4]

---

[4] If the Court finds that the Indictment fails to allege a scheme to defraud based on manipulative trading, the Court should dismiss not only the CEA charges (Counts I and II), but also the wire fraud charges because the wire fraud

Prices are "artificial" when they have been set by some mechanism that has the effect of "distort[ing] those prices" and "prevent[ing] the determination of those prices by free competition alone." *Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012). The mere intent to affect prices is not enough. *Commodity Futures Trading Comm'n v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024, at *14 (S.D.N.Y. Nov. 30, 2018) (criticizing CFTC manipulation theory as "tautological" for "conflat[ing] artificial prices with the mere intent to affect prices"). Instead, a defendant must intend to cause "prices that [he] understood to be unreflective of the forces of supply and demand." *Id.* at *15. In other words, an artificial price does not exist (and market manipulation does not occur) where a defendant's rational market participation "does not send a false signal." *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) (*Amaranth II*), aff'd, 730 F.3d 170 (2d Cir. 2013); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 100 (2d Cir. 2007) (fraud allegation based on market manipulation must allege manipulator "engaged in market activity aimed at deceiving investors as to how other market participants have valued a security"). The Indictment uses the right word—artificial—but in a manner wholly divorced from its significance and meaning in market manipulation cases.

### i.    *The trading described in the Indictment could not have caused an artificial price.*

Certain trading practices involve deceptive conduct that has no purpose other than creating an artificial price. *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 205 (1976) (describing "specific practices that were considered so inimical to the public interest as to require express

---

charges depend on the same "antecedent scheme to defraud." *See Radley*, 632 F.3d at 180 (dismissing CEA charges and related wire fraud charges where wire fraud charges were based on the same "antecedent scheme to defraud," holding "when the government's allegations charge market manipulation and cornering as the 'scheme to defraud,' and our preceding discussion explains why [under the CEA] this is not criminal conduct . . . the same scheme cannot alone be re-characterized and rendered illegal as wire fraud.").

prohibition"); 15 U.S.C. § 78i (prohibiting certain per se manipulative transactions). "Manipulation" in the context of a market manipulation fraud claim is "virtually a term of art when used in connection with securities markets [and] refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *ATSI Commc'ns, Inc*, 493 F.3d at 99–100 (discussing market manipulation claims under Section 10(b) of the SEA) (quoting *Santa Fe Indus. v. Green*, 430 U.S. 462, 476 (1977)). Unsurprisingly, market manipulation claims premised on these inherently deceptive trading practices have been repeatedly upheld. *See, e.g., Hochfelder*, 425 U.S. at 205 (wash sales and matched orders); *United States v. Goodrich*, 12 F.4th 219, 224 (2d Cir. 2021) (same); *United States v. Russo*, 74 F.3d 1383, 1387 (2d Cir. 1996) ("parking" and unauthorized placement of shares). But the Indictment describes legitimate transactions, conducted transparently in the open market, with willing market participants on the opposite side of each trade. These transactions cannot, without some other deceptive conduct, support a manipulation claim. *See ATSI Commc'ns, Inc.*, 493 F.3d at 101 ("Furthermore, short selling—even in high volumes—is not, by itself, manipulative . . . To be actionable as a manipulative act, short selling must be willfully combined with *something more* to create a false impression of how market participants value a security.") (emphasis added). Without more, Phillips' alleged trading, which involved actual trades with willing market counterparties, is not manipulative. *See also United States v. Mulheren*, 938 F.2d 364, 371 (2d Cir. 1991) (significant trading over short period of time "alone . . . does not make the investor a manipulator"); *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995) ("They say that [the defendant] prevented the price from rising . . . by selling short more and more stock. This is just to say that [the defendant], like a bluffer in a poker game, kept redoubling its bet until the other players lost heart. But so what?").

17

### ii.     *Phillips' alleged subjective intent to affect the market does not change the analysis.*

A legitimately structured trade "supported by a legitimate economic rationale. . .cannot be the basis for liability under the CEA because it does not send a false signal." *Amaranth II*, 587 F. Supp. 2d at 534. No false signal results just because that same trade is made with a mixed motive— both for a legitimate economic reason and with a manipulative intent. *See Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) (finding no artificial price established where defendant traded with alleged manipulative intent and with a "rationale and a formula that support[ed] the" trading activity). Thus, in order to proceed on an open-market manipulation claim, the government must allege that "but for the manipulative intent, the defendant would not have conducted the transaction." *Sec. & Exch. Comm'n v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007); *see also Commodity Futures Trading Comm'n v. Amaranth Advisors, LLC*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008) (applying the *Masri* test distinguishing between open-market transactions made for a "legitimate economic reason" and transactions made solely with the "intent of artificially affecting the price").

