UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  09/01/2023
```

------------------------------------------------------------------X
:
UNITED STATES OF AMERICA,                  :
:
-v-                            :               22-cr-138 (LJL)
:
NEIL PHILLIPS,                             :
:               OPINION AND ORDER
Defendant.           :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Neil Phillips ("Defendant" or "Phillips") moves, pursuant to Federal Rule of

Criminal Procedure 12(b)(3)(C), to dismiss the indictment against him.  Dkt. No. 21.  For the

following reasons, the motion is denied without prejudice to Defendant making a Rule 29 motion

for judgment of acquittal after the close of the Government's evidence and, if the Rule 29 motion

is not granted then, after the close of all evidence.

## BACKGROUND

On March 3, 2022, a grand jury sitting in the Southern District of New York returned a

four-count indictment (the "Indictment") against Defendant.  Dkt. No. 2.  Count One charges

Defendant with conspiracy to commit the crime of commodities fraud under Title 7, United

States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section

180.1, in violation of Title 18, United States Code, Section 371.  *Id.* ¶¶ 30–32.  Count Two

charges him with commodities fraud, in violation of Title 7, United States Code, Sections 9(1)

and 13(a)(5) and Title 17, Code of Federal Regulations, Section 180.1.  *Id.* ¶¶ 33–34.  Count

Three charges Defendant with conspiracy to commit the crime of wire fraud under Title 18,

United States Code, Section 1343, in violation of Title 18, United States Code, Section 371.  *Id.*

¶¶ 38–39.  Finally, Count Four charges him with wire fraud in violation of Title 18, United States Code, Section 1343.  *Id.* ¶¶ 38–39.

All four counts arise from the same alleged scheme in or about December 2017 to artificially manipulate the United States dollar ("USD")/South African rand ("ZAR") exchange rate in order to trigger a payment under a barrier options contract into which Defendant's hedge fund had entered.  *Id.* ¶ 1.  At all relevant times Phillips was the co-founder and co-Chief Investment Officer of a hedge fund (the "Hedge Fund") based in the United Kingdom, which was registered in the United States as a commodity pool operator with the Commodity Futures Trading Commission ("CFTC").  *Id.* ¶¶ 3–4.

In October 2017, through a financial services firm that acted as an intermediary on behalf of undisclosed underlying clients, the Hedge Fund purchased a "one touch" digital barrier option for the USD/ZAR currency pair with a notional value of $20 million, a barrier rate of 12.50, and an expiration date of January 2, 2018 (the "One Touch Option").  *Id.* ¶ 10–11.  The Indictment alleges that the financial intermediary firm "permits its underlying clients to maintain anonymity in such transactions."  *Id.* ¶ 11.  The Hedge Fund's counterparty to the One Touch Option was a subsidiary of a bank headquartered in New York, New York ("Bank-1").  *Id.*  At no time were the Hedge Fund and Bank-1 aware of the identity of each other.  *Id.*

Under the terms of the One Touch Option, in the event that the USD/ZAR exchange rate went below 12.50 at any point prior to on or about January 2, 2018, the Hedge Fund would be entitled to a $20 million payment.  *Id.* ¶ 10.  The Hedge Fund subsequently allocated the notional value of the One Touch Option to a client fund ("Client Fund-1") such that Client Fund-1 would receive $4,340,000 in the event that the $20 million payment was triggered and the Hedge Fund would receive the remaining $15,660,000.  *Id.* ¶ 12.

A bank that was headquartered in Manhattan, New York ("Bank-2") acted as the Hedge Fund's prime broker in connection with the One Touch Option. *Id.* ¶ 13.  After the Hedge Fund entered into the One Touch Option, Bank-2 provided the Hedge Fund with a letter agreement setting forth the terms and conditions of the transaction. *Id.*  These terms and conditions indicated that the Hedge Fund would act as the Calculation Agent in connection with the One Touch Option and required the Hedge Fund to "act[] in good faith and in a commercially reasonable manner" in that capacity and that the Hedge Fund's "determinations and calculations" would be "binding in the absence of manifest error." *Id.*  The letter agreement incorporated by reference the "2005 Barrier Option Supplement" published by the International Swaps and Derivatives Association, Inc., which stated, among other things, that the "Barrier Determination Agent" is "the party who determines whether or not a Barrier Event has occurred and provides notice if it determines that a Barrier Event has occurred" and that the "Barrier Determination Agent shall be the Calculation Agent" unless otherwise specified. *Id.*  The 2005 Barrier Option Supplement also stated that the "occurrence of a Barrier Event shall be determined in good faith and in a commercially reasonable manner by the Barrier Determination Agent." *Id.*

Throughout November and mid-December 2017, the USD/ZAR exchange rate fluctuated between approximately 14.50 and approximately 13.15. *Id.* ¶ 14.  On or about December 18, 2017, following the announcement that a particular candidate had been elected president of the African National Congress political party in South Africa, the USD/ZAR exchange rate dropped substantially to as low as approximately 12.52, but did not breach the 12.50 barrier. *Id.* ¶ 15. Between shortly before midnight on December 25, 2017 and the early morning of December 26, 2017, faced with the looming expiration of the One Touch Option, Defendant, located in South Africa at the time, directed a large number of spot trades, selling approximately $725 million for

ZAR.  *Id.* ¶ 18.  Defendant acted through a Singapore-based employee of a third bank (the "FX Trading Bank").  *Id.*  The express purpose of these trades was to drive the USD/ZAR exchange rate below 12.50.  *Id.* ¶¶ 18, 20.  The trades were conducted through a Bloomberg chat room, which included two other employees of the Hedge Fund, one of whom was located in London and the other in New York, New York, and another employee of the FX Trading Bank, who was located in New York, New York.  *Id.* ¶ 19.  The Indictment does not allege whether either the Hedge Fund employee or the employee of the FX Trading Bank located in New York, New York had any involvement in the trades.

