UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _10/10/2023_

-------------------------------------------------------------------X
                              :

UNITED STATES OF AMERICA,          :

                               :

           -v-               :            22-cr-138 (LJL)

                               :

NEIL PHILLIPS,                 :         OPINION & ORDER

                               :

                  Defendant.      :

                               :

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Neil Phillips ("Defendant") moves *in limine* to admit and preclude certain evidence, testimony, and theories of guilt. Dkt. No. 42. The Government moves *in limine* to prevent certain evidence, arguments, and questioning. Dkt. No. 41. The Government also moves to exclude the proposed testimony from two of Defendant's experts. Dkt. No. 40. For the reasons set forth below, each of those motions is granted in part and denied in part.

## BACKGROUND

      The Court assumes familiarity with the facts described in the prior Opinion and Order addressing Defendant's motion to dismiss the Indictment. Dkt. No. 36. The following facts are taken from the Indictment. Dkt. No. 2.

      On March 3, 2022, a grand jury sitting in the Southern District of New York returned the four-count Indictment against Defendant. *Id.* Count One charges Defendant with conspiracy to commit commodities fraud under Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1, in violation of Title 18, United States Code, Section 371. *Id.* ¶¶ 30–32. Count Two charges him with commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1. *Id.* ¶¶ 33–34. Count Three charges Defendant with conspiracy to

commit wire fraud under Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 371.  *Id.* ¶¶ 38–39.  Finally, Count Four charges him with wire fraud in violation of Title 18, United States Code, Section 1343.  *Id.* ¶¶ 38–39.

The four counts arise from the same alleged scheme in or about December 2017 to artificially manipulate the United States dollar ("USD")/South African rand ("ZAR") exchange rate in order to trigger a payment under a barrier option contract into which Defendant's hedge fund had entered.  *Id.* ¶ 1.  At all relevant times Phillips was the co-founder and co-Chief Investment Officer of a United Kingdom-based hedge fund (the "Hedge Fund"), which was registered in the United States as a commodity pool operator with the Commodities Futures Trading Commission.  *Id.* ¶¶ 3–4.

In October 2017, the Hedge Fund purchased a "one touch" digital barrier option for the USD/ZAR currency pair with a notional value of $20 million, a barrier rate of 12.50, and an expiration date of January 2, 2018 (the "One Touch Option").  *Id.* ¶¶ 10–11.  The Hedge Fund purchased the One Touch Option through a financial services firm that acted as an intermediary ("Financial Intermediary-1") that "permits its underlying clients to maintain anonymity in such transactions."  *Id.* ¶ 11.  The Hedge Fund's counterparty to the One Touch Option was a subsidiary of a bank headquartered in New York, New York ("Bank-1").  *Id.*  The Hedge Fund and Bank-1 were unaware of each other's identity.  *Id.*

The One Touch Option provided that if the USD/ZAR exchange rate went below 12.50 at any point prior to on or about January 2, 2018, the Hedge Fund would receive a $20 million payment.  *Id.* ¶ 10.  After entering into the One Touch Option, the Hedge Fund allocated the notional value of the One Touch Option to a client fund ("Client Fund-1").  *Id.* ¶ 12.  As a result,

the Client Fund-1 would receive $4,340,000 in the event that the $20 million payment was triggered and the Hedge Fund would receive the remaining $15,660,000.  *Id.* ¶ 12.

A Manhattan-based bank ("Bank-2") acted as the Hedge Fund's prime broker in connection with the One Touch Option.  *Id.* ¶ 13.  Bank-2 provided the Hedge Fund with a letter agreement that set forth the terms and conditions of the transactions.  *Id.*  Under those terms, the Hedge Fund served as the Calculation Agent for the One Touch Option.  *Id.*  The letter agreement also incorporated by reference the "2005 Barrier Option Supplement" published by the International Swaps and Derivatives Association, Inc., which stated that the "Barrier Determination Agent" is "the party who determines whether or not a Barrier Event has occurred and provides notice if it determines that a Barrier Event has occurred" and that the "Barrier Determination Agent shall be the Calculation Agent" unless otherwise specified.  *Id.*

Between November and mid-December 2017, the USD/ZAR exchange rate fluctuated between approximately 14.50 and approximately 13.15.  *Id.* ¶ 14.  On or about December 18, 2017, following the announcement that a particular candidate had been elected president of the African National Congress political party in South Africa, the USD/ZAR exchange rate dropped substantially to as low as approximately 12.52.  *Id.* ¶ 15.  Between shortly before midnight on December 25, 2017 and the early morning of December 26, 2017, faced with the looming expiration of the One Touch Option, Defendant, located in South Africa at the time, directed a large number of spot trades (the "Boxing Day Trades"), selling approximately $725 million for ZAR.  *Id.* ¶ 18.  Defendant effectuated the Boxing Day Trades through a Singapore-based employee ("CC-1") of a third bank (the "FX Trading Bank").  *Id.*  The express purpose of these trades was to drive the USD/ZAR exchange rate below 12.50.  *Id.* ¶¶ 18, 20.  The trades were conducted through a Bloomberg chat room, which included two other employees of the Hedge

Fund, one of whom was located in London ("CC-2") and the other in New York, New York, and another employee of Bank-3, who was located in New York, New York (collectively, the "Chat Members").  *Id.* ¶ 19.

The Boxing Day Trades triggered the One Touch Option.  At approximately 12:42 A.M. London time on December 26, 2017, CC-1 informed Defendant that he had sold USD for 12.4990 ZAR.  *Id.* ¶ 20(h).  At 12:52 A.M., Defendant instructed CC-2 to notify Intermediary Firm-1 that the One Touch Option had been triggered.  *Id.* ¶ 23.  The email CC-2 sent to the intermediary firm omitted the fact that the triggering event had occurred as a result of the Hedge Fund's USD/ZAR trades.  *Id.*  The following day, a Hedge Fund employee informed Bank-2 that the One Touch Option had been triggered, but that employee omitted the fact that the triggering event had occurred as a result of the Hedge Fund's spot trading.  *Id.* ¶ 24.  That same day, Bank-1 sent a $20 million wire transfer, which passed through New York, New York, to the broker for Intermediary Firm-1.  *Id.* ¶ 25.  On December 28, 2023, Bank-2, acting as the Hedge Fund's prime broker, sent a wire transfer of $15,660,000 to one of the Hedge Fund's bank accounts and a wire transfer of $4,340,000 to a bank account of the client of the Hedge Fund; both wires passed through New York, New York.  *Id.*

## PROCEDURAL HISTORY

On April 28, 2023, Defendant moved to dismiss the Indictment.  Dkt. No. 21.  The Government opposed that motion.  Dkt. No. 24.  The Court denied Defendant's motion to dismiss the Indictment on September 1, 2023.  Dkt. No. 36.

On September 25, 2023, the Government filed a letter "inform[ing] the Court and the defense that it does not intend to proceed at trial on Counts Three and Four of the Indictment." Dkt. No. 37 at 1.  While the Government maintained that "it could adduce evidence to support a

guilty verdict" on those counts, it dropped the conspiracy to commit wire fraud and wire fraud counts because "the jury and the Court may well find otherwise." *Id.*

The Government filed the instant motions *in limine*, Dkt. No. 41, and to exclude the testimony of two of Defendant's experts, Dkt. No. 40, on September 29, 2023. Defendant filed his motions *in limine* on September 30, 2023. Dkt. No. 42. The Government filed an opposition to Defendant's motions *in limine* on October 6, 2023. Dkt. No. 48. That same day, Defendant filed his opposition to the Government's motions *in limine* and to exclude the testimony of the two experts. Dkt. 46. The Court heard oral argument on these motions on October 10, 2023.

## LEGAL STANDARD

"The purpose of an *in limine* motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quoting *Banque Hypothecaire Du Canton De Geneve v. Union Mines*, 652 F. Supp. 1400, 1401 (D. Md. 1987)). The decision whether to grant an *in limine* motion "resides in a district court's inherent and discretionary 'authority to manage the course of its trials.'" *United States v. Ray*, 2022 WL 558146, at *1 (S.D.N.Y. Feb. 24, 2022) (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008)). "The trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006). "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

## DISCUSSION

### I.     Evidence of the USD/ZAR Exchange Rate After the Boxing Day Trades

First, Defendant moves to admit evidence that "the USD/ZAR exchange rate fell as he predicted after Boxing Day and remained below 12.50 for the days that followed—prior to the one touch option's formal expiry date—and several months thereafter."  Dkt. No. 42 at 14.  Defendant contends this is relevant to both his intent and whether the Boxing Day Trades were manipulative.  *Id.*  Specifically, he avers that the exchange rate following the Boxing Day Trades shows that his investment thesis regarding the results of the 2017 South African election was correct.  *Id.* at 15.  Defendant also contends that the broader context of his trades are relevant to counter the Government's narrow focus on the USD/ZAR FX spot market between 1:50 and 2:48 A.M. South Africa Standard Time on December 26, 2017.  *Id.* at 14 n.5.

