**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

  v.

NEIL PHILLIPS,

                *Defendant*.

No. 1:22-cr-00138 (LJL)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NEIL PHILLIPS'
REQUESTS TO CHARGE**

Sean Hecker
Jenna M. Dabbs
David Gopstein
Anne Yearwood
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
ayearwood@kaplanhecker.com

October 12, 2023

**Table of Contents**

PRELIMINARY STATEMENT ...................................................................................................... 2

ARGUMENT ............................................................................................................................... 2

   I.   INTENT ............................................................................................................................2

   II.   MATERIALITY .................................................................................................................7

   III. EXTRATERRITORIALITY .............................................................................................10

   IV. MARKET MANIPULATION ...........................................................................................20

   V.  RULE OF LENITY ..........................................................................................................22

   VI. GRAND JURY INSTRUCTIONS ....................................................................................23

CONCLUSION.......................................................................................................................... 25

## PRELIMINARY STATEMENT

We write in response to Your Honor's request for a brief summarizing the parties' disagreements on jury instructions.  Mr. Phillips' proposed instructions (ECF 54) differ from the government's (ECF 50) in four material respects—namely, on the appropriate instructions for intent, materiality, extraterritoriality, and market manipulation.

Because Mr. Phillips' proposed instructions correctly state applicable law, we ask that Your Honor read them to the jury at the conclusion of this case.

## ARGUMENT

### I.      INTENT

The parties agree that a trader acts with specific intent only if he trades for the purpose of artificially affecting the exchange rate.[1]  We depart, however, on application of this standard.  Mr. Phillips contends that unlawful purpose—such as a non-investment purpose—must be *the* reason for trading.  *See SEC v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007). Trading for both unlawful and lawful purposes is thus insufficient to convict, since the non-investment purpose is not the reason (*i.e.*, sole reason) for trading.  The government disagrees, contending that unlawful purpose need only serve as *a* reason for trading.

The government is mistaken. An abundance of relevant precedent favors Mr. Phillips' proposed instruction.  Properly understood, the specific intent requirement in market manipulation cases requires proof that the defendant traded *solely* for a non-investment purpose. Judge Holwell's decision in *Masri* is particularly instructive.  In *Masri*, the Court held that, to establish liability for market manipulation in an open market transaction, the government must prove "that the sole intent [is] to artificially affect the price of the stock."  *Id.* at 372.

---

[1] *Compare* Def.'s Proposed RTC at 21, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Oct. 10, 2023), ECF 54, *with* Gov't Proposed RTC at 12-13, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Oct. 9, 2023), ECF 50.

The Court in *Masri* reached that conclusion for three reasons. *First*, Judge Holwell drew guidance from the Second Circuit's controlling opinion in *United States v. Mulheren*, 938 F.2d 364 (2d Cir. 1991), where the government pressed the theory that "an open-market transaction could violate [the securities laws] where it was done with the 'sole intent' to affect the price of securities, and not for any 'investment purpose.'" *Masri*, 523 F. Supp. 2d at 373 (quoting *Mulheren*, 938 F.3d at 368). Judge Holwell reasoned that "[b]ecause the Second Circuit accepted the government's theory only with 'misgivings,' then *a fortiorari*, it would find problematic a theory under which an investor could be found liable for market manipulation *when only one of the investor's purposes was to alter the price*." *Id.*

*Second*, Judge Holwell concluded that a dual-motive theory of intent would make little sense in the context of open market manipulation cases. As he rightly explained, "if a transaction would have been conducted for investment purposes or other economic reasons, and regardless of the manipulative purpose, then it can no longer be said that it is 'artificially' affecting the price of the security or injecting inaccurate information into the market, which is the principal concern about manipulative conduct." *Id.* (quoting *Ernst Ernst v. Hochfelder*, 425 U.S. 185, 198 (1976)).

*Finally*, Judge Holwell invoked principles of lenity. "[G]iven the inherent ambiguity in determining intent, the concerns about imposing liability for otherwise legal activity based solely on intent, and the potential for chilling such legal activity," he determined that the wiser course was "to err on the side of caution" and apply a "sole intent" standard. *Id.*

*Masri* is no outlier. For instance, the D.C. Circuit has similarly held that that the "[l]egality" of an open market transaction "depend[s] entirely on whether the investor's intent was . . . 'solely'" for a non-legitimate purpose. *Markowski v. SEC*, 274 F.3d 525, 528 (D.C. Cir. 2001). And other courts in this District have instructed juries that the government must prove that a defendant

accused of market manipulation engaged "in conduct with the *sole* intent … to create a false impression of market activity." *See, e.g.*, Jury Instructions, Tr. 7210:5–6, *United States v. Tuzman*, No. 15 Cr. 536 (PGG) (S.D.N.Y. Jan. 11, 2018), ECF 706; *see also In re College Bound Consol. Litig.*, No. 93 Civ. 2348 (MBM), 1995 WL 450486, at *5 (S.D.N.Y. July 31, 1995) ("As a preliminary matter, the complaint must state clearly that [the defendant] purchased … shares with 'the sole intent' of raising the price of the stock." (quoting *Mulheren*, 938 F.2d at 368)). Notably, during the charge conference in *United States v. Tuzman*, Judge Gardephe correctly observed that there was "substantial support in the case law" to apply a "sole intent" standard. Charge Conference, Tr. 6751:12–13, *United States v. Tuzman*, No. 15 Cr. 536 (PGG) (S.D.N.Y. Jan. 11, 2018), ECF 702.  Indeed, the current U.S. Attorney for the Southern District of New York was the prosecutor in that case and agreed to the 'sole intent' instruction.  *Id.* at 6753:12.