Indeed, courts in this district have refused to find that even a defendant who traded with a subjective intent to affect the price of a product necessarily created an artificial price. *See Wilson*, 2018 WL 6322024, at *15, 21 (ordering judgment for defendants under Fed. R. Civ. P. 52(a)).[5] To allege market manipulation, the government must allege something more than the trader's intent. It must allege the defendant engaged in deceptive conduct that has "the effect of distorting [the]

---

[5] In *Gorman I*, the court articulated its view that in an open-market manipulation case, manipulation could conceivably be established where legitimate transactions were made with an intent to manipulate, contradicting the court's rationale in *Wilson*. *Gorman I*, 587 F. Supp. 3d at 43. The court noted that *Wilson* was decided in a different posture, after trial, as opposed to on a motion to dismiss. *Id.* at 45. Setting aside the departure from *Wilson*, the court ultimately denied dismissal of the complaint because the CFTC "plausibly allege[d] Gorman intentionally planned and timed his trades with the purpose and effect of creating an artificial price for Ten-Year Swap Spreads." *Id.* at 44. Here, even if the Court applies the logic of *Gorman I*, the Indictment fails to allege that Phillips manipulated a relevant market and, as argued *supra* at 18-20, fails to allege Phillips created an artificial price.

price[]" and "preventing the determination of [the] price[] by free competition alone," by, for example, making bids the defendant "thought might be unprofitable" or "could not be accepted by a counterparty." *Id.* at *11, 13. This additional requirement exists for good reason. Without it, regulatory and criminal actions would "encroach on legitimate economic decisions," "discourag[ing] the very activity that underlies the integrity of the markets they seek to protect." *Amaranth II*, 587 F. Supp. 2d at 535.

The Indictment itself supports the notion that Phillips' trades had a legitimate economic rationale. Specifically, the Indictment makes clear that Phillips traded USD/ZAR on December 26, 2017 for the same reason he bought the Option in the first place: because he believed the Rand would strengthen relative to Dollar. He became even more confident in this prediction after seeing the market's reaction to the December 18, 2017 election. *See* Ind. ¶ 15 (explaining that the USD/ZAR rate "lowered substantially" in the wake of the election). His letter to investors spells out his lawful rationale. *See* Ind. ¶ 27 ("We had anticipated the potential for large swings in South African assets around the ANC . . . electoral conference and, in particular, believed that the market had priced in too little risk of a [Candidate-1] victory."). These allegations would not survive a motion to dismiss in a civil case because they spell out a legitimate economic rationale; they cannot possibly support a criminal prosecution.

In this Circuit, defendants have only been convicted of manipulation stemming from open-market trades where, in addition to trading with a manipulative intent, the defendant engaged in other deceptive conduct aimed at creating a price that was "dictated not by market forces." *See United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008) (upholding conviction for defendants who shorted stocks based on misappropriated confidential information concerning FBI and SEC investigations). Indeed, the Second Circuit has expressed "misgivings" about the possibility of a

prosecution based on the precise theory the government advances here—namely, legitimate trades made with "the purpose and intent of driving the price" of a stock to a particular level. *Mulheren*, 938 F.2d at 365.[6] Those misgivings should be particularly acute here, where the alleged open-market manipulation involved absolutely no deceptive conduct and occurred in a market governed by neither the securities nor the commodities laws.

### III.   THE INDICTMENT FAILS TO ALLEGE AN ACTIONABLE OMISSION.

Wire fraud requires (1) a scheme to defraud, (2) with money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme. *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015). A material falsehood, made either as an affirmative misrepresentation or "omission[] of material information that the defendant has a duty to disclose," is an essential component of a scheme to defraud. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000).[7] There is no such affirmative falsehood or qualifying omission here.