The scheme was successful.  At approximately 12:42 a.m. London time on December 26, 2017, the Singapore-based employee of the FX Trading Bank reported to Defendant that he had sold USD for 12.4990 ZAR.  *Id.* ¶ 20(h).  A pricing service showed the low as 12.4975.  *Id.* ¶ 20(i).  Phillips directed the Singapore-based employee of the FX Trading Bank to confirm the details with the London-based employee of the Hedge Fund, which was done through the Bloomberg chat room.  *Id.* ¶ 20(j).  At 12:52 a.m. London time on December 26, 2017, Defendant instructed the London-based employee of the Hedge Fund to notify the intermediary firm through which the Hedge Fund purchased the One Touch Option that the One Touch Option had been triggered.  *Id.* ¶ 23.  The email that the employee sent to the intermediary firm omitted the fact that the triggering event had occurred as a result of the Hedge Fund's USD/ZAR trades. *Id.*  On December 27, 2017, an employee of the Hedge Fund also notified Bank-2 that the One Touch Option had been triggered and again omitted the fact that the triggering event had occurred as a result of the Hedge Fund's spot trading.  *Id.* ¶ 24.  On December 27, 2017, the Hedge Fund's counterparty to the transaction sent a $20 million wire transfer, which passed through New York, New York, to the broker for the intermediary firm.  *Id.* ¶ 25.  On

December 28, 2023, Bank-2, the Hedge Fund's prime broker, sent a wire transfer of $15,660,000 to one of the Hedge Fund's bank accounts and a wire transfer of $4,340,000 to a bank account of the client of the Hedge Fund; both wires passed through New York, New York.  *Id.*

On December 26, 2017, the USD/ZAR spot trades were settled through a settlement bank headquartered in New York, New York (the "Settlement Bank").  *See id.* ¶¶ 9, 26.  The Settlement Bank also received settlement instructions from the FX Trading Bank and another bank acting on the Hedge Fund's behalf in the United States.  *Id.* ¶ 26.  On December 28, 2017, the settlement bank settled currency trades across all eighteen currencies in which it transacts and the FX Trading Bank transferred USD into accounts held at the Federal Reserve Bank of New York and the Settlement Bank transferred USD from an account held at the Federal Reserve Bank of New York to the other bank acting on behalf of the Hedge Fund.  *Id.*

## DISCUSSION

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Cr. P. 7(c)(1).  "A defendant seeking to challenge the sufficiency of an indictment on a motion to dismiss faces a high hurdle."  *United States v. Silver*, 117 F. Supp. 3d 461, 464–65 (S.D.N.Y. 2015); *see also United States v. Pham*, 2022 WL 993119, at *3 (S.D.N.Y. Apr. 1, 2022) (Nathan, J.) ("A defendant faces a high standard in seeking to dismiss an indictment." (citation omitted)).  "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also id.* ("[A]n indictment need 'do little more than

to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" (citation omitted)).

It is not the function of an indictment to inform the defendant of the evidence or the facts which the Government will use to prove its case.  As a general matter, the Government need not show its hands before trial "because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." *Pham*, 2022 WL 993119, at *3; *see also Hamling*, 418 U.S. at 117 ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" (quoting *United States v. Carll*, 105 U.S. 611, 612 (1881))).  The proper remedy "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused," is not for the indictment to be dismissed; it is for the defendant to request a bill of particulars. *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (citation omitted); *see also United States v. Raniere*, 384 F. Supp. 3d 282, 322 (E.D.N.Y. 2019) ("Courts are only required to grant a bill of particulars 'where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" (quoting *Chen*, 378 F.3d at 163)). Even then, however, the defendant is not entitled to "obtain a preview of the government's evidence before trial" or "to learn the legal theory upon which the government will proceed." *United States v. Kang*, 2006 WL 208882, at *1 (E.D.N.Y. Jan. 25, 2006); *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).

It follows then that the function of a motion to dismiss the indictment is limited. "[S]ummary judgment does not exist in federal criminal procedure." *United States v. Aiyer*, 33 F.4th 97, 117 (2d Cir. 2022) (quoting *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021)). Thus, "the Court will not look beyond the face of the indictment and draw inferences as to proof to be adduced at trial, for the sufficiency of the evidence is [generally] not appropriately addressed on a pretrial motion to dismiss." *United States v. Bankman-Fried*, 2023 WL 4194773, at *7 (S.D.N.Y. June 27, 2023) (cleaned up). Instead, on a motion to dismiss, the court is tasked with determining whether the grand jury has performed its function under the Sixth Amendment to the United States Constitution by finding all of the essential elements of the crime. *See Costello v. United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits." (citation omitted)). Thus, "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (cleaned up) (citing *Dowling v. United States*, 473 U.S. 207, 213 (1985)) (holding indictment insufficient where allegation that defendant stole digital property did not allege a crime under the relevant statute); *see also, e.g.*, *United States v. Pirro*, 212 F.3d 86, 92–93 (2d Cir. 2000) (upholding dismissal of tax fraud count of an indictment because the conduct alleged did not violate the applicable statutes); *United States v. Heicklen*, 858 F. Supp. 2d 256, 275–76 (S.D.N.Y. 2012) (dismissing indictment where facts alleged did not constitute the crime of attempting to influence the actions of a juror); *United States v. Kerik*, 615 F. Supp. 2d 256, 271–74 (S.D.N.Y. 2009) (dismissing false-statement charge because defendant's alleged failure to disclose information in response to a question that the court determined was "fundamentally ambiguous" was not a crime as a matter of law). In that

instance, the grand jury will not have found one or more of the elements necessary to bind a defendant over for trial.  On a motion to dismiss an indictment, the court is also tasked with determining whether the defendant has been sufficiently informed of the crime of which he is accused so as to plead double jeopardy as a bar to a subsequent prosecution.  *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007); *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) ("An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events.").

There is an "extraordinarily narrow" "exception to the rule that a court cannot test the sufficiency of the government's evidence" on a pretrial motion to dismiss.  *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018).  A court may review the sufficiency of the evidence and determine whether the indictment states a crime if "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial."  *Wedd*, 993 F.3d at 121 (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)).  A speaking indictment alone does not satisfy the "full proffer" requirement; the government must "proffer[] *all* of its evidence."  *Sampson*, 898 F.3d at 283 (emphasis in original); *see also United States v. Mennuti*, 639 F.2d 107, 108–09 (2d Cir. 1981) (holding that "an affidavit of an Assistant United States Attorney, . . . stating the facts on which it would rely as showing that defendants' alleged acts were within the statute" could be used by a court to test the sufficiency of the evidence).  The Government, or the grand jury more precisely, is permitted to give a defendant more detail regarding the evidence against him without assuming the risk that a court will treat such detail as a proffer of all of the evidence.

There are benefits to the Government of providing a full proffer of the evidence before trial. *See Alfonso*, 143 F.3d at 777 n.7. If the Court grants the defendant's motion to dismiss based on the evidence that the Government has presented, the Government will have an opportunity to gather more evidence or to seek a superseding indictment and ask the grand jury to find any elements that a court has found to be lacking. *Cf. United States v. Martinez*, 2023 WL 2118081, at *1 (S.D.N.Y. Feb. 17, 2023) (noting that the Government sought a superseding indictment in response to the defendant's motion to dismiss). Or the Government may take an appeal, challenge the district court's conclusions of law, and attempt to establish before a jury has been empaneled that the Government's evidence is sufficient to establish the defendant's criminal conduct. *See* 18 U.S.C. § 3731 ("In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment . . . as to any one or more counts, or any part thereof."); *United States v. Hoskins*, 902 F.3d 69, 76 (2d Cir. 2018) (concluding that the Government could appeal a court order "dismiss[ing] two significant parts of a count" of the indictment). If the Government elects not to provide a full proffer of its evidence and instead to proceed to trial, it runs the risk that the Court will find the Government's evidence deficient before a jury has returned a verdict, a decision that is unappealable under the Double Jeopardy Clause. *See Fong Foo v. United States*, 369 U.S. 141, 143 (1962) (per curiam) (concluding that the Court of Appeals erred when it "set aside the judgment of acquittal [directed by the district court] and directed that the petitioners be tried again for the same offense" even when the Court of Appeals' ruling that the "acquittal was based upon an egregiously erroneous foundation" was "not without reason"); *see also United States v. Scott*, 437 U.S. 82, 91 (1978) ("A judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is

insufficient to convict, may not be appealed.").  But a district court cannot "*require* the government, before trial, to" make a full proffer of its evidence and thereby "force a summary judgment-like motion on the government."  *Sampson*, 898 F.3d at 282 (emphasis in original).