For its part, the Government moves to preclude Defendant "from making arguments or offering evidence concerning the market prices of USD/ZAR following the conclusion of his scheme on December 28, 2017."  Dkt. No. 41 at 12.  The Government argues that information is irrelevant to his intent because "he could not have, and did not, know the future."  *Id.*  The Government also asserts that permitting the jury to hear that evidence would be "unfair" because those price movement "occur in a world where Phillips has already manipulated the price."  *Id.*  Finally, the Government seeks to prevent Defendant from arguing "his deception caused no harm to [Bank-1] or the market because the rate eventually fell below 12.50."  *Id.* at 13.

Federal Rule of Evidence 401 provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," Fed. R. Evid. 401(a), and "the fact is of consequence in determining the action," Fed. R. Evid. 401(b).  "[T]he definition of relevance under Fed. R. Evid. 401 is very broad."  *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 90 (2d Cir. 2014).  "[E]vidence need not be conclusive in order to be

relevant.  An incremental effect . . . is sufficient."  *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d

134, 147 (2d Cir. 1981).  Relevant evidence is presumptively admissible.  *See* Fed. R. Evid. 402.

However, a court may exclude evidence under Rule 403 even if it is relevant "if its probative

value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Fed. R. Evid. 403.

The Court grants Defendant's motion *in limine* to admit evidence of the USD/ZAR

exchange rate following the Boxing Day Trades and denies the Government's motion *in limine*

to exclude that evidence.  First, evidence of the exchange rate after the Boxing Day Trades is

relevant to whether Defendant acted with the requisite intent or instead traded "for a legitimate

purpose."  *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021).

Defendant's "subjective belief" is a "critical issue in this case."  *United States v. Onumonu*, 967

F.2d 782, 786 (2d Cir. 1992).  And while the Government is correct that Defendant could not

have *known* with absolute certainty what the USD/ZAR exchange rate would be in advance,

evidence that corroborates the reasonableness of the legitimate investment thesis Defendant has

proffered for his trades makes it "more . . . probable" that he traded on that basis.  Fed. R. Evid.

401(a); *see also In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 252

(S.D.N.Y. 2022) ("[C]ourts have held that such hindsight evidence is relevant, though not

dispositive, in determining the reasonableness of a projection or prediction.").

Second, evidence of the USD/ZAR exchange rate following Boxing Day is relevant to

whether the Boxing Day Trades were manipulative, *i.e.*, whether they "artificially affect[ed]" the

exchange rate by distorting supply and demand.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199

(1976); *see Set Capital LLC*, 996 F.3d at 76; *cf. In re Term Commodities Cotton Futures Litig.*,

2020 WL 5849142, at *31 (S.D.N.Y. Sept. 30, 2020) ("When determining if artificial prices

exist, a court may consider . . . historical prices [and other] supply and demand factors." (quoting

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 2012 WL 6700236, at *12

(S.D.N.Y. Dec. 21, 2012)).  Defendant is entitled to mount a defense that the Boxing Day Trades

did not artificially affect the USD/ZAR exchange rate because that rate dropped below 12.50 due

to undistorted forces of supply and demand.  The exchange rate following the Boxing Day

Trades is relevant to that defense.

The Government asserts that the exchange rate following the Boxing Day Trades might

instead reflect the effects of Defendant's trades.  That contrary interpretation of the exchange

rate data may dictate how much weight the jury should place on that evidence, but it does not

show that evidence lacks *any* probative value.  Accordingly, the Government is free to present its

contrary interpretation of the exchange rate after the Boxing Day Trades to the jury.  *See Sir*

*Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) ("Any question as to

the weight to be accorded a relevant document is a matter for the jury." (citing *Smith v. Lightning*

*Bolt Prods.*, 861 F.2d 363, 367 (2d Cir. 1988)).

But the Court grants the Government's motion to prevent Defendant from going one step

further and *arguing* that the jury should acquit him because the exchange rate dropped below

12.50 as a result of supply and demand factors instead of the Boxing Day Trades and thus Bank-

1 was not harmed by his trading.  As the defense conceded at argument, the remaining counts do

not require the Government to prove that Defendant harmed Bank-1.  *See United States v. Litvak*,

808 F.3d 160, 178 (2d Cir. 2015) (explaining "intent to deceive, manipulate or defraud," for

purposes of Section 10(b) does not require "contemplated harm").  *See generally* Kenneth W.

Simons, *The Crime/Tort Distinction: Legal Doctrine and Normative Perpsectives*, 17 Widener

L.J. 719, 718 (2007) ("Tort law typically requires harm as a prerequisite to a remedy.  Criminal law does not.").  As a result, any testimony or argument that Bank-1 was not harmed would be of, at most, minimal probative value to any "fact of consequence."  Fed. R. Evid. 401(b).  Furthermore, that value would be "substantially outweighed" by the risk of "confusing the issues" for the jury.  Fed. R. Evid. 403.

## II.    Other USD/ZAR FX Spot Market Participants' Trading Strategies and Activities

Next, Defendant moves to introduce evidence of "Bank-1's and other market participants' trading strategy and activity during the days leading up to and on Boxing Day."  Dkt. No. 42 at 19.  Defendant contends that evidence provides "necessary background concerning the charged offense," *id.* at 22, by shedding light on his "investment thesis and the overall dynamics of the market—the market conditions—in which his transactions played out," *id.* at 24.  Defendant further argues that Bank-1's trading strategy shows that his spot trading was not material to any decision by Bank-1 in connection with the One Touch Option.  *Id.* at 25.  According to Defendant, that evidence supports the conclusion that Bank-1 could not reasonably have expected that Defendant would not engage in the trades at issue "when it understood that conduct to be commonplace and indeed engaged in the very same conduct, at precisely the same time, itself."  *Id.* at 26.

On the other hand, while the Government acknowledges that the timing and size of bids leading up to and during the Boxing Day Trades are relevant, it moves to preclude evidence on Bank-1's trades and the motivations or strategy behind those trades.  Dkt. No. 41 at 7.  The Government contends that evidence is irrelevant to Defendant's guilt or innocence, *id.*, and "will confuse the jury" by encouraging a verdict based on jurors' perceptions of the propriety of Bank-1's actions, *id.* at 10; Dkt. No. 48 at 16.  The Government also urges the court to preclude evidence suggesting that "barrier chasing" or "barrier defense"—*i.e.*, trading by a party to a one

touch option to affect the price of an underlying asset and thereby either trigger or prevent a barrier event—is common in the FX industry or proper.  Dkt. No. 41 at 3.

As an initial matter, the Court will admit evidence on market participants' trades in the USD/ZAR FX spot market leading up to and on Boxing Day.  The Government does not appear to dispute the relevance of this evidence.  Like evidence regarding the exchange rate after the Boxing Day Trades, activity in the USD/ZAR FX spot market leading up to and during the Boxing Day Trades is probative of whether those trades artificially affected the exchange rate by distorting supply and demand.  Accordingly, that evidence is relevant to whether the Boxing Day Trades were manipulative, *see Hochfelder*, 425 U.S. at 199, and thus admissible under Federal Rule of Evidence 402.  Trades in the USD/ZAR FX spot market leading up to and on December 26, 2017 are also admissible as "[b]ackground evidence" that shows "the circumstances surrounding the events" at issue and informs "the understanding or intent with which" Defendant made the Boxing Day Trades.  *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (quoting *United States v. Coonan,* 938 F.2d 1553, 1561 (2d Cir. 1991)); *see also United States v. Ray*, 585 F. Supp. 3d 445, 455 (S.D.N.Y. 2022).