That prevailing view is not only right as a matter of law, it also makes particularly good sense in the context of the government's open market manipulation theory.  Here, the government readily concedes that Mr. Phillips' conduct was not inherently manipulative. *See* Gov't Opp'n to Def.'s Mot. to Dismiss at 10, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. May 26, 2023), ECF 10 (explaining that the Indictment's CEA counts do not allege "that Phillips' spot trades, on their own, were criminal").  Nor has the government proven that any of the relevant trades bear the traditional hallmarks of manipulative conduct.  Instead, the government seeks to establish Mr. Phillips' guilt based exclusively on his intent. *See, e.g, ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (acknowledging that "in some cases scienter is the only factor that distinguishes legitimate trading from improper market manipulation").

That choice comes with consequences.  Where, as here, the government's theory of market manipulation turns on intent alone, the government must meet its burden to show, beyond a

reasonable doubt, that the manipulative intent was *the only* reason for Mr. Phillips' action.  *See Masri*, 523 F. Supp. 2d at 372-73.  Why?  Because there is an inherent difficulty in distinguishing "a 'manipulative' investor from one who is simply over-enthusiastic, a true believer in the object of investment."  *Markowski*, 274 F.3d at 528.  Indeed, as this Court recognized just a few days ago, "the value of any asset is a function not just of some concept of its inherent value but of the value and importance that market participants ascribe to it given their own economic and financial positions."  Op. & Order on Mots. In Lim. at 13, n.1, *United States v. Phillips*, No. 22 Cr. 138 (LJL) (S.D.N.Y. Oct. 10, 2023), ECF 55.  Accordingly, courts apply a sole intent instruction to market manipulation claims to avoid criminalizing "otherwise legal activity." *Masri*, 523 F. Supp. 2d at 373; *cf. Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (advising that criminal anti-fraud laws should not interpreted to outlaw the "incidental byproduct of [a] scheme").

The government offers no reason to depart from this settled precedent.  Instead, the government asserts that "[t]he forbidden 'specific intent need not be the actor's sole, or even primary, purpose."  *See* Gov't Proposed RTC at 13, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Oct. 9, 2023), ECF 50 (citing cases).  In support of that assertion, the government cites a handful of published cases, all of which are inapposite.  None involved the criminal commodities fraud statute at issue here, none involved allegations of open market manipulation, and none involved lawful conduct that is made criminal purely by the defendant's intent.  *See, e.g.*, *United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014) (the specific intent to remain outside the U.S. to avoid prosecution required under fugitive disentitlement forfeiture statute "need not be the actor's sole, or even primary, purpose"); *United States v. Gatto*, 986 F.3d 104, 110, 129 n.12 (2d Cir. 2021) (scheme to defraud universities by bribing student-athlete families to attend in violation of NCAA rules); *United States v. Pizarro*, No. 17 Cr. 151 (AJN), 2019 WL 3406603, at

*10 (S.D.N.Y. July 29, 2019) (killing with the specific intent to prevent communication with law enforcement); *Anderson v. United States*, 417 U.S. 211, 213, 226 (1974) (conspiracy to cast fictitious votes for candidates for federal, state, and local offices in primary election).  We are happy to concede that murdering witnesses to prevent law enforcement investigation and large-scale election fraud are the types of criminal activity where a dual intent instruction is appropriate.  But, as courts have recognized, such an instruction is wholly inappropriate in a market manipulation case like this one.

Finally, even if this Court harbored any lingering doubt as to the propriety of a sole intent instruction, principles of due process, fair notice, and the rule of lenity militate against the government's preferred instruction.  *See McBoyle v. United States*, 283 U.S. 25, 27 (1931). As Judge Holwell rightly recognized, "given the inherent ambiguity in determining intent," this Court would be "wise to err on the side of caution" and apply a "sole intent" instruction.  *Masri*, 523 F. Supp. 2d at 373.

At bottom, the government invites this Court to ignore relevant precedent, disregard the unique context of open market manipulation charges, and adopt a novel theory that would criminalize wholly innocent conduct based on partial intent.  The Supreme Court has routinely "step[ped] in and overturn[ed] . . . conviction[s]" on such novel theories.  *See United States v. Porat*, 76 F.4th 213, 224 (3d Cir. 2023) (Krause, J., concurring); *see also Ciminelli v. United States*, 598 U.S. 306, 309 (2023) (reversing conviction secured under the Second Circuit's then-existing 'right to control' theory).  This Court should not follow the government down that misguided path. Instead, Mr. Phillips respectfully requests that Your Honor instruct the jury that, to convict, they must find, beyond a reasonable doubt, that Mr. Phillips traded solely for a non-investment purpose.

## II.        MATERIALITY

Materiality is a bedrock of fraud claims.  *See Neder v. United States*, 527 U.S. 1, 22 (1999) ("[T]he common law could not have conceived of 'fraud' without proof of materiality" (internal citation omitted)).  Commodities fraud claims are no different.  *See CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325, 1327 (11th Cir. 2018) (requiring materiality); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226 (E.D.N.Y. 2018) (same), *reconsideration denied,* 321 F. Supp. 3d 366 (E.D.N.Y. 2018).  The government therefore must prove materiality; in particular, they must establish that Mr. Phillips' trading on December 26, 2017, mattered to a reasonable party in the position of his option counterparty, Bank-1.  *See United States v. Litvak*, 889 F.3d 56, 64–65 (2d Cir. 2018).[2]

The government, for its part, leaves materiality out of the equation.[3]  To them, materiality applies only in fraud cases alleging a false statement or omission of material fact.  *See* 17 C.F.R. § 180.1(a)(2).  On the government's theory, cases alleging fraudulent *schemes* charged under subsections (1) or (3)—like this case—do not require materiality.  *See* 17 C.F.R. § 180.1(a)(1), (3).  Tellingly, however, the government cites no case law to support this position.  And for good reason.  It is decidedly not the law.  *See Neder*, 527 U.S. at 20, 25 (holding that "materiality" is "an element of a 'scheme or artifice to defraud'" (internal citation omitted)).