The Indictment does not allege any misrepresentation or omission made by Phillips himself. Rather, the only omission alleged in the Indictment was in connection with the notification by a Glen Point employee that the Barrier Event had occurred. *See* Ind. ¶ 24. And that notification (which was true) was made by Glen Point in its capacity as "Calculation Agent" and "Barrier Determination Agent"—roles that, by the terms of the Agreement cited in the Indictment, could have been filled by third parties. In other words, the only alleged omission in this case was the

---

[6] Whether a criminal prosecution can proceed under Rule 10b-5 (the corollary to the CEA section charged here) on the theory that a defendant made a legitimate open-market transaction "solely to affect the price of a security" remains an open question. *Id.* at 368. We are aware of no criminal conviction for fraud based on market manipulation that did not involve the use of any deceptive device. *Cf., e.g.*, *United States v. Smith*, 555 F. Supp. 3d 563, 575 (N.D. Ill. 2021) (spoofing); *United States v. Johnson*, 945 F.3d 606, 613–15 (2d Cir. 2019) (affirmative misrepresentations to contractual counterparty); *United States v. Scop*, 846 F.2d 135, 137–38 (2d Cir.) (matched orders through fictitious nominees), *modified on reh'g on other grounds*, 856 F.2d 5 (2d Cir. 1988); *United States v. Gilbert*, 668 F.2d 94, 95 (2d Cir. 1981) (matched orders and wash sales); *United States v. Minuse*, 114 F.2d 36, 38 (2d Cir. 1940) (fictitious accounts, matched orders, wash sales, and dissemination of false literature).

[7] Commodities fraud claims based on omissions similarly require the existence of a duty. *See Sec. & Exch. Comm'n v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016); *Gorman I*, 587 F. Supp. 3d at 45.

failure to disclose information to Glen Point's broker that any other third party acting as Calculation Agent would not even have known.[8]

The alleged omission cannot form the basis for a wire fraud claim for three reasons: first, because Phillips (and Glen Point) had no duty of disclosure to any party to the Option; second, because the alleged omission to Glen Point's broker was not misleading; and third, because it was not material.

### A. Phillips Owed No Duty of Disclosure to Any Party to the One Touch Option.

Fraud premised on an omission, whether charged under the CEA or the wire fraud statute, requires proof that the defendant had a duty to disclose the omitted information. *See United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 482 & n.259 (S.D.N.Y. 2013). A duty to disclose "arises [only] when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States,* 445 U.S. 222, 228 (1980) (internal quotation marks and alteration omitted); *see also United States v. Szur*, 289 F.3d 200, 210 (2d Cir. 2002) (same).

In the absence of any actual duty to any party to the Option, the Indictment relies on Glen Point's role as Calculation Agent to determine the occurrence and provide notice of the Barrier Event to Bank-2 in a "good faith" and "commercially reasonable manner." *See* Ind. ¶ 13. As a matter of law, this provision in the Confirmation Agreement between Glen Point and Bank-2 cannot form the basis for a duty to disclose trading activity.[9]

---

[8] Notably, the Indictment does not allege that the notification was made to Bank-1, the counterparty to the Option. This is not surprising: as the discovery in this case has confirmed, Bank-1 had a separate contract with its own broker regarding the terms of the Option. Under that contract, Bank-1 was the Barrier Determination Agent and Calculation Agent. And in that capacity, Bank-1 independently determined that a Barrier Event had occurred. In other words, Bank-1 paid the notional value on the option not because of any notification by Glen Point personnel but because Bank-1 *itself* determined that it had in fact been triggered.

[9] Although the Court must take the allegations in the indictment as true in deciding a motion to dismiss, courts can and do consider the terms of a contract that is "the very subject of the indictment." *United States v. Gen. Dynamics Corp.*, 644 F. Supp. 1497, 1500 (C.D. Cal. 1986), *rev'd on other grounds*, 828 F.2d 1356 (9th Cir. 1987); *see also*

First, the Agreement imposes no fiduciary or other duty on Glen Point in its capacity as the buyer of the One Touch Option. *See* Ex. A. Indeed, it expressly states that each party represents that it "is not acting as a fiduciary or financial, investment or commodity trading advisor" to the other. *Id.* at 4. Further, if these sophisticated parties intended to impose a duty on Glen Point, particularly in light of the explicit disclaimer, they would have said so in the Agreement. *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (NY 1990) (noting court must assume contract contains all aspects of the parties' agreement).