The Government here declined to make a full proffer of its evidence.  During oral argument, the Government explicitly stated that "we are not going to make a full proffer at this stage" and indicated that they "underst[ood] the consequences of" making that choice.  Dkt. No. 32 at 28, 30.  Though the Government proffered additional evidence beyond what was contained in the indictment during oral argument, *see, e.g.*, *id.* at 28–29 (pointing to guidance from the New York Federal Reserve's Foreign Exchange Committee), it was careful to clarify that this evidence did not represent the full universe of evidence it intended to offer at trial, *id.* at 28 (noting that this was "just one example").  Because "[t]he government's brief statement during oral argument . . . cannot fairly be described as a full proffer for purposes of a pretrial ruling on the sufficiency of the evidence," *Alfonso*, 143 F.3d at 777, the Court on this motion is limited to determining whether the Indictment is sufficiently precise to "inform the defendant of the charges he must meet" and contains "enough detail that he may plead double jeopardy in a future prosecution based on the same set of events," *Stavroulakis*, 952 F.2d at 693.  The Court finds that it does.

Defendant argues that the Indictment should be dismissed in its entirety.  He first argues that the Commodity Exchange Act ("CEA") counts—Counts One and Two of the Indictment— should be dismissed because the Indictment (1) alleges an impermissible extraterritorial application of the CEA, Dkt. No. 22 at 8–9, 12–15, and (2) does not allege fraudulent conduct involving a transaction covered by the CEA nor a scheme to defraud based on manipulative trading, *id.* at 7–8, 9–12, 15–20.  He then argues that the wire fraud counts—Counts Three and

Four—must be dismissed because the Indictment fails to allege an actionable omission.  *Id.* at 20–26.  Finally, Defendant argues that the application of the CEA and the wire fraud statute to his conduct fails to give fair warning in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution.  *Id.*  at 26–29.  The Court addresses each argument in turn.

## I.      Commodity Exchange Act Counts

Defendant first argues that the CEA counts fail because the Indictment alleges an impermissible extraterritorial application of the CEA.  He then argues that the CEA counts fail because the Indictment does not allege fraud in connection with a swap and does not allege that Defendant created an artificial price.

### A.      Extraterritorial Conduct

Defendant argues that the Indictment alleges an impermissible extraterritorial application of the CEA.  Defendant contends that the One Touch Option is not governed by the CEA because it does not "have a direct and significant connection with activities in, or effect on, commerce in the United States."  *Id.* at 8 (quoting 7 U.S.C. § 2(i)(1)).  He further argues that the One Touch Option cannot be reached by the CEA's antimanipulation provision because Section 6(c)(i) does not contain a "'clear indication of an extraterritorial application' to rebut the presumption against extraterritorial application," *id.* at 12 (citation omitted), and the Indictment does not allege a domestic application of the statute, *id.* at 13–14.  The Government counters that Defendant's extraterritoriality argument cannot be addressed before trial, Dkt. No. 24 at 15, and that, even if it can, the Indictment charges a domestic application of the statute, *id.* at 18, or, in the alternative, Section 2(i)(1) represents the required "clear indication of an extraterritorial application" and the One Touch Option falls within the CEA's extraterritorial reach, *id.* at 21.

As a threshold matter, the Court finds that Defendant misunderstands the relationship between Section 2(i) and Section 6(c)(1).  Courts employ a two-step framework in applying the presumption against extraterritoriality.  *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 143 S. Ct. 2522, 2528 (2023).  First, a court determines whether "Congress has affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct."  *Id.* (citation omitted).  If Congress has not given the provision extraterritorial effect, a court then addresses whether the suit seeks a permissible domestic application of the provision by identifying the statute's focus and asking "whether the *conduct relevant to that focus* occurred in United States territory."  *Id.* (emphasis in original) (citation omitted); *see also Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 102 (2d Cir. 2019) ("[C]ourts must evaluate whether the domestic activity involved implicates the 'focus' of the statute.").

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") was passed in the wake of the 2008 financial crisis "[t]o promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to protect the American taxpayer by ending bailouts, to protect consumers from abusive financial services practices, and for other purposes."  Pub. L. 111-203, 124 Stat 1376, 1376 (2010).  "Title VII of Dodd–Frank amended the [CEA] to 'establish a comprehensive new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to implement that framework."  *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017) (citation and footnote omitted).  As relevant here, Dodd-Frank amended Section 6(c) of the CEA to add the antimanipulation provision, making it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery

on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance."  Pub. L. 111-203, 124 Stat at 1750 (codified at 7 U.S.C. § 9(1)).  Dodd-Frank also defined the jurisdiction of the CEA as it relates to swaps by amending Section 2 of the CEA and adding the following language:  "The provisions of this Act relating to swaps that were enacted by the Wall Street Transparency and Accountability Act of 2010 (including any rule prescribed or regulation promulgated under that Act), shall not apply to activities outside the United States unless those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States."  *Id.* at 1673 (codified at 7 U.S.C. § 2(i)(1)).

It is undisputed that Section 6(c)(1) alone "lacks . . . a clear statement of extraterritorial effect."  *Prime Int'l Trading, Ltd.*, 937 F.3d at 102 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010)).  However, reading the statute as a whole—as the Court is required to do, *see Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (Courts must interpret a statute "'as a symmetrical and coherent regulatory scheme,' and 'fit, if possible, all parts into an harmonious whole.'" (citations omitted))—makes clear that Section 6(c)(1) *does* apply extraterritorially when swap-based conduct is at issue.  Section 2(i) establishes that all "provisions of this chapter relating to swaps . . . apply to activities outside the United States [if] those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1).  Thus, Section 6(c)(1) applies extraterritorially insofar as the activities related

to swaps "have a direct and significant connection with activities in, or effect on, commerce on the United States." *Id.*[1]

Whether the conduct alleged in the Indictment—if the Government were to prove nothing more—would constitute an impermissible extraterritorial application of Section 6(c)(1) is not a question appropriately raised on a pretrial motion to dismiss. Case law does not explicitly address whether challenges to the territorial application of a statute are appropriately brought on a pretrial motions to dismiss, *see, e.g.*, *Bankman-Fried*, 2023 WL 4194773, at *11 (S.D.N.Y. June 27, 2023) (acknowledging the question but concluding that "the Court need not decide whether it would be premature to dismiss the indictment on extraterritoriality grounds at this stage"), and the Second Circuit has never spoken directly on the issue. However, the Second Circuit has held that the extraterritorial reach of a criminal statute does not implicate a court's subject matter jurisdiction or its "judicial jurisdiction"—that is, it does not "raise[] the question whether a case comes within the judicial power of the court, so that the court possesses the legal power to adjudicate the case." *United States v. Prado*, 933 F.3d 121, 132–33 (2d Cir. 2019). Rather, it implicates a court's "legislative, or prescriptive, jurisdiction[, which] concerns itself with the reach of a nation's (or any political entity's) laws." *Id.* at 133; *see also id.* at 136 ("Specifying the circumstances in which a nation's laws apply extraterritorially typifies a

---

[1] *Prime International Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, can be read to suggest that Section 2(i) does not directly modify Section 6(c)(1). *See id.* at 103 ("[T]he existence of an enumerated extraterritorial command in Section 2(i) reinforces our conclusion that the lack of any analogous directive in either Section 6(c)(1) or Section 9(a)(2) bars their extraterritorial application here."). However, the Circuit did not examine how Section 2(i) modified Section 6(c)(1), because the argument was waived on appeal. *See id.* ("[E]ven a charitable reading of the docket reveals that Plaintiffs neglected to raise this argument until *after* the district court rendered its final judgment." (emphasis in original)). Thus, the Court does not read *Prime International* as foreclosing its interpretation of the relationship between Sections 2(i) and 6(c)(1).