The Government argues that while those trades may be received in evidence, the identity of Bank-1 as the entity making certain trades—including trades on the other side of the market from Defendant—should not be received.  Dkt. No. 41 at 7.  It argues that evidence is irrelevant to any fact in dispute and will invite the jury either to consider whether Bank-1 was harmed or to conclude that Defendant's trading activity was lawful if others engaged in similar trading.  *Id.* Defendant responds that he does not intend to argue that Bank-1 was unharmed or that his activity was lawful just because others engaged in the same activity.  Dkt. No. 42 at 28.  Rather,

Defendant argues that Bank-1's identity is relevant to Defendant's intent and materiality or whether Bank-1 was deceived.  *Id.*

The Court will admit evidence of Bank-1's identity, trades, and strategy.  "A defendant has a fundamental due process right to present a defense."  *United States v. Mi Sun Cho*, 713 F.3d 716, 721 (2d Cir. 2013) (citing *Washington v. Texas*, 338 U.S. 14, 19 (1967)).  The Indictment charges that Defendant engaged in the scheme for the purpose of defrauding the counterparties to the option contract.  Dkt. No. 2 ¶ 2.  As the Government stated at oral argument, it is the Government's theory that Defendant intended to deceive Bank-1, as the counterparty to the One Touch Option.  Evidence that it was customary for banks in the position of Bank-1, who were parties to one touch options, to engage in transactions that would have either the intent or effect of "defending the barrier" and causing the exchange rate to move farther from the point at which the option would be triggered is relevant to Defendant's intent as a long-time participant in the market.  And evidence that Bank-1 engaged in such transactions is further relevant to the custom in the industry.  The evidence likewise is relevant to whether Bank-1 was deceived by what the Government claims to have been a false price signal that Defendant injected into the USD/ZAR FX spot market and the options market.  If Defendant had told Bank-1 that he intended to engage in the trades at issue in this case with the effect of moving the exchange rate and making it more likely that the One Touch Option would be triggered, such evidence undoubtedly would be relevant to whether the price signal effected by the trades would have been important to Bank-1 and thus whether Bank-1 was deceived by the price-signaling effects of the Boxing Day Trades.  It follows necessarily that if Bank-1 was aware from other sources that such conduct was to be expected from the counterparty to the One Touch Option, that evidence too would make the Government's contention that the scheme was one to deceive

Bank-1 less probable.  *Cf. Tan v. Goldman Sachs Grp. Inc.*, 2023 WL 2753238, at *6 (S.D.N.Y.

Mar. 31, 2023) ("Given the clear factual allegations in the Complaint that Archegos was on

notice of and indeed participated in the trading that occurred . . . the Court is hard pressed to

cobble together any theory that Defendants acted in deception of Archegos while trading.  The

Court fails to see how Archegos could be deceived when it was aware of and, in some instances

facilitated, the relevant trades.").  Put bluntly, on Defendant's theory, Defendant would be doing

just what Bank-1 should have expected Defendant to do.  The question is not one of the propriety

of Bank-1's actions; it is whether Bank-1's actions are reflective of the fact that the price signal

sent as a result of the Boxing Day Trades had a capacity to deceive.  Thus, it is not sufficient for

Defendant to put on evidence of the trades that occurred without indicating that the party who

placed several of those trades was also a counterparty to the One Touch Option.  The relevant

proposition is that it is customary for counterparties to one-touch options to trade in the assets

underlying those options, not merely that trades occur in the underlying markets.  Moreover,

while the Government argues that evidence risks confusing the issues by leading jurors to render

a verdict based on the perceived propriety of Bank-1's actions as opposed to Defendant's, *see*

Dkt. No. 41 at 10, the Court can mitigate that risk through curative instructions reminding the

jury that it is tasked with deciding Defendant's guilt or innocence, not Bank-1's, *see SEC v.

Ripple Labs, Inc.*, 2023 WL 5670711, at *11 (S.D.N.Y. Mar. 6, 2023) ("Any potential concerns

about . . .  prejudice or confusion do not 'substantially outweigh' the probative value of [the]

testimony, and, in any case, may be remedied via curative instruction if necessary.").  The risk of

prejudice from evidence of Bank-1's trades and strategy is further lessened here as Defendant

has stated that he will not argue or suggest that Bank-1 violated the law to put forward an

"'everybody's doing it' defense, because that is not a defense."  Dkt. No. 42 at 28 (quoting

*United States v. Connolly*, 2019 WL 2125044, at *13 (S.D.N.Y. May 15, 208)).  The Court

therefore deems evidence of Bank-1's trades and strategy both relevant and admissible, as the

risk of prejudice from that evidence does not substantially outweigh its considerable probative

value.

Similarly, the Court will not preclude questioning, evidence, or argument suggesting

barrier chasing or barrier defense is common or proper.  First, that evidence is relevant to the

Government's theory that Defendant placed the Boxing Day Trades to deceive Bank-1 because,

if barrier chasing and barrier defense are standard industry practice, then it is less likely that

Defendant's trades would deceive or have the ability to deceive Bank-1.  Stated differently, if

barrier chasing and defense is common knowledge, Bank-1 would likely have anticipated market

activities like the Boxing Day Trades as the USD/ZAR exchange rate approached the 12.50

barrier.  A jury could reasonably conclude that a widespread and expected practice would not

deceive or have the tendency to deceive a financial institution like Bank-1.[1]  Although there is

certainly a risk that evidence on whether barrier chasing and protection is common could confuse

the jury, the Court can manage that risk with a curative instruction.  And, again, Defendant will

not argue that the mere fact that barrier chasing or defense was widespread is a legal defense to

the crimes with which he has been charged.[2]

---

[1] Additionally, it is at least arguable that if each party to a one-touch option understands that its counterparty will trade in the underlying FX spot market around the barrier to protect and/or further its own economic interests such that those trades are not conducted with the intent to deceive the other party to the option, then any ensuing effect the trades will have on prices in the FX spot market could be considered the result of the natural interplay of supply and demand. After all, the value of any asset is a function not just of some concept of its inherent value but of the value and importance that market participants ascribe to it given their own economic and financial positions.

[2] At oral argument, the Government stated that it is not common for market participants to chase the barrier or to protect the barrier.  The Government, of course, is free to offer such evidence at trial.

The Court therefore grants Defendant's motion *in limine* to introduce evidence of the trading strategies and activities of other market participants, including Bank-1, leading up to and during the Boxing Day Trades.  The Government's motions to exclude that evidence and any evidence, questioning, or argument on whether barrier chasing or protection is common or proper are denied.

## III.   Constructive Amendment

Defendant moves the Court to prohibit the Government from proceeding on an allegedly uncharged "fraud-on-the-market theory of prosecution" that is "incompatible with the allegations in the Indictment."  Dkt. No. 42 at 29.  According to Defendant, that theory would "constitute an impermissible constructive amendment of the Indictment."  *Id.* at 30.  The Government responds that the Indictment alleges that Defendant manipulated the USD/ZAR exchange rate by placing a large volume of spot trades during a relatively illiquid period and "[t]he Government will present that same theory of the case at trial."  Dkt. No. 48 at 10.

"To establish a constructive amendment, [Defendant] must show that trial evidence [will] 'so alter[] an essential element of the charge that, upon review, it is uncertain whether [he would be] convicted of conduct that was the subject of the grand jury's indictment."  *United States v. Rigas*, 490 F.3d 208, 227 (2d Cir. 2007) (quoting *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003)) (alterations added).  "Since the constructive amendment, or broadening, of the charging instrument at trial destroys the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury, it is a per se violation of the grand jury clause of the Fifth Amendment where such amendment affects an essential element of the offense."  *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) (internal citations and quotations omitted).  However, "'where a generally framed indictment encompasses the specific legal theory or evidence used at trial,' there is no constructive amendment."  *Rigas*, 490 F.3d at 228

(quoting *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005)).  The Second Circuit has

"'consistently permitted significant flexibility in proof, provided that the defendant was given

notice of the core of criminality to be proven at trial.'"  *Id.* (quoting *United States v. Patino*, 962

F.2d 263, 266 (2d Cir. 1992)).

Defendant has not established that the Government has engaged in a constructive

amendment.  The Government confirmed at oral argument that it remains its intention to show

that Bank-1 was the victim of Defendant's scheme and that the scheme was one to deceive Bank-

1 by sending a false pricing signal (and not just a scheme to trigger the One-Touch Option).