Fraudulent schemes are those that trick or deceive.  For that to be possible, the alleged victim must care enough about what the defendant is doing or saying to consider changing their behavior (i.e., the purported fraud must be "material").  *See United States v. Rybicki*, 354 F.3d 124, 146 n.20 (2d Cir. 2003) (en banc) (explaining that materiality is embedded in "the phrase 'scheme or artifice to defraud'" (internal citation omitted)); *United States v. Raza*, 876 F.3d 604,

---

[2] *See* Def.'s Proposed RTC at 11, 19, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Oct. 10, 2023), ECF 54.
[3] *See* Gov't Proposed RTC at 7, 8, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Oct. 9, 2023), ECF 50.

615 (4th Cir. 2017) ("[T]he federal courts have generally applied a . . . materiality element in fraud schemes."). Indeed, fraudulent schemes are typically the compilation of false statements and omissions, *see Preston v. United States*, 312 F.3d 959, 960 (8th Cir. 2002), and those, the government agrees, must be material. But, apparently for the government, the whole is not the sum of its parts.

Case law interpreting the "in connection with" requirement further bolsters the conclusion that materiality is an element, and establishes that the alleged scheme must have been material to the counterparty to the swap. The Supreme Court has squarely held in the securities context that "in connection with the purchase or sale of a covered security" imposes a requirement that the alleged fraudulent conduct be "material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014). The Supreme Court reasoned that "[t]he phrase 'material fact in connection with the purchase or sale' suggests a connection that matters," and "a connection matters where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security." *Id.* at 387-88. Further, the Supreme Court observed that "every securities case in which this Court has found a fraud to be 'in connection with' a purchase or sale of a security has involved victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained an ownership interest in financial instruments" based on the underlying fraudulent conduct." *Id.* In other words, the alleged scheme must have been material to a person who held a direct interest in the covered financial product—here, the counterparty to the one touch option. And lower courts have consistently applied this interpretation to fraud cases in both the criminal and civil context, including in this district. *See United States v. McLellan*, 959 F.3d 442, 458-59 (1st Cir. 2020) ("[T]he alleged fraud must reach a certain threshold of materiality

to be deemed made 'in connection with' a transaction in securities" (quoting *Troice*, 571 U.S. at 387-88).); *Bai v. Tegs Mgmt.*, LLC, No. 20-CV-4942 (DLC), 2022 WL 602711, at *6 (S.D.N.Y. Mar. 1, 2022) (explaining that "even a scheme liability claim" under 10b-5 "must have occurred in connection with the purchase or sale of a security," which requires the conduct is "material to a decision by one or more individuals . . . to buy or to sell a covered security" (quoting *Troice*, 571 U.S. at 387)), *aff'd*, No. 22-0681, 2023 WL 6458542 (2d Cir. Oct. 4, 2023).

The government's position is also remarkable because it contradicts their position taken on a similar issue before Judge Kaplan in a case alleging conspiracy to commit commodities fraud. There, the government's proposed request to charge says: "materiality means *the scheme*, statement, omission, act, practice, or course of conduct must have the natural tendency to influence or be capable of influencing the actions of a person who was a target of the scheme, statement, omission, act, practice, or course of conduct." Gov't Proposed RTC, Request No. 27, *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Aug. 21, 2023), ECF 214 (emphasis added). The government has not explained its reason for revising its position less than two months later.

For these reasons, Mr. Phillips respectfully requests that Your Honor instruct the jury that materiality is an element of commodities fraud, and that the alleged conduct must be material to Glen Point's counterparty to the one touch option. 7 U.S.C. §§ 9(1), 13(a)(5); 17 C.F.R. § 180.1; 18 U.S.C. § 2.[4]

---

[4] Relatedly, the government appears to contend that, assuming materiality is an element, that requirement is satisfied simply because the 'swap' triggered with the USD/ZAR exchange rate hitting 12.50. This too is incorrect. Materiality is not an outcome-based test, based on a pre-determined formula. It is person-based test. Conduct is material where it would matter to a "a reasonable investor . . . in making an investment decision." *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012).

### III.      EXTRATERRITORIALITY

The parties also disagree with respect to the instruction on extraterritoriality.[5]  Both parties have included two alternate means of establishing territorial jurisdiction in their Requests to Charge: a "direct and significant connection" to U.S commerce under 7 U.S.C. § 2(i), or a domestic application of the statute.

Under § 2(i)(1), the CEA's provisions relating to swaps "shall not apply to activities outside the United States unless those activities have a direct and significant connection with activities in, or effect on, commerce of the United States."  7 U.S.C. § 2(i)(1).  The defense position is that foreign activities do not have a direct and significant effect on U.S. commerce, or a direct and significant connection with U.S. commerce, unless they pose a systemic risk to the United States financial system. It is not enough that the amount of money involved in the alleged conduct be significant in some generic sense. Our proposed standard gives full effect to the text of § 2(i)(1), including in particular its requirement that the activities in question have *both* a "direct" and a "significant" connection with or effect on U.S. commerce.