Second, the Agreement stated that Bank-2 may buy and sell "the asset underlying the option in the spot" market and that it might trade that asset "before the [B]arrier [E]vent occurs," which may "affect the likelihood of" the Barrier Event occurring. Ex. A at 3. In other words, the Agreement explicitly contemplated trading by one of the parties to the Confirmation Agreement. Again, if the parties intended to prohibit trading that would "affect the likelihood of" a Barrier Event occurring, or impose a duty to disclose such trading, they could have done so. Instead, they did the opposite.

The Indictment invents a duty that did not exist based on the very written agreement that disclaimed it. On these facts, Bank-2 could not even maintain a claim for breach of contract against Phillips because it could not point to any provision of the Confirmation Agreement that Phillips violated. *See (RC) 2 Pharma Connect, LLC v. Mission Pharmacal Co.*, No. 21-cv-11096 (LJL), 2022 WL 2441046, at *7 (S.D.N.Y. July 5, 2022) (explaining that it is an "essential requirement for a breach of contract claim that [p]laintiff identify the specific provisions of a contract that it

---

*United States v. Liberto*, No. CR RDB-19-0600, 2020 WL 5994959, at *7 (D. Md. Oct. 9, 2020) (same). The meaning of a contract is "purely a matter of law for the court" that "should" be decided on a motion to dismiss. *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980); *see also United States v. George*, 223 F. Supp. 3d 159, 163 (S.D.N.Y. 2016) ("A court can resolve a dispute without trial of the general issue when a motion to dismiss an indictment is made solely upon an issue of law, and not fact.").

alleges the defendant has violated") (internal quotation marks omitted). Yet the government incredibly maintains Phillips should be held *criminally* liable under the same circumstances.

## B. The Indictment Fails to Allege a Material and Misleading Misrepresentation or Omission.

The Indictment should be dismissed because it fails to allege that the information Phillips allegedly omitted—that his trading moved the USD/ZAR exchange rate to 12.50—was material. Whether this failure to disclose is framed as an omission (as in the Indictment), affirmative misrepresentation, or half-truth, the result is the same.[10] While an omission made as a half-truth may be actionable even in the absence of an independent duty, a half-truth can only support a fraud claim when the omitted information is material and its omission is misleading. *See In re Vivendi, S.A. Securities Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) (defining half-truths as statements that become "misleading by omission")*.*

### i.     *The alleged omission was not misleading.*

As a preliminary matter, Glen Point's notification was accurate: a Barrier Event occurred and Glen Point accurately reported it. Glen Point had no duty to report *how* the Barrier Event occurred, but rather *whether* it occurred. *See* Ind. ¶ 13 (Calculation Agent "determines whether or not a Barrier Event has occurred and provides notice if it determines that a Barrier Event has occurred"). In other words, as Calculation Agent, Glen Point was supposed to make a calculation. It did so, and its notification was not misleading. Indeed, where a party to an agreement provides the precise information the agreement calls upon them to provide, and nothing more, the omission of additional information cannot form the basis for a half-truth fraud claim. *See United States v.*

---

[10] In a January 27, 2023 letter to the government, the undersigned counsel requested clarification from the government concerning several claims and legal theories in the Indictment, including the source of any duty that could support a fraud charge based on an omission. On April 11, 2023, the government responded that "in the interest of avoiding unnecessary motion practice . . . the Government intends to argue that the defendant's [omission] . . . was a half-truth and a misleading affirmative representation."

*Connolly*, 24 F.4th 821, 842–43 (2d Cir. 2022) (reversing convictions for defendants prosecuted for making fraudulent omissions or half-truths by making LIBOR submissions as required in the BBA LIBOR Instruction to LIBOR submitters, but failing to disclose the LIBOR submissions were trader-influenced, which was not prohibited by the BBA LIBOR Instruction in place at the time).

### ii.     *The alleged omission was not material.*

A statement is material only if it "would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc). Even a false statement made to a counterparty cannot support a fraud conviction unless it would "affect a reasonable person's evaluation of a proposal." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal quotation marks omitted); see *also Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) ("materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation'"). To determine whether omitted information charged as a half-truth is material and misleading, "the proper question" is not "what might have happened had a company remained silent, *but what would have happened if it had spoken truthfully*." *Vivendi*, 838 F.3d at 258 (emphasis added).

Although materiality is often treated as a mixed question of fact and law, it is clear on the face of the Indictment that the omitted information alleged here cannot support a wire fraud charge. Wire fraud requires the government to allege that the defendant engaged in a scheme to defraud in order to obtain money or property. *See Binday*, 804 F.3d at 569. At best, the Indictment alleges an omission made to two entities (Bank-2 and Intermediary Fund-1) to whom no duty was owed and from whom no money could have been (or was) obtained. Because the Indictment itself makes clear the alleged omission was not material, this Court should dismiss Counts III and IV.