legislature's exercise of *legislative jurisdiction* by defining the statute's reach." (emphasis in original)).  The question whether an indictment impermissibly charges extraterritorial conduct is thus a "merits" one.  *Id.* at 139; *see also Morrison*, 561 U.S. at 254 ("[T]o ask what conduct § 10(b) reaches . . . is a merits question."); *see also Fogel v. Chestnutt*, 668 F.2d 100, 106 (2d Cir. 1981) (Friendly, J.) ("[W]hen the plaintiff bases his cause of action upon an act of Congress[,] jurisdiction cannot be defeated by a plea denying the merits of his claim." (first alteration in original) (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913))).

It does not follow, as the Government suggests, *see* Dkt. No. 24 at 15 ("Because extraterritoriality is a merits question, it is not a basis for dismissing an Indictment."), that the Court's review of an indictment must be limited to whether it states the elements of an offense and that no examination of facts implicating the extraterritorial reach of a statute is ever appropriate on a pretrial motion to dismiss.  There exist other doctrines that constrain the Government's ability to try defendants for conduct entirely remote from the United States and United States interests and there may be circumstances where the connection between the Defendant's conduct and the United States is so remote that the issue can be addressed pretrial.  First, a defendant can challenge whether the indictment alleges sufficient facts to demonstrate that the case is properly tried in the district where it is brought—that is, whether venue is adequately alleged.  Because, under the Vicinage Clause of the Constitution, the defendant has the right to be tried in "the State and district wherein the crime shall have been committed," U.S. Const. amend. VI, and under Article III, the trial of crimes must be held "in the State wherein the crime shall have been committed," U.S. Const. Art. III, § 2, cl. 3,[2] venue may be challenged on a

---

[2] In addition, Federal Rule of Criminal Procedure 18 requires that defendant be tried in the district where their crime was "committed."  Fed. R. Crim. P. 18.

pretrial motion to dismiss.  *See United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005) (Chin, J.); *see also United States v. Motz*, 652 F. Supp. 2d 284, 290 (E.D.N.Y. 2016) ("[T]he Government need only show that the . . . indictment alleges facts sufficient to support venue."); Fed. R. Crim. P. 12(b)(3)(A)(i) (noting that "improper venue" "must be raised by pretrial motion").  Although a challenge to venue admittedly is different from a territorial challenge to the application of a statute, the two speak to the extent to which the defendant's conduct is connected to the United States or United States interests.

A defendant can also challenge whether the court has personal jurisdiction over him on a pretrial motion to dismiss, though such challenges are narrow in scope.  *See United States v. McLaughlin*, 949 F.3d 780, 781 (2d Cir. 2019) ("When a District Court has subject matter jurisdiction over the criminal offenses charged, it has personal jurisdiction over the individuals charged in the indictment and present before the court to answer those charges."); *United States v. Turkiye Halk Bankasi A.S.*, 426 F. Supp. 3d 23, 33 (S.D.N.Y. 2019) ("In a criminal prosecution, it is well settled that a district court has personal jurisdiction over any party who appears before it, regardless of how his appearance was obtained." (cleaned up)).  A country which is offended by the application of a United States law to conduct of one of its nationals located outside the United States and subject to the laws of that foreign country may refuse to extradite the individual and thereby deprive the United States court of the ability to adjudicate the case against that individual.  *See United States v. Salinas Doria*, 2008 WL 4684229, at *6 (S.D.N.Y. Oct. 21, 2008) (Lynch, J.) ("American courts take personal jurisdiction of extradited defendants subject to . . . the extradition orders of the surrendering state.").

Finally, there is case law to suggest that the Indictment must contain sufficient allegations to establish that the charged offense, when applied to extraterritorial conduct, does not violate the

Due Process Clause of the Fifth Amendment.  "[A]s a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'"  *United States v. Al Kassar*, 660 F.3d 108, 117–18 (2d Cir. 2011) (alteration in original) (quoting *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003)).  However, there are important limitations on this general proposition.  First, as discussed above, there is a presumption against extraterritoriality that can be overcome by a clear expression from Congress that the statute should apply to foreign conduct.  *See supra* p. 12.  Second, even if Congress provides such an instruction, the extraterritorial application of the statute must still comply with the Due Process Clause.  *See United States v. Kalichenko*, 2019 WL 1559422, at *6 (E.D.N.Y. Apr. 10, 2019) (Bianco, J.) ("[E]ven if Congress writes a law to apply beyond the territorial boundaries of the United States," it must be consistent with due process.).  "Generally, '[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.'"  *United States v. Antonius*, 73 F.4th 82, 87 (2d Cir. 2023) (alteration in original) (quoting *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016)).  "When individuals who are not United States citizens act on foreign soil, nexus is present where 'the aim of [the] activity is to cause harm inside the United States or to U.S. citizens or interests.'"  *Id.* (alteration in original) (quoting *Al Kassar*, 660 F.3d at 118); *see also Strassheim v. Daily*, 221 U.S. 280, 285 (1911) (Holmes, J.) ("Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power.").  The Second Circuit has suggested that whether an application of a statute is "arbitrary or fundamentally unfair" is appropriately raised on a pretrial motion to

dismiss.  *See United States v. Yousef*, 750 F.3d 254, 262 (2d Cir. 2014), *abrogated on other grounds by Class v. United States*, 138 S. Ct. 798 (2018) ("The absence of the required nexus . . . may have been grounds for dismissing the indictment before the district court.").