Thus, the scheme articulated by the Government at oral argument remains the same scheme

described in its opposition to the motion to dismiss the Indictment.  Under the Government's

theory, Defendant's trading in the USD/ZAR FX spot market was a means to the broader

purpose of deceiving the counterparties to the One-Touch Option.  The broad language of the

Indictment encompasses the theory that Defendant's spot trades sent false signals to participants

in the USD/ZAR FX spot market.  *See* Dkt. No. 2 ¶ 17 (alleging Defendant "engaged in a

scheme to intentionally and artificially manipulate the USD/ZAR exchange rate to drive the rate

below 12.50 and trigger payment under the $20 Million One Touch Option"); *id.* ("[B]y selling a

large volume of USD in return for ZAR in a short period of time, [Defendant] created an

artificial demand for the ZAR."); *id.* ¶ 34 (alleging that Defendant "engaged in a scheme

involving the intentional and artificial manipulation of the USD/ZAR exchange rate.").  The

Second Circuit has recognized that market activity can be "manipulative" when it "'sends a false

pricing signal to the market' or otherwise distorts estimates of the 'underlying economic value'

of the [assets] traded."  *Set Capital LLC*, 996 F.3d at 76 (quoting *ATSI Commc'ns, Inc. v. Shaar*

*Fund, Ltd.*, 493 F.3d 87, 100–02 (2d Cir. 2007)).[3]  As a result, Defendant's premise—that evidence or argument suggesting the Boxing Day Trades misled the USD/ZAR FX spot market generally would constructively amend the Indictment—is mistaken.

At argument, Defendant conceded that its motion went instead to the admissibility of evidence and the arguments that the Government would be permitted to make.  It articulated two concerns: that the Government should not be permitted to argue (1) that Defendant's trades sent a false signal to the market or (2) that Defendant's failure to disclose the Boxing Day Trades is evidence of consciousness of wrongdoing unless the Government also establishes that Defendant had a duty to disclose the Boxing Day Trades.  The Government responded that it intended to offer evidence that Defendant's trades were made with the intent of affecting the spot FX market and that they had that effect, and that its consciousness of wrongdoing evidence would be limited to evidence that Defendant engaged in the Boxing Day Trades late at night without informing anyone at his firm of the trades.  The Government also indicated that Defendant's nondisclosure of the Boxing Day Trades is relevant to whether Bank-1 was deceived.  The Government's arguments appear to be well taken.  In any event, the Court need not conclusively address those questions now because the sole argument Defendant makes in its motion *in limine* is constructive amendment and Defendant has not shown a constructive amendment.  *See United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 828 F. Supp. 2d 698, 715 (S.D.N.Y. 2011) (denying a motion *in limine* that "amount[ed] to an anticipatory claim that the indictment will be constructively amended should the Government put on [certain] evidence").  Accordingly, the Court denies Defendant's motion *in limine* based on constructive amendment.

---

[3] To address this motion, the Court need not decide what proof is necessary for a pricing signal to be "false" or for a price not to reflect an asset's "underlying economic value."

IV.     **Testimony Regarding the Decision to Enter into the One Touch Option**

Defendant moves to preclude witnesses for Bank-1 and Intermediary Firm-1 from

testifying that they would not have entered into the One Touch Option in October 2017 if they

had known that Defendant was going to engage in the conduct alleged in the Indictment.  Dkt.

No. 42 at 31.  But the Government responds that it "will not argue to the jury that [Defendant]

deceived or intended to deceive counterparties to the [One Touch] Option at the time it was

adopted."  Dkt. No. 48 at 13.  The Court will therefore deny Defendant's motion *in limine* to

exclude testimony on the decision to enter into the One Touch Option as moot.  *See Irizarry v.

Corknard*, 2012 WL 2990021, at *1 (N.D.N.Y. July 20, 2012).

V.      **Lay Opinion Testimony on the Meaning of Terms in the Bloomberg Chat**

Defendant also moves to prevent the Government from eliciting lay testimony from the

Chat Members on the meaning of certain terms and instructions used in the Bloomberg chat

between Defendant and CC-1 on December 26, 2017.  Dkt. No. 42 at 33.  Because those three

individuals did not participate in the chat and were not in the chatroom at the time of the relevant

messages, Defendant avers that their testimony would not be based on personal perception, but

rather after-the-fact observation.  *Id.* at 37–38.  He further argues that their opinion would be

based on specialized knowledge from their industry experience in FX market trading.  *Id.* at 39.

At argument, however, Defendant indicated that his objection was more limited—namely, that

the witnesses should not be permitted to testify to their understanding of Defendant's meaning in

text messages that they did not see contemporaneously.  In opposing Defendant's motion, the

Government argues the Chat Members' testimony would be "based on their day-to-day work,"

Dkt. No 48 at 39, and is admissible under Rule 701, *id.* at 41.

Federal Rule of Evidence 701 permits opinion testimony from a lay witness only if that

testimony is rationally based on the witness's perception, helpful to the jury, and not based on

scientific, technical, or other specialized knowledge.  *See United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005) ("Rule 701 simply recognizes lay opinion as an acceptable 'shorthand' for the 'rendition of facts that the witness personally perceived.'" (quoting 4 Weinstein's Federal Evidence § 701.03[1])).

The Court denies Defendant's motion.  The witnesses each are in a position where they would be familiar with the terms used at the Hedge Fund and by Defendant.  They may be shown the chats to situate the jury as to the relevance of the questions that will follow, asked if they have ever heard certain terms that are in the chats used in the business or by Defendant himself, and—after a proper foundation is laid that they have had personal experience and a personal opportunity to observe—testify to how they have heard those terms used at the Hedge Fund or by Defendant.  So limited, the testimony is admissible.  That testimony would be rationally based on the witnesses' perceptions because it "derive[s] from [their] direct participation in the [trading] activities of the [relevant] enterprise, not on participation in the [trading] activities of some unrelated [enterprise]."  *United States v. Yannotti*, 541 F.3d 112, 125 (2d Cir. 2008); *Rigas*, 490 F.3d at 224.  Additionally, that testimony would be helpful for the jury, since many of the trading terms used in the Bloomberg chat are likely unfamiliar to ordinary jurors.  Nor would that testimony rest on scientific, technical, or other specialized knowledge, as the Chat Members would draw on their "own [trading] experience" and perceptions, which is "a reasoning process familiar to average persons."  *Yannotti*, 541 F.3d at 126.

Defendant's motion *in limine* to exclude lay testimony from the Chat Members on the meaning of terms from Bloomberg chat as limited by the Government is therefore denied.

## VI.   Evidence of Defendant's December 28, 2017 Trades

Defendant moves to exclude evidence that on December 28, 2017, he allegedly manipulated the USD/ZAR exchange rate by executing large spot trades that led the exchange

rate to fall below 12.25, thereby triggering a different one touch option held by the Hedge Fund. Dkt. No. 42 at 46. Defendant avers that those trades are not direct evidence of the charged conduct, *id.* at 7, are inadmissible other act evidence under Rule 404(b), *id.* at 51, and in any event must be excluded under Rule 403, *id.* at 54. The Government retorts that evidence of the December 28, 2017 trades constitute direct evidence of the existence of a conspiracy between Defendant and CC-2. Dkt. No. 48 at 24. Further, the Government avers that those trades are relevant to rebut Defendant's anticipated defense that he executed the Boxing Day Trades to create greater exposure to ZAR in his portfolio. *Id.* at 25.

Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but that such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Evidence is direct evidence of a charged offense—and thus not subject to Rule 404(b)—"if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez,* 110 F.3d 936, 942 (2d Cir. 1997)). However, "courts in this District have interpreted these [categories] narrowly." *United States v. Martoma*, 2014 WL 31191, at *3 (S.D.N.Y. Jan. 6, 2014). Thus, "where it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *United States v. Defreitas*, 2010 WL 2292194, at *2 (E.D.N.Y. June 3, 2010) (quoting *United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004)).

Defendant's December 28, 2017 trades are direct evidence of the offenses charged in the Indictment.  First, those trades are relevant to the existence of a conspiracy between Defendant and CC-2.  Count One of the Indictment alleges a conspiracy to manipulate the USD/ZAR exchange rate and trigger the One Touch Option that lasted until December 28, 2017, when the Boxing Day Trades settled and Bank-2 wired the $20 million to the Hedge Fund and its client fund.  Dkt. No. 2 ¶ 32(f)–(i).  Defendant's December 28, 2017 trades thus coincided with the conspiracy charged in the Indictment.  Moreover, Defendant allegedly effected those trades by instructing CC-2 to place them up until the USD/ZAR exchange rate crossed the 12.25 barrier, at which time Defendant told CC-2 to stop trading.  Dkt. No. 48 at 26.  "Where, as in this case, 'the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself.'"  *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (quoting *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997)).  Evidence that Defendant coordinated with CC-2 to further manipulate the USD/ZAR exchange rate on December 28, 2017 in order to trigger a one touch option directly supports the inference that Defendant and CC-2 committed the conspiracy charged in the Indictment.  Specifically, that evidence is probative of CC-2's "knowledge of the conspiracy," "willingness to overtly act in furtherance of the conspiracy," and "the close relationship and mutual trust the Defendant had with [CC-2]."  *United States v. Brown*, 2022 WL 17261398, at *3 (D. Conn. Nov. 29, 2022); *United States v. Black*, 2014 WL 5783067, at *4 (E.D.N.Y. Nov. 5, 2014).  As such, evidence of the December 28, 2017 trades goes directly to the charged conspiracy and is not subject to Rule 404(b).