The government's proposed instruction, in contrast, strays far from the language of the statute.  In its view, "[c]onduct that causes people or entities in the United States to make payment pursuant to a swap has a direct and significant effect on, or connection with, commerce in the United States."  Gov't Proposed RTC at 27, United States v. Phillips, No. 22 Cr. 138 (S.D.N.Y. Oct. 9, 2023), ECF 50.  But on that formulation, "direct and significant" do not bear any analytical weight.  Any conduct that causes a swap payment to be made *a fortiori* has a direct and significant effect on U.S. commerce.  Even if that understanding sufficed to establish a direct effect, it does nothing to establish that the effect was *significant*. *Cf. United States v. Perez*, 962 F.3d 420, 440

---

[5] *Compare* Def.'s Proposed RTC at 23, United States v. Phillips, No. 22 Cr. 138 (S.D.N.Y. Oct. 10, 2023), ECF 54, with Gov't Proposed RTC at 27, United States v. Phillips, No. 22 Cr. 138 (S.D.N.Y. Oct. 9, 2023), ECF 50.

(9th Cir. 2020) (holding, in RICO case, that it was "wrong" for the district court to instruct that jury that "extraterritoriality" simply requires "any part of the charged crime" to occur "within the United States"). Yet it is hornbook law that each of those terms must be given independent meaning and effect. *See Hibbs v. Winn*, 542 U.S. 88, 1001 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06 (rev. 6th ed 2000))).

The government relies on the CFTC's final rule addressing the cross-border application of the swap provisions of the CEA, *see* 85 Fed. Reg. 56,924, et seq., in support of its argument that mere payment by a U.S. entity pursuant to a swap is sufficient to meet the "direct and significant test."[6] The government's view is misguided, not least because the final rule post-dates the conduct at issue by almost three years. *See United States v. Juv. Male*, 581 F.3d 977, 981–82 (9th Cir. 2009) ("A statute or regulation that imposes retroactive punishment violates the constitutional prohibition on the passage of ex post facto laws." (citing U.S. Const. Art. I § 9, cl. 3; *Smith v. Doe*, 538 U.S. 84, 92 (2003)), *rev'd on other grounds*, 564 U.S. 932 (2011)). And even if the final rule predated Mr. Phillips' conduct, the CFTC's interpretation would not be binding in a criminal case. *See Abramski v. United States*, 573 U.S. 169, 191 (2014) (declining to defer to agency interpretation of a criminal statute because "criminal laws are for courts, not the Government, to construe").

---

[6] It is worth noting that the CFTC relied on cases applying the standard for assessing the validity of congressional regulation under the Commerce Clause, which employs a "substantial effects" test rather than a "direct and significant" test. *See, e.g., Gonzales v. Raich*, 545 U.S. 1 (2005); *Wickard v. Filburn*, 317 U.S. 111 (1942). But the Supreme Court has made clear that its "substantial effects" test sweeps much more broadly than would any test that required a "direct" as opposed to "indirect" effect. *See Wickard*, 317 U.S. at 125 ("[E]ven if appellee's activity be local . . . , it may still . . . be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this is irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'"). And of course, the regulation of domestic interstate commerce implicates none of the international comity concerns animating the "direct and significant" requirement of the CEA.

The final rule indicates that the CFTC views itself as having the authority to regulate "swap activities" that "as a class, or in the aggregate, have a direct and significant connection with activities in, or effect on, U.S. commerce." 85 Fed. Reg. at 56,930. The government has suggested that this language means the CEA applies to all "manipulative conduct with respect to swaps." (Tr. 43:19-20 (Aug. 1, 2023).)  But that reading fails, because "by saying that any conduct that violates 6(c) that has a direct effect on a U.S. investor, is by definition significant, you are depriving the word 'significant' of any independent meaning." (*Id.* at 44:7-14.) "The 'canon against surplusage,'" is "'a cardinal principle of statutory construction' . . . [that] requires courts to 'give effect, if possible, to every clause and word of a statute.'" *Panjiva, Inc. v. United States Customs & Border Prot.*, 975 F.3d 171, 178 (2d Cir. 2020) (internal citations omitted).  So, the word "significant" in § 2(i) must mean something separate and apart from "direct," and the government must offer proof of significance separate and apart from proof of directness.  7 U.S.C. § 2(i)(1).

The plain meaning of "significant" is something "[s]ufficiently great or important to be worthy of attention; noteworthy; consequential, influential." *Significant*, Oxford English Dictionary; *see also* Significant, Black's Law Dictionary (defining "significant" as "[o]f special importance; momentous, as distinguished from insignificant"). And various statutes employing the term treat "significant" as indicating something of import or that can have a large effect on something. For example, 6 U.S. § 322, which requires the President to "develop and maintain a plan to maintain and restore the economy of the United States in response to a significant event," defines "significant event" as "an event that causes severe degradation to economic activity in the United States. 6 U.S. § 322(d)(4). In interpreting the phrase "significantly affecting the quality of the human environment" in Section 102(2)(C) of the National Environmental Policy Act, the Second Circuit observed that it must necessarily mean more than just any effect, in light of the fact

that "almost every major federal action, no matter how limited in scope, has *some* adverse effect on the human environment." *Hanly v. Kleindienst*, 471 F.2d 823, 830 (2d Cir. 1972). The panel went on to explain that "[b]y adding the word 'significantly,'" Congress demonstrated that it intended the phrase to apply to "greater environmental impact," ultimately concluding that courts should consider the degree of the adverse environmental effects relative to the existing environment in assessing whether a federal action "significantly" affects the human environment. *See id.*