First, the Agreement between Bank-2 and Glen Point makes clear that the parties to the Option might trade in ways that could affect the USD/ZAR exchange rate, and if they did, they had no obligation to disclose it. Ex. A at 3. Indeed, the facts alleged in the Indictment, taken together, make clear that as Calculation Agent, Glen Point would have to trade in the USD/ZAR spot market after purchasing the Option to be able to determine when the exchange rate reached a particular level. *See e.g.*, Ind. ¶ 7 ("[t]here is no single, official marketplace for FX," "[c]ustomers trade directly with FX dealer banks"), ¶ 13 (Calculation Agent is "the party who determines whether or not a Barrier Event has occurred"—here whether or not the USD/ZAR rate reached 12.50).

Second, information concerning Glen Point's USD/ZAR spot trading activity was clearly not something any party to the One Touch Option needed or expected to know. The only reason that there was any communication from Glen Point to Bank 2 after the Barrier Event occurred was because it happened to serve as Calculation Agent, a role that could have been filled by someone else. *See* Ind. ¶ 13. And if a third party had served as Calculation Agent, a possibility expressly contemplated in the ISDA Supplement, that third party could not possibly have disclosed information concerning Glen Point's trading because it would not have had it. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199 (S.D.N.Y. 2018) (finding no duty to disclose information omitted in alleged half-truth where "no reasonable investor would have considered significant" the undisclosed information "*in deciding whether to invest*," making the "alleged misstatement . . . therefore immaterial") (emphasis added).

Finally, the alleged omission was not material because it would not "naturally tend to lead or [be] capable of leading a reasonable [person] to change [his] conduct." *Rybicki*, 354 F.3d at 145. The government's theory appears to be that, if Glen Point had informed *Bank-2* about its trading

(which it had no obligation to do), *Bank-1* reasonably would have changed its conduct. But how? Bank-1 was obligated to pay the option if a Barrier Event occurred; it determined that a Barrier Event occurred; and it made the required payment. Bank-1 was not deciding whether to enter the Option—it had already done that months before. For all of these reasons, as a matter of law, the alleged omission cannot satisfy the materiality requirement.

## IV.     THE INDICTMENT SHOULD BE DISMISSED BECAUSE APPLICATION OF THE CEA AND WIRE FRAUD STATUTES TO PHILLIPS' CONDUCT VIOLATES THE DUE PROCESS CLAUSE.

Due Process requires that a defendant have "fair warning" of precisely what conduct a criminal law prohibits. *McBoyle v. United States*, 283 U.S. 25, 27 (1931). The Indictment implicates two manifestations of the fair warning requirement: the vagueness doctrine and the principle that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Benjamin*, No. 21-CR-706 (JPO), 2022 WL 17417038, at *13 (S.D.N.Y. Dec. 5, 2022) (quoting *United States v. Lanier*, 520 U.S. 259, 266 (1997)). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267.

First, the government's novel open-market Manipulation Theory does not provide fair warning that the alleged conduct, which has never before formed the basis of a criminal conviction, violated the law. Second, the government's theory that Phillips fraudulently omitted disclosure of his trading in USD/ZAR in violation of a duty created by the Confirmation Agreement is void for vagueness because the Agreement expressly allowed the parties to trade in a manner that could affect the exchange rate. Phillips cannot be charged with a crime for allegedly breaching a contractual duty when the alleged conduct falls well within a reasonable interpretation of the contract.

### A. Novel Construction

Here, the government's Manipulation Theory is a novel construction of both the CEA and the wire fraud statute. There is no precedent for criminalizing sophisticated traders for predicting that a market—regulated by neither the securities nor commodities laws—will shift in a particular direction and then trading in support of that prediction, even with the hope that their trading might further that outcome.