Defendant, however, does not challenge venue or assert that the application of the CEA to him would violate the Constitution for lack of the required territorial nexus.[3]  And any such arguments would fail.  The Indictment contains sufficient allegations to properly allege venue, and to defeat any extraterritorial due process concerns.  The Indictment alleges that Bank-2, a bank headquartered in Manhattan, New York, acted as the Hedge Fund's prime broker in connection with the One Touch Option. Dkt. No. 2 ¶ 13.  The Hedge Fund also entered a letter agreement with the same bank delineating the Hedge Fund's duties as Calculation Agent.  *Id.* ¶ 24.  It further alleges, with respect to Count One—conspiracy to commit the crime of commodities fraud—that the agreement to commit commodities fraud occurred "in the Southern District of New York and elsewhere," *id.* ¶ 30, and that overt acts in furtherance of the conspiracy "were committed in the Southern District of New York and elsewhere." *id.* ¶ 32.  In particular, it alleges that in connection with the scheme, Defendant sent messages which passed through the Southern District of New York, *id.* ¶ 32(c), and caused wires to be sent which passed through the Southern District of New York, *id.* ¶¶ 32(e), (f).  All of Defendant's relevant foreign currency trades were in United States dollars, *see, e.g.*, *id.* ¶ 21, the value of which is indisputably an area of American interest, and the funds to settle the transactions necessarily "flowed in and out of bank accounts held at the Federal Reserve Bank of New York," *id.* ¶ 32(i); *see also id.* ¶ 26.  The payouts to both the Hedge Fund and Client Fund-1 were wired by Bank-2,

---

[3] Defendant also does not challenge that the Court has personal jurisdiction over him.  Nor could he.  Defendant appeared in-person for his arraignment in this District on January 5, 2023.  *See* Minute Entry (Jan. 5, 2023).

denominated in U.S. dollars, and also passed through New York.  *Id.* ¶ 25.  Similarly, the

Indictment alleges with respect to Count Two—commodities fraud—that Defendant's actions

occurred "in the Southern District of New York and elsewhere."  *Id.* ¶ 34.  These allegations are

sufficient to establish venue in this District.  *See United States v. Lange*, 834 F.3d 58, 70 (2d Cir.

2016) ("[W]here a crime consists of distinct parts which have different localities the whole may

be tried where any part can be proved to have been done." (alteration in original) (citation

omitted)).  And they are sufficient to establish that the territorial application of the statute

comports with due process of the law because "the aim of [the] activity [was] to cause harm

inside the United States or to U.S. citizens or interests," *Antonius*, 73 F.4th at 87 (first alteration

in original) (citation omitted)—Defendant's actions implicate substantial sums of U.S. dollar,

U.S. financial institutions, and U.S. commerce.  It thus cannot be said, based on the Indictment

alone, that the application of the CEA to Defendant's conduct is "arbitrary or fundamentally

unfair."  *Id.*

      Whether the Government will be able to establish that there was sufficient conduct in the

United States or that the conduct had "a direct and significant connection with activities in, or

effect on, commerce in the United States" such that that the crimes charged in Counts One and

Two properly fall within the territorial reach of Section 6(c)(1) of the CEA is not an easy issue,

but it is one that the Court need not, and does not, address at this point.  The Government is

entitled to put on its evidence, which may include facts beyond those alleged in the Indictment,

and Defendant is entitled to challenge that evidence as insufficient, both on a Rule 29 motion and

before the jury.  What the Court is not entitled to do on a motion to dismiss is to weigh the

evidence that the Government has presented.

B.      "In Connection With" a Swap

Section 6(c)(1) makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap . . . any manipulative or deceptive device or contrivance," in violation of rules promulgated by the CFTC.  7 U.S.C. § 9(1).  In turn, Rule 180.1 promulgated by the CFTC prohibits, "in connection with any swap," using "any manipulative device, scheme or artifice to defraud," making any "untrue or misleading statement" of fact or omission, or engaging in "any act, practice or course of business, which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 180.1(a).  Defendant argues that the CEA claims must be dismissed because the Indictment does not allege that his actions were taken "in connection with" a swap as required both by the CEA and the rules promulgated thereunder.  Specifically, Defendant argues that the CEA does not apply to foreign-exchange spot trades and therefore Defendant's trades fall outside of the reach of the statute and cannot form the basis of the CEA charges.  *See* Dkt. No. 22 at 7 (citing 7 U.S.C. § 2(c)(1)(A)); *see also id.* at 9–10.  Defendant further argues that the CEA requires that the manipulative conduct be "in connection with" the formation of the swap, *id.* at 10–12, and must be material to that decision, Dkt. No. 26 at 4–5, neither of which is alleged in the Indictment.[4]  For the purposes of this motion, the Government does not dispute that the CEA does not reach foreign-currency spot transactions in isolation.  *See* Dkt. No. 24 at 10.  But the Government counters that the Indictment does not allege a manipulative scheme in the foreign-currency spot transaction market; rather, it alleges a scheme related to the triggering of a swap

---

[4] Defendant also argues that Section 6(c)(1) "covers only fraud-based manipulations" and that the "Indictment does not allege any misrepresentations, half-truths, fraudulent omissions, or deceptive conduct."  Dkt. No. 22 at 10.  The Court addresses this argument when it addresses Defendant's argument that the Indictment does not allege a scheme to defraud below.  *See infra* Section I.C.

that relied in part on manipulation of the foreign-exchange spot market.  *Id.* at 10–11.  The

Government further argues that Defendant reads the "in connection with" requirement too

narrowly and that the statute reaches actions taken in connection with the triggering of the One

Touch Option.  *Id.* at 12.

The CEA defines a "swap" as "any agreement, contract, or transaction . . . that provides

for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is

dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or

contingency associated with a potential financial, economic, or commercial consequence."

7 U.S.C. § 1a(47)(A)(ii).  The Indictment alleges that the One Touch Option was a "contract,"

*see* Dkt. No. 2 ¶ 11 ("the One Touch Option contract"), that provided for a "payment," *see id.*

(the Hedge Fund's counterparty was "obligated to pay $20 million in the event" the One Touch

Option was triggered), based on the "occurrence of an event," namely the USD/ZAR exchange

rate falling below 12.50 at any point prior to on or about January 2, 2018, *id.* ¶ 10.  Thus, the

One Touch Option itself falls squarely within the CEA.

The fact that the manipulative conduct occurred in an unregulated market does prohibit

the application of the CEA.  "Courts have allowed . . . CEA manipulation claims based on

actions taking place in one market where the allegedly manipulated market was influenced by

actions taken in another market."  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*,

2016 WL 5108131, at *18 (S.D.N.Y. Sept. 20, 2016) (collecting cases) (concluding that the

plaintiffs could rely on trades in the unregulated foreign exchange spot market for their

manipulation claims "where Defendants' activity . . . was the 'means of manipulating' prices on"

a regulated market); *cf. In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 511 (S.D.N.Y.