Second, evidence of the December 28, 2017 trades is necessary to complete the story of the crime on trial and rebut Defendant's anticipated explanation for the Boxing Day Trades— namely, that he wanted to increase his portfolio's exposure to ZAR.  Once the 12.25 one touch

option was triggered following the December 28, 2017 trades, Defendant allegedly began to sell large sums of ZAR that same day, effectively unwinding the substantial exposure to ZAR he had acquired through the Boxing Day Trades.  Dkt. No. 48 at 26.  Evidence of Defendant's December 28, 2017 trades is therefore directly relevant to whether Defendant acted with the requisite intent when placing the Boxing Day Trades, because it "belie[s] his defense," *United States v. Jackson*, 2015 WL 4601021, at *5 (D. Conn. July 29, 2015), *aff'd*, 792 F. App'x 849 (2d Cir. 2019), by making the purported legitimate purpose for those trades "less probable," Fed. R. Evid. 401(a).  In providing a potential explanation for why Defendant held the ZAR he purchased during the Boxing Day Trades for as long as he did, evidence of the December 28, 2017 trades fills a "conceptual void in the story of the crime."  *United States v. Roberts-Rahim*, 2015 WL 6438674, at *4 (E.D.N.Y. Oct. 22, 2015) (quoting Weinstein's Federal Evidence §404.20[2][c]); *see United States v. Chan*, 2002 WL 46994, at *3 (S.D.N.Y. Jan. 14, 2002) (admitting direct evidence that "provides a significant contextual basis for the jury to understand the defendant's actions").  As a result, the Court admits evidence of the December 28, 2017 trades as direct evidence of the charged crime of commodities manipulation.

Defendant contends evidence of the December 28, 2017 trades must be excluded under Rule 403 in any event because that evidence would lead the jury to render a verdict based on an uncharged manipulation scheme and would create a mini-trial on the purposes and context of those trades.  Dkt. No. 42 at 54–55.  But those risks do not substantially outweigh the considerable probative value of the December 28, 2017 trades for both the conspiracy and commodities manipulation counts.  The concern that jurors will treat the December 28 trades as if they were charged in the Indictment can be "averted by a proper limiting instruction to the jury by the Court" explaining that the Indictment charged Defendant with manipulation in connection

with the 12.50 One Touch Option.  *United States v. Roberts-Rahim*, 2015 WL 6438674, at *5 (E.D.N.Y. Oct. 22, 2015) (citing *Garcia*, 291 F.3d at 136).  Moreover, while the introduction of that evidence will, like all evidence, "introduce the jury to a new set of facts," Dkt. No. 42 at 55, that fact alone does not warrant excluding it under Rule 403.  The Court can prevent evidence on the December 28, 2017 trades from devolving into an unnecessary mini-trial by excluding evidence that would result in "undue delay, wast[ed] time, or needless[] present[ation of] cumulative evidence."  Fed. R. Evid. 403.  Finally, there is little risk that evidence of the December 28, 2017 trades will "unduly inflame the passion of the jury," *United States v. Quattrone,* 441 F.3d 153, 186 (2d Cir. 2006), because those trades do "not involve conduct more inflammatory than the charged crime," *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999)).

In sum, the Court will permit the Government to present evidence of Defendant's December 28, 2017 trades.  Defendant's motion *in limine* to exclude that evidence is denied.

## VII.    Co-Conspirator Hearsay Exclusion

Defendant moves to prevent the Government from introducing statements from his alleged co-conspirators, CC-1 and CC-2, under the hearsay exclusion for statements by co-conspirators under Federal Rule of Evidence 801(d)(2)(E).  Dkt. No. 42 at 56.  Defendant contends that the Government lacks evidence to establish a conspiracy, so "the Court should require the government to establish each prerequisite of Rule 801(d)(2)(E) *before* putting such statements before the jury."  *Id.* at 57.  The Government retorts that co-conspirator statements can be admitted on a conditional basis, subject to the Court determining at the conclusion of the Government's case-in-chief whether the requirements of Rule 801(d)(2)(E) are satisfied.  Dkt. No. 48 at 34.  The Government has established that it may offer co-conspirator statements that are made in furtherance of the conspiracy on a conditional basis without first offering evidence

to establish that CC-1 and CC-2 were co-conspirators, but the Government has not established

that any particular statements that it intends to offer are proper co-conspirator statements in that

they are being offered for their truth and were made in furtherance of the conspiracy.

Federal Rule of Evidence 801(c) defines hearsay as any statement that "the declarant

does not make while testifying at the current trial or hearing . . . offer[ed] in evidence to prove

the truth of the matter asserted in the statement." Fed. R. Evid. 801(c).  Hearsay is generally

inadmissible.  Fed. R. Evid. 802.  However, Rule 801(d)(2)(E) excludes from the definition of

hearsay a statement that "is offered against an opposing party and . . . was made by the party's

coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  To

admit a statement under this rule, a district court must find by a preponderance of the evidence:

(1) that a conspiracy existed that included the defendant and the declarant; and (2) the statement

was made during the course of, and in furtherance of, that conspiracy.  *Bourjaily v. United*

*States*, 483 U.S. 171, 175 (1987); *see also United States v. Maldonado-Rivera*, 922 F.2d 934,

958 (2d Cir. 1990); *United States v. Ray*, 2022 WL 842254, at *1 (S.D.N.Y. Mar. 20, 2022).

"[S]tatements proffered as coconspirator statements may be admitted in evidence on a

conditional basis, subject to the later submission of the necessary evidence of those [those]

prerequisites." *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing *United States v.*

*Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969)).  If at the close of the Government's case-in-chief,

"the government succeeds in persuading the court that the conditionally admitted coconspirator

statements were made during and in furtherance of a conspiracy of which both the declarant and

the defendant were members, the statements are allowed to go to the jury." *Id.*  But "[i]f the

court is not so persuaded, it either should instruct the jury to disregard the statements, or, if those

statements were 'so large a proportion of the proof as to render a cautionary instruction of doubtful utility,' should declare a mistrial." *Id.* (quoting *Geaney,* 417 F.2d at 1120).

The Government has identified sufficient evidence to warrant the admission of statements of CC-1 and CC-2 under Rule 801(d)(2)(E) on a conditional basis, to the extent that such statements are being offered for their truth and were made in furtherance of the conspiracy. Courts in the Second Circuit routinely follow that practice. *See, e.g.*, *United States v. Fallas*, 2010 WL 3468605, at *4 (S.D.N.Y. Aug. 19, 2010); *United States v. Coffey*, 361 F. Supp. 2d 102, 124 (E.D.N.Y. Mar. 29, 2005); *United States v. Paredes*, 176 F. Supp. 2d 183, 188–89 (S.D.N.Y. 2001); *United States v. Segura*, 2000 WL 1838331, at *1 (D. Conn. Oct. 31, 2000). Although Defendant asserts that "this is not the typical case," Dkt. No. 42 at 56, the Court "finds no reason to deviate from general procedure here," *United States v. Adelekan*, 567 F. Supp. 3d 459, 468 n.4 (S.D.N.Y. 2021). Thus, the Government may offer co-conspirator statements under the hearsay exclusion of Rule 801(d)(2)(E) on a conditional basis. The Court, however, will hear argument on whether any particular statement of CC-1 or CC-2 offered at trial will in fact be offered for a hearsay purpose and in particular on whether CC-1's statement to his manager explaining that Defendant had instructed him to place the Boxing Day Trades and that, based on those trades, CC-1 believed Defendant had a barrier option at 12.50 was in furtherance of the conspiracy.

Defendant's motion *in limine* to prevent the Government from offering the statements of CC-1 and CC-2 at trial on a conditional basis pursuant to the hearsay exclusion in Rule 801(d)(2)(E) is denied.