The history and purpose of the CEA makes clear that it is similarly focused on issues that are important to U.S. commerce, relative to its size. The CFTC's interpretive guidance makes clear that §2(i) is meant to address "risks like those that occurred during the 2008 Financial Crisis, where foreign affiliates of U.S. institutions engaged in risky swap trades that 'result[ed] in or contribute[d] to substantial losses to U.S. persons and threaten[ed] the financial stability of the entire financial U.S. system.'" *CFTC v. Gorman*, No. 21-Civ.-870 (VM), 2023 WL 2632111, at *9 n.9 (S.D.N.Y. Mar. 24, 2023) (emphasis added) (quoting 78 Fed. Reg. at 45,295). Indeed, even the final rule relied on by the government, in the context of discussing the "aggregate effects" theory, states: "The Commission believes that section 2(i) provides it express authority over swap activities outside the United States when certain conditions are met, but it does not require the Commission to extend its reach to the outer bounds of that authorization. Rather, in exercising its authority with respect to swap activities outside the United States, the Commission will be guided by international comity principles and will focus its authority on potential significant risks to the U.S. financial system." 85 Fed. Reg. at 56924.

And commentators have observed that the government's view that any form of trading activity is sufficient so long as it involves a U.S.-based entity is "self evident[ly]" incorrect. *See*

John Coffee, *Extraterritorial Financial Regulation: Why E.T. Can't Come Home*, 99 Cornell L. Rev. 1259, 1297 (2014) ("[I]t is difficult to argue that . . . [trading is 'direct and significant'] . . . simply because [it involves] a foreign bank with a U.S. presence . . . [I]f a non-U.S. bank with a small branch office in the United States engages in proprietary trading in Europe (with the order being originated in New York), it seems self evident that [this is insufficient] . . .  Nor is it clear that . . . [the statute would apply] . . .  where no U.S.-domiciled bank is a party to [the trade].").

As illustrated by this matter, the "direct and significant" requirement honors the "international comity principles" involved in a cross-border case. *See Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants*, 85 Fed. Reg. 56,924, 56,928 (Sept. 14, 2020).  Extraterritorial overreach "'creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs.'" *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 824 (7th Cir. 2015) (Posner, J.) (internal citation omitted). And we need not guess how Mr. Phillips' country—the U.K.—feels about the interference of U.S. criminal prosecutors with its domestic financial regulatory scheme, because its own legal system has repeatedly rejected efforts to extradite U.K. citizens for conduct that largely took place and affected people or entities in the U.K. *See Scott v. U.S.A.* [2018] EWHC 2021 (Admin) [23] (Eng.) (citing *Love v. U.S.A.* [2018] EWHC 172 (Admin) [22] (Eng.)); *see also* Brief of the U.K. of Great Britain and Northern Ireland as Amicus Curiae Supporting Respondents at 25–26, *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) (No. 08-1191) ("U.S. judicial interference in [regulatory] decisions risks damaging the mutual respect that comity is meant to protect and could be perceived as an attempt to impose American economic, social and judicial values."); Evan Norris and Alma M. Mozetic, *Are U.K. Courts Pushing Back Against DOJ's Global Reach?*, N.Y. Univ. School of Law (Aug. 16, 2018),

https://wp.nyu.edu/compliance_enforcement/2018/08/16/are-u-k-courts-pushing-back-against-dojs-global-reach/.

This is not a theoretical concern in this case.  Here, the government charged Mr. Phillips, a U.K. resident and the CIO of a London-based hedge fund that is separately regulated by the U.K. financial authorities, with allegedly manipulative trading that took place in an unregulated market while Mr. Phillips was located in South Africa.  His trading activity was conducted through Singapore-based employees of a Japanese bank.  Mr. Phillips did not know that the counterparty on the one touch option was the U.K. subsidiary of a U.S.-headquartered global financial institution, though Glen Point contracted with a U.K. intermediary firm to purchase the position. The only facts the government can point to that even touch on the United States in any manner are twofold: (i) that certain of Mr. Phillips' spot trades were matched on a trading platform that maintains servers in Secaucus, New Jersey, and (ii) the ultimate payment on the one touch option involved wires that were transmitted in the United States.[7]  There have been obvious jurisdictional defects with this prosecution from its inception—defects there are good reasons to think international partners, such as the U.K., would have questioned.  It is particularly telling that the U.S. Attorney's Office, after obtaining an indictment on March 3, 2022, kept that indictment under seal for five months, while Mr. Phillips continued to reside in London and conduct his business from there, only unsealing the indictment and effecting his arrest when he traveled to Spain on vacation in August 2022.   It is not difficult to infer that the government specifically sought to avoid having to overcome the U.K.'s extradition precedent, in light of the fact that the conduct in this case so clearly centers on activity in or relating to the U.K., and having the most tenuous of

---

[7] The government may suggest that the mere fact that the one touch option involved a U.S.-denominated exchange rate supports application of the statute.  But the overwhelming prevalence of the U.S. dollar is a reflection of the stability of the currency and is not what jurisdiction should hinge on. To do so would essentially swallow the rule: the U.S. dollar is involved in almost 90% of foreign exchange market transactions globally.

connection to the United States, and certainly not connections that rise to the level of the "direct and significant" connection to activities in, or effect on, U.S. commerce standard that applies in this case.

An unduly expansive interpretation of Section 2(i) risks disrupting "harmonious international regulatory efforts."  Br. of the Sec. Indus. and Fin. Mkts. Ass'n and the Competitive Enter. Inst. at 17, *Toshiba Corp. v. Automotive Indus. Pen. Tr. Fund*, No. 18-486 (Dec. 6, 2018).  If construed broadly, federal courts would find themselves opining on the difficult "market efficiency concerns and political sensitivities inherent in questions of extraterritorial application of the U.S. securities laws." *Id.* (quoting Kellye Y. Testy, *Comity and Cooperation: Securities Regulation in a Global Marketplace*, 45 Ala. L. Rev. 927, 929 (1994)).  This case is a prime example. It is therefore crucial that the term "significant" be given robust meaning.