As discussed above, *see supra* Section II, market manipulation requires something more than legitimately structured trades on the open-market that do not create an artificial price. In every criminal market manipulation case based on actual trading activity that moved the price of a security or commodity, there was some additional element of fraud or manipulation. But here, in addition to there being no security or commodity, there are also "[n]one of the traditional badges of manipulation." *United States v. Mulheren*, 938 F.2d 364, 370 (2d Cir. 1991). Criminal charges based on market manipulation must involve some sort of deceptive act or tool. *See supra* at 20 (collecting cases). Indeed, in one of the few cases involving a remotely similar fact pattern, the Second Circuit reversed a criminal conviction for insufficient evidence of scienter while expressing "misgivings" about the government's view that nothing more than intent is needed to support a market manipulation criminal charge. *Mulheren*, 938 F.2d at 368.

In light of this precedent, the charges in this case require a "novel construction" not contemplated by the language of the statutes themselves or any case interpreting them. *Lanier*, 520 U.S. at 266. Indeed, the Indictment raises the question of when and to what extent Phillips could have traded in USD/ZAR before the Option expired, and how much he could trade before his lawful trading activity would become criminal. The Indictment therefore violates Phillips' right to fair warning that his conduct runs afoul of the law under the Due Process Clause. *Cf. Mulheren*, 938 F.2d at 370; *see also United States v. Bogucki*, No. 18-CR-00021-CRB-1, 2019 WL 1024959,

at *7 (N.D. Cal. Mar. 4, 2019) (granting judgement of acquittal where the trading activity "violated no clear rule or regulation, was not prohibited by the agreements between the parties, and indeed was consistent with the parties' understanding of the arms-length relationship in which they operated").

### B.  Vagueness

The charges against Phillips are unconstitutionally vague as applied to his conduct. Specifically, the lynchpin of the Government's theory for all counts is that Phillips fraudulently omitted the fact that he traded in a manner that caused the price of USD/ZAR to reach 12.50. Because, as charged, the offenses turn on the permissibility of his conduct under the terms of the Agreement, "the 'fair warning' principle of the Due Process Clause must be applied to the terms of the [Agreement]." *United States v. Bryant*, 556 F. Supp. 2d 378, 442 (D.N.J. 2008). Where fraud charges are based on a "'scheme or artifice to defraud' predicated on a violation of" a contract, that contract itself must have made it "reasonably clear" that a defendant's conduct was prohibited. *Id.* Put another way, "the application of the vagueness doctrine to the [contract] requires not just that a jury might reasonably find that [the defendant] violated the [contract], but that the [contract] gave 'fair warning'—a warning that is '*reasonably clear*'—that [his] conduct was prohibited." *Id.*

Here, as described above, the Confirmation Agreement imposed no duty on Glen Point, no limitation on its trading activity, and contained no requirement that it provide the information that Phillips is accused of omitting.[11] Because Phillips' conduct was "authorized under a reasonable

---

[11] In determining whether the Indictment comports with the fair warning principle, this Court can consider the terms of the One Touch Option and related governing documents. Where a contract is "the very subject of the indictment," "[i]f those terms make it clear that the indictment should not proceed, it would be a travesty if the [d]efendant[] w[as] forced to engage in a lengthy trial with the inevitable result that the Court would then dismiss the indictment once the Contract came into evidence." *Gen. Dynamics Corp.*, 644 F. Supp. at 1500. "For example, if a contract explicitly and clearly said that a [defendant] could do 'X', and an indictment were returned that said the [defendant] had conspired to commit a fraud under the contract by doing 'X', it would be absurd to require a trial." *Id.* Thus, "whenever a defendant's statement or action under a contract accords with a reasonable construction of the enabling language of

interpretation of the contract," *Race*, 632 F.2d at 1120 (4th Cir. 1980), application of the CEA or wire fraud statutes to impose criminal liability for precisely that conduct would violate Phillips' right to fair warning under the Due Process Clause. *See Bryant*, 556 F. Supp. 2d at 448 ("If such a reasonable construction supports [the defendant]'s actions, even if another reasonable interpretation prohibits those actions, the contract would be ambiguous, and [his] prosecution for mail and wire fraud for such conduct would be barred by the Due Process Clause of the Fifth Amendment.").

## CONCLUSION

For the foregoing reasons, the Indictment should be dismissed in its entirety.


Dated:   April 28, 2023
       New York, New York

By: _____

Sean Hecker
Jenna M. Dabbs
David Gopstein
Alexandra Conlon
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
aconlon@kaplanhecker.com
*Counsel for Defendant Neil Phillips*

---

the contract," fraud charges "cannot stand under those circumstances." *United States v. Race*, 632 F.2d 1114, 1120 (4th Cir. 1980).