2004) (holding that wash trading in the natural gas market—which may not have been

21

independently actionable—could form the basis of a manipulation claim under the CEA when the wash trading was "one means of manipulating the natural gas futures market").  This reading of the statute is consistent with the statute's text and purpose.  Section 6(c)(1) prohibits "any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap . . . , any manipulative or deceptive device or contrivance."  7 U.S.C. § 9(1); *see also* 17 C.F.R. § 180.1(a)(1) ("It shall be unlawful for any person, directly or indirectly, in connection with any swap . . . to intentionally or recklessly . . . [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud.").  Nowhere does the text of the statute, or the Rule implementing the statutory text, limit such "manipulative or deceptive device or contrivance" to devices or contrivances related to markets directly regulated under the CEA.[5] The definition of a "swap" in the CEA is broad.  *See* 7 U.S.C. § 1a(47)(A).  It applies to "contract[s] . . . that provides for any . . . payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency."  *Id.* § 1a(47)(A)(ii). It also applies to a yet unknown "agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap."  *Id.* § 1a(47)(A)(iv).  There is no requirement that a swap be written on a commodity or other underlying item that trades in a market regulated by the CEA.  *But see* § 1a(47)(B) (Exclusions).  And Dodd-Frank intended the

_____

[5] The phrase "manipulative or deceptive device or contrivance" was borrowed from the antimanipulation provision of the Securities Exchange Act of 1934 (the "Exchange Act").  *See* 15 U.S.C. § 78j(b).  The Supreme Court has interpreted that provision broadly "as a catch-all clause to prevent fraudulent practices."  *Chiarella v. United States*, 445 U.S. 222, 226 (1980). "And when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'"  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (citation omitted).  The interpretation of the same phrase in the context of the Exchange Act thus lends support to the conclusion that Section 6(c)(1) was intended to apply broadly and to reach activity in markets not regulated by the CEA, when such activity affects markets that are.

regulatory framework for swaps to be robust.  *See In re Interest Rate Swaps Antitrust Litig.*, 261

F. Supp. 3d at 445 ("Title VII of Dodd–Frank amended the [CEA] to 'establish a comprehensive

new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to

implement that framework." (citation and footnote omitted)).  If the term "in connection with"

were read to only include manipulation in markets directly regulated by the CEA, it would place

large swaths of the swaps market, and manipulative conduct related to the swaps market, beyond

the reaches of the CEA.  And there is nothing in the statute or the statutory purpose that indicates

that such a limitation was intended.  In fact, the CFTC explicitly contemplated that Rule 180.1

would apply to "cross-market manipulation," including to markets unregulated by the CFTC,

because Rule 180.1 was drafted to apply "to the fullest extent allowed by law when determining

whether conduct in one market is 'in connection with' an activity or product subject to the

jurisdiction of the Commission."  *Prohibition on the Employment, or Attempted Employment, of*

*Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg.

41,398, 41,406 (July 14, 2011) (to be codified at 17 C.F.R. pt. 180).  Thus, the CFTC "decline[d]

to modify the proposed Rule in response to comments requesting that only statements and acts

pertaining to 'transactions' in futures, swaps, or commodities markets underlying futures or

swaps may give rise to liability under proposed Rule 180.1."  *Id.* at 41,403; *see also Commodity*

*Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 243 (S.D.N.Y. 2012)

("Defendants' interpretation excludes from the CEA any course of conduct that happens to

involve transactions covered by [a different statutory exemption].  But such a broad reading

frustrates the CEA's primary purpose of preventing and deterring price manipulations.").

    The single CEA case that Defendant cites in support of its contention that his conduct

falls outside of the CEA's jurisdiction is inapposite.  In *United States v. Radley*, 632 F.3d 177

(5th Cir. 2011), the Fifth Circuit upheld a district court's dismissal of the indictment's price manipulation count because the conduct underlying the count fell within the statutory exemption for off-exchange commodities transactions. *See id.* at 181–84.  There, the court found that all of the conduct constituted "transactions" and thus fell outside of the reaches of the CEA. *Id.*  Here, in contrast, the Indictment does not allege that that Defendant violated the CEA through his conduct in the unregulated foreign-exchange spot market; rather, it alleges that Defendant's conduct in the foreign-exchange spot market violated the CEA, because it was part of a scheme to commit fraud in connection with the One Touch Option, a swap that Defendant does not dispute falls within the jurisdiction of the CEA.

Defendant next argues that the Indictment's CEA claims fail because the alleged fraud was not "in connection with" the formation of the One Touch Option.  *See* Dkt. No. 22 at 11 ("Even where courts have broadly construed the 'in connection with' requirement under the CEA, they have done so only when the alleged manipulative or fraudulent device 'coincide[d]' sufficiently with or was 'contemporaneous with' the transactions at issue." (citation omitted)). In support of the proposition that the manipulative conduct must have been performed in connection with the formation of the One Touch Option to be actionable, Defendant relies primarily on judicial interpretations of the Securities Exchange Act of 1934 ("Exchange Act"). *See id.* at 10–11.  The Exchange Act prohibits the use of a "manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).  This language is similar to Section 6(c)(1)'s prohibition on using or employing "any manipulative or deceptive device or contrivance" "in connection with any swap."  7 U.S.C. § 9(1).  Thus, it is appropriate to look to judicial interpretations of the identical language in the Exchange Act's antimanipulation provision when giving meaning to the CEA's antimanipulation provision. *See*

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (looking to interpretation of "in connection with the purchase or sale" in Section 10(b) and Rule 10(b)(5) context when examining identical phrase in Securities Litigation Uniform Standards Act because "when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'" (citation omitted)); *see also Prohibition on Manipulative and Deceptive Devices*, 76 Fed. Reg. at 41,405 ("The Commission intends to be guided by this and other precedent interpreting the words 'in connection with' in the securities context.").

Where Defendant's argument falters is that he does not take account of the differences between the Exchange Act's and the CEA's antimanipulation provisions.  Specifically, the Exchange Act bars certain conduct "in connection with *the purchase or sale of any security*," 15 U.S.C. § 78j(b) (emphasis added), whereas the CEA bars conduct "in connection with *any swap*," 7 U.S.C. § 9(1) (emphasis added).  The broader language of the CEA's antimanipulation provision suggests that Congress wanted to reach beyond the formation of a swap to all events critical in the lifecycle of a swap, including those that trigger the swap.  *Cf. Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017) ("[U]sually at least, when we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning."); *see also Prohibition on Manipulative and Deceptive Devices*, 76 Fed. Reg. at 41,405 ("Section 6(c)(1) and final Rule 180.1 reach all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, pendency, or termination of any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity.  Accordingly, final Rule 180.1 covers conduct

including, but not limited to, *all of the payment and other obligations* arising under a swap." (emphasis added)); *see also Prime Int'l Trading, Ltd.*, 937 F.3d at 107 ("There is nothing in Section 6(c)(1)'s text suggesting that it is focused on 'purchases and sales of securities in the United States.'" (internal quotation marks and citation omitted)).  And that is precisely what the Indictment alleges:  It alleges that in order to drive the USD/ZAR exchange rate below 12.50 and trigger the One Touch Option, Defendant sold $725 million USD for ZAR in the foreign-exchange spot market.