## VIII.   Expert Testimony of Professor Holmes

Defendant moves to exclude the anticipated expert testimony of Professor Carolyn Holmes. Dkt. No. 42 at 64. According to Defendant, her proposed testimony on South African

government and politics is inadmissible to the extent it rests upon academic articles and other media sources, *id.* at 66, because experts cannot simply summarize the views of other experts or recite secondary sources to the jury, *id.* at 68.  Defendant also objects that Professor Holmes intends to opine that experts were divided on who would prevail in the 2017 South African election.  *Id.* at 65.  The Government opposes Defendant's motion, averring that Professor Holmes's testimony "would necessarily include her own expert analysis, informed by her research and expertise in South African politics and would be properly introduced under Rule 702."  Dkt. No. 48 at 47.

Federal Rule of Evidence 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide expert testimony, so long as: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).  Courts are to adhere to a "liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005), beginning with "a presumption that expert evidence is admissible," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)).  However, a court still must determine that the evidence is "sufficiently reliable so as to be admissible."  *Amorgianos v. Amtrak*, 303 F.3d 256, 268 (2d Cir. 2002).

The Court denies Defendant's motion *in limine* to exclude Professor Holmes's anticipated expert testimony on South African politics and the 2017 election.  That evidence is relevant for the jury to understand the USD/ZAR exchange rate leading up to, during, and after the Boxing Day Trades.  Testimony that, prior to the 2017 election, experts were divided on which candidate would prevail is also relevant for the jury to assess Defendant's intent when he placed those trades.  Moreover, courts routinely permit expert testimony on foreign countries' socio-political situations to provide jurors with context on otherwise-unfamiliar situations abroad.  *See, e.g.*, *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 125 (D.D.C. 2019) (expert testimony on "Iraqi politics after the overthrow of Saddam Hussein, including Iraqi political factions"); *Avendano v. Balza*, 442 F. Supp. 3d 417, 426 (D. Mass. 2020) (expert testimony on "the current political and socioeconomic climate in Venezuela"), *aff'd*, 2021 WL 82378 (1st Cir. Jan. 11, 2021); *Bowoto v. Chevron Corp.*, 2006 WL 2604592, at *3 (N.D. Cal. Aug. 23, 2006) (expert testimony on "the social, political, and economic history of Nigeria"); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 327 (E.D.N.Y. 2013) (expert testimony on "the role of charitable and non-governmental aid organizations in the Palestinian Territories"); *United States v. Choudhry*, 330 F. Supp. 3d 815, 851 (E.D.N.Y. 2018) (expert testimony on "gender dynamics in Pakistani culture"), *aff'd*, 813 F. App'x 4 (2d Cir. 2020).  And Professor Holmes is qualified to offer expert testimony on South African politics.  She is "a political scientist with expertise in the politics of sub-Saharan Africa particularly post-conflict reconciliation and democratization in South Africa."  Dkt. No. 43-4 at 2.  Bringing her academic background and professional experience to bear on the 2017 election "will help the trier of fact to understand" the dynamics in the USD/ZAR FX spot market when Defendant placed the Boxing Day Trades. Fed. R. Evid. 702(a).

Nor is Professor Holmes's expert testimony inadmissible merely because she reviewed scholarly articles and mass media to prepare for trial. "The fact that [an expert's] conclusions are based, in part, upon a review of . . . relevant literature in the area does not render [her] testimony inadmissible, as long as [she] bases [her] conclusions on [her] own expertise and analysis, and as long as those sources are 'of a type reasonably relied upon by experts' in [her] field." *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *11 (S.D.N.Y. May 2, 2011) (quoting Fed. R. Evid. 703); *see also Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015); *United States v. Kassir*, 2009 WL 910767, at *7 (S.D.N.Y. Apr. 2, 2009); *In re M/V MSC Flaminia*, 2017 WL 3208598, at *22 (S.D.N.Y. July 28, 2017) ("It is well established that an expert may rely upon another expert to form an opinion under Rule 703."). Defendant does not contend that political scientists in Professor Holmes's field would not reasonably rely on academic articles and mass media. Accordingly, while Professor Holmes cannot merely parrot the views of other experts, *Auther v. Oshkosh Corp.*, 2013 WL 5272959, at *3 (W.D.N.Y. Sept. 16, 2013), or read secondary sources to the jury, *see In re Rsrv. Fund Sec. & Derivative Litig.*, 2012 WL 12356742, at *3 & n.1 (S.D.N.Y. Sept. 10, 2012), Professor Holmes's expert testimony is admissible as long as she brings her academic expertise to bear when testifying as to the events described and views espoused in the sources she reviewed.

The Court therefore denies Defendant's motion to exclude Professor Holmes's expert testimony.

## IX.    Expert Testimony of Professor Lyons

Next, Defendant moves to prevent Professor Richard Lyons from providing expert testimony on whether communications in the Bloomberg chat were consistent with an effort to sell USD at a high price and minimize the impact of that selling. Dkt. No. 42 at 69. Defendant avers that Professor Lyons is unqualified to offer that testimony because he "lacks experience as

a trader in the FX market." *Id.* at 68.  The Government responds that Professor Lyons is

qualified to offer that opinion because his expertise is grounded not only on his analyses of

trading data but also his observations of FX traders and trading floors.  Dkt. No. 48 at 48.

Rule 702 provides that a witness can be "qualified as an expert by knowledge, skill,

experience, training, or education."  Fed. R. Evid. 702.  "[A]ny one of these five forms of

qualifications will satisfy the rule."  *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458

(S.D.N.Y. 2007) (Sullivan, J.).  "Courts within the Second Circuit have liberally construed expert

qualification requirements when determining if a witness can be considered an expert."  *SEC v.*

*Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (quoting *Cary Oil Co. v.*

*MG Ref. & Mktg., Inc.*, 2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003)).

Professor Lyons's academic background qualifies him to opine on whether the

Bloomberg chats are consistent with a particular trading strategy.  "Professor Lyons has

extensive experience researching and publishing on FX markets and microstructure, including

the textbook *The Microstructure Approach to Exchange Rates*.  His textbook and decades of

publication in this field are based on direct observation of foreign exchange traders and trading

floors and use of data from multiple trading systems."  Dkt. No. 42-6 at 1.  Although Defendant

argues that Professor Lyons lacks practical experience working as an FX trader, practical

experience is not necessary to qualify him as an expert under Rule 702 and admit his testimony.

*See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y.

2018) ("A formal education in a particular field is sufficient to qualify a witness as an expert as a

general matter, such that a lack of extensive practical experience directly on point does not

necessarily preclude [the] expert from testifying." (quoting *Cary Oil Co.*, 2003 WL 1878246, at

*2)).  Rather, Defendant's objection is "the type of 'quibble over an expert's experience . . .

[that] go[es] to the weight and credibility of an expert's testimony instead of the admissibility of his opinions.'" *Cruz v. Kumho Tire Co.*, 2015 WL 2193796, at *6 (N.D.N.Y. May 11, 2015) (quoting *Milliman v. Mitsubishi Caterpillar Forklift Am., Inc.,* 594 F. Supp. 2d 230, 237 (N.D.N.Y. 2009)).  As such, Professor Lyons's purported lack of practical experience in FX trading can be "properly explored on cross-examination." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).[4]

Thus, the Court denies Defendant's motion in *in limine* to exclude Professor Lyons's anticipated expert testimony on the Bloomberg chats.

## X.     The Use of U.S. Wires

Defendant's final motion *in limine* asks the Court to prevent the Government from arguing that that "the use of wires in New York and the facilitation of settlement through a bank in New York" support a finding that the charged conduct has a sufficient connection to the United States to support jurisdiction under the Commodity Exchange Act ("CEA").  Dkt. No. 42 at 71–72.  Defendant argues that those facts are irrelevant to CEA jurisdiction. *Id.* at 71.  The Government contends that evidence shows "the deep interconnection between his scheme and commence" in the United States, so it is both relevant and admissible.  Dkt. No. 48 at 52.

As explained in this Court's prior opinion, the relevant anti-manipulation provision of the CEA applies if "there was sufficient conduct in the United States or . . . the conduct has 'a direct

---

[4] At oral argument, Defendant voiced concern with the Government's statement that Professor Lyons would testify how Defendant's instructions "led the banker working with the defendant to sell at worse prices when those prices would more quickly get the exchange rate under 12.50, and to show that the defendant's trading stopped once that 12.50 barrier was crossed."  Dkt. No. 48 at 49.  But the Court does not interpret that statement to mean Professor Lyons will offer impermissible fact testimony on whether the statement, in fact, caused the banker to engage in the trades.  Such testimony would not be admissible.  But Professor Lyons can testify to what in the instructions Defendant asked the banker to do would lead to trades at worse prices that would make the exchange rate move quickly.  Such opinion falls within Professor Lyons's expertise and is an appropriate subject for expert testimony.

and significant connection with activities in, or effect on, commerce in the United States.'"  Dkt. No. 36 at 19 (quoting 7 U.S.C. § 2(i)(1)).  Although the use of wires in New York and facilitation of settlement through a bank in New York may not suffice to bring the charged conduct within the jurisdiction of the CEA, that nexus to the United States has at least *some* tendency to make it more probable that the charged conduct had a sufficient connection with the United States or commerce therein.  Thus, that evidence is both relevant and admissible.  *See Litvak*, 808 F.3d at 179–80 (2d Cir. 2015) ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." (citation omitted)); *see also Certified Env't Servs., Inc.*, 753 F.3d at 90; *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (explaining relevance is a "very low standard" (quoting *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008)).