No less than the former commissioner of the CFTC, J. Christopher Giancarlo, has warned about the perils of American overreach with respect to regulation of swaps. The commissioner expressed "long-standing concerns about the CFTC's current approach to applying its swaps rules to cross-border activities," which is "premised on the false assumption that nearly every single swap a U.S. person enters into, no matter where and how transacted, has a direct and significant connection with activities in, and effect on, commerce of the United States that requires the imposition of CFTC transaction rules." J. Christopher Giancarlo, U.S. C.F.T.C., *Cross-Border Swaps Regulation Version 2.0: A Risk-Based Approach with Deference to Comparable Non-U.S. Regulation*, at i (Oct. 1, 2018). As the commissioner explains, the many adverse consequences of this approach have "driven global market participants away from transacting with entities subject to CFTC swaps regulation and fragmented what were once global markets into a series of separate liquidity pools," which "is not only incompatible with global swaps reform efforts, but also

detrimental to them." *Id.* at ii. He also emphasizes that Section 2(i) "imposes a significant limitation on the CFTC's extraterritorial authority" and "certainly was not intended by the U.S. Congress to justify broad extraterritorial application of CFTC rules." *Id.* at 20.

At the pretrial conference, the Court expressed concern that a standard met by a finding that the swap activities, on their own, create a systemic risk to the U.S. financial system could render the statutory provision "meaningless," because little that occurs outside the United States on an individual basis could give rise to a systemic risk. (Pretrial Conf. Tr. At 10:10-20.)

There are, of course, prominent examples of individual or entity-level financial conduct in swap markets that could, theoretically, give rise to jurisdiction under a standard that requires the conduct be "significant" or important to the U.S. financial system. For example, in *In the matter of JPMorgan Chase Bank, N.A.*, a JPMorgan unit, through a JPMorgan branch in London, engaged in aggressive trading activity in connection with a particular type of credit default swap known as "CDX" that resulted in the bank's parent company "los[ing] more than $6 billion." *In re JPMorgan Chase Bank, N.A.* at 3, CFTC Dkt. No. 14-01 (Oct. 16, 2013). And the 1998 case of Long-Term Capital Management ("LTCM"), while it was entirely domestic, involved a hedge fund using highly leveraged trades in a manner that led to a $3.65 billion rescue package from the Federal Reserve to prevent a systemic crisis in the world financial system. LTCM, which held approximately $5 billion in equity, had borrowed over $125 billion, a leverage factor of approximately 30 to one. *See* Roger Lowenstein, *Long-Term Capital Management: It's a Short-Term Memory*, N.Y. Times (Sept. 7, 2008). To the extent swap activities cause an impact of similar magnitude and thereby became "significant" to the U.S. financial system, it would be entirely appropriate for U.S. regulators to step in, even where the conduct occurred abroad.

But impacts of this magnitude—*i.e.*, losses of several billion dollars to a U.S. financial institution or the requirement of a multi-billion dollar bailout by the Federal Reserve—are obviously a very far cry from a single, $20 million payment made pursuant to a one touch option, negotiated at arms' length by two sophisticated parties in which each hedged its risk and expects its counterparty to do the same.[89]

In the alternative, in order to satisfy the required connection to the United States, the government may also argue that this case is fairly considered a domestic application of the CEA. Both the government's and Mr. Phillips' Requests to Charge accordingly include an instruction on whether the government has proven a domestic application of the statute. To make this determination, courts look to whether the "conduct" that is the focus of the statute occurred in the United States. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010).

To be clear, the starting point must be where the conduct that is "relevant" to Section 6(c)(1)'s "focus" on "manipulation in commodities markets" took place. *See Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019). Accordingly, Mr. Phillips' proposed jury instruction appropriately identifies the "relevant conduct" for this purpose as "actual conduct or actions allegedly taken by Mr. Phillips, or his co-conspirators in the event that you determine the government has proven the elements of a conspiracy, to manipulate the USD/ZAR exchange rate in order to trigger the Option." Def.'s Proposed RTC at 24, United States v. Phillips, No. 22 Cr.

---

[8] Additionally, spot trades in the FX market cannot fairly be considered "swap activities" within the meaning of Section 2(i). The government should not be able to assert that Mr. Phillips $725 million purchase of rand has a significant connection with activities in, or effect on, U.S. commerce where Congress has expressly declined to regulate that market, effectively indicating that activity within it cannot meet the "direct and significant" test.

[9] Even if the $20 million payment under the one touch option resulted in a loss to Bank-1 (which would likely require ignoring the bank's gains on related hedging trades), it is highly unlikely a loss of that size—or even a multiple of that amount—would be material to Bank-1. For example, financial statements near the time of the events underlying the complaint list potential legal liabilities that Bank-1 considers to reflect "a material loss." These legal liabilities include potentially losses in the hundreds of millions. *See* Morgan Stanley, Quarterly Report (Form 10-Q) (September 2018). Bank-1 would not consider $20 million to be a material loss; and if that amount is not even material to the financial institution that paid it, it certainly does not have a significant impact on U.S. commerce.