To the degree that Defendant argues that the CEA counts must fail because the Indictment does not allege how the foreign-exchange trading was *material* to any decision made by Bank-1, *see* Dkt. No. 22 at 11; Dkt. No. 26 at 4–5—a notion that the Government does not dispute on this motion, *see* Dkt. No. 24 at 13 ("So long as the scheme is 'material to' the parties to the swap—whether it be their decision to purchase, sell, exercise, or terminate—the scheme is in connection with the swap.")—that argument requires the Court to analyze the sufficiency of the Government's evidence, which the Court is not permitted to do on a motion to dismiss.  *See United States v. Perez*, 575 F.3d 164, 166–67 (2d Cir. 2009) ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").

### C.      Scheme to Defraud: Artificial Price

Defendant next argues that the Government is required to allege "the four necessary elements of a non-fraud-based manipulation," including that "the defendant specifically intended to and did cause an artificial price to exist."  Dkt. No. 22 at 15.  Defendant argues that the indictment does not charge trades that are "manipulative" because the trades took place in the open market without any deceptive conduct.  *Id.* at 17–19.  The Government, drawing on the case law surrounding Section 10(b) of the Exchange Act and Rule 10(b)(5), counters that manipulative intent is sufficient to transform legitimate activity into manipulative activity, Dkt.

No. 24 at 32, and that Defendant's argument to the contrary relies on impermissibly importing elements from Section 9(a)(2) into Section 6(c)(1), *id.* at 28–30.

Defendant's argument is without merit.  The Indictment "informs the defendant of the charges he must meet," contains sufficient information to permit the defendant to plead double jeopardy, and adequately meets the requirement that it "track the track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *Alfonso*, 143 F.3d at 776.  Stated otherwise, the Indictment alleges that Defendant caused an artificial price using deceptive conduct.  The Indictment alleges that Defendant "engaged in a scheme to intentionally and artificially manipulate the USD/ZAR exchange rate to drive the rate below 12.50 and trigger payment under the $20 million One Touch Option" and, when the Hedge Fund communicated that the One Touch Option was triggered, it "omitted the fact that the triggering event . . . had occurred as a result of the manipulation of the USD/ZAR exchange rate by [Defendant]."  Dkt. No. 2 ¶¶ 17, 23.  He did so by selling $725 million of USD for ZAR—which constitutes "a large volume of USD"—"in a short period of time," thus creating "artificial demand for ZAR, which had the impact of strengthening the ZAR against the USD."  *Id.*  The Indictment further alleges that this scheme occurred "[b]etween shortly before midnight London time on December 25, 2017 (Christmas day) and approximately 12:45 a.m. London time on December 26 , 2017 (Boxing Day)."  *Id.* ¶ 18.

Defendant claims that the Indictment's allegations are insufficient because the Indictment does not allege that Defendant intended to and did cause an "artificial price."  Dkt. No. 22 at 15 (citing *U.S. Commodity Futures Trading Comm'n v. Wilson*, 2018 WL 6322024, at *12 (S.D.N.Y. Nov. 30, 2018) (Sullivan, J.)).  Defendant further claims that an "artificial price" is one that must be set by forces other than the forces of supply and demand and that "legitimate

transactions, conducted transparently in the open market, with willing market participants on the oppose side of each trade" cannot be manipulative.  Dkt. No. 22 at 16–17.

The Second Circuit, however, has rejected the notion that open-market trades that are conducted with willing counterparties cannot be manipulative.  *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76–77 (2d Cir. 2021) ("[A] defendant may manipulate the market through open-market transactions."); *see also Commodity Futures Trading Comm'n v. Gorman*, 587 F. Supp. 3d 24, 41 (S.D.N.Y. 2022) (noting that "this Circuit [has] found [that] open-market activity" can be "manipulative" and that "this line of cases" has been "extended . . . to the CEA").  In *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, for example, the Circuit concluded that the complaint stated a claim under Section 10(b) because it alleged an actionable manipulative act, even though such act was accomplished through open-market transactions: The defendant "flooded the market with millions of additional XIV Notes for the very purpose of enhancing the impact of its hedging trades," resulting in considerable profit to the defendant.  *Id.* at 77–78.  Similarly, in *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), the Circuit indicated that "trading engineered to stimulate demand," like the Indictment alleges Defendant's trading did here, "can mislead investors into believing that the market has discovered some positive news and seeks to exploit it" and can be manipulative.  *Id.* at 101. Thus, the fact that the trades were made in the open market with willing participants does not alone defeat the Government's claim of manipulation.

Further, the Indictment alleges that to accomplish his goal of breaching the 12.50 USD/ZAR exchange rate, Defendant engaged in what could be characterized as deceptive conduct:  He traded during a relatively short period of time when the market was illiquid.  The Indictment alleges that, beginning shortly before 12:00 a.m., London time, on Christmas Day and

continuing for approximately 45 minutes, Defendant sold $725 million of USD for ZAR.  Dkt. No. 2 ¶ 17–18.  According to the Indictment, it was no accident that Defendant picked this timing:  His goal was to move the exchange rate below 12.50 and he was informed that the market was relatively thin, making the task easier.  *Id.* ¶ 20(c) (informing Defendant that he was "the only seller[] in the market" and there was relatively little "depth" in buyers until "the bid" got closer to 12.50).  This is similar to conduct that the Second Circuit has found to be manipulative.  *See Set Cap. LLC*, 996 F.3d at 77 (noting that part of the defendant's scheme was to "exacerbate[] the risk of illiquidity in the VIX futures market"); *cf. United States v. Royer*, 549 F.3d 886, 887, 900 (2d Cir. 2008) (holding that seeking to "artificially affect the prices of various securities by directing [others] to trade and to disclose the negative information [related to thinly traded securities] at times and in manners orchestrated by the defendants . . . squarely meets the ordinary meaning of 'manipulation'"); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008) (Chin, J.) (noting that "marking the close"—or "the execution of purchase or sale orders at or near the close of the market [when it is easier to affect prices in order] to affect the closing price of a security"—can "constitute manipulation in contravention of the CEA" (citation omitted)).

Finally, Defendant contends that so long as an open-market transaction is "supported by a legitimate economic rationale," it "cannot form the basis for liability under the CEA because it does not send a false signal."  Dkt. No. 22 at 18.  The trades here, Defendant argues, "had a legitimate economic rationale":  He "believed that the [r]and would strengthen relative to the dollar," thus motivating his purchase of rand.  *Id.* at 19.  The problem with Defendant's argument is that the Indictment specifically alleges that the trades were made only for a single purpose: "to drive the USD/ZAR rate below 12.50" and thus to trigger the One Touch Option.  *See* Dkt.

No. 2 ¶ 20; *see also id.* ¶ 2 (Defendant "engaged in these USD/ZAR spot transactions for the purpose of intentionally and artificially driving the USD/ZAR exchange rate below the threshold level set by the barrier options contract in order to trigger the $20 million payment" under the One Touch Option).  The Court, which must accept the allegations of the Indictment as true, is not permitted to find that any motivation other than the one that appears on the face of the Indictment was the purpose behind the trades.  Defendant will have an opportunity to argue at trial that a legitimate economic rationale underpinned the Hedge Fund's sale of $725 million for ZAR and that this rationale legitimizes activity that may otherwise be deemed manipulative under the CEA.  However, it is premature for the Court to decide on this motion whether such conduct, if evidence of it was offered and it was proved, would legitimize otherwise manipulative activity.