The jury may ultimately conclude that the use of wires and facilitation of settlement through a bank in New York carry scant weight in demonstrating the requisite connection to the United States.  But that possibility does not render the evidence wholly irrelevant.  *See Florez v. CIA*, 829 F.3d 178, 184 (2d Cir. 2016) ("Relevance is a legal determination.  Conversely, it is the province of the finder of fact to determine what weight to accord such relevant evidence.").

The Court therefore denies Defendant's motion *in limine* to preclude the Government from arguing that the use of wires in New York and facilitation of settlement through a bank in New York establish jurisdiction under the CEA.  However, the parties are encouraged to confer to devise a way to offer that evidence to the jury in a manner that avoids "undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

## XI.  Personal Factors and Potential Punishment

The Government moves *in limine* to prevent evidence, argument, or questioning on Defendant's family, health conditions, age, circumstances of arrest, conditions of pretrial release,

the punishment or consequences he faces if convicted, or any other personal factor unconnected

to guilt or innocence.  Dkt. No. 41 at 2.  The Government argues that such evidence is irrelevant

and, even if it were relevant, its probative value would be substantially outweighed by the risk of

prejudice such that it would warrant exclusion under Rule 403.  *Id.*  Defendant responds that

"[t]o the extent [he] seeks to introduce evidence of his personal or professional background, that

evidence—such as the fact that he grew up in South Africa and has more than thirty years of

experience in trading and investing—will be relevant to [his] defense."  Dkt. No. 46 at 2.  At oral

argument, Defendant stated that he would offer evidence of his age and residence, that he grew

up in South Africa, and his experience in investing.  Defendant also represented that he would

not offer evidence or argument on the circumstances of his arrest or pretrial release, his potential

punishment, or the age of his children.  The Government responded that it had no objection to

that evidence.  Thus, the Court denies the Government's motion *in limine* to preclude evidence,

questioning, or argument on personal factors unrelated to guilt or innocence as moot.

## XII.   **Expert Testimony of Mr. Newman**

The Government moves to exclude Mr. Andrew Newman's proposed expert testimony on

several grounds.  Dkt. No. 40 at 5.

First, the Government contends that Mr. Newman intends to offer impermissible state-of-

mind testimony on the trading strategies and motivations of the Hedge Fund, Defendant, and FX

market participants generally.  *Id.* at 5–10, 12, 19–20.  Defendant objects to that characterization

of Mr. Newman's proposed testimony, contending Mr. Newman can properly opine on "standard

industry practices, market participants' expectations and notions of reasonable conduct, and

general information about how investors or traders operate in a particular market."  Dkt. No. 46

at 14–15.

Both parties agree that "[o]pinions concerning state of mind are an inappropriate topic for expert opinion." *SEC v. Am. Growth Funding II, LLC*, 2019 WL 1772509, at *1 (S.D.N.Y. Apr. 23, 2019) (quoting *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011)); *see also Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 182–83 (S.D.N.Y. 2008) (collecting cases). But, as his expert disclosure makes clear, Mr. Newman's testimony will not involve opining on any market participant's motive, intent, or state of mind. *See* Dkt. No. 40-1 at 2–6; Dkt. No. 46 at 14. Instead, he will testify as to strategies, investment theses, and incentives that FX market participants typically have, and whether particular portfolios or trades are consistent with and successful under those strategies, theses, and incentives. Those are proper subjects for expert testimony. *See SEC v. Lek Sec. Corp.*, 2019 WL 3729386, at *2 n.10 (S.D.N.Y. Aug. 7, 2019) (explaining a witness "provided expert testimony principally regarding [defendant's] layering strategy, and whether it was consistent with a market making strategy"). And as an expert in "FX, options, global fixed income, derivatives, and interest rate swaps products and markets," Dkt. No. 41-1 at 1, Mr. Newman is qualified to offer that testimony. The Government objects that such testimony would overgeneralize and elide "idiosyncratic reasons" market participants may have for their actions. Dkt. No. 40 at 12. However, that "criticism . . . may be explored at trial" on cross-examination. *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *16 (S.D.N.Y. Mar. 28, 2022). Thus, the Court denies the Government's motion to preclude Mr. Newman's expert testimony on the grounds that it constitutes impermissible opinion on a party's state of mind.

Next, the Government avers that Mr. Newman seeks to impermissibly opine on ultimate legal issues by testifying as to whether the Boxing Day Trades resulted in artificial demand or an artificial price in the USD/ZAR FX spot market. Dkt. No. 40 at 16. Defendant retorts that Mr.

Newman's testimony will "focus[] on factual conclusions rather than legal characterizations." Dkt. No. 46 at 25.  At oral argument, Defendant reiterated that Mr. Newman will not offer legal conclusions as to whether the Boxing Day Trades resulted in artificial price or demand, nor whether they sent false price signals.  Thus, the Court denies the Government's motion as moot to the extent it seeks to prevent Mr. Newman from offering legal conclusions on artificiality or manipulation.

The Government similarly moves to preclude Mr. Newman from testifying on whether Defendant's actions were consistent with his fiduciary duties and the best interests of the Hedge Fund's clients.  Dkt. No. 40 at 13–14.  According to Defendant, that testimony will not reach an ultimate legal question because this "case does not turn on whether [Defendant] breached a fiduciary duty."  Dkt. No. 46 at 23.  Although Defendant is correct, the Court grants the Government's motion precisely because Defendant's fiduciary duties are not at issue in this case. The Government has stated that it does not intend to argue that Defendant profited at the expense of his investors or that he had any different interest than that of his investors.  It is the Government's theory that the trades benefitted the Hedge Fund and thereby benefitted Defendant.  Mr. Newman's proposed testimony on fiduciary duties and bests interests thus does not respond to any Government argument or theory but rather speaks at most to Defendant's motive for placing the Boxing Day Trades.  However, the crimes charged in the Indictment turn upon Defendant's intent and not upon his motives.  A benevolent motive thus may be relevant to sentencing, but it does not negate criminal intent.  *See United States v. Malka*, 623 F. Supp. 3d 306, 329 (S.D.N.Y. 2022).  Put differently, acting to uphold one's fiduciary duty or promote the best interests of one's clients is not a valid defense, so testimony on fiduciary duties or best interests is irrelevant here.  Likewise, testimony that Defendant's actions were consistent with

his fiduciary duty and promoted his clients' bests interests carries a substantial risk of "confusing the issues [and] misleading the jury" as to the proper legal standard for assessing Defendant's actions.  Fed. R. Evid. 403.

The Court will permit Mr. Newman to testify as to whether the Boxing Day Trades were consistent with standard industry practice.  Whether activities like the Boxing Day Trades comport with industry standards in the USD/ZAR FX spot market and by participants in the options market is relevant to whether those trades were manipulative, because "[d]eception is the gravamen of a claim for market manipulation."  *Set Capital LLC*, 996 F.3d at 77.  If it could be expected that participants in the options market—which is adjacent to the FX spot market— would pursuant to their economic self-interest engage in trades like the Boxing Day Trades then, even if such trades had an impact on the USD/ZAR exchange rate, they would not be sent with the intent to create a "false" price signal.  Instead, the price signal would be the function of legitimate trading activity, *i.e.*, trading activity understood by all parties to have been engaged in by parties to one touch options to affect their general market position.  Additionally, evidence on standard industry practices is relevant for the jury to assess the Government's contention that Defendant's Boxing Day Trades ultimately deceived Bank-1.  Any risk that the jury would take the evidence to be in support of the impermissible argument that Defendant's conduct was lawful simply because others engage in it, *see Connolly*, 2019 WL 2125044, at *13, can be managed through a curative instruction.  As a result, the risk of confusion does not substantially outweigh the probative value of testimony on whether Defendant acted in accordance with standard industry practice.  Thus, the Court will permit Mr. Newman to opine on that subject.