138 (S.D.N.Y. Oct. 10, 2023), ECF 54.   In contrast, the government's proposed instruction suggests that "some conduct relevant to the offenses charged" is all that is required for a domestic application, a construction that is directly refuted by the controlling caselaw.  And the government goes even further, to expressly state that qualifying relevant conduct would include things like "the occurrence of manipulative trades in the United States or the transmission of communications or funds through the United States."  From the discovery and other disclosures in the case, we assume that when the government refers to "the occurrence of manipulative trades in the United States," they must be referring to the fact that certain trades, instructed by Mr. Phillips while located in South Africa, and facilitated by the Singapore desk of a Japanese bank, were matched by the software of a particular electronic trading platform, whose servers happen to be located in Secaucus, New Jersey.  This entirely incidental U.S. activity does not rise to the level of "conduct" that is the "focus" of the CEA's anti-manipulation provision.

Moreover, while in certain contexts, such as the wire fraud offense charged in the *Napout* case that the government cites, wires themselves may indeed constitute the core conduct that is "relevant" or the "focus" of a given statute's enforcement objective, we do not believe that wires at issue in this case are even close.  Unlike the wire fraud statute, where the use of interstate or foreign wires is an element of the offense, the CEA is not focused on the use of wires and the fact that funds or communications "passed through" wires in the United States, Ind. ¶ 25, is not the type of conduct that can be considered in determining whether the government's prosecution of Mr. Phillips is a proper domestic application of the statute.  Nor is the statute focused on spot trades in the FX market—on the contrary, the FX spot market remains "free from supervision" under the CEA. *Dunn v. CFTC*, 519 U.S. 465, 473 (1997).  Domestic application of the statute also requires conduct "based predominantly" in the United States.  *Laydon v. Cooperatieve*

*Rabobank U.A.*, 55 F.4th 86, 92, 92 (2d Cir. 2022), *cert denied*, -- S. Ct. --, 2023 WL 6378459; *see also* Jury Charge, *U.S. v. Gasperini*, ("It is essential . . . that the government demonstrate beyond a reasonable doubt that substantial conduct—as opposed to isolated or incidental conduct—took place in the U.S. and that this conduct was important to achieving the goals of the fraud.").  The mere incidental use of domestic wires, where use of wires is not the focus of the CEA, are not the sort of evidence that the jury should be allowed to consider in determining whether "substantial conduct" took place in the United States, and they certainly should not be instructed that they alone are adequate.

For these reasons, Mr. Phillips respectfully requests that Your Honor adopt Mr. Phillips' Request to Charge on the element of extraterritoriality.

## IV.    MARKET MANIPULATION

The government contends that the Court should not provide a robust instruction on what constitutes market manipulation, including any reference to the four elements set forth in *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013).[10]  That contention is unavailing. Because the government has premised its theory of the case on market manipulation, *see* Ind. ¶ 34, the Court must instruct the jury that the government bears the burden of proving each of the four elements of market manipulation.  *See CFTC v. Gorman*, 21 Civ. 870 (VM), 2023 WL 2632111, at *4 (S.D.N.Y. Mar. 24, 2023) ("[I]nsofar as the Commission alleges price manipulation as the underlying manipulative act, the Commission will need to also allege a specific intent to create an artificial price.").  In fact, the government itself has tacitly conceded as much by relying repeatedly on the legal standard for price manipulation, which incorporates the four *Amaranth* elements, in its submissions to the Court.  (*See* Gov't Mot. in Lim. (ECF No. 41) at 7

---

[10] *Compare* Def.'s Proposed RTC at 14-17, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Oct. 10, 2023), ECF 54, *with* Gov't Proposed RTC at 8-9, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Oct. 9, 2023), ECF 50.

(citing intent standard under 7 U.S.C. § 13(a)(2) and *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 529 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013)); Gov't Opp'n to Def.'s Mot. in Lim. (ECF No. 48) at 11 (same).)

Nevertheless, the government claims in its proposed instructions that it need not prove any element at all other than manipulative intent.  (Pretrial Conf. Tr. at 9:9-11 ("It seems to me that the government's charge gives the jury very, very little guidance and could be almost reduced to the notion of a bad intent is sufficient.").)  That view is incorrect.

Manipulation is a "term of art" when used in connection with financial markets, and it requires the specific intent to artificially affect the price.  And the Second Circuit has outlined four elements for market manipulation claims, including those under Section 6(c)(1): "(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *Amaranth*, 730 F.3d at 173.  And courts have expressly rejected attempts to "read out" the market manipulation elements "by collapsing [them] into the subjective intent requirement" as the government seeks to do here.  *See CFTC v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018). Consequently, this Court should instruct the jury as to the four elements that the government must prove to establish market manipulation.

In an effort to sidestep its burden of proof, the government claims that the market manipulation elements do not apply to scheme liability.  (*See* Gov't Opp'n to Def.'s Mot. to Dismiss at 30.)  But taken to its logical conclusion, the government's argument means that Mr. Phillips could have purchased one dollar of rand in the multi-trillion dollar FX market and been charged with market manipulation simply because he held the misguided hope that it would move the price.  Criminal market manipulation requires more than that.

The government charged Mr. Phillips with successfully manipulating the USD/ZAR market and should be required to prove it.  Indictment ¶ 25 ("The manipulation of the USD/ZAR rate on or about December 25, 2017, caused by NEIL PHILLIPS, the defendant, . . . resulted in the $20 Million One Touch Option being triggered, thereby defrauding the parties to the $20 Million One Touch Option.").)  But at a minimum, the government should be required to prove that Mr. Phillips created a scheme that in fact had the ability to manipulate the price of rand, took steps to implement that scheme, and had the specific intent to artificially affect the price.  So under any potential legal theory alleged by the government, the Court should instruct the jury on more than just manipulative intent.

For these reasons, Mr. Phillips respectfully requests that the court instruct the jury that the government must prove the *Amaranth* market manipulation elements.