Accordingly, Defendant's motion to dismiss Counts One and Two for failure to allege an artificial price is denied.

## II.    Wire Fraud Counts

Defendant argues that the wire fraud counts must be dismissed because the Hedge Fund, in its role as the Calculation Agent, had no duty to disclose that it had purchased ZAR with the intent to move the USD/ZAR exchange rate below 12.50.  Dkt. No. 22 at 21–22.  Defendant further argues that the alleged omission was neither misleading nor material.  *Id.* at 23–24.

"The 'essential elements of'" [a wire fraud violation] are '(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme.'"  *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023) (citation omitted).  Count Three alleges that Defendant "and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and

property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of" 18 U.S.C. § 1343.  Dkt. No. 2 ¶ 37.  And Count Four alleges that Defendant "transmitted and caused to be transmitted" the same.[6]  *Id.* ¶ 39.  "Because Counts Three and Four track the relevant statutory . . . language . . . , apprise the defendant of the nature of the accusations against him, and—when read in conjunction with the [paragraphs 1 through 29 and 32] of the indictment, which Counts Three and Four incorporate by reference— provide notice generally of where and when the crime occurred, both counts sufficiently allege" wire fraud.  *Bankman-Fried*, 2023 WL 4194773, at *10.

Each of Defendant's arguments go to the sufficiency of the Government's evidence, which is inappropriate on a motion to dismiss an indictment absent a full proffer of the evidence. The Indictment alleges that the Hedge Fund, in its role as Calculation Agent, had a duty to determine whether a barrier event had occurred "in good faith and in a commercially reasonable manner."  Dkt. No. 2 ¶ 13.  Defendant argues that this obligation "cannot form the basis for a duty to disclose trading activity."  Dkt. No 22 at 21; *see also id.* at 22 ("The Indictment invents a duty that did not exist.").  The Government, however, is entitled to put on evidence that the

---

[6] Defendant's argument can be read to suggest that the wire fraud count fails because it does not allege that the omission was made by Defendant.  *See* Dkt. No. 22 at 20 ("The Indictment does not allege any misrepresentation or omission made by Phillips himself.  Rather, the only omission alleged in the Indictment was in connection with the notification by a Glen Point employee that the Barrier Event had occurred.").  However, that fact alone does not lessen Defendant's liability for the wire fraud scheme.  *See Williams v. Equitable Acceptance Corp.*, 443 F. Supp. 3d 480, 492 (S.D.N.Y. 2020) ("The mail and wire fraud statutes only require that the scheme, in which [the defendant] allegedly participated with knowledge or intent, contain a material misrepresentation, not that [the defendant] made any misrepresentation by [himself].  As long as [the defendant] had an intent to defraud in participating in the scheme and the scheme contained a material misstatement, [the defendant] may be held liable for mail and wire fraud violations." (citations omitted)).

Hedge Fund's failure to disclose its trading activity violated its duty to act in good faith and a commercially reasonable manner, and that this violation in turn exposed Defendant to criminal liability.  Defendant next argues that the omission was not misleading because the Hedge Fund "had no duty to report *how* the Barrier Event occurred, but rather *whether* it occurred."  *Id.* at 23 (emphasis in original).  But this argument too goes to the sufficiency of the evidence:  The Government may be able to present evidence that the Hedge Fund's obligation to act in good faith and a commercially reasonable manner required it to disclose how the 12.50 barrier was breached and thus its omission was misleading; it may not be able to present evidence to that effect.  Both sides have presented powerful arguments.  But the Government is entitled to make that argument to a jury and Defendant is entitled to raise the arguments it raises here after the full presentation of the Government's evidence on a Rule 29 motion.  Finally, Defendant argues that the omission was not material because, *inter alia*, "it would not 'naturally tend to lead or [be] capable of leading a reasonable [person] to change [his] conduct."  *Id.* at 25 (alterations in original) (citation omitted).  The Government might have to prove beyond a reasonable doubt to a jury that a bank—either in the role of a counterparty to the One Touch Option or a broker of the option—would have acted differently had it known of the omitted information, but it does not need to do so based solely on the facts alleged in the Indictment alone.

Accordingly, Defendant's motion to dismiss Counts Three and Four is denied.

## III.   Constitutional Challenges

Finally, Defendant argues that the Indictment violates the Due Process Clause because its theory of market manipulation "is a novel construction of both the CEA and the wire fraud statute" and because "[t]he charges against [Defendant] are unconstitutionally vague as applied to his conduct."  Dkt. No. 22 at 26–28.  Defendant's constitutional challenges to the Indictment are premature and not properly made on a motion to dismiss.

"The Supreme Court has [] made clear that principles of due process require 'fair warning . . . in language that the common world will understand' as to what conduct is prohibited by law." *United States v. Benjamin*, 2022 WL 17417038, at *13 (S.D.N.Y. Dec. 5, 2022) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). "There are three related manifestations of the fair warning requirement": the vagueness doctrine, the rule of lenity, and a bar on the application of a "novel construction" of a statute. *United States v. Lanier*, 520 U.S. 259, 266 (1997).

By Defendant's own admission, he is only bringing as-applied challenges to the CEA and wire fraud statutes under both the vagueness and novel construction doctrines. *See id.* This approach is consistent with Second Circuit precedent, which has "repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.'" *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) (collecting cases) (citation omitted); *see also United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991) ("In the absence of first amendment considerations, vagueness challenges must be considered in light of the facts of the particular case."). "An implicit requirement of [the vagueness] test is that it must be clear what the defendant did." *United States v. Raniere*, 384 F. Supp. 3d 282, 320–21 (E.D.N.Y. 2019) (citation omitted). The same can be said for Defendant's "novel constructing" challenge, which bars the application of "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. at 266. In each case, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that *the defendant's conduct* was criminal." *Id.* at 267

(emphasis added).  Thus, the Court requires full factual development at trial before it can determine whether the CEA and wire fraud statutes failed to provide Defendant fair warning that his conduct was prohibited by law, as required by the Due Process Clause.  *See United States v. Milani*, 739 F. Supp. 216, 217 (S.D.N.Y.1990) ("In the absence of a plenary trial record this Court is unable to rule on whether the statute is impermissibly vague as applied to defendant. Surely it is not void on its face."); *see also United States v. Avenatti*, 432 F. Supp. 3d 354, 366 (S.D.N.Y. 2020) (denying as premature an as-applied vagueness challenge to honest services charge on a motion to dismiss).

## CONCLUSION

The motion to dismiss the Indictment is denied without prejudice to Defendant making a Rule 29 motion for judgment of acquittal after the close of the Government's evidence and, if the Rule 29 motion is not granted then, after the close of all evidence.

The Clerk of Court is respectfully directed to close Dkt. No. 21.


SO ORDERED.


Dated: September 1, 2023
     New York, New York                             LEWIS J. LIMAN
                                         United States District Judge