Testimony regarding whether Defendant's subsequent nondisclosure of the Boxing Day Trades when declaring a barrier event under the One Touch Option was consistent with industry

practice is also relevant and admissible.  That omission was central to the wire fraud count that the Government will no longer pursue at trial.  But the Government has maintained that it will introduce evidence of Defendant's nondisclosure of the Boxing Day Trades in order to prove, *inter alia*, intent to deceive and/or consciousness of guilt.  Dkt. No. 37.  According to Defendant, because the Government will thereby put his nondisclosure of the Boxing Day Trades at issue, Mr. Newman should be permitted to testify that nondisclosure would be consistent with standard industry practice.  Dkt. No. 46 at 32.  The Court agrees that as the Government will introduce evidence of Defendant's nondisclosure, whether market participants would expect a party in Defendant's position to disclose trading activities related to the barrier event will be a "fact of consequence" at trial.  Fed. R. Evid. 401(b).  As such, it is only fair to permit Defendant to offer testimony that nondisclosure is standard industry practice.  *See* Fed. R. Evid. 401(a). Accordingly, Mr. Newman's anticipated testimony on whether Defendant's nondisclosure of the Boxing Day Trades comports with standard industry practice is relevant and admissible.

Finally, the Government challenges Mr. Newman's proposed testimony by reprising two arguments from its motions *in limine*.  First, the Government contends that Mr. Newman should be prohibited from opining on Bank-1's particular trading strategies and motivations, as well as how other market participants would have expected Bank-1 to trade.  Dkt. No. 42 at 10, 22.  As explained above, the Court concludes evidence on Bank-1's trades and strategy is admissible. The Court therefore denies that motion.  Second, the Government seeks to prevent Mr. Newman from testifying as to the USD/ZAR exchange rate after the Boxing Day Trades.  *Id.* at 18.  But the Court deems that evidence relevant and admissible for the reasons stated above.  While the Government avers that Mr. Newman's analysis fails to account for confounding variables, "[s]uch matters may be and should be explored and highlighted through cross-examination of the

expert and presentation of contrary evidence, not at the preliminary admissibility stage." *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *5 (E.D.N.Y. Dec. 21, 2012) (quotation omitted); *see also Bernstein v. Cengage Learning, Inc.*, 2023 WL 6303424, at *11 (S.D.N.Y. June 9, 2023).  The Court therefore denies the Government's motion to exclude Mr. Newman's proposed testimony on the USD/ZAR exchange rate following the Boxing Day Trades.

## XIII.   Expert Testimony of Professor Froot

The Government also moves to exclude "the majority" of Professor Kenneth Froot's proposed expert testimony.  Dkt. No. 40 at 27.

According to the Government, Professor Froot intends to improperly opine on the state of mind of the Hedge Fund and Defendant by testifying on why their portfolio was structured in a certain way and how that structure reflected their core investment theses.  *Id.*  As explained above, experts cannot testify on another's intent or motives.  *See Am. Growth Funding II, LLC*, 2019 WL 1772509, at *1; *Highland Capital Mgmt., L.P.*, 551 F. Supp. 2d at 182–83; *see also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).  But Professor Froot does not intend to testify to the strategy, investment thesis, or motivation any person had.  Rather, he intends to testify what, based on his observation, the portfolio of the Hedge Fund demonstrates about its and Defendant's investment strategy, theses, or incentives.  That testimony is admissible.

The Government further contends that the Court should prohibit Professor Froot from testifying on the risk management and trading strategies of hedge funds as a general matter.  Dkt. No. 40 at 28–29.  The Government avers that testimony would elide the diversity of approaches among hedge funds.  *Id.* at 29 ("[O]ne of the principal ways hedge funds compete with one another for investment is that they have *different* approaches.").  But that objection challenges the substance of Professor Froot's testimony and not his ability to give it.  If it is his expert

opinion, Professor Froot can testify that hedge funds generally employ certain risk management and trading strategies, and the Government can challenge whether that generalization always is true or whether there might be outliers.  In other words, the Government's objection "goes to the weight of the expert's testimony, not its admissibility." *Kahn v. Town Sports, Int'l, Inc.*, 2005 WL 2192486, at *2 (S.D.N.Y. Sept. 12, 2005); *see also Chefs Diet Acquisition Corp. v. Lean Chefs, LLC*, 2016 WL 5416498, at *10 (S.D.N.Y. Sept. 28, 2016).   To the extent the Government is concerned that Professor Froot's testimony on common strategies utilized by hedge funds will not adequately account for other trading tactics that hedge funds adopt, the Government "may probe . . . weaknesses in the opinion's basis, the sufficiency of assumptions, as well as the strength of the opinion" on cross-examination.  *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 141 F. Supp. 2d 320, 324 (E.D.N.Y. 2001) (internal citation and quotation omitted). Thus, the Court denies the Government's motion to preclude Professor Froot from offering general testimony on hedge funds' risk management and trading strategies.

Next, the Government moves to prevent Professor Froot from testifying as to the fiduciary duties hedge fund managers owe to their investors.  Dkt. No. 40 at 29.  Like Mr. Newman's proposed testimony on fiduciary duties, the Court deems Professor Froot's anticipated testimony on those duties both irrelevant testimony on motive under Rule 401 and, even if relevant, excludable under Rule 403 due to the risk of confusing the issues and misleading the jury.  The Court therefore grants the Government's motion to exclude this aspect of Professor Froot's proposed testimony.

The Government's last challenge to Professor Froot's proposed testimony argues that he is not qualified to opine on the macroeconomic investment implications of political developments in South Africa.  *Id.* at 30.  The Government argues Professor Froot is not

qualified to opine on that subject because he lacks "expertise in South Africa or South African politics." *Id.* Defendant responds that Professor Froot is qualified to opine on "valuation of the South African rand" because that testimony "draws on his extensive knowledge of currency valuation models." Dkt. No. 46 at 34. Professor Froot has "published extensively on a broad array of topics relating to foreign exchange, foreign exchange markets and macro investing, including on subjects related to the impact of political events on economic markets, international investing, institutional investor behavior, and how to measure investment performance." Dkt. No. 40-2 at 2. Professor Froot's academic experience amply satisfies the liberal expert qualification requirement under Rule 702. *See Revelation Capital Mgmt., Ltd.*, 215 F. Supp. 3d at 273; *Cary Oil Co.*, 2003 WL 1878246, at *1. And so long as "[an] expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)). As an authority on FX markets and the impact of political events on those markets, Professor Froot's general expertise is sufficiently related to the specific subject of how political developments in South Africa affected the USD/ZAR FX spot markets to be admissible. *See United States v. Tuzman*, 2017 WL 6527261, at *9 (S.D.N.Y. Dec. 18, 2017) ("[A]n expert should not be required to satisfy an overly narrow test of his own qualifications." (quoting *Arista Records LLC*, 2011 WL 1674796, at *3)). Accordingly, the Court denies the Government's motion to exclude Professor Froot's proposed testimony on the macroeconomic implications of political developments in South Africa.[5]

---

[5] Again, the Government argues that Professor Froot's testimony on the effect of political

**XIV.   The Rebuttal Testimony Disclosures of Mr. Newman and Professor Froot**

The Government argued that the supplemental expert notices for Mr. Newman and

Professor Froot failed to adequately disclose their anticipated rebuttal testimony, in compliance

with Federal Rule of Criminal Procedure 16.  Dkt. No. 40 at 34.  Defendant subsequently

submitted revised supplemental disclosures for Mr. Newman and Professor Froot to address the

Government's concerns.  In light of Defendant's revised disclosures, the Court will reserve

judgment on whether those disclosures now satisfy Defendant's obligations under Rule 16 and

provide sufficient notice to the Government.

## CONCLUSION

Defendant's motions *in limine*, Dkt. No. 42, and the Government's motions *in limine*, Dkt.

No. 41, and to exclude the expert testimony of Mr. Newman and Professor Froot, Dkt. No. 40, are

granted in part and denied in part.[6]

The Clerk of Court is respectfully directed to close Dkt. Nos. 40, 41, and 42.


SO ORDERED.

Dated: October 10, 2023
     New York, New York                                                 
LEWIS J. LIMAN
United States District Judge

---

developments on the USD/ZAR exchange rate may not "account[] for all the relevant variables,"
Dkt. No. 40 at 32, but that objection is one of credibility that should be raised on cross-
examination, not admissibility, *see Bernstein*, 2023 WL 6303424, at *11.
[6] This Opinion will be sent to the parties via email on October 10, 2023, in addition to being filed
on the Court's docket.