## V.        RULE OF LENITY

Mr. Phillips believes that his proposed jury instructions accurately reflect the law.  But if there were any remaining uncertainty surrounding any of these key elements of the crimes charged, the Court should apply the rule of lenity.  That "venerable rule" resolves "ambiguous criminal laws" in the defendant's favor, to give effect to the "fundamental principle that no citizen should be imprisoned for a violation of a statute whose commands are uncertain."  *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion); *see also id.* at 511, 514 (construing term "proceeds" in the federal money laundering statutes, which could mean "either 'receipts' or 'profits,'" to mean the latter because that term was "always more defendant-friendly").  The rule of lenity is essential to ensuring that "criminal statutes . . . provide fair warning concerning conduct rendered illegal," *Liparota v. United States*, 471 U.S. 419, 427 (1985), and properly applies where the "traditional canons of statutory construction" do not clarify what constitutes prohibited conduct, *Shular v. United States*, 589 U.S. --, 140 S. Ct. 779, 787 (2020); *see also Muscarello v. United States*, 524

U.S. 125, 138 (1998) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, . . . we can make no more than a guess as to what Congress intended." (internal quotation marks omitted)).

Where there are two plausible interpretations of a legal element or term, the Supreme Court has invoked the rule of lenity in favor of the defendant. *See Santos*, 533 U.S. at 511, 514. To the extent the Court determines that there remains ambiguity on any of these disputed elements, the rule of lenity should apply, and Mr. Phillips' proposed instructions should be given.

## VI.        GRAND JURY INSTRUCTIONS

It stands to reason that the government's proposed jury instructions mirror the instructions that it provided to the grand jury. And given the multiple ways in which the government's jury instructions misstate the law, there is reason to believe that the grand jury was incorrectly instructed as well. Mr. Phillips therefore requests that the Court either disclose or conduct an *in camera* review of the relevant grand jury proceedings pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i)-(ii).

Rule 6(e)(3)(E) grants districts courts the authority to disclose, or review *in camera*, grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." *United States v. Teman*, 465 F. Supp. 3d 277, 296 (S.D.N.Y. 2020); *see also Frederick v. New York City*, No. 11 Civ. 469 (JPO), 2012 WL 4947806, at *7, *15 (S.D.N.Y. Oct. 11, 2012) (ordering submission of "grand jury minutes . . . for review *in camera*"). One such ground is that the government failed to instruct the grand jury properly, such as by failing to instruct the jury correctly on all the elements of the offense. *See United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (finding that "the government's misleading statements of law" to the grand jury warranted dismissal of the

indictment).  "Although the government is under no obligation to provide the grand jury with legal instructions, courts have found error where the government endeavors to provide the grand jury legal instructions but does so incompletely or erroneously." *United States v. Monzon-Luna*, 2014 WL 223100 (E.D.N.Y. Jan. 21, 2014) (citing cases and internal citations omitted).  And if that error is prejudicial, courts will dismiss an indictment.  *Id.* (citing standard); *United States v. Braniff Airways, Inc.*, 428 F. Supp. 579, 590 (W.D. Tex. 1977) (dismissing indictment where prosecutor failed to instruct jury on relevant statutory provision).  The government's request to charge provides ample basis upon which to conclude that a prejudicial error may have occurred before the grand jury.

First, it appears that the government did not instruct the grand jury on extraterritoriality. *See* MTD Tr. 46:17-21 (government stating that it does not believe the grand jury needs to make a finding on extraterritoriality).  But if the government must prove beyond a reasonable doubt at trial that Mr. Phillips' conduct had a "direct and substantial" impact on U.S. commerce, it follows that it was required to make some showing on the very same issue to the grand jury.  Indeed, if no finding by the grand jury were required, then the question of whether there is a permissible extraterritorial application of a statute would come into play *only* at the very end of a case, and *only* in the few cases that go to trial.  That would be fundamentally inconsistent with both due process and the threshold nature of the extraterritoriality inquiry.  *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253 (2010) (applying the "Rule 12(b)(6) label" to describe its review of the "extraterritorial reach of § 10(b)"); *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016, 1041 (10th Cir. 2021) ("[D]istrict courts should ordinarily decide questions about . . . extraterritorial reach as a matter of law, preferably in the litigation's early stages.").  Moreover, even if the government is under no obligation to provide the grand jury with legal instructions, it

is required to inform the grand jury of the applicable statutes.  *United States v. Lopez-Lopez*, 282 F.3d 1, 9 (1st Cir. 2002) (noting that prosecutor can "satisfactorily explain[] the offense to be charged" by "reading the statute to the grand jury").  Here, that includes CEA 2(i). And given the government's position that the grand jury need not make a finding on extraterritoriality, it appears likely that they it did not inform the grand jury of Section 2(i)'s requirements.

Second, the government's requests to charge suggest that the grand jury was incorrectly instructed on each of the key disputed issues discussed above.  These are not minor points. The reason the parties jointly requested rulings on these issues prior to opening statements is because they will have a significant impact on how this case is presented to the jury. So too for the grand jury.  It stands to reason that the government presented the grand jury with the same instructions it seeks for trial.  And those instructions were incorrect as a matter of law.

Mr. Phillips therefore respectfully requests that the Court either disclose or conduct an *in camera* review of the grand jury proceedings.

## **CONCLUSION**

For the reasons stated above, Mr. Phillips asks that you instruct the jury as described and consistent with his Requests to Charge.


Dated: October 12, 2023                              Respectfully submitted,

Sean Hecker
Jenna M. Dabbs
David Gopstein
Anne Yearwood
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
Fax: (212) 564-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
ayearwood@kaplanhecker.com
*Counsel for Defendant Neil Phillips*