Nannphi1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                        22 Cr. 138 (LJL)

 5   NEIL PHILLIPS,

 6            Defendant.

 7   ------------------------------x     Trial

 8
                                         New York, N.Y.
 9                                       October 23, 2023
                                         9:00 a.m.
10

11   Before:

12
                          HON. LEWIS J. LIMAN,
13
                                         District Judge
14                                       and a Jury
                             APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  THOMAS S. BURNETT
          KIERSTEN A. FLETCHER
18        ANDREW M. THOMAS
          Assistant United States Attorneys
19

20   SEAN HECKER
     JENNA M. DABBS
21   DAVID N. GOPSTEIN
     ANNE R. YEARWOOD
22        Attorneys for Defendant

23

24

25
```

Nannphi1

1

2              (Trial resumed; jury not present)

3              THE COURT:  I hope everybody had a good weekend.  I

4     received and I have reviewed the letters from the government

5     and from the defense with respect to the tape recording.  I am

6     going to reserve decision with respect to that issue until

7     after the close of the defense case.

8              I understand that there are some other issues that the

9     government wants to raise?  Is that correct?

10             MS. FLETCHER:  Your Honor, I don't believe the

11    government has any more issues.  I think the defense may have

12    some.

13             THE COURT:  Okay.

14             Ms. Dabbs.

15             MS. DABBS:  Your Honor, we just have two exhibits.  We

16    have had a back-and-forth over the weekend with the government

17    about some additional items that the defense intends to offer

18    into evidence before we conclude our case.

19             There are just two where we haven't managed to reach

20    agreement.  They are two chats that the defense intends to

21    offer to show Mr. Phillips' state of mind with respect to

22    topics relevant to the issues in this case.

23             They are Defense Exhibit 608, which is a chat between

24    Mr. Phillips and his co-CIO, Mr. Fayman, on November 17, 2017.

25    Within that chat, Mr. Phillips with respect to the upcoming

1    election in South Africa writes, "South Africa with the right

2    result will be at 12."

3         We think that that is appropriately introduced not for

4    the truth but to show Mr. Phillips' state of mind at that time.

5         The second one, your Honor, is Government Exhibit 426.

6    This is a chat on December 28 of 2017, between Phil Costa, and

7    Dave Coratti.  It is a chat in which Mr. Costa and Mr. Coratti

8    are discussing trading activity on December 28, specifically

9    trading execution on December 28.

10         Within the chat they are referring to discussions with

11   Mr. Phillips about the trade execution and the objective, which

12   we think also goes to Mr. Phillips' state of mind on that

13   particular day with respect to the trading activity.

14         THE COURT:  Okay.

15         Can somebody post the relevant portions of those for

16   me to look at, and then I will hear what the government has to

17   say.

18         MS. DABBS:  Sure.

19         THE COURT:  Do you want to highlight the portion of

20   426 that you want to offer.

21         Then show me the other one.

22         MS. DABBS:  Okay.

23         Let me just identify for Court the -- pardon me, your

24   Honor.  It doesn't have page numbers, so I'm just counting.

25         Page 7, about a little under the halfway point, where

Nannphi1

1    it says, "I think worth posting Neil on the 150."

2              "Yep.  Calling him now."

3              "spoke to Neil.  He said cool.  Let's keep going."

4              I am just looking to see if there is a second portion,

5    your Honor.  I think what we have up on the screen is the main.

6              Then, again -- sorry, if we can page forward.  I think

7    it's the top of page 10.

8              At the top here, "I think it might be worth telling

9    Neil how much it has thinned out."

10              "Will do."

11              And then a little bit further down that same page,

12    "Neil say anything on the last one hundred."

13              If we could pull up the part that starts at time stamp

14    4:22:05.  There's more that follows after that.

15              Mr. White, if we could pull up the block from "Neil

16    say anything on the last one hundred down" to "great result."

17              "Neil say anything on the last one hundred."

18              "Hold off."

19              "Yes, said let's book it out and chill."

20              "Awesome.  Great result."

21              These are the portions, your Honor, that we think bake

22    in communications clearly with Mr. Phillips and go to his state

23    of mind with respect to the trading activity and execution on

24    December 28.

25              THE COURT:  I will hear from the government.

Nannphi1

1          MR. THOMAS:  Yes, your Honor.

2          With respect to GX 426, the statements here are

3     actually statements by Mr. Costa and Mr. Coratti.  They are not

4     Mr. Phillips' statements.  There is a second level of hearsay

5     that is in the form of them characterizing Mr. Phillips'

6     statements.  But the speaker here, his state of mind would be

7     Mr. Coratti's state of mind or Mr. Costa's state of mind.  That

8     is obviously not relevant.  So we think that is an easy call.

9          With respect to Defense Exhibit 608, the government

10     wouldn't object if the Court instructs the jury that the

11     balance of the chat, which is many pages ranging over other

12     topics, is not being offered for the truth.  I think the issue

13     here is that the defense is selecting one line out of a longer

14     conversation that touches on many other subjects.  So it sort

15     of is out of balance to the nature of the proof as it's

16     presented.

17          THE COURT:  So I guess that raises the question of,

18     with respect to 608, what the defense is offering, whether they

19     are offering the entirety of the chat or just that portion.  I

20     take it if they're just offering the portion that was shown to

21     me with the time stamp you wouldn't have an objection to it, it

22     seems like.

23          MR. THOMAS:  No, your Honor.  We have no objection to

24     them proving up that Mr. Phillips thought in November that the

25     right result would be 12 or whatever.

Nannphi1

| 1 | THE COURT: Or to the receipt of that snippet from the |
| 2 | chat? |

3          MR. THOMAS: Yes, your Honor.

4          THE COURT: Okay. All right.

5          Let me hear from you, Ms. Dabbs, with respect to 608

6     first.

7          MS. DABBS: With respect to 608, Judge, that really is

8     the part that we are interested in offering. We don't have an

9     objection to what Mr. Thomas is proposing.

10         THE COURT: So that resolves that.

11         The portion of 608 that contains the statement where

12    Mr. Phillips says, "With the right result we will be at 12"

13    will be received as to Mr. Phillips' state of mind.

14         With respect to 426, I think the government is right,

15    that that's an easy call. Mr. Costa's state of mind is not at

16    issue here. Mr. Coratti's state of mind is not at issue.

17         So I will give you one last shot, Ms. Dabbs, at why I

18    should receive it.

19         MS. DABBS: I think we will stand down, your Honor.

20         THE COURT: Okay. All right.

21         Let's see if we have the jury.

22         Then if we do, we will have the witness take the

23    stand.

24         MR. GOPSTEIN: Should I get him?

25         THE COURT: Yes. Why don't you get him.

Nannphi1

ANDREW NEWMAN, resumed.

THE COURT:  We are still waiting on one juror.

I will come back out once we've got a complete jury.

Actually, before I step off, how long does the defense expect the examination of this witness to be?

MR. GOPSTEIN:  I believe it will be approximately one hour.

THE COURT:  Okay.  Is there any further update with respect to whether your client intends to testify?

MR. HECKER:  He does not intend to testify.

THE COURT:  All right.

I will see you as soon as we've got a full jury.

(Recess)

THE COURT:  Be seated.

Juror No. 11 called in.  She tested positive on Saturday morning for COVID.  So I propose to excuse Juror No. 11.  We will move up so Juror No. 12 will sit in the seat of Juror No. 11; Juror No. 13 will sit in the seat of Juror No. 12.

I don't see a particular need to tell the jury anything about why Juror No. 11 is not here unless any party requests that or has anything else that they want to raise with the Court.

From the government?

MR. THOMAS:  That seems like an acceptable solution to

Nannphi1

1    the government.  We have no requests.

2              THE COURT:  Okay.

3              Mr. Hecker?

4              MR. HECKER:  Same for the defense.

5              THE COURT:  Okay.  Let's bring in the jury.

6         (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Be seated.

3           Members of the jury, I hope you all had a restful

4   weekend.  We'll continue with the direct examination.

5           Mr. Gopstein, you may proceed.

6           MR. GOPSTEIN:  Thank you, your Honor.  Before

7   beginning the questioning, the defense would like to move in a

8   handful of additional exhibits all of which I believe are

9   without objection.

10          At this time, the defense moves Defense Exhibits 309,

11  315, 318, 319, 320, 321, 322, 817, 2053, 2054, 2055, and 2056.

12          THE COURT:  Any objection?

13          MR. BURNETT:  No objection.

14          THE COURT:  They are all received.

15          (Defendant's Exhibits 309, 315, 318, 319, 320, 321,

16  322, 817, 2053, 2054, 2055, and 2056 received in evidence)

17          MR. GOPSTEIN:  Thank you, your Honor.

18  DIRECT EXAMINATION (Continued)

19  BY MR. GOPSTEIN:

20  Q.  Good morning, Mr. Newman.

21  A.  Good morning.

22  Q.  On Friday, you testified about certain trades on December

23  26, 2017.

24          Do you recall that?

25  A.  Yes, I do.

1    Q.  And just to be clear, are you offering any opinion in this

2    case about what Neil Phillips intended to do?

3    A.  No, I am not.

4    Q.  Are you offering any opinion about what Glen Point intended

5    to do?

6    A.  No, I am not.

7    Q.  Are you offering any opinion about what anybody else

8    intended to do?

9    A.  No, I am not.

10   Q.  Instead, is it your opinion that Glen Point's trading on

11   December 26, 2017, was consistent with a delta replacement

12   strategy?

13   A.  Yes, it is.

14   Q.  Do you recall on Friday testifying that Glen Point did not

15   make any trades in USD/ZAR on December 18, 2017?

16   A.  Yes, I do.

17   Q.  Was that testimony right?

18   A.  It was a mistake.

19   Q.  How do you know that?

20   A.  Over the weekend I went back and reviewed the trade

21   blotter, and I found that Glen Point sold $100 million

22   purchasing ZAR on December 18.

23   Q.  At approximately what price were those sales?

24   A.  They were -- 50 million of it was at approximately 12.75,

25   and the other 50 million of it was at approximately 12.75 --

Nannphi1                        Newman - Direct

1    12.777.

2    Q.  And at approximately what was the low price of the USD/ZAR

3    on December 18, 2017?

4    A.  It was 12.52.

5         MR. GOPSTEIN:  If we could please publish for the jury

6    Defense Exhibits 2016 and 2017 side by side, both of which are

7    in evidence.

8         Thank you, Mr. White.

9    BY MR. GOPSTEIN:

10   Q.  Starting with Defense Exhibit 2016, Mr. Newman, do you

11   recognize this slide?

12   A.  Yes, I do.

13   Q.  Can you explain -- the slide is titled, "Refinitiv Trades

14   Occurred After the Cessation of Glen Point Boxing Day Trades."

15        Correct?

16   A.  Yes.

17   Q.  What is the time period reflected on this slide?

18   A.  This is from -- on December 26, from 2:49 a.m. South Africa

19   time to 3:33 a.m. South Africa time.

20        MR. GOPSTEIN:  Your Honor, I believe the jury doesn't

21   have the slides on their screens.

22        THE COURT:  Does any juror not have --

23        JUROR:  Yes, just got them.

24        THE COURT:  They all have it.  Okay.

25        MR. GOPSTEIN:  Thank you, your Honor.

1    BY MR. GOPSTEIN:

2    Q.  Mr. Newman, I will repeat that question so everybody can

3    hear with the slide in front of them.

4             What is the time period reflected on Defense Exhibit

5    2016?

6    A.  Yes.  It is December 26 from 2:49 a.m. to 3:33 a.m. South

7    Africa Standard Time.

8    Q.  Now, if I could direct your attention to Defense Exhibit

9    2017.  Is that a slide titled "Refinitiv Trades After Glen

10   Point's Last Trades On Boxing Day by Counterparties"?

11   A.  That is correct.

12   Q.  If I could direct your attention to the first column on the

13   left that says "Time"?

14   A.  Yes.

15   Q.  What is the first time reflected in this chart?

16   A.  It's 2:49 a.m.

17   Q.  And what is the last time reflected in this chart?

18   A.  3:33 a.m.

19   Q.  Is this the same time period that is reflected in Defense

20   Exhibit 2016?

21   A.  Yes, it is.

22   Q.  Now, going back to Defense Exhibit 2016, please, in the

23   title, where it says "Refinitiv Trades Occurred After the

24   Cessation of Glen Point's Boing Day Trades," where it says

25   "after the cessation of Glen Point Boxing Day trades," what is

1    that a reference to?

2    A.   That is a reference to the period of time after which Glen

3    Point, Glen Point's trades through Nomura stopped.

4    Q.   On Boxing Day?

5    A.   On Boxing Day.

6    Q.   Now, just staying on this graph, if you could explain,

7    starting with the red dots at the top of the graph, what do the

8    red dots reflect?

9    A.   The red dots reflect the traded price, traded prices.

10   Q.   So just using the entry all the way to the left on the

11   graph, let's use that.  Let's start with that.

12   A.   I'm sorry.  Could you repeat that.

13   Q.   Sure.

14   A.   Okay.

15   Q.   Using the first entry on this graph --

16   A.   Uh-huh.

17   Q.   -- all the way to the left --

18   A.   Uh-huh.

19   Q.   -- currently you can see it's highlighted at the 2:49 a.m.

20   trade.

21   A.   Correct.

22   Q.   What does that red dot reflect?

23   A.   That red dot reflects the traded price.

24   Q.   And turning back to Defense Exhibit 2017, does that red dot

25   on 2016 reflect the first entry on this chart at 2:49 a.m.?

Nannphi1                          Newman - Direct

1  A.  Yes, it does.

2  Q.  And turning to the next column on 2017, where it says

3  "Quantity" --

4  A.  Uh-huh.

5  Q.  -- what is that a reference to?

6  A.  The amount of -- the trade size.

7  Q.  So here, where it says "1," what does "1" mean?

8  A.  $1 million.

9  Q.  And staying on 2017 --

10 A.  Uh-huh.

11 Q.  -- what was the price of this trade?

12 A.  12.50, 12.5025.

13 Q.  Who were the parties to this trade?

14 A.  Mitsubishi Bank and Deutsche Bank.

15 Q.  Let's go back to Defense Exhibit 2016.  I want to stay on

16 this first example all the way on the left side --

17 A.  Uh-huh.

18 Q.  -- of the graph, okay?

19 A.  Okay.

20 Q.  There is a black line underneath that red dot.

21        Do you see that?

22 A.  A black line underneath the red dot, yes.

23 Q.  What does that line reflect?

24 A.  That line reflects the bid/offer spread.

25 Q.  Again, what is the bid/offer spread?

1    A.   It's the price at which somebody -- a participant is

2    willing to buy dollars and sell rand, and the offer is the

3    price at which a participant is willing to sell dollars and

4    purchase rand.

5    Q.   So is it right that the longer that line the bigger the

6    bid/ask spread?

7    A.   That is correct.

8    Q.   And the shorter that line, the smaller the bid/ask spread?

9    A.   That is correct.

10   Q.   Sticking still with this first example on the slide, if we

11   could direct your attention to the very bottom where there's

12   the yellowish graph -- yellowish, excuse me, bar.

13   A.   Yes.

14   Q.   What does that reflect?

15   A.   That reflects the trade volume trade size.

16   Q.   Does that reflect the $1 million trade volume that we just

17   saw on Defense Exhibit 2017 under quantity?

18   A.   Yes.

19   Q.   Now, working our way -- let's go to the next entry.  So the

20   next dot, there's a red dot right at the line for 12.50.

21        Do you see that?

22   A.   Yes.

23   Q.   What does that reflect?

24   A.   That reflects the -- well, the red line, the red dot

25   reflects the trade.

1    Q.  What was the price of that trade?

2    A.  12.50, the figure.

3    Q.  You just stated "the figure."

4    A.  Uh-huh.

5    Q.  What does the figure mean?

6    A.  Well, in foreign exchange trading, the traders often quote

7    prices in the last two numbers.  So the figure would mean,

8    would indicate that the price is 12.5000.

9    Q.  And sticking on Defense Exhibit 2017, do you see a number

10   of trades on this chart that state 12.5?

11   A.  Yes, I do.

12   Q.  Are those trades that took place at 12.5 the figure?

13   A.  Yes, they took place at 12.5 -- at 12.50 the figure, yes.

14   Q.  And is that different, for example, from the trade that, if

15   you look at the first trade on Defense Exhibit 2017 --

16   A.  Uh-huh.

17   Q.  -- that occurred at 2:50 a.m?

18   A.  At 2:50 a.m.?

19   Q.  Uh-huh.

20   A.  That one right there?

21   Q.  Yes.

22   A.  Yes.

23   Q.  What was the price there?

24   A.  The price there is 12.5050.

25   Q.  So that is not a trade at 12.50 the figure; is that right?

1  A.  That's correct.

2  Q.  Now, we are not going to go through every single trade on

3  this chart, but I would like to ask you, approximately how many

4  trades are reflected on this chart?

5  A.  23 I believe.

6  Q.  And approximately how many of these trades on this chart

7  took place at 12.50 the figure?

8  A.  I believe it's seven.

9  Q.  Now, if I could direct your attention to a trade -- the

10  first trade at 3:01 a.m. on Defense Exhibit 2017.

11  A.  Yes, I see that.

12  Q.  What was the time of this trade?

13  A.  3:01 a.m.

14  Q.  What was the quantity of this trade?

15  A.  $1 million.

16  Q.  What was the price of this trade?

17  A.  12.50, the figure.

18  Q.  Who were the parties to this trade?

19  A.  Citibank and Morgan Stanley.

20  Q.  Does the next entry on this chart reflect another trade at

21  the same time for the same quantity at the same price with the

22  same two parties?

23  A.  Yes.

24  Q.  If I could direct your attention to the second-to-last

25  entry on Defense Exhibit 2017.

1   A.   Yes, I see that.

2   Q.   What was the time of this trade?

3   A.   3:29 a.m.

4   Q.   What was the quantity of this trade?

5   A.   It was $5 million.

6   Q.   What was the price of this trade?

7   A.   12.50 the figure.

8   Q.   Who were the parties to this trade?

9   A.   Royal Bank of Scotland and Morgan Stanley.

10  Q.   Finally, the last trade that is reflected on Defense

11  Exhibit 2017, what is the timing of this trade?

12  A.   3:33 a.m.

13  Q.   What was the quantity of this trade?

14  A.   2 million.

15  Q.   What was the price of this trade?

16  A.   12.50 the figure.

17  Q.   And who were the parties to this trade?

18  A.   United bank of Switzerland and Morgan Stanley.

19  Q.   Now, approximately how many minutes after Nomura's last

20  trade on behalf of Glen Point was this 3:33 a.m. trade between

21  the United Bank of Switzerland and Morgan Stanley for $2

22  million at 12.5 the figure?

23  A.   48 minutes.

24       MR. GOPSTEIN:  Mr. White, if we could please pull at

25  the same time Defense Exhibits 2018 and 2019.

BY MR. GOPSTEIN:

Q.  Mr. Newman, if we could start with Defense Exhibit 2018, titled "Morgan Stanley USD/ZAR Spot Trades On Boxing Day 2017 2:00 to 3:00 a.m. SAST."

        Do you see that?

A.  Yes, I do.

Q.  What does SAST stand for?

A.  South Africa Standard Time.

Q.  And below it says, "Trades Executed At R2, R2B and SWR2 Platforms."

        Do you know what those are?

A.  They're trading platforms at Morgan Stanley.

Q.  Let's start with the left column, titled "MS Purchases from and Volume Dollar."

        What does this column reflect?

A.  This reflects the -- the far left column reflects the counterparty that Morgan Stanley bought U.S. dollars and sold ZAR with.

Q.  And are these transactions that occurred during the time period 2 a.m. to 3 a.m. on Boxing Day South Africa time?

A.  Yes, they are.

Q.  And so between 2 a.m. and 3 a.m. South Africa time on Boxing Day, how much USD/ZAR did Morgan Stanley purchase from Barclays?

A.  They purchased $8 million.  Barclay's sold $8 million and

1    Morgan Stanley purchased $8 million.

2    Q.  What about from Citibank?

3    A.  Citibank sold to Morgan Stanley $167 million.

4    Q.  Deutsche Bank?

5    A.  Deutsche Bank sold $34 million to Morgan Stanley.

6    Q.  Goldman Sachs?

7    A.  Goldman Sachs sold $19 million to Morgan Stanley.

8    Q.  Nomura Securities?

9    A.  Nomura Securities sold $300 million to Morgan Stanley.

10   Q.  And other entities?

11   A.  $35 million.

12   Q.  What was the total in this one-hour period?

13   A.  $563 million.

14   Q.  Just focusing you back up on the entry for Nomura

15   Securities, do you where it says $300 million?

16   A.  Yes, I do.

17   Q.  Is this the same number that you were able to identify

18   through the Refinitiv database that you showed to the jury on

19   Friday?

20   A.  Yes, it is.

21   Q.  That's $300 million transacted between Nomura and Morgan

22   Stanley on the Refinitiv database on Boxing Day?

23   A.  That's correct.

24   Q.  Now, on the right column, what is this showing?

25   A.  This is dollars that Morgan Stanley sold to counterparties.

Nannphi1                        Newman - Direct

1    Q.  And it reflects six different sales; is that correct?

2    A.  That's correct.

3    Q.  For a total of 23 million?

4    A.  That's correct.

5    Q.  So 23 million sold and 563 million purchased?

6    A.  That's correct.

7    Q.  Now, if I could direct your attention to Defense Exhibit

8    2019 on the screen.

9    A.  I see that.

10   Q.  Is this a graphical depiction of the left column of Defense

11   Exhibit 2018?

12   A.  Yes, it is.

13   Q.  Now, what does the red column, the red bars, what does that

14   reflect?

15   A.  That reflects purchases by Morgan Stanley.

16   Q.  And the line, the dotted line that is in yellow --

17   A.  That is the --

18   Q.  Sorry.  In between two thousand -- in between approximately

19   2:37 a.m., and --

20   A.  That's --

21   Q.  -- 2:39 a.m.?

22           Let me finish the question.

23   A.  I'm sorry.

24   Q.  Sorry for the court reporter as well.

25           The dotted yellow line between 2:37 a.m. and 2:39

1    a.m.?

2    A.   That is the first trade that occurred at 12.50 at 2:38 a.m.

3    CHECK.

4            MR. GOPSTEIN:  Mr. White, if we could please pull at

5    the same time Defense Exhibits 2022 and 2023.

6    BY MR. GOPSTEIN:

7    Q.   Mr. Newman, starting with Defense Exhibit 2022, titled

8    "Refinitiv Total USD/ZAR Bid Column Outstanding by Order Price,

9    December 26, 2017, at 1:50 a.m., SAST, Beginning of Glen

10   Point's Boxing Day Trades."

11           Now, the slides we were looking at previously, were

12   those showing approximately one hour of data?

13   A.   Yes.

14   Q.   In terms of time, what is this slide showing?

15   A.   In terms of time, this is showing what the outstanding bids

16   in the order book were at 1:50 a.m. on -- this is 1:50 a.m.

17   South Africa Standard Time.

18   Q.   So is this slide showing the outstanding bids at one point

19   in time at 1:50 a.m. South Africa time?

20   A.   Yes, that's correct.

21   Q.   Where the title says "Beginning of Glen Point's Boxing Day

22   Trades," what does that mean?

23   A.   That is basically the starting point of the transaction.

24   Q.   Now, what was the bid order volume as reflected in

25   Refinitiv of USD/ZAR at 1:50 a.m. South Africa time?

1    A.  It was $464 million.

2    Q.  How many of those bids at 1:50 a.m. were at or above 12.50?

3    A.  330 million.

4    Q.  What was the spot rate at 1:50 a.m. South Africa time?

5    A.  It was 12.5675.

6    Q.  Now, just continuing to focus in on Defense Exhibit 2022,

7    there are bids that are reflected at the top at about 12.57, is

8    that right?

9    A.  That's correct.

10    Q.  Approximately?

11    A.  Yes.

12    Q.  And then something at approximately 12.56?

13    A.  Yes.

14    Q.  And it looks like if you work your way down there are other

15    bars there; is that correct?

16    A.  That's correct.

17    Q.  What do we see at approximately 12.52?

18    A.  That's a bid for -- it looks like $100 million.

19    Q.  And then at 12.50, what is that a reflection of in terms of

20    volume?

21    A.  It's bids for $200 million.  I would just say that they're

22    slightly above 12.50.  They're -- there is a bid for $100

23    million at 12.5075 and a bid for a hundred million at 12.5050.

24    Q.  In fact, the slide here reflects volume at 12.50 or above?

25    A.  Yeah.  It's -- the 12.50 number is 12.50 to 12.51.

1   Q.  Mr. Newman, based on your review of the data, do you know

2   who placed most of these bids?

3   A.  Yes, I do.

4   Q.  Who?

5   A.  It was Morgan Stanley.

6   Q.  Turning to Defense Exhibit 2023, titled, "Refinitiv Total

7   USD/ZAR Bid Volume Outstanding By Order Price, December 26,

8   2017 2:28 a.m. South Africa Time," and it says, "After Morgan

9   Stanley First Adds 1019M in Bid Order Volume."

10          Do you see that?

11  A.  I do.

12  Q.  Does that number reflect a little bit over a billion?

13  A.  Yes, it does.

14  Q.  Now, the last slide that we were looking at, 2022, I

15  believe you testified that that reflected a point in time at

16  1:50 a.m.

17          Is that right?

18  A.  Yes.

19  Q.  Does Defense Exhibit 2023 also reflect Refinitiv total

20  USD/ZAR bid volume that was outstanding by order price at 2:28

21  a.m. South Africa time?

22  A.  Yes, it does.

23  Q.  Okay.  What was the bid order volume, as reflected in

24  Refinitiv outstanding by order price, what was the total bid

25  order volume at 2:28 a.m.?

1    A.  It was 1.347 billion.

2    Q.  What was the bid order volume at 12.50 or above at 2:28

3    a.m. South Africa time?

4    A.  It was 1.210 billion.

5    Q.  What was the spot rate?

6    A.  It was approximately -- it was, excuse me, 12.5025.

7    Q.  Now, I believe you testified that in Defense Exhibit 2022

8    at 1:50 a.m. that was just before Nomura had started trading on

9    behalf of Glen Point, is that right?

10   A.  That's correct.

11   Q.  In Defense Exhibit 2023, at 2:28 a.m., based on your review

12   of the data, had Nomura at this time started trading --

13   A.  Yes.  This is --

14   Q.  Had --

15   A.  I'm sorry.

16   Q.  Had Nomura at this time started trading on behalf of Glen

17   Point?

18   A.  Yes, it had.

19   Q.  Where it says at the top of the slide after Morgan Stanley

20   first adds just over a billion dollars in bid order volume,

21   what is that referring to?

22   A.  That is referring to new bids that Morgan Stanley placed

23   into the order book during the trading period.

24   Q.  Now, did you review data reflecting the underlying bids

25   that are shown in this blue bar on 2023?

Nannphi1                        Newman - Direct

1    A.  Yes, I did.

2    Q.  Approximately what was the size of the bids placed by

3    Morgan Stanley after Nomura started trading in the USD/ZAR

4    market on the morning of Boxing Day?

5    A.  They placed a bid for $150 million at 12.5025.  They placed

6    three bids -- excuse me.  They placed one bid of $80 million at

7    12.50 the figure, they placed three bids each of $200 million

8    at 12.50 the figure, and they put in one additional bid of $189

9    million at 12.50 the figure.

10   Q.  During the course of your work in this matter, did you also

11   review Nomura's order and trade volume?

12   A.  Yes, I did.

13   Q.  And what, if any, databases did you use to review that

14   information?

15   A.  I used the Refinitiv database to review the Nomura orders

16   data.

17   Q.  What, if anything, did you find about Nomura's order and

18   trade volume during this time?

19   A.  Yes.  So the average size of Nomura's orders was about $2.6

20   million.  And if you look at the trade size that they went

21   through, it was about $1.7 million over the 421 trades they

22   did.

23   Q.  Mr. Newman, all things being equal, which one of these

24   orders would be more likely to impact price, a 1.7 million

25   dollar order or a $200 million order?

1    A.  It would be, the $200 million order would have greater

2    impact on price.

3    Q.  Why is that?

4    A.  Well, it would be in the market and participants could see

5    that bid in the market and it could impact how people

6    potentially respond to the market.

7         MR. GOPSTEIN:  Mr. White, if we could please pull

8    these down and put up -- again, side by side -- Defense

9    Exhibits 2023 and 2024.

10   BY MR. GOPSTEIN:

11   Q.  Just to orient, Defense Exhibit 2023, is that what we were

12   just looking at?

13   A.  Yes, it is.

14   Q.  Total USD/ZAR bid volume outstanding by order price at 2:28

15   a.m.?

16   A.  That is correct.

17   Q.  Now let's move to Defense Exhibit 2024.  Is this another

18   slide showing the total USD/ZAR bid volume outstanding by order

19   price at a particular point in time?

20   A.  Yes, it is.

21   Q.  And what is the point of time reflected in this exhibit,

22   Defense Exhibit 2024?

23   A.  It's 2:50 a.m. South Africa Standard Time.

24   Q.  So that is 32 minutes later, approximately?

25   A.  Yeah.  That would be -- well, it's not 32 minutes later.

Nannphi1                    Newman - Direct

1    Q.  Right.

2    A.  It sai 22 minutes later.

3    Q.  Thank you, Mr. Newman.

4         Now, what was the bid order volume at 2:50 a.m. South

5    Africa time?

6    A.  The total bid order volume was $562 million.

7    Q.  What was the bid order volume at 2:50 a.m. at 12.50 or

8    above?

9    A.  I'm sorry.  Could you repeat that?

10   Q.  Sure.  What was the bid order volume at 12.50 or above at

11   2:50 a.m. South Africa time?

12   A.  It was $46 million.

13   Q.  What was the spot rate?

14   A.  It was 12.50, the figure.

15   Q.  Just comparing Defense Exhibits 2023 to 2024, what happened

16   to the bids that were reflected in 2023 at 12.50 or above?

17   A.  They were canceled.

18   Q.  How many of these bids -- were they all canceled?

19   A.  One of them, originally the $80 million bid remained, but

20   it had been -- but there were some transactions which took

21   place on it and it was -- it went -- it was now a $46 million

22   bid.

23   Q.  How many of these bids were placed by Morgan Stanley?

24   A.  Of those 12.50 bids, they were all placed by Morgan

25   Stanley.

Nannphi1                    Newman - Direct

1  Q.  Did there come a time when Morgan Stanley traded in USD/ZAR

2  at 12.5 the figure?

3  A.  Yes, the first time they traded dollar/ZAR at 12.50 the

4  figure was roughly 2:42 a.m.

5  Q.  Approximately how long after Morgan Stanley traded at 12.50

6  the figure did Morgan Stanley cancel its bids?

7  A.  11 seconds.

8          MR. GOPSTEIN:  Mr. White, if we could please pull

9  Defense Exhibit 2025.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    BY MR. GOPSTEIN:

 2    Q.  This is a slide titled 12.50 one-touch market value before

 3    Boxing Day.

 4           And again, just to orient, what is the time period

 5    reflected on this slide?

 6    A.  It goes from October 30th, 2017 to December 25th, 2017.

 7    Q.  And what does the dotted, the dashed red line reflect?

 8    A.  The dashed red line reflects the price of the dollar versus

 9    the South African rand.

10    Q.  And what does the blue line reflect?

11    A.  It reflects the value of the one-touch option.

12    Q.  And what does the slide show about the relationship between

13    the USD/ZAR and the value of the one-touch option?

14    A.  What it shows is, as the rand, as dollar/rand goes lower,

15    as the rand strengthens and the dollar weakens, the value of

16    the one-touch option increases.

17    Q.  And just starting all the way at the left, approximately at

18    around October 30th, is that around when the parties entered

19    into the one-touch option?

20    A.  Yes, it is.

21    Q.  What was the approximate value of the option on that date?

22    A.  The option was purchased for $2.075 million.

23    Q.  And going all the way to the end of the slide, at

24    approximately Christmas 2017, what was the approximate market

25    value of the one-touch option on that date?

1  A.  It was approximately $13.8 million.

2  Q.  Just so we're clear, the market values on this slide are

3  shown on the leftmost axis; is that correct?

4  A.  That's correct.

5  Q.  And those USD/ZAR prices are shown on the rightmost side of

6  the slide; right?

7  A.  Yes.

8  Q.  Now, how do we calculate the market value of options?

9  A.  What traders like myself typically use is a tool on

10  Bloomberg called OVML, which is an options pricing model.

11      MR. GOPSTEIN:  Mr. White, if we could please publish

12  for the jury in evidence defense Exhibit 2026.

13  Q.  This is a slide titled, profit contributions from

14  725 million spot position and 12.5 OT option, Boxing Day

15  through December 27th, 2017, end of day marks.

16      Now, I'd like to start, Mr. Newman with the smaller

17  portion of the circle in dark blue?

18  A.  Mm-hmm.

19  Q.  What is the number stated in that circle?

20  A.  5.81 million.

21  Q.  Can you please explain for the jury what this 5.81 million

22  figure reflects?

23  A.  I took the price of dollar/ZAR from 4:00 on Christmas Day

24  and put it into the OVML model and calculated what the premium

25  value of the one-touch option was.  It was roughly

1   $14.2 million.  And what it reflects is, because the option

2   expired that day, it reached its level, is what the increase in

3   value of the option was, what the profit contribution for that

4   one-touch option.

5   Q.  So does this reflect the difference between the $20 million

6   payout and the value that was calculated via OVML?

7   A.  Yes.

8   Q.  You said 4:00, was there a time zone you recall using?

9   A.  It was New York.

10  Q.  Now, in the other portion of the circle, what does the

11  14.58 million figure reflect?

12  A.  It reflects the change in value, the profit contribution

13  from the $725 million delta replacement compared to what the

14  end of day price was on December 27th, 2017.

15  Q.  I want to break this down a little bit.

16  A.  Okay.

17  Q.  There were trades on Boxing Day in the spot market;

18  correct?

19  A.  Yes, there were.

20  Q.  What was the total sum of those trades, as reflected on

21  this slide?

22  A.  The sum of the trades that Glen Point executed was -- that

23  Glen Point traded through Nomura was $725 million.

24  Q.  So here, where it says, end of day marks, December 27th,

25  did you look to see what those $725 million of spot were worth

1    at the end of the day on the 27th?

2    A.  Yes, I did.

3    Q.  Do you recall if it was New York or London or some other

4    time?

5    A.  I believe it was like the end of the New York trading day.

6    Q.  And did this 14.58 million figure showing the difference

7    between what the spot $725 million was worth at the end of the

8    day on the 27th and what it was worth at the time of the

9    transaction when it was 725 million?

10   A.  Yes, it's the difference between the execution price or the

11   price that Glen Point was -- received the rand, which was

12   12.5116, roughly, versus the end of day price, which was

13   approximately 12.2650.

14   Q.  And from your review of the data in this case, Mr. Newman,

15   are you aware of approximately when Glen Point bought dollars?

16   A.  They bought dollars on the 28th of December.

17   Q.  Is that the day after December 27th that's reflected here?

18   A.  Yes.

19   Q.  And approximately, what was the profit earned on the spot

20   position when Glen Point bought those dollars on the 28th?

21   A.  Well, what it would be is that that 14 million -- between

22   10 and $11 million.

23          MR. GOPSTEIN:  Mr. White, if we could put defense

24   Exhibit 2034, publish it for the jury, in evidence.

25   Q.  It's a slide entitled USD spot purchases December 28, 2017,

NANGphi2                         Newman - Direct

1    net USD purchases against other currencies.

2              Do you see this?

3    A.  Yes, I do.

4    Q.  I'd just like you to explain for the jury what each column

5    on this chart reflects, starting with the leftmost column.

6              What does that bar on top of the letters AUD reflect?

7    A.  That would be the Aussie dollar versus the USD.

8    Q.  What does this show Glen Point doing on December 28th with

9    regard to the Aussie dollar compared to the US dollar?

10   A.  It shows selling Aussie dollars and buying US dollars, a

11   little bit more than $200 million.

12   Q.  In the next column, what does it show Glen Point doing on

13   December 28th, 2017, with regard to a currency labeled CHF?

14   A.  It's the dollar versus the Swiss franc.

15   Q.  What does it show Glen Point doing on December 28th, 2017?

16   A.  It shows them buying $100 million and selling Swiss francs.

17   Q.  The next column, where it says EUR, what is the currency

18   and what does it show Glen Point doing?

19   A.  It's the euro versus the dollar.

20   Q.  What does it show Glen Point doing on December 28th, 2017?

21   A.  Selling euros and buying dollars for roughly $80 million.

22   Q.  Next column, where it says JPY, what is the currency and

23   what does it show Glen Point doing on December 28th, 2017?

24   A.  It's the dollar versus the yen.  And it shows Glen Point

25   purchasing dollars and selling yen.

NANGphi2                          Newman - Direct

Q.   Next Column, MXN, what's the currency, and what does it

show Glen Point doing on December 28th, 2017?

A.   It shows Glen Point -- well, this is the dollar versus the

Mexican peso.  And it shows Glen Point purchasing dollars and

selling Mexican pesos, looks to be about $25 million.

Q.   Final column, ZAR, what's the currency, and what does it

show Glen Point doing on December 28th, 2017?

A.   It's the dollar versus the ZAR.  And it shows them

purchasing $598 million.

Q.   Mr. Newman, how many trading days were left after

December 28th, 2017 in the year 2017?

A.   Just one.

Q.   Mr. Newman, if we could publish for the jury defense

Exhibit 2036.  And Mr. Newman, during your work on this case,

did you review information relating to a different one-touch

option -- not the 12.50 one-touch option that we've been

talking about -- but a different one-touch option that Glen

Point entered into with Goldman Sachs?

A.   Yes, I did.

Q.   What was the barrier on that option?

A.   It was 12.25.

Q.   What was the expiration date on that option?

A.   I believe it was January 15th, 2018.

Q.   Now, turning to the slide titled outstanding Goldman Sachs

bid offers by price, December 26th, 2017, 12:00 a.m. South

NANGphi2                          Newman - Direct

1  Africa time to December 28th, 2017, 10:37 a.m. South Africa

2  time.  If we can start with the purple line at the top.  What

3  is that reflecting?

4  A.  The purple line at the top reflects the dollar/rand spot

5  price.  So the dollar versus the rand, as the number gets

6  smaller, it shows the rand strengthening and the dollar

7  weakening.

8  Q.  Approximately where did it start at the beginning of this

9  chart?

10  A.  It looks to be about, let's say, 12.60.

11  Q.  And approximately, where is it on the right side of this

12  chart?

13  A.  On right side of the chart, it looks like it's right around

14  12.25.

15  Q.  And what do the blue bars reflect on this chart?

16  A.  They reflect bids by Goldman Sachs placed in the Refinitiv

17  order book.

18  Q.  And these are bids placed at approximately what prices?

19  A.  Well, what you can see is that the outstanding bids

20  reflect -- are bids placed at or above 12.25.

21  Q.  Mr. Newman, are you familiar in the industry with something

22  called anticipatory hedging?

23  A.  Yes, I am.

24  Q.  What is it?

25  A.  It is doing trades in anticipation of an event occurring.

NANGphi2                    Newman - Direct

1    Q.  In your experience in the industry, do you banks often

2    engage in anticipatory hedging?

3    A.  Yes.  They do it all the time.

4    Q.  In your experience in the industry, would you expect to see

5    similar type of activity on the opposite side of the

6    transaction with banks?

7    A.  Yes, I would.  It doesn't always have to happen, but often

8    does.

9    Q.  In your opinion, is the trading activity reflected in

10   Defendant's Exhibit 2036 consistent with the seller of a

11   one-touch option placing bids just above a barrier as the price

12   approaches the barrier?

13   A.  Yes.  Yes, it does.

14   Q.  And is that consistent with what we saw Morgan Stanley do

15   with regard to the 12.5 one-touch option we looked at earlier?

16   A.  Yes, it is.

17   Q.  Mr. Newman, does placing hundreds of millions of dollars of

18   bids just above a barrier make it more less likely that the

19   option will be triggered?

20   A.  It makes it less likely.

21           MR. GOPSTEIN:  Mr. White, if we could please pull and

22   publish for the jury defense Exhibit 2040.

23   Q.  This is a slide titled USD/ZAR price chart, Boxing Day,

24   December 26th, 2017, South Africa time.

25           Starting with the y-axis, what is that showing?

1    A.  The y-axis is the dollar/ZAR exchange rate.

2    Q.  So the bottom of the chart here is?

3    A.  The bottom of chart is the time of the trading day.  We

4    could see it --

5    Q.  I'm sorry, the bottom of the y-axis, the lowest number.

6    A.  Well, the lowest number, it's 12.4 is the lowest.

7    Q.  And the highest number on this chart?

8    A.  The highest number on this chart is 13.2.

9    Q.  What does the blue line reflect?

10   A.  That reflects the price of dollar/ZAR from the --

11   throughout the trading day.

12   Q.  Mr. Newman, approximately how much did the USD/ZAR drop

13   during Boxing Day?

14   A.  Roughly, like a little less than one percent.

15   Q.  During the course of your work on this case, did you review

16   data regarding volatility of the USD/ZAR throughout the month

17   of December 2017?

18   A.  Yes, I did.

19   Q.  How did the range of prices for USD/ZAR on Boxing Day

20   compare to other days in December, 2017?

21   A.  In terms of the distance from high to low, it was less than

22   the days in the -- most of days in December, so in December of

23   2017.

24   Q.  Putting aside Christmas Day, where did Boxing Day rank in

25   December 2017, in terms of the difference between the highest

NANGphi2                          Newman - Direct

1    price and the lowest price on that day?

2    A.  It was the least volatile day.

3          MR. GOPSTEIN:  Mr. White, if we could publish in

4    evidence defense Exhibits 2053 and 2054 at the same time.

5    Q.  Mr. Newman, let's start with defense Exhibit 2053, titled

6    one bid placed before 11:00 p.m. South Africa time on

7    December 24th, pricing volume of bid orders, December 24th,

8    2017 to December 25th, 2017.

9          Now, you see that there's sort of two different shades

10   of blue here, starting on the left half of the slide.

11         Do you see that?

12   A.  Yes.

13   Q.  What is this slide depicting?

14   A.  It's depicting a bid for $1 million.

15   Q.  And is this slide depicting bids that were placed into the

16   order book between 12:00 a.m., starting at 12:00 a.m. on

17   December 24th, 2017?

18   A.  Yes.

19   Q.  So there was a $1 million bid?

20   A.  Yes.

21   Q.  Were there other bids place before 11:00 p.m. South African

22   time?

23   A.  I think there was some stuff in the book, but it was --

24   there -- this was like a new bid that was placed.

25   Q.  So were there bids that were placed earlier that were still

NANGphi2                    Newman - Direct

1   reflected in the book?

2   A.  Yeah, I think there may have been a couple.

3   Q.  In terms of new bids that were placed on December 24th, is

4   this what's reflected here?

5   A.  Yes.

6   Q.  Turning to defense Exhibit 2054, a slide titled Archbishop

7   said Zuma must go, pricing volume of bid orders, December 24th,

8   2017 to December 25th, 2017.

9           Is this the same slide as on the left side of the

10  screen that's showing the time of the Archbishop's sermon?

11  A.  Yes.

12  Q.  Was that at 11:00 p.m. South African time?

13  A.  Yes.  That's when the transcript was released.

14          MR. GOPSTEIN:  Now, if we could please publish at the

15  same time, Mr. White, defense Exhibits 2055 and 2056.

16  Q.  Starting with defense Exhibit 2055, titled MS placed more

17  than 2 billion in new bids, pricing volume of bid orders,

18  December 24th, 2017 to December 25th, 2017.  What is this slide

19  showing with regard to bids placed by Morgan Stanley after

20  11:00 p.m. on Christmas Eve South Africa Standard Time?

21  A.  It shows that Morgan Stanley placed more than $2 billion

22  worth of new bids 43 minutes after the speech.

23  Q.  Now, are these blue circles reflecting bids placed by

24  Morgan Stanley?

25  A.  Yes, they are.

1     Q.  And the orange circles within the blue circles, those are

2     bids placed by other market participants?

3     A.  Other market participants.

4     Q.  Turning your attention to defense Exhibit 2056, titled

5     HSBC, Credit Suisse and others also placing bids, pricing

6     volume bid orders, December 24th, 2017 to December 25th, 2017.

7               Is this the same slide as we just saw that's showing

8     additional bid orders placed in the market after 11:00 p.m.

9     Christmas Eve 2017?

10    A.  It's showing other market participants placing bids in the

11    marketplace.

12    Q.  Thank you, Mr. Newman.

13              MR. GOPSTEIN:  Mr. White, we can take that down.

14    Q.  Mr. Newman, I would like to ask you about a few terms that

15    are used in the trading industry; okay?

16    A.  Sure.

17    Q.  Are you familiar with the term "hitting bids?"

18    A.  Yes, I am.

19    Q.  Are you familiar with the term "giving bids?"

20    A.  Yes, I am.

21    Q.  Do they mean essentially the same thing?

22    A.  Yes, they do.

23    Q.  What does it mean to hit or give bids?

24    A.  It means to sell on the best price that's available.

25    Q.  In your experience trading -- approximately 30 years;

NANGphi2                         Newman - Direct

1   right?

2   A.  Mm-hmm.

3   Q.  Have you ever hit bids?

4   A.  Yes.

5   Q.  Is hitting bids a common method of trading?

6   A.  Yes.

7   Q.  And in what context is it a common method of trading?

8   A.  It's in the context of just normal transactions.  People

9   hit bids and take offers all the time.  It's just a normal part

10  of trading.

11  Q.  Can you think of a reason why a trader would want to hit

12  bids?

13  A.  Well, they would want to be able to do a trade that they

14  want to do, to transact at a price that they find attractive

15  and get their trade done.

16  Q.  And is time a factor when deciding whether or not to hit

17  bids?

18  A.  Absolutely.

19          MR. BURNETT:  Objection.

20          THE COURT:  Sustained as to leading.

21  BY MR. GOPSTEIN:

22  Q.  What factors might a trader consider when deciding whether

23  hitting bids is a strategy that they want to employ?

24  A.  Time.

25  Q.  Are there other common methods of trading in the FX market?

NANGphi2                        Newman - Direct

1   A.  Well, yeah, sure.  I mean, you can place an offer in the
2   market.
3   Q.  There's lots of --
4   A.  Lots of other ways.  There are many, many different ways of
5   trading.
6   Q.  Mr. Newman, are you familiar with the term "yard?"
7   A.  Yes, I am.
8   Q.  What does a yard mean?
9   A.  It means 1 billion.
10  Q.  Sorry, what does yard mean?
11  A.  1 billion, an increment of 1 billion.
12  Q.  Billion with a B?
13  A.  Yes.
14  Q.  In your approximately 30 years in the industry, have you
15  used the phrase "trade through" a price point?
16  A.  I have.
17  Q.  Have you heard others use the phrase "trade through?"
18  A.  I have.
19  Q.  What is your understanding of what "trade through" means in
20  the industry?
21  A.  Based upon my professional experience, trade through is a
22  term related to effectively setting a limit price and it's a
23  desire to access the liquidity that's available in the market.
24  Q.  Mr. Newman, are you familiar with the term "ref?"
25  A.  Yes, I am.

1  Q.  Is that an abbreviation for something?

2  A.  Yes, it is.

3  Q.  What is it an abbreviation for?

4  A.  Reference, reference meaning refer the price, reference the

5  price, which is effectively another way in the foreign exchange

6  market of people saying canceling their prices.

7  Q.  So ref the offer in the industry would mean what?

8  A.  To take my offer out.

9  Q.  Mr. Newman, are you familiar with a concept in FX trading

10 referred to as "gapping down?"

11 A.  Yes, I am.

12 Q.  What is "gapping down?"

13 A.  Often what happens when you get to a technical level and

14 the price goes through that technical level, the market will

15 move quickly down to sometimes the next technical level.  But

16 it's basically a breakthrough, a level that participants have

17 been watching, a technical level and a move either below it or

18 it can also be above it as well.

19 Q.  Mr. Newman, as part of forming your opinion in this case

20 that the trading was consistent with a delta replacement

21 strategy, in addition to the data that we have discussed, did

22 you also review a chat between Neil Phillips and a salesperson

23 at Nomura on Boxing Day?

24 A.  Yes, I did.

25 Q.  Was that chat relevant to informing your opinion that the

trading was consistent with a delta replacement strategy?

A.  Yes, it was.

Q.  How so?

A.  Well, first of all, in terms of looking at the amount that was traded, which was $725 million, that amount was consistent with my calculation of what the delta of the one-touch option was.  And therefore, the sale of the dollars was consistent with a delta replacement strategy.

Secondly, if you look at the pace of trading -- and I can see that from the chat -- when they do the initial -- when the initial $25 million trade is executed, it's done over a period of eight minutes, which, in terms of the FX market, is a long time.  And then the next hundred dollars -- and let me just say that the whole execution, from beginning to end, was like 50, 55 minutes -- the next $100 was sold over about like a 30-minute period.  And at that point, liquidity was building in the book, so there was a lot of -- we saw -- I showed previously that there were over a billion dollars that came in.  This is roughly around the time that the liquidity was coming into the book, and that's when the pace of trading picked up.  So I could basically conclude from the chat that the trading was pretty measured.

Q.  Was there anything about the last trade that Nomura entered into on Boxing Day for USD/ZAR that informed your opinion with regard to delta replacement, with regard to the trading being

NANGphi2                          Newman - Cross

1    consistent with a delta replacement strategy?

2    A.  Yes.  So at -- there's a point at which Nomura trades at

3    12.50 to figure, and they communicate that information, that

4    12.50 to figure is traded.  And following that, there is

5    another order entered to sell $100 million versus the rand, and

6    that order is executed.

7              MR. GOPSTEIN:  Thank you, Mr. Newman.

8              Just one moment.

9              (Conferring)

10             MR. GOPSTEIN:  Thank you, Mr. Newman.  No further

11   questions.

12             THE COURT:  Cross-examination.

13             And while the government is getting ready -- I assume

14   you have cross?

15             MR. BURNETT:  Yes, your Honor.

16             May I step out for just a minute before I begin.

17             THE COURT:  Is it going to be a long break that you

18   need?

19             MR. BURNETT:  No.  Two minutes.

20             THE COURT:  We'll do cross-examination.  But while the

21   government is setting up, we'll do a stretch break.

22             (Pause)

23             THE COURT:  We will proceed with cross-examination.

24   CROSS-EXAMINATION

25   BY MR. BURNETT:

NANGphi2                          Newman - Cross

1  Q.  Good morning, Mr. Newman.

2  A.  Good morning.

3  Q.  We haven't met before; correct?

4  A.  We have not met before.

5  Q.  I'm Tom Burnett, nice to meet you.

6  A.  Nice to meet you.

7  Q.  I want to start out with a couple basic questions about the

8  extent of your testimony here; okay?

9  A.  Sure.

10  Q.  I want to be clear, you don't know what was in the

11  defendant's head at 2:00 o'clock in the morning right after

12  Christmas --

13  A.  I do not.

14  Q.  -- 2017; correct?

15  A.  That would be correct.

16  Q.  You weren't in the room with him?

17  A.  No.

18  Q.  You don't know what was on his screens?

19  A.  I do not.

20  Q.  You don't know what data he was looking at?

21  A.  I do not.

22  Q.  You don't know if he was looking at the same data that you

23  have shown to the jury in the last two days; correct?

24  A.  I do not.

25  Q.  You don't know if he even had the same data that you have

1   been showing to the jury in the last couple days; correct?

2   A.  I don't know what data he had.

3   Q.  You never worked at Glen Point; correct?

4   A.  I never worked at Glen Point.

5   Q.  You never traded for him?

6   A.  I never traded for Neil Phillips.

7   Q.  You didn't execute trades for him, you don't know how he

8   did his trade execution; is that correct?

9   A.  That's correct.

10  Q.  On that point, I want to pick up with something you talked

11  about earlier today, and that's trading language, what's

12  common, not common.  You testified about that; correct?

13  A.  I did.

14  Q.  Fair to say, you don't know what was common or what was

15  uncommon for the defendant; right?

16  A.  I don't know what was common or uncommon for him.

17  Q.  And that's because you never actually traded for him;

18  right?

19  A.  That's correct.

20  Q.  So you don't know what his trading styles were; right?

21  A.  I don't know what his trading style was.  I can see from

22  the trade blotters, because I looked at Glen Point's total

23  trade blotters over the period of time -- I could see that Glen

24  Point was a very active fund.

25  Q.  You could know he was active, but not the words he used to

NANGphi2                        Newman - Cross

1    execute trades; right?

2    A.   That's correct.

3    Q.   Do you know that the head trader from Glen Point testified

4    earlier in this trial?

5    A.   Which --

6            MR. GOPSTEIN:   Objection to time period.

7            THE COURT:   Overruled.

8            What's the objection?

9            MR. GOPSTEIN:   Objection to when this person became

10   head trader.

11           THE COURT:   Overruled.

12           THE WITNESS:   Can you remind me the name of the head

13   trader.

14   BY MR. BURNETT:

15   Q.   David Coratti, does that ring a bell?

16   A.   Yes, I -- I think I saw a portion of his testimony.

17   Q.   You were shown a portion of his testimony, really?

18   A.   I mean, I was in the room when he -- when he testified.  I

19   didn't -- when he testified.

20   Q.   When you were in the room, were you there for the part

21   where David Coratti was testifying about the types of words

22   that Mr. Phillips did and didn't use during his actual trading?

23   A.   I believe that I wasn't here for that.

24   Q.   You weren't here for that part.

25           Well, were you here for the part where Mr. Coratti

NANGphi2                     Newman - Cross

1   talked about the term trade through?

2   A.  I was not.

3   Q.  And you testified just a few minutes ago that that's a

4   common industry term; correct?

5   A.  It's a term that I've heard before.  It's a term that I've

6   used before.

7   Q.  You don't know if the defendant uses it, do you?

8   A.  The only thing that I have seen with it is the use of the

9   term in a chat.

10  Q.  Just that one chat from Boxing Day; correct?

11  A.  That's correct.

12  Q.  Why don't we take a look at and pull up the transcript,

13  page 532.

14          MR. BURNETT:  Apologies for the technical difficulty

15  here.  We'll get it up in just a minute.

16  Q.  Do you see, at the top of this page, Mr. Coratti's

17  testimony?

18  A.  I see that.

19  Q.  And let's go to lines 15 to 17.

20  A.  Can -- excuse me, can I just -- I haven't -- would you mind

21  if I just take a minute to read through a little bit of it.

22  Q.  Of course, take all the time that you need.

23  A.  How can I adjust this up or --

24  Q.  I think you might have to ask us to scroll up and down.

25  A.  Can you scroll up a little bit.

1    THE COURT:  You will indicate, Mr. Burnett, for the

2    record where you're scrolling up to.

3    MR. BURNETT:  Of course.  I'll narrate here.  Right

4    now, we're at the top of page 532.

5    THE WITNESS:  Can you just scroll down a little bit.

6    Just hold on one second.  Can you scroll down a little bit

7    more.

8    MR. BURNETT:  Let's publish this for the jury, if you

9    wouldn't mind.

10   BY MR. BURNETT:

11   Q.  Mr. Newman, is it okay if I ask you about some words?

12   A.  I appreciate you letting me do that.

13   Q.  Absolutely.  Why don't we highlight and look at lines 15 to

14   17.

15       Do you see where it says:

16       Question:  "When you were at Glen Point, did the

17   defendant ever direct you to trade through a particular level?"

18       Do you see that?

19   A.  Yes, I do.

20   Q.  What was Mr. Coratti's answer?

21   A.  He answered no.

22   Q.  You also testified earlier about the term give bids.

23       Do you remember that?

24   A.  Yes, I do.

25   Q.  And you said it was a common industry term to use, industry

1    practice; is that right?

2    A.  Yes.

3    Q.  You don't know if it was a common way that the defendant

4    traded, do you?

5    A.  I don't know what his -- if giving bids was a common way

6    for him to trade.  I mean, I -- I don't -- again, I really -- I

7    can't tell how he specifically enters his orders from the trade

8    blotters that I looked at.

9    Q.  And you never worked with him, so how would you know;

10   correct?

11   A.  Exactly.

12   Q.  Were you here when Mr. Coratti testified about that?

13   A.  I was -- when he -- this is the first day that he

14   testified; is that correct?

15   Q.  I believe so, yes.

16   A.  I wasn't here for that.

17   Q.  So why don't we scroll down a little bit and take a look at

18   lines 18 to 20.

19        Do you see that Mr. Coratti was asked the question:

20   "When you were at Glen Point, did the defendant ever direct you

21   to give bids in the market?"

22        Do you see that?

23   A.  Yes, I do.

24   Q.  What was Mr. Coratti's answer?

25   A.  No.

1  Q.  Fair to say that Mr. Coratti would have more experience
2  with the way the defendant actually did trading than you do;
3  correct?
4  A.  That would be correct.
5       MR. BURNETT:  So why don't we take this down,
6  Mr. Sears.
7  Q.  And I want to get a little background about how you got
8  involved in this case.
9       At some point, did someone from the defense reach out
10 to you?
11 A.  Yes.
12 Q.  Who reached out?
13 A.  Well, I believe it was through the economic consulting firm
14 that I work with, the Brattle Group.
15 Q.  Did you interview with someone from the defense team before
16 you were hired?
17 A.  Yes.
18 Q.  How many times did you interview with them?
19 A.  I interviewed, I believe, once.
20 Q.  And is it fair to say that, when the defense was
21 interviewing you, you know that they were working for the
22 defendant; correct?
23 A.  Yes, I -- I had read the -- I had read the case, the
24 complaint before.
25 Q.  You had read the indictment; is that right?

1    A.  Mm-hmm.

2    Q.  So you knew that the defendant had been charged with

3    manipulating the dollar/rand exchange rate on Boxing Day when

4    you started interviewing with the defense; is that correct?

5    A.  Yeah, I guess -- I read the indictment, yeah.

6    Q.  And fair to say, you understood that you were more likely

7    to get hired if your opinion was that the defendant wasn't

8    manipulating on Boxing Day; is that right?

9    A.  I -- I think that my -- the decision to select me was based

10   upon my knowledge of the market.

11   Q.  You don't think it had anything to do with whether or not

12   you were going to say he was manipulating the exchange rate?

13   A.  Again, I was -- when I was interviewed, I don't think I

14   expressed any opinions as to what I thought.  I hadn't done any

15   investigation of it.

16   Q.  Well, the law firm you were interviewing with, that was a

17   law firm called Kaplan Hecker; is that right?

18   A.  That's correct.

19   Q.  And that includes Mr. Hecker in the name, over here; is

20   that right?

21   A.  That's correct.

22   Q.  This isn't the first time you worked for Mr. Hecker's law

23   firm, is it?

24   A.  I have worked for Mr. Hecker before.

25   Q.  How many times?

1   A.  Once.

2   Q.  How much did you make from that case?

3   A.  I think it was 300,000.

4   Q.  And fair to say that you would like to work for Mr. Hecker

5   again in the future?

6   A.  I -- you know, I mean, I found it a good work environment,

7   and I enjoyed working with him.

8   Q.  And you were ultimately hired by the defense to come work

9   on this case; is that right?

10  A.  That's correct.

11  Q.  How long ago was that?

12  A.  That was in April.

13  Q.  And you were hired through a consulting firm, you said; is

14  that correct?

15  A.  Well, I guess, I basically knew the people at Brattle, and

16  I also knew Mr. Hecker.

17  Q.  The firm was Brattle Group and the law firm was

18  Mr. Hecker's firm; is that correct?

19  A.  Mm-hmm.

20  Q.  What's your billing rate again?

21  A.  $800 an hour.

22  Q.  How much have you made on this case already?

23  A.  I think I've done roughly 200 hours, I might have done

24  more.

25  Q.  So about 160,000; is that right?

NANGphi2                         Newman - Cross

1  A.  Something like that, yes.

2  Q.  And Brattle Group is also billing on the case; correct?

3  A.  That's correct.

4  Q.  They're in the back of the room right now, aren't they,

5  some of them?

6  A.  Yeah, they are.

7  Q.  They have been with you in the room with you for chunks of

8  the trial; is that right?

9  A.  That's correct.

10 Q.  Working on your testimony over the weekend; is that fair?

11 A.  I work with them, yes.

12 Q.  And do you get a cut of what they make?

13 A.  No.

14 Q.  Now, part of the time that your spent working on this case

15 was also meeting with the defense; is that right?

16 A.  I met with the defense, yes.

17 Q.  How many times did you meet with them?

18 A.  I met with them -- basically, I think, I started meeting

19 with them at the end of September.  And we have, over the last

20 couple of weeks, reviewed slides, especially as trial got

21 closer.

22 Q.  How many times a week are we talking?

23 A.  Maybe -- well, I met in the end of September, I think I met

24 with them twice in one week.  And then maybe the first week of

25 October, maybe once.  And then a little more frequently as we

NANGphi2                         Newman - Cross

1  approached the trial.

2  Q.  And did you see their legal filings in the case?

3  A.  Their motions?

4  Q.  Yes.

5  A.  I might have read some of them, but not all of them.

6  Q.  You got a sense of what they were arguing in the court

7  before you came in to testify; correct?

8  A.  I had some sense of it.

9  Q.  And you also got to sit here as they were asking questions

10 and you were watching; right?

11 A.  Yeah.

12 Q.  So you were getting a sense of the types of questions that

13 they were asking; right?

14 A.  I mean, I -- again, I'm not a lawyer, in terms of the legal

15 practice of it, but I understand, you know, I mean, I saw that

16 they were active in the motion end of this.

17 Q.  I want to switch now away from the background here and talk

18 a little bit about some of the slides that you were showing.

19 And why don't we start with defense Exhibits 2016 and 2017.

20        You testified about these earlier today; correct?

21 A.  Yeah, I did.

22 Q.  And these are, you testified, slides showing that there was

23 trading around the 12.50 level after Nomura's trading stopped

24 on Boxing Day; correct?

25 A.  That's correct.

1  Q.  Now, you were here for Professor Lyons' testimony; correct?

2  A.  I was.

3  Q.  You were here to hear him talk about how the exchange rate

4  was driven down to that 12.50 level; correct?

5  A.  I did hear him say that, yes.

6  Q.  You were also here when Professor Lyons showed Government

7  Exhibit 607; is that right?

8  A.  Yes.

9          MR. BURNETT:  Why don't we take a look at that on the

10  screen, please, Mr. Sears.

11  Q.  This is the chart that shows the price line on

12  December 26th, Boxing Day; correct?

13  A.  That's correct.

14  Q.  Now, fair to say that you were testifying about that little

15  part of this line that's after the end of the blue box and

16  before the price bounces back up?

17  A.  That's correct.

18  Q.  And you didn't testify about any of the stuff after the

19  price bounced back up about an hour after Nomura's trading;

20  correct?

21  A.  I did not.

22  Q.  And you didn't testify about how the price got down to

23  12.50 before there were those trades around the 12.50 level you

24  talked about; correct?

25  A.  I'm sorry, I don't understand the question.

1   Q.  There's a big drop to get from 12.62 down to around 12.50;

2   right?

3   A.  There is a price decline, yes.

4   Q.  You testified about some trading that happened after the

5   price already got down there; right?

6   A.  Yes, I did.

7   Q.  But not what happened after it bounced back up?

8   A.  I didn't -- I basically took the period from 48 minutes

9   afterwards.

10  Q.  So right before it bounced back up?

11  A.  Mm-hmm.

12          THE COURT:  Sir, you have to answer yes or no.

13          THE WITNESS:  Yes.

14  BY MR. BURNETT:

15  Q.  Let's talk about these bids in the market you testified

16  about.

17          You testified about how there were bids in the market

18  at around the 12.5 level on Boxing Day; correct?

19  A.  That's correct.

20  Q.  And you testified about the size of those bids; right?

21  A.  Correct.

22  Q.  Now, fair to say that those were resting bids?

23  A.  They were bids placed in the order book, so yes, they're

24  resting bids.

25  Q.  They were sitting there waiting to see if something would

NANGphi2                        Newman - Cross

come down and hit them; correct?

A.  They were bids that were placed in the market, yes.  They were resting bids.

Q.  Now, you testified that, all things being equal, the bid at $200 million would have a bigger effect than an offer at $1.7 million; right?

A.  Yes.

Q.  Now, all things aren't necessarily equal; right?

A.  Well, I'm basically speaking from my experience in the market and, generally, looking at the way that price dynamics work in terms of how bids and offers are placed.  But you know, there are times when the standard way of thinking things just doesn't work out quite that way.

Q.  Maybe I can put it a little more simply.

        Nomura and Glen Point weren't placing resting offers; right?

A.  Well, Nomura, the combination of the way they traded, looking at the data, it wasn't only hitting bids.  There were times where they had some offers in that were taken.

Q.  Sometimes, there were offers, but other times, they were out there hitting bids; is that correct?

A.  That's correct.

Q.  That's because the defendant told them to hit bids; right?

A.  That's -- well, the defendant was looking for -- I can't speak for what the defendant was, but the order that was placed

1    said hit bids.

2    Q.  Those were the words he used; correct?

3    A.  Yes.

4    Q.  And when you hit bids, you go and eat into the liquidity

5    that's available in the resting bids; right?

6    A.  Well, I mean, you do to a certain point.

7             But if you look at the way that the orders were

8    entered, those resting bids were there, you could see the size

9    of those resting bids.  And rather than hit the entire resting

10   bid, which could have been done, they were doing it in small

11   amounts.

12   Q.  You can see the size because you have all the data; right?

13   A.  I can see the size because I have the data, yes.

14   Q.  But the defendant didn't have the same data that you did;

15   right?

16   A.  I don't know what data he had or didn't have.

17   Q.  You don't know what he could actually see about the size of

18   the bids that were in the market; correct?

19   A.  I don't know what size he could see.

20   Q.  You don't know what the banker was telling him about the

21   size of the bids in the market; right?

22   A.  Well, he did make some representations of what he thought

23   was in the book, saying there's -- you know, it's a hundred

24   every 25 pips or something like that.

25            I don't know what the banker was able to see, but

NANGphi2                     Newman - Cross

1  there seemed to be some type of indication that he knew that

2  there was interest in the market.

3  Q.  Exactly, so the defendant could know what the banker was

4  telling him; right?

5  A.  That's generally what salespeople do is they provide color.

6  Q.  But he didn't have access to all this chart data that you

7  were showing to the jury, did he?

8  A.  Like I said, I don't know what he did or didn't have access

9  to.

10  Q.  Now, let's stay focused on what he did or didn't have

11  access to.

12        Your testimony is that the defendant's trading was

13  consistent with delta replacement; is that right?

14  A.  Yes.

15  Q.  And ultimately, whether something is or is not delta

16  replacement is about what's in the trader's head; correct?

17  A.  Well, in terms of -- can you repeat that one more time, I'm

18  sorry.

19  Q.  Sure.  Maybe we can take it back to what I asked you

20  earlier.

21        You don't know what he was actually thinking; right?

22  A.  I don't know what Neil Phillips was thinking.

23  Q.  Was it consistent with anything else?

24  A.  I'm sorry?

25  Q.  You used the word consistent.  I'm just trying to figure

NANGphi2                      Newman - Cross

1    out what that means.

2    A.   In terms of the way that I have executed -- excuse me, let

3    me just get a little water -- I have executed delta replacement

4    trades in my professional career and have done effectively

5    measure the -- looked at the delta of my option and attempted

6    to replace it in order to maintain my position.  That's what my

7    knowledge of delta replacement is.

8    Q.   Let's dig into that a little bit.

9         You said that there was this $750 million target for

10   the delta replacement; is that right?

11   A.   That's correct.

12   Q.   And that's what you were measuring the defendant's trading

13   against, was that $750 million target?

14   A.   Mm-hmm.

15   Q.   Now, why don't we take a look at defense Exhibit 2002.

16        This is the chart that you plotted out that showed the

17   one-touch delta before Boxing Day; right?

18   A.   That's correct.

19   Q.   So the darker, the solid line is the delta of that option

20   changing over time?

21   A.   That's correct.

22   Q.   And that's the line that you used to figure out the target

23   that you picked for the delta replacement; correct?

24   A.   Hold on.  Let me -- can you just repeat that one more time.

25   Q.   Sure.  You testified early -- this was the chart you were

NANGphi2                    Newman - Cross

1    looking at when you said that the delta replacement target was

2    $750 million; right?

3    A.   That's correct.

4             MR. BURNETT:   Can we take a look at Government

5    Exhibit 862, which is just a demonstrative for the jury.

6    Q.   You see I put a little bullseye here on the screen?

7    A.   I see that.

8    Q.   That bullseye level is at $750 million; is that right?

9    A.   That's correct.

10   Q.   So that's the target that you picked as the reference point

11   for this delta replacement?

12   A.   That's correct.

13   Q.   And that's what you were measuring the defendant's

14   2:00 a.m. Boxing Day trading against, that target, that

15   $750 million?

16   A.   What I looked at was the OVML calculation that I did,

17   basically, on the -- I looked at the OVML calculation on the

18   22nd and came up with 737.  And between 737 and 750 was kind of

19   the benchmark.

20   Q.   And we can agree that this delta was swinging around wildly

21   between days; is that right?

22   A.   I would agree with you that the way that these one-touch

23   options work is the spot rate can move a little bit and it

24   swings the delta around.

25   Q.   That's what was happening here, right, it was swinging

NANGphi2                          Newman - Cross

1    around?

2    A.  The delta swings around, yes.

3    Q.  For example, if we take a look at Government Exhibit 863,

4    if you had used just a day earlier, the delta replacement

5    target would have been at $450 million; right?

6    A.  If you can just remind, what specific -- is that the 21st?

7    Q.  Sure.  There's a new bullseye there; is that right?  Do you

8    see that?

9    A.  Yeah, exactly, I see it.  You can see the spot rate went up

10   a little bit on that day.  So again, these options are very

11   sensitive to movements in the spot rate.

12   Q.  And they're sensitive within the days too; correct?

13   A.  That's correct.

14   Q.  Now, you also plotted out the delta of this option all the

15   way out to Christmas; right?

16   A.  Yeah, that's right.

17   Q.  Right before the defendant's trading?

18   A.  That would be before the defendant's trading.

19   Q.  Closer to the defendant's trading than Friday the 22nd;

20   right?

21   A.  That would be closer to the defendant's trading on Friday,

22   the 22nd.

23   Q.  If we take a look at Government Exhibit 864, if you had

24   used that as the target, it would have been much higher than

25   $750 million; right?

1   A.  That number is higher than $750 million.

2   Q.  In fact, it's close to $900 million; right?

3   A.  Again, it's a higher number, yes.

4   Q.  But that wasn't the number that you used for your reference

5   point when coming up with this delta replacement theory; right?

6   A.  Yeah, I used a different number and, you know -- again, I'm

7   not Neil Phillips.  But what I would seek to do is, you know,

8   you kind of use the last risk report as your benchmark.  And

9   it's the type of thing that you would try to benchmark against

10  that.  So if you saw on the report that it was roughly 750,

11  that's what you would want to try to replace.

12  Q.  You don't know what risk reports he was actually looking

13  at; right?

14  A.  I don't know which specific risk reports he was using.

15  Q.  In fact, you know that there was a lot of delta that was

16  left out of his risk reports; correct?

17  A.  I am aware of that.

18  Q.  In fact, to prepare for your testimony, you actually put

19  together a chart that added in all the delta that Mr. Phillips

20  was leaving out of his risk reports; correct?

21  A.  I did.  And that's just the way I do my analysis is I want

22  to look at everything.

23  Q.  It's not something you showed to the jury during your

24  direct testimony; correct?

25  A.  I did not show that.

1  Q.  So why don't we take a look at it.  And I want to have a

2  look at slide -- it's the backup work product, which is slides

3  four, five, six is how it's labeled.  And if we could go over

4  to the tab that says options delta.

5          Now, this spreadsheet here is all work that you did to

6  calculate delta on the different options that were actually in

7  Glen Point's portfolio; correct?

8  A.  Yes.

9  Q.  And you went and you used the Bloomberg calculator to go

10 put these calculations together; is that right?

11 A.  That's correct.

12 Q.  And fair to say you needed to go to the Bloomberg

13 calculator to do it because these numbers weren't actually in

14 the defendant's records; right?

15 A.  That is correct.

16 Q.  There wasn't delta listed for, say -- well, why don't we

17 look at Column F.

18          Do you see that one?

19 A.  Yup.

20 Q.  That's a one-touch option with a strike price of 12.25?

21 A.  That's right.

22 Q.  And those delta numbers, none of those were in the

23 defendant's records; correct?

24 A.  I noticed that there was a period of time beginning after

25 December 8th where some of the options, they weren't listing

NANGphi2                          Newman - Cross

1   deltas for them, yes.

2   Q.  And this was one of them; right?

3   A.  This was one of them.

4   Q.  Now, if you scroll over to Column E, that's for some

5   one-touch options that had a strike price of 12; is that right?

6   A.  Uh-huh.

7        Can you just -- what was the expiry date, do you

8   happen to know?

9   Q.  I don't have it off the top of my head, sorry.

10       We can agree the strike price is 12?

11  A.  We can agree.

12       I mean, there was one 12 option that they had that

13  they were risk managing.

14  Q.  How about 11.6, the D column, do you see that?

15  A.  I do see that.

16  Q.  No deltas in the records for that?

17  A.  No deltas in the records for that.

18  Q.  Is it fair to say that the deltas on some of these options

19  that the defendant wasn't keeping track of got really large

20  right after Boxing Day; right?

21  A.  The deltas -- and you can see that some of them got large

22  after Boxing Day, you can -- you can see that, yes.

23  Q.  I want to take a look at how large.

24       MR. BURNETT:  Can we pull up Government Exhibit 1135

25  alongside this.

NANGphi2                              Newman – Cross

1   Q.   Government Exhibit 1135 is one of these risk reports that

2   you have been referring to; correct?

3   A.   Yes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Just to orient you, do you see the date on this one is

2  December 27, 2017?

3  A.  Yes.

4  Q.  So that's a day after Boxing Day?

5  A.  Yeah, that's the day after Boxing Day.

6  Q.  Why don't you look to the very bottom of this chart.

7        Do you see that it says FX dollar/ZAR?

8  A.  Yes, I see that.

9  Q.  The delta there is listed as minus 1617.4, correct?

10 A.  That's correct.

11 Q.  So that's minus about $1.6 billion?

12 A.  Yeah.

13 Q.  Now that doesn't have one-touch options, correct?

14 A.  Um, well, in that -- that options number there was a

15 risk-managed one-touch option.

16 Q.  One of them?

17 A.  One of them.

18 Q.  OK.  But the rest of them weren't in here?

19 A.  The remaining options that were in there, there was a put

20 for $400 million at 12:46:51 and there were the two six-month

21 seagull trade and like a three-month seagull trade.

22 Q.  But not the rest of the one-touch options?

23 A.  Not the rest of the one-touch options.

24 Q.  I want to take a look at the very top of FX delta USD.

25        Do you see that?

Nannphi3                          Newman - Cross

1    A.  The very top of FX delta, yeah.  Right up there, yes.

2    Q.  Do you see there is a column that says "Total"?

3    A.  Yes.

4    Q.  And the total there is minus 2374.5?

5        Do you see that?

6    A.  I do see that.

7    Q.  That means the total delta across this whole portfolio here

8    that you're keeping track of is minus $2.3 billion dollars;

9    right?

10   A.  Yes, that's correct.

11   Q.  Why don't we take a look over to your chart where you

12   calculated those missing deltas, okay?

13   A.  Uh-huh.

14   Q.  Let's take a look at row --

15       THE COURT:  You have to say yes or no.

16   A.  Yes.  I'm sorry.

17   Q.  Let's take a look at row 13.

18   A.  Uh-huh, yes.

19       MR. BURNETT:  Mr. Sears, you can actually expand this

20   if you wouldn't mind.

21   BY MR. BURNETT:

22   Q.  The total column is column K, right?

23   A.  The total column is column K, yes.

24   Q.  And that means that's the total delta on the dollar -- just

25   the dollar/rand portfolio as of December 27, right?

Nannphi3                         Newman - Cross

1    A.  That's correct.

2    Q.  Now, remember on that e-mail we just looked at, the

3    dollar/rand delta that the defendant was seeing was minus $1.6

4    billion, right?

5    A.  That's correct.

6    Q.  And here it's minus $3 billion, right?

7    A.  That's correct.

8    Q.  So the defendant's delta reports were off by almost one and

9    a half billion dollars, is that fair?

10   A.  Based upon what the total portfolio was saying and compared

11   to what he was select -- what he selected in his risk

12   management, there is a difference, yes.

13   Q.  Of $1.5 billion, right?

14   A.  Yeah, it would seem that way.

15   Q.  In fact, that minus 3 billion dollars is bigger than the

16   total risk number that was on the report that we were looking

17   at earlier, right?

18   A.  It is a big number, yes.

19   Q.  It is a big number that he wasn't seeing, right?

20   A.  Well, he was -- he wasn't -- he -- based upon --

21            MR. GOPSTEIN:  Objection, your Honor.

22            THE WITNESS:  -- the reports.

23            THE COURT:  The objection is overruled.

24            It's cross-examination.

25   A.  Okay.  I'm sorry.  Could you repeat that question.

Nannphi3                          Newman - Cross

1    Q.  Sure.  It is a big number that the defendant wasn't seeing,

2    right?

3    A.  That's correct.

4    Q.  I would like to switch to a different topic now that came

5    up yesterday -- sorry, not yesterday.  The weekend has gotten

6    away from me.  On Friday.

7           MR. BURNETT:  We can take this -- sorry.  Before I

8    move on from this, we will offer slides 4, 5 and 6 in evidence

9    and add an exhibit number later.

10          THE COURT:  Any objection?

11          MR. GOPSTEIN:  No objection.

12          THE COURT:  Those are received.

13          (Government Exhibit Slides 4, 5, and 6 received in

14   evidence)

15          MR. BURNETT:  Thank you, Mr. Sears.

16          You can take that down.

17          THE COURT:  What you will do is you will put on the

18   record later what exhibit slides 4, 5, and 6 correspond to.

19          MR. BURNETT:  Of course.

20          Thank you, your Honor.

21   BY MR. BURNETT:

22   Q.  Now, let's talk about this bilateral credit limit issue you

23   talked about yesterday.

24   A.  Sure.

25          THE COURT:  Again, not yesterday.

1           MR. BURNETT:  Yes, I'm sorry.

2           THE COURT:  Sometimes lawyers have a problem with

3    weekends, but I think you meant to refer to Friday.

4           MR. BURNETT:  I think I have a problem with nights,

5    weekends, mornings, the whole nine yards lately.

6    BY MR. BURNETT:

7    Q.  So Friday you testified about bilateral credit agreements,

8    right?

9    A.  That's correct.

10   Q.  An important word in the phrase bilateral credit agreements

11   is the word "bilateral," right?

12   A.  That's right.

13   Q.  It means between two parties, correct?

14   A.  That's correct.

15   Q.  So the bilateral credit limit that you were looking at was

16   between Nomura and Morgan Stanley, right?

17   A.  Yes.

18   Q.  So it wasn't between Nomura and any other party, correct?

19   A.  That's correct.

20   Q.  When you put up that chart on the screen back on Friday

21   that showed the timing of when trades between Nomura and Morgan

22   Stanley stopped, that was just trades between Nomura and Morgan

23   Stanley, right?

24   A.  That's just trades between Nomura and Morgan Stanley, yes.

25   Q.  Nomura as still able to continue trading on the Refinitiv

1    platform after the trades with Morgan Stanley stopped, correct?

2    A.  Yes.  But based upon the data that I looked at, the volume

3    of trading that they were able to do on Refinitiv became less,

4    but they were still able to trade with other counterparties,

5    yes.

6    Q.  The volume of trading they were able to do or the volume of

7    trading they did?

8    A.  That they did.

9    Q.  Right.  So they kept trading on the Refinitiv platform even

10   after that Morgan Stanley bilateral limit was hit, right?

11   A.  Yeah.  They were still trading on Refinitiv, but a greater

12   portion of their volume was then shifted to FastMatch.

13   Q.  But that -- then the bilateral credit -- I'll scratch that.

14   Let's talk about a different thing you discussed on Friday.

15   You also talked about delta exchange transactions that Glen

16   Point had engaged in on other occasions, is that right?

17   A.  When they were -- I showed when they were trading options

18   on the delta exchange that they did.

19   Q.  There is a difference between delta exchange and delta

20   replacement, correct?

21   A.  Yeah, there is.

22   Q.  Now, let's take a look at Defense Exhibit 2007.  Actually,

23   why don't we back up instead and take a look at Defense Exhibit

24   2008.

25              All right.  This is one of those charts that you

Nannphi3                    Newman - Cross

1    discussed for delta exchange on Friday, correct?

2    A.  Correct.

3    Q.  This reflects Glen Point buying options, correct?

4    A.  Yes.  This is Glen Point purchasing the options, and what

5    they're doing is that they are buying dollars as part of the

6    delta exchange, yes.

7    Q.  So they're buying options, not selling options on this

8    chart, correct?

9    A.  That's correct.

10   Q.  This is not options triggering; it's options being

11   purchased.  Right?

12   A.  It's initial trades, initial options trades where they're

13   doing them and doing a delta exchange with the dealer.

14   Q.  A delta exchange with the person selling them the option,

15   correct?

16   A.  Correct.

17   Q.  Let's talk about the details of that.  Why don't we focus

18   on the first one.  That's from July 13.  Correct?

19   A.  Correct.

20   Q.  This is an option that Glen Point was buying from RBS,

21   right?

22   A.  That's correct.

23   Q.  So this shows that Glen Point bought the option from RBS,

24   correct?

25   A.  Correct.

Nannphi3                          Newman - Cross

1    Q.   And exchanged delta with the bank at the same time; is that

2    right?

3    A.   That's right.

4    Q.   And when it exchanged delta with the bank at the same time,

5    that was at a fixed price with the bank, correct?

6    A.   Um, they agreed on a price, and then they agreed on an

7    exchange rate.  And they agree on the options price, and then

8    they do a delta exchanges at an agreed upon rate.

9    Q.   So this wasn't the defendant going out into the market and

10   buying a spot position, correct?

11   A.   That's correct.

12   Q.   Also, you don't know if the defendant even held on to this

13   delta after he purchased it, do you?

14   A.   Well, again, I reviewed trading records, and I saw that

15   they like to trade around, and there were times where they

16   would take it off.  But there was trading around, around

17   options positions, and, you know, the delta over time of the --

18   it looked to me like they were actively trading based upon the

19   trading records that I saw.

20   Q.   They might have acquired the spot position and might get

21   rid of it right after they acquire it, right?

22   A.   Yeah, over the course of the day.

23   Q.   In fact, if you want to take on the risk from the option,

24   you would want to get rid of the spot position, right?

25   A.   Well, if you're using the option as a means of making a

1    statement on the appreciation or depreciation of the asset,

2    well, then you don't want to be -- you don't want to have a

3    neutral delta.  You want to have exposure to the market so you

4    would want to unwind it.

5    Q.  Now let's look at the next one.  This is an option with

6    Morgan Stanley?

7    A.  That's correct.

8    Q.  This is Glen Point buying an option, right?

9    A.  Uh-huh.

10   Q.  An exchange delta with the bank that it is buying the

11   option from, correct?

12   A.  Correct.

13   Q.  At a fixed price, right?

14   A.  At a fixed price, yes.

15   Q.  At the same time as it's buying the option, right?

16   A.  That's right.

17   Q.  This isn't about selling an option, right?

18   A.  It not about selling an option.

19   Q.  It is not about an option being triggered?

20   A.  It is not about an option being triggered.

21   Q.  And this isn't about the defendant going into the market to

22   make -- to buy a spot position, right?

23   A.  No.  It is a privately negotiated delta exchange.

24   Q.  In fact, every single set of borrowers that is on this

25   chart is the same situation that we've just described, right?

Nannphi3                        Newman - Cross

1    A.  Yes.

2    Q.  So each one of them it's the defendant buying an option,

3    correct?

4    A.  Correct.

5    Q.  Exchanging delta with the bank at the same time, right?

6    A.  Correct.

7    Q.  At a fixed price, correct?

8    A.  At an agreed-upon price.

9    Q.  Right.  Not going into the market?

10   A.  That's right.

11   Q.  And for any of these transactions, you don't know how long

12   Glen Point actually held on to the spot position for, correct?

13   A.  I -- I -- as part of my analysis, I looked at their

14   trading, and I didn't -- I didn't monitor exactly, you know,

15   how long they -- they held down with those hedges.

16   Q.  Now, let's take a look at the couple of times you talk

17   about selling options, which is Defense Exhibit 2007.

18            Do you see that?

19   A.  Um, now I do.

20   Q.  All right.  Now, the one chart we were just looking at was

21   buying options, correct?

22   A.  That's right.

23   Q.  The first two sets of bars on the left here are when Glen

24   Point was selling options, right?

25   A.  That's correct.

Nannphi3                        Newman - Cross

1  Q.  Now, fair to say that the bar on the far right, the
2  December 26 one, that was not Glen Point selling an option,
3  right?
4  A.  That was an option that had exercised, and the spot trade
5  is representative of a delta replacement.
6  Q.  To be clear, it didn't trigger until after all that spot
7  trading was finished, right?
8  A.  The point at which 12.50 traded, Glen Point had not
9  completed their spot trading.
10  Q.  All right.  So let's break that down.  Let's take a look
11  first at December 19 MS.
12         Do you see that?
13  A.  I'm sorry.  Could you repeat that again?  I didn't hear
14  that.
15  Q.  Sure.  Let's take a look at December 19 MS, right?
16  A.  Yep.
17  Q.  So the dark blue bar is the defendant selling an option; is
18  that right?
19  A.  That's right.  It was a package of one one-touch and two
20  European digitals.
21  Q.  And it did a spot -- and the defendant did a delta exchange
22  with the same bank that was trading with it?
23  A.  That's correct.  That's correct.
24  Q.  At the same time, right?
25  A.  That's correct.

Nannphi3                    Newman - Cross

1  Q.  And at a negotiated price, correct?

2  A.  That's correct.

3  Q.  Same thing for this other December 19 J.P. Morgan one?

4  A.  Yes.  That was also a European digital that they unwound

5  and did a spot exchange for.

6  Q.  Now, I noticed here on the chart you wrote "spot exposure

7  after trades" to describe those blue bars, right?

8  A.  Correct.

9  Q.  The light blue bar specifically, right?

10  A.  Correct.

11  Q.  Isn't it true that the defendant got rid of this spot

12  exposure within a couple hours of acquiring it?

13  A.  Well, are you speaking specifically of the Morgan Stanley

14  trade?

15  Q.  The spot exposure, the net spot exposure.

16  A.  Okay.  So what happened with the Morgan Stanley is they did

17  the seagulls the same day.  So what happens is, is the spot

18  exposure from the -- this Morgan Stanley trade and for all

19  intents and purposes the JP Morgan trade offset the delta on

20  seagulls.  If you look at them, they kind of net each other

21  out.  So what happened on that day is Morgan -- is that Glen

22  Point unwound the one one-touch and two European digitals.

23  They unwound the European digital that they had on with J.P.

24  Morgan, and then they did the seagulls.  If you look at the

25  long and the short of the seagulls, they offset each other.

1    Q.   Exactly.

2              MR. BURNETT:  Why don't we take look at government --

3    or Defense Exhibit 206 side by side to show that.  2006.  It is

4    here on the screen now.   2006.

5              I apologize.  It's 2008.

6    BY MR. BURNETT:

7    Q.   Now the seagull you are referring to is the set of bars on

8    the far right.  Do you see that?

9    A.   That's correct.

10   Q.   It looks like the spot trade there is buying just shy of

11   $600 million?

12   A.   It was five something.

13   Q.   And if you look on the left hand screen, DX 2007, those two

14   light blue bars add up to what?  A little bit less than $600

15   million going the other way?

16   A.   Okay.  So, yeah, I think that that first one is -- it's

17   like four something.  I think the J.P. Morgan was like 85.

18   There was a little mismatch.  They had a spot position where

19   they were short dollars and they got a little bit less.  It was

20   like $61 on the mismatch.

21   Q.   But pretty close, right?

22   A.   Yeah, pretty close.

23   Q.   Fair to say what this is showing is that the defendant

24   wasn't keeping the spot exposure on December 19; he was

25   flipping it into another option.  Right?

Nannphi3                      Newman - Cross

1    A.  Effectively what happened was they unwound one-touches and

2    some European digitals, and they bought the seagulls.

3    Q.  Right.  So the spot exposure wasn't how the defendant was

4    taking on new risk on December 19, correct?

5    A.  What it was, was a swap into a vanilla options position.

6    Q.  That is not the same thing as what happened on Boxing Day,

7    right?

8    A.  That's different than what happened on Boxing Day.

9    Q.  Boxing Day they never flip it into another option, right?

10   A.  Um, they -- on Boxing Day, they don't flip it into another

11   option.  They take the spot position.

12   Q.  Now, let's switch over here and talk a little bit about

13   this archbishop speech that you were testifying about earlier.

14          Do you remember that?

15   A.  Yep.

16   Q.  Hold on.  All right so what is this speech?

17   A.  It was his midnight mass Christmas Day sermon.

18   Q.  You took that Christmas Day sermon and you plotted a line

19   for it on a chart; is that right?

20   A.  That's right.

21   Q.  Why did you do that?

22   A.  Because that was the -- why did I look at the Christmas Day

23   sermon?

24   Q.  Yeah.

25   A.  Well, it was an important piece of relevant news in the

Nannphi3                        Newman - Cross

1  fact that the archbishop asked for the president to step

2  down -- effectively step down and have a new president come in.

3  Q.  You said it is an important piece of relevant news.  You

4  are not a South Africa expert?

5  A.  I am not a South Africa expert.

6  Q.  How did you know it was an important piece of relevant

7  news?  Who told you that?

8  A.  Well, I was -- I mean, I asked the Brattle Group to give me

9  all the relevant pieces of articles and information, and I read

10 them.  You know, I am not a South Africa expert, but I do have

11 a background in macro trading.

12 Q.  So you asked Brattle Group, who was working for the

13 defendants, to give you some articles, right?

14 A.  I asked them to send me everything that they had.

15 Q.  And you picked out this archbishop speech as the one you

16 were going to plot out?

17 A.  I picked it out, yeah.  I thought it -- I viewed it as

18 important.

19 Q.  You talked to the defense about how you thought it was

20 important?

21 A.  We had, we had discussions about the, you know, relevant

22 news in South Africa.

23 Q.  Now, did you Google the archbishop at all before you

24 decided to put it out in the chart?

25 A.  It -- did I do research on the archbishop?

Nannphi3                          Newman - Cross

1    Q.  Yes.

2    A.  No, I did not.

3    Q.  So you don't know anything about what the archbishop had

4    actually been saying before that midnight mass, right?

5    A.  I didn't.  I didn't do research on the archbishop,

6    specifically himself, no.

7    Q.  So when you were asking the Brattle Group to give you

8    context in the relevant articles, you chose this sermon, but

9    you didn't ask them for the context about the guy who was

10   giving the sermon; is that right?

11   A.  I asked for relevant articles, and that is what I got back.

12   Q.  Now, did you know that that archbishop had already

13   previously called for Zuma's resignation?

14   A.  I didn't know that.

15   Q.  Did you know that he'd given sermons before that sermon

16   that were also critical of President Zuma?

17   A.  I was not aware of that.

18   Q.  Fair to say that you, as a macro trader, when you are

19   assessing whether news is important or not important, you would

20   want to know the background about who the people in the news

21   are, right?

22   A.  I mean, there is some relevance to that.

23   Q.  A lot of relevance, right?

24   A.  Yeah, I mean, it's -- I mean, you re-- you have some --

25   facts matter.

Nannphi3                          Newman - Cross

1    Q.  Why don't we look at some of those actual facts.

2            I would like to show you Government Exhibit 849.

3            MR. BURNETT:  The government offers Exhibit 849.

4            THE COURT:  Any objection?

5            MR. GOPSTEIN:  No objection, your Honor.

6            THE COURT:  Received.

7            (Government Exhibit 849 received in evidence)

8            MR. BURNETT:  All right.

9            Let's publish it for the jury.

10   BY MR. BURNETT:

11   Q.  Now, do you see this is an article from August 11, 2017?

12   A.  Yes.  May I take a minute to read it?

13   Q.  Of course.  Go ahead.

14   A.  Thank you.  Okay.  I have read it.

15   Q.  Why don't we take a look at the second paragraph of this

16   article here.  All right.

17           Do you see that it says, "On Monday, Anglican leaders

18   joined a coalition of civil society and faith groups on the,

19   hashtag, unite behind march through the city calling for South

20   African politicians to vote in favor of a no-confidence

21   motion."

22           Do you see that?

23   A.  I do.

24   Q.  Now, Anglican leader Thabo Makgoba is one of those Anglican

25   leaders, correct?

1    A.  Correct.

2    Q.  He is an Anglican archbishop, right?

3    A.  That is right.

4    Q.  You know that South Africa is a parliamentary system of

5    government, correct?

6    A.  I do, yes.

7    Q.  And a vote of no confidence is something that you hold when

8    you try to kick someone out of office?

9    A.  That's correct.

10   Q.  Did you know when you plotted that line on the chart about

11   the sermon that the archbishop had already supported a vote of

12   no confidence against Zuma a few months earlier?

13   A.  I didn't know.

14   Q.  Is it fair to say that would be important context for

15   understanding whether his speech was important new information

16   to the market or not?

17   A.  Um, well, I mean there would -- there would be some, yeah,

18   context with it, but I would say that the situation in December

19   was a little bit different.

20   Q.  You are not a South Africa expert?

21   A.  I am not a South Africa expert.

22   Q.  You have no idea what people on the ground in South Africa

23   thought was different or not about December from this point, do

24   you?

25   A.  Well, I'm not -- I'm not a South African expert.  I mean,

Nannphi3                    Newman - Cross

1  there was an ANC election which, you know, could potentially

2  change the landscape a little bit.

3  Q.  You have no idea if the defendant thought at all about this

4  archbishop sermon, correct?

5  A.  I don't know what he was –– he was –– what his thought was

6  regarding the sermon.

7  Q.  In fact, this archbishop had been giving speeches against

8  President Zuma going back even before August, hadn't he?

9  A.  Um, I mean, I see these –– I see this speech from August.

10  Are there any other ones?

11  Q.  You didn't look for any others when you were preparing for

12  this case, did you?

13  A.  I didn't –– like I said, I didn't research the archbishop

14  specifically.

15         MR. BURNETT:  Why don't we take a look at Government

16  Exhibit 868.

17         The government offers Exhibit 868.

18         MR. GOPSTEIN:  One second, your Honor, so I can pull

19  it up.

20         THE COURT:  Okay.

21         MR. GOPSTEIN:  No objection, your Honor.

22         THE COURT:  868 is received.

23         (Government Exhibit 868 received in evidence)

24         MR. BURNETT:  Now, let's publish this for the jury.

25  BY MR. BURNETT:

1    Q.  Do you see the title here is "No Need to Despair Even as

2    the Dream of South Africa Feels Like a Nightmare."

3            Do you see that?

4    A.  Yes.

5    Q.  And that is from -- published April 16, 2017?

6    A.  Yeah.

7    Q.  You see that the Anglican archbishop of Cape Town is listed

8    there on the author line?

9    A.  Let me just look at it.  "Anglican archbishop of Cape Town

10   and chancellor of the university of Western Cape."

11           Yes, I see that

12   Q.  Thabo Makgoba is actually mentioned directly underneath

13   that, right?

14   A.  Yes.

15           MR. BURNETT:  Why don't we turn to the second page

16   here.  Let's highlight the two paragraphs right under the

17   italics at the top here, Mr. Sears.

18   BY MR. BURNETT:

19   Q.  This is Thabo Makgoba writing.  Let's read what he says.

20           He says, "Our nightmare is similar to that under which

21   the ancient Hebrews once lived.  In our case, while we aren't

22   being disadvantaged by colonial slavery any longer and

23   apartheid is over, some of our institutions, parts of our

24   economy, and some among our leaders have become slaves to a new

25   form of oppression.

1          "It's a moral and economic oppression that manifests

2     itself in the form of one family's capture of our country and a

3     president whose integrity, soul, and heart have been

4     compromised."

5          Do you see that?

6     A.  I do.

7     Q.  Did you know when you plotted that December sermon out on

8     the chart that all the way back in April Thabo Makgoba said

9     President Zuma's integrity, soul, and heart had been

10    compromised?

11    A.  I had not read this April article.

12    Q.  That is because you didn't look into any of the context for

13    the December Christmas speech about Thabo Makgoba, correct?

14    A.  Like I previously testified, I didn't research the

15    archbishop.

16    Q.  You just put it on the chart, right?

17    A.  I saw it as a relevant event and I used it.

18    Q.  All right.  Let's take -- were there other announcements or

19    events that you did similar analyses for?

20    A.  Well, in terms of the day before, there was the ANC, the

21    executive committee also put support behind Ramaphosa as well,

22    which I thought had some degree of importance based upon the

23    analysis of the stuff that I read.

24    Q.  Did you look into events that happened about the NEC

25    conference over that prior week in news articles about them?

1    A.  Yes, I did.

2    Q.  Let's take a look at one of those.  Why don't we take a

3    look at Government Exhibit 807.

4            The government offers 807.

5            MR. GOPSTEIN:  One second, your Honor.

6            THE COURT:  Okay.

7            MR. GOPSTEIN:  No objection.

8            THE COURT:  807 is received.

9            (Government Exhibit 807 received in evidence)

10           MR. BURNETT:  Let's publish this for the jury, please.

11   BY MR. BURNETT:

12   Q.  Have you seen in one before?

13   A.  I believe -- I have read a good bit of stuff.  I believe I

14   have seen this, yes.

15   Q.  Do you see this one is from December 21, 2017?

16   A.  Yeah.

17   Q.  So that's Thursday, right?

18   A.  Yep.

19   Q.  And it's titled "Zuma Backed Into a Corner," right?

20   A.  Yes, "Zuma Backed Into a Corner."

21   Q.  Let's read the very first paragraph here.

22           Do you see that?

23   A.  Yep.

24   Q.  It says, "The ANC is finally in the position to pin down

25   President Zuma and now has the ability to hold him accountable

1    and recall him from office."

2            Do you see that?

3    A.  Yes, I do.

4    Q.  And why don't we turn to page 2 here.  And look at the top

5    paragraph.

6            This article says, "This effectively means that

7    Ramaphosa and the new NEC have authority over Zuma and he is

8    compelled to implement what they instruct him to do.  If he

9    fails to do so, they have the ability to recall him from

10   office."

11           Do you see that?

12   A.  I do see that.

13   Q.  Did you map out the market effect of this?

14   A.  Did I map out the market effect of this?  No.

15   Q.  You didn't do what you did for the sermon with this news

16   announcement, right?

17   A.  I didn't.

18   Q.  And did you do it for -- why don't we take another article.

19   Why don't we take a look at Government Exhibit 808.

20           MR. GOPSTEIN:  No objection, your Honor.

21           THE COURT:  808 received.

22           (Government Exhibit 808 received in evidence)

23           MR. BURNETT:  Can we publish that for the jury,

24   please.

25   BY MR. BURNETT:

1  Q.  Now, what's the title of this one?

2  A.  "Zuma Is Now Firmly In the Firing Line."

3  Q.  That's not from over the weekend, right?

4  A.  The article is published on December 21.

5  Q.  Right.  So that's Thursday?

6  A.  Yeah.

7  Q.  And let's read what that article says.  Let's take a look

8  at the paragraph that begins "with the conference."

9         This says, "With the conference endorsing greater

10  powers for the ANC's integrity committee and the immediate

11  appointment of a commission of inquiry into state capture, a

12  recall of all those implicated -- Zuma foremost -- is likely."

13         Do you see that?

14  A.  I do see that.

15  Q.  Did you read this article before you made your charts?

16  A.  I -- uh, I'm looking at this.  I don't recall seeing this

17  article.

18  Q.  So this wasn't context that you had when you plotted out

19  that archbishop sermon on the chart?

20  A.  That's correct.

21  Q.  Why don't we take a look at the next paragraph down here.

22         You see that it says, "The conference also resolved

23  that the new National Executive Committee (NEC) look into the

24  issues of two centers of power and act accordingly -- another

25  serious threat to Zuma's bid to see out the rest of his term."

Nannphi3                          Newman - Cross

1           Did I read that right?

2     A.  "National Executive Committee look into the issue of

3     two" -- I do see that, yeah.

4     Q.  Now, did you map out this announcement and try to determine

5     the market effect of it?

6     A.  I did not.

7     Q.  And let's take a look at one more.  Why don't we take a

8     look at Government Exhibit 809.

9           THE COURT:  Mr. Burnett, after we look at 809, let's

10    take our midmorning break.

11          MR. BURNETT:  Thank you, your Honor.

12          THE COURT:  Any objection to 809?

13          MR. GOPSTEIN:  No objection, your Honor.

14          THE COURT:  809 is received.

15          (Government Exhibit 809 received in evidence)

16          MR. BURNETT:  All right.  Let's publish this for the

17    jury, please.

18    BY MR. BURNETT:

19    Q.  The title of this article here is, "Ramaphosa Must Act

20    Against Corruption Urgently -- ANC Stalwarts."

21          Do you see that?

22    A.  Yes.

23    Q.  Now, in your research on South Africa, did you come across

24    the ANC stalwarts?

25    A.  The ANC stalwarts, I did not.

Nannphi3                          Newman - Cross

1  Q.  Those were the people who effectively led the campaign

2  against apartheid, correct?

3  A.  I am not familiar with the ANC stalwarts.

4  Q.  So you are familiar with Thabo Makgoba, but not the ANC

5  stalwarts?

6  A.  I don't -- I'm not familiar with the ANC stalwarts.

7  Q.  This wasn't part of the context you looked into when you

8  were doing your research on your case, right?

9  A.  It was not.

10  Q.  Let's talk about that.  I want to take a look at page 1,

11  the paragraph that begins, "The stalwarts said in a statement

12  on Thursday."  It is the third one down.

13         Here it is:  "The stalwarts said in a statement on

14  Thursday" --

15         We'll pause there.

16         That would be Thursday, December 21, right?

17  A.  Yes.

18  Q.  So before the weekend?

19  A.  Yes.

20  Q.  -- "that they wished Ramaphosa well on what they viewed as

21  a difficult journey for the political party and country,

22  stating that they wish his presidency would bring about a

23  'breath of fresh air for the ANC and the nation.'"

24         Did you see that?

25  A.  I do see that.

1    Q.  Let's go to page 2 now, the third paragraph that begins in

2    the statement.

3            Do you see that it says, "In the statement, the

4    stalwarts also advised Ramaphosa and his national executive

5    committee to get rid of Zuma as the head of state and to make

6    sure he faces corruption charges which he has been dodging for

7    years."

8            Do you see that?

9    A.  I do.

10   Q.  That is another one of those events that you didn't map

11   out, right?

12   A.  I did not see the stalwarts speech, no.

13   Q.  You just focused on the sermon?

14   A.  I focused on the sermon.

15   Q.  And not any of that guy's prior sermons?

16   A.  I did not read any of his prior sermons.

17           MR. BURNETT:  Now is a good time, your Honor.

18           THE COURT:  Members of the jury, it is a little after

19   11:30.  Lets take a 15-minute break now.  Please don't talk

20   about the case amongst yourselves or do any research.

21           (Continued on next page)

22

23

24

25

```
 1                    (Jury not present)
 2                    THE COURT:  All right.  The witness may step down.
 3                    Mr. Burnett, for planning purposes, any sense of how
 4       much longer you've got?
 5                    MR. BURNETT:  I need to check my notes, but probably
 6       like 30 minutes.
 7                    THE COURT:  Okay.
 8                    All right.  Be back here at 11:45.
 9                    You will have noticed I circulated a draft charge over
10       the weekend.  I may have some further words to say about
11       extraterritoriality.  You will have noticed that with respect
12       to conduct in the United States I focused on the Supreme
13       Court's decision in Abitron plus the Second Circuit's decision
14       in Prime.
15                    For the language about when the statute applies with
16       respect to conduct occurring outside of the United States, the
17       Court looked at principles of international comity and the
18       Supreme Court's decision in Morrison.
19                    I'm prepared to hear what people have to say and
20       objections obviously with respect to that charge and anything
21       else, but I thought it would be helpful for you as you think
22       about that going into the afternoon to know what was on the
23       Court's mind.
24                    Thank you.
25                    (Recess)
```

Nannphi3                          Newman - Cross

1              THE COURT:  Be seated.

2              Let's bring in the jury.

3              (Jury present)

4              THE COURT:  Be seated.

5              Mr. Burnett, you may continue.

6              Mr. Newman, you are remind under you are still under

7    oath.

8              MR. BURNETT:  Thank you, your Honor.

9    BY MR. BURNETT:

10   Q.  Now that we have the context for the sermon, I would like

11   to go to your chart, which was Defense Exhibit 2055.  Okay?

12   A.  Okay, yes.

13   Q.  All right.  Now, the dotted yellow line there, that's the

14   archbishop's sermon, correct?

15   A.  Correct.

16   Q.  Now, let's start first with how you picked where that line

17   goes.  You said it was like 11 p.m., is that right?

18   A.  Yes.

19   Q.  Wasn't that a midnight mass?

20   A.  It was a midnight mass.  There was a copy of his speech

21   which was published on the internet at 11 p.m.

22   Q.  Got it.  You don't know if anyone at Morgan Stanley was

23   reading that speech at 11 p.m., do you?

24   A.  I don't.

25   Q.  You don't know if anyone at Morgan Stanley even knew he was

Nannphi3                          Newman - Cross

1  going to be speaking at that time, correct?

2  A.  I don't.

3  Q.  Right.  The time period around 11 p.m., midnight, that's

4  sort of an important time in lots of markets, right?

5  A.  It's an important time in lots of markets?  Well, this is

6  in South Africa time, correct?

7  Q.  That's correct.  It is your chart.

8  A.  12 a.m. South Africa time.  Typically it is more important

9  if you look at -- the GMT time would be.

10  Q.  We will get to the timing in a minute.  First.

11        The big blue circles here are Morgan Stanley, right?

12  A.  Correct.

13  Q.  And then there is a couple of these little small dots,

14  which are the other banks, right?

15  A.  That's correct.

16  Q.  You don't think that Morgan Stanley was the only bank that

17  was sitting there reading the archbishop's speech and reacting

18  to it, do you?

19  A.  I don't know what Morgan Stanley was doing.

20  Q.  If other banks or anyone really cared about this, don't you

21  think you would see more than just Morgan Stanley coming into

22  the market?

23  A.  Again, I don't know if the reason why Morgan Stanley put

24  those bids in has to do with the sermon.  I just know that

25  there were bids put in after the sermon.

Q.  Mr. Newman, if you don't know why they put them in, why did
you line them up right after the sermon?

A.  Why did I line them up right after the sermon?

Q.  Yes.  Why put this chart together if you don't know that
one caused the other?

A.  I put it together to reflect that there was interest that
came into the market at a specific time.

Q.  Wouldn't you be interested in knowing if it was interest
that was coming into the market at the same time on other days
of the week?

A.  Um, yes, I -- that would be -- that would be something that
would be worth looking at.

Q.  It would be important context to know if at right around 12
o'clock South Africa time a big bid came in the entire week
leading up to this, wouldn't it?

A.  Well, I was aware that there were bids that Morgan Stanley
was placing in the market as far back as I could look from
December 17.

Q.  But you didn't give that context in this chart, did you?

A.  I did not.

Q.  Now let's take a look at some of that context.  I would
like to take a look at Government Exhibit 629.

        Now, you were here for Professor Lyons's testimony
last week, weren't you?

A.  I was.

1    Q.  You remember that Professor Lyons showed and testified

2    about this chart that he put together, correct?

3    A.  Correct.

4    Q.  Do you remember that he testified that the tall blue lines

5    on this chart show the number of bids that are available in the

6    market above 12.50 over time, correct?

7    A.  Correct.

8    Q.  And do you notice something about what happens right around

9    midnight South Africa time on each of these days?

10   A.  There seems to -- well, 12 a.m.  I see that on the 18th

11   there weren't any.  There were some on the 19th, there were

12   some on the 20th and the 21st and 22nd, yes.

13   Q.  Let's march through that.  Let's look at right around

14   midnight on December 19th into 20th.

15            MR. BURNETT:  Can we zoom in on that.

16   BY MR. BURNETT:

17   Q.  Now, that's right around the same time that you plotted out

18   on your archbishop chart, correct?

19   A.  Yeah.

20   Q.  Fair to say the archbishop didn't give a speech around 11

21   p.m. on December 19, right?

22   A.  That there -- I didn't see a speech by the archbishop on

23   December 19.

24   Q.  But there were a lot of new bids that come in right around

25   that time, aren't there?

Nannphi3                          Newman - Cross

1    A.  There are bids that come into the market, yes.

2    Q.  Why don't we take the next day.  Let's look between

3    December 20 and 21.

4    A.  Okay.

5    Q.  Focusing on the same time of day that was in your chart,

6    correct?

7    A.  That's correct.

8    Q.  You see a bunch of bids come in here as well, right?  Right

9    around midnight?

10   A.  That's correct.

11   Q.  No archbishop speech before that, either correct?

12   A.  No archbishop speech before that.

13   Q.  Let's look at just the last day to complete it.  Can we

14   take a look at December 21 and December 22.  There is another

15   big spike right around midnight, right?

16   A.  That's correct.

17   Q.  No archbishop speech there either, correct?

18   A.  No.

19   Q.  But you didn't give that context when you put your chart

20   together, did you?

21   A.  I didn't.

22   Q.  Let's take a look at one last thing.  I want to take a look

23   at Defense Exhibit 2026.  Actually, no, before I get there,

24   there is one question I had wanted to circle back on from

25   earlier.

1        Do you remember when you testified about what the

2   defendant could or couldn't see about bids that were available

3   in the market?

4        Do you remember that?

5   A.  Yes.

6   Q.  And you were looking at bids that were on the Refinitiv

7   platform, correct?

8   A.  That's correct.

9   Q.  That is an interbank market, right?

10  A.  That's an interbank market.

11  Q.  So it is not something that hedge funds have access to,

12  correct?

13  A.  They can't trade directly on Refinitiv.

14  Q.  They have to go through a bank to do it?

15  A.  Yeah.

16  Q.  So the defendant wouldn't have been looking at the

17  Refinitiv screen himself, correct?

18  A.  He would not have been looking at the Refinitiv screen.

19  Q.  All right.  Let's take a look now at Defense Exhibit 2026.

20  This is that profitability chart that you put together earlier,

21  correct?

22  A.  Correct.

23  Q.  The point here seems to be to show that profitability on

24  the spot position was really large compared to profitability on

25  the one-touch option, is that right?

Nannphi3                        Newman - Cross

A.  I think that it's to show that there was profitability on

both spot and the option.

Q.  Well, let's look at the numbers you picked.  You put 14.58

million as the size of the profitability on this spot position,

correct?

A.  Correct.

Q.  So fair to say that when the defendant purchased the spot

position, he didn't know if he was going to profit on it,

right?

A.  When you put a position on in the market, you never know if

you are going to make or lose on it.

Q.  He could have made something; he could have lost something?

A.  There's not a hundred percent certainty.

Q.  But he knew if he hit 12.50 he was going to get his payout

on the one-touch option, correct?

A.  There was a trigger point at 12.50, yes.

Q.  Let's talk about this $14.58 million number that you have

here.  That is from the end of the day on December 27, correct?

A.  Correct.

Q.  But the defendant didn't actually spell the spot position

on the end of the day December 27, right?

A.  No, he did not.

Q.  He sold it the following day, correct?

A.  He sold a portion of it on the following day, on the 28th.

Q.  His actual profit on the spot position was lower than 14.58

Nannphi3                         Newman - Cross

1    million, right?

2    A.   Yeah.  It was, if you look at it over the two-day period,

3    it was probably somewhere between 10 and 11.

4                 (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NANGphi4                        Newman - Cross

1  BY MS. FLETCHER:

2  Q.  But you didn't put 10 or 11 million on this chart; right?

3  A.  I believe that I -- I did testify that, on the 28th, it was

4  10 or $11 million.

5  Q.  But when you wanted to put a picture of what was happening,

6  you chose a bigger number; right?

7  A.  I chose a number that just reflected that two-day period,

8  from Boxing Day to the 27th.

9  Q.  But not what his actual lower profit was on the position;

10  correct?

11  A.  I didn't do that, no.

12  Q.  Let's talk about the other side of this chart here, that's

13  the $5.8 million part; okay?

14  A.  Mm-hmm.

15  Q.  Now, this $5.8 million figure, that's a calculation that

16  you came up with; correct?

17  A.  That's correct.

18  Q.  It's not something you saw on any Glen Point records;

19  right?

20  A.  It's not something that I saw on the Glen Point records.

21  Q.  Let's talk about how you put that together.

22      MR. BURNETT:  Can we go to the work papers here that

23  are the slides 3, 26 is the file name.  At the top.

24      THE COURT:  Are we going to give this an exhibit

25  number, Mr. Burnett?

NANGphi4                        Newman - Cross

1          MR. BURNETT:  We will, but it might have to come after

2     the examination, if that's all right.

3          THE COURT:  Just be clear what you are showing him.

4          MR. BURNETT:  I am showing you the work book --

5          MR. GOPSTEIN:  Your Honor, it's not showing up on our

6     screens.  I don't know what the number is.

7          MR. BURNETT:  Can we publish it to all the parties.

8     We'll offer this in evidence as slide 3, 26 -- Government

9     Exhibit 883, look at that, right on time.

10          THE COURT:  You are showing 883, which corresponds to

11     what?  What is that?

12          MR. BURNETT:  So this is the work papers for one of

13     the expert witness' exhibits.

14          THE COURT:  It corresponds to slide 3.26; is that

15     correct?

16          MR. BURNETT:  So it corresponds to a couple different

17     slides, actually.

18     BY MR. BURNETT:

19     Q.  Why don't we start in the -- what you are seeing here, this

20     is the chart that you had plotted out showing the value of that

21     one-touch option over the course of time; correct?

22     A.  Correct.

23     Q.  And the $5.8 million profit number figure, you came to that

24     by focusing on the value of the option as of December 25th;

25     correct?

NANGphi4                          Newman - Cross

1    A.  Correct.

2    Q.  Now, it's interesting, you chose December 25th when looking

3    at the profitability of this option, but not December 25th when

4    you were looking at the delta target number; right?

5    A.  Again, it's really difficult, in terms of the movement of

6    the spot, to have the most accurate delta number, but I -- I

7    focused on the 25th for this, yes.

8    Q.  And that's because it was higher than it was on Friday;

9    right?

10   A.  On -- this number, if you look at it, as to where --

11   because there was a little bit of trading on Christmas Day, the

12   spot moved a little bit lower.  And the sensitivity of these

13   options around these times are very large.

14   Q.  Let's talk about what the difference would have been if you

15   had picked Friday, the last work day, instead of Saturday.

16          MR. BURNETT:  Can we go to the tab, the 12.5 pricing,

17   please.

18   Q.  And this is the backup data for the chart that we were just

19   looking at; correct?

20   A.  Yes.

21          MR. BURNETT:  Why don't we scroll down to row 60 --

22   sorry -- I mean row 66.

23   Q.  So these are the numbers from December 25th, Christmas;

24   right?

25   A.  Correct.

NANGphi4                        Newman - Cross

1    Q.  And here, the value of the option is 14.2 million,

2    basically; right?

3    A.  Correct.

4    Q.  And the difference between 14.2 and 20 million is a little

5    over 5, which is how you come to the profit number in your

6    chart; right?

7    A.  That's right.

8    Q.  Now, if you had chosen Friday, the last work day, it would

9    have been a much lower number; right?

10   A.  It would have been a little bit lower, but these things

11   move around a lot.  The spot is lower.

12   Q.  Let's go to row 63 here.  This is what it would have been

13   on Friday; right?

14   A.  That's right.

15   Q.  So it would have been $12 million; correct?

16   A.  That's what the valuation of the option says.

17   Q.  So your pie chart would have shown $8 million instead of

18   $5 million; right?

19   A.  The pie chart part, if I used that, it would have shown 8,

20   yes.

21   Q.  It would have been 8 million on the one-touch and, if you

22   used the real spot profit, it would have been 10 million there;

23   right?

24   A.  That's correct.

25   Q.  So closer to 50/50 than what you are showing on the chart?

NANGphi4                        Newman – Cross

1    A.  One would have been 8, one would have been 10, that's

2    closer to 50/50.

3    Q.  Now, I want to be really clear about something.  These

4    numbers you have here, they are not Glen Point's numbers;

5    right?

6    A.  They're not Glen Point's numbers.

7    Q.  You don't know if the defendant was thinking about his

8    profit and loss this way, do you?

9    A.  I don't.

10   Q.  Did you read the emails where the defendant talks about his

11   profit and loss on this position?

12   A.  I did not see those emails.

13   Q.  Why don't we take a look at them.

14            MR. BURNETT:  Why don't we take a look at Government

15   Exhibit 424.

16            MR. GOPSTEIN:  Objection, your Honor, to –– approach

17   at sidebar.

18            THE COURT:  Okay.

19            (Continued on next page)

20

21

22

23

24

25

 1              (At sidebar)

 2              THE COURT:  Does somebody have a hard copy of 424 I

 3      can look at?

 4              MR. BURNETT:  It's already in evidence.

 5              MR. GOPSTEIN:  On the direct, we tried to be very

 6      careful to stay out of the defendant's head.  The cross just

 7      now was entirely appropriate as to what the numbers were.

 8              Now, it appears to be saying, did you look at what the

 9      defendant was thinking; he said no.  Now, it appears that the

10      government is going to show what the defendant was thinking.

11      It's entirely irrelevant to what he did because he didn't opine

12      to the defendant's intent at all.  They can argue it in

13      closing.  To show what the defendant was thinking at this point

14      in time is not appropriate cross because we stuck with the

15      numbers and that was the entirety of his direct.

16              MR. BURNETT:  May I, your Honor.

17              The whole point of this chart about profit and loss

18      was to show that the one-touch option profit was not a big deal

19      and not a big deal compared to the size of the spot position.

20      There's evidence, which is in Government Exhibit 424, that the

21      defendant actually thought, he wrote this down, that as of

22      Friday, the value of that one-touch option was at 34 percent,

23      so about $6 million, which would have meant that the net profit

24      he was getting on it by triggering it was really $14 million,

25      which is significantly higher than the 5.8 that they have

NANGphi4                          Newman – Cross

1    plotted on the chart.

2           If you want me to ask it in terms of what the

3    defendant wrote down, I'm happy to do that.  But it's important

4    for the jury to understand, when thinking about the context of

5    the profit and loss, that the defendant was looking at numbers

6    and using numbers that were fundamentally different than what

7    the witness showed them.

8           THE COURT:  You are trying to undermine the testimony

9    of the witness; is that right?

10          MR. BURNETT:  Yes.

11          THE COURT:  I'm going to permit the testimony.  It's

12   permissible testimony to show the limits of the expert's

13   testimony.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury present)

2    BY MR. BURNETT:

3    Q.  Mr. Newman --

4           MR. BURNETT:  Is everyone able to see Government

5    Exhibit 424?  Let's publish it for the jury, please, and the

6    witness.

7    Q.  Do you see here that there is an email thread from

8    December 27th, 2017?

9    A.  I do.

10          MR. BURNETT:  So let's start by going to page 2.

11   Q.  And I want you to take a look at the email that's in the

12   middle of the screen here.

13          MR. BURNETT:  Could you please blow that up.

14   Q.  So this is from December 27th, 2017, this is the day after

15   Boxing Day, correct, the first workday back?

16   A.  Yes.

17   Q.  And this is from Mr. Phillips?

18   A.  Yes.

19   Q.  Do you see that Mr. Phillips said, "Matt, the rand P&L is

20   completely wrong, please look at it ASAP?"  Do you see that?

21   A.  Mm-hmm.

22   Q.  Let's follow along.

23          MR. BURNETT:  You can take this down and let's scroll

24   up one page.  Now, let's blow up the response from Matt

25   Garnett.

Q.  Now, Matt Garnett writes, "Hi, Neil, I have looked at the dollar/ZAR P&L.  The OT P&L is booked and the P&L is included correctly in today's P&L."

I want to focus on the third like here, where it says the 12.5 OTP?

A.  Yup.

MR. BURNETT:  Can we highlight this, please.

Q.  This says, "The 12.5 OT was marked at 60.66 percent on Friday, so P&L to 100 percent, 7.87 million."

Do you see that?

A.  Yes.

Q.  So that's Matt reporting to the defendant that the profit on that one-touch option between Friday and triggering is about 7.87 million?

A.  Yes.

Q.  Let's scroll up to see what Mr. Phillips says.  Do you see here, Mr. Phillips responds, "Okay.  Just thought USD/ZAR was 12.72 on Friday and one-touch 12.50 marked at 34 percent."

Do you see that?

A.  I do see that.

Q.  Now, if the one-touch had been marked at 34 percent, it would have been, what, like a $6 million value; correct?

A.  It would have been a $7 million value.

Q.  So about a $13 million profit hitting it from that reference point; right?

1    A.  Yeah.

2    Q.  That's what the defendant wrote about the one-touch as of

3    Friday; correct?

4    A.  Friday.  But again, this -- if you look, this is based upon

5    a 12.72 spot rate, as opposed to the New York close.  And what

6    I saw that kind of Glen Point kept two P&Ls; a New York P&L and

7    a London P&L.

8    Q.  And you never actually saw a P&L from Christmas; right?

9    A.  I didn't see a Christmas Day P&L.

10   Q.  So you are using numbers that Glen Point wasn't using;

11   right?

12   A.  I used a Christmas number to calculate the value of the

13   option, yes.

14   Q.  You came up with a Christmas number, you didn't use Glen

15   Point's; correct?

16   A.  I didn't use Glen Point's.  I consistently tried to use the

17   New York close just simply as a means of -- that just seems

18   sort of the end of the trading day, from the way I see things.

19            MR. BURNETT:  No further questions, your Honor.

20            THE COURT:  Redirect examination.

21            MR. GOPSTEIN:  Thank you, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. GOPSTEIN:

24   Q.  Mr. Newman, on cross-examination, you were shown a number

25   of articles from 2017 about South Africa.

NANGphi4                         Newman – Redirect

1           Do you recall that?

2   A.  I do.

3   Q.  Do you recall that one article you were shown was from

4   April 2017?

5   A.  Yes.

6   Q.  Do you recall that another article you were shown was from

7   August 2017?

8   A.  Yes.

9   Q.  When was the election for president in South Africa in

10  2017?

11  A.  The ANC conference was in December of 2017.

12  Q.  Let's move to December, because you were also shown an

13  article from December 21st, 2017.

14          Do you recall that?

15  A.  Yes.

16  Q.  On cross-examination, you were shown an article from

17  December 22nd, 2017.

18          Do you recall that?

19  A.  Yes.

20  Q.  And do you recall being asked why you didn't plot the

21  effect of these articles from December 21st and December 22nd

22  on the market?

23  A.  Yes.

24  Q.  Mr. Newman, when were the trades in the spot market that

25  were for $725 million?

1    A.  They were done on December 26th, 2017.

2    Q.  And when was the Archbishop's sermon?

3    A.  The Archbishop's sermon was on December 25th.

4            MR. GOPSTEIN:  If we can please pull up defense

5    Exhibit 2055.

6    Q.  Do you recall being asked questions on cross-examination

7    about this slide?

8    A.  Yes.

9    Q.  And then being shown, just for context, is defense Exhibit

10   2055 and is this the slide that shows more than $2 billion in

11   new bids being placed after the Archbishop's sermon?

12   A.  Yes.

13   Q.  Do you recall, after being shown this slide, you were shown

14   on cross-examination, Government Exhibit 629?

15   A.  Yes.

16   Q.  And just while we're looking at this slide, 2055,

17   approximately how many bids were placed on this day prior to

18   these bids that were placed after the Archbishop's sermon?

19   A.  There were very, very few; small amounts.

20   Q.  After being shown this slide, you were shown Government

21   Exhibit 629; correct?

22   A.  Correct.

23           MR. GOPSTEIN:  If we could please publish that for the

24   jury.

25   Q.  Do you recall being shown this slide and being pointed on

1   each day to the activity that was happening around midnight?

2   A.  Yes.

3   Q.  If I can direct your attention to the left side of this

4   slide, what does it say in terms of active bids?

5   A.  The very left side of the slide?

6   Q.  Does that say in USD millions?

7   A.  Yes, it's dollar/ZAR active bids USD millions, yes.

8   Q.  On December 18th, what's the highest bar here?

9   A.  The highest bar is 9 -- it looks like somewhere between

10   900 million and a billion.

11   Q.  Do you see anything on this slide that shows $2 billion of

12   bids being placed?

13   A.  I don't.

14   Q.  We just looked at the number of bids that were placed just

15   before the Archbishop's sermon, I believe you testified that

16   there was essentially nothing?

17   A.  That's right.

18   Q.  What do you see on this slide as to bids prior?

19   A.  That there were some bids in the markets.

20        MR. GOPSTEIN:  Thank you, Mr. Newman.

21        MR. BURNETT:  A little bit of cross.  Can we pull up

22   defense Exhibit 2055 and Government Exhibit 629 side by side.

23   RECROSS EXAMINATION

24   BY MR. BURNETT:

25   Q.  Mr. Gopstein was just asking you to compare $2 billion of

1  bids from DX 2055 with about $500 million of bids in Government

2  Exhibit 629; is that correct?

3  A.  That's correct.

4  Q.  Now, fair to say that defense Exhibit 2055 plots out bids

5  at 12.50 but also bids below 12.50; correct?

6  A.  That's correct.

7  Q.  That's how you are adding it up to $2 billion?

8  A.  Well, I mean, I understand what you're saying.  There's an

9  important difference, in the fact that if you look at the

10 exchange rate, it's at roughly, let's call it a straight line

11 across, at 12.75.  If you look at the exchange rate on the

12 dates of December 18th, December 19th, December 20th, if you

13 look at the start of the day, it's basically above 12.75.  So

14 naturally, you would expect more bids above 12.5 with the

15 dollar/rand being at a higher price.

16 Q.  I am asking little bit of a different question.

17      So the $2 billion that you are getting to on DX 2055

18 is because you are adding up the bids at 12.50 --

19 A.  Yes.

20 Q.  -- the bids at 12 and the bids at 11.50?

21 A.  Yes.

22 Q.  Now, look over at Government Exhibit 629.

23 A.  Mm-hmm.

24      MR. BURNETT:  Mr. Sears, can we highlight the square

25 at the top where it says active bids dollar/ZAR greater than

1    12.50.

2    Q.  Can you read that?

3    A.  Yes.

4    Q.  And that's because this chart here is only plotting out the

5    bids that are 12.50 and above; correct?

6    A.  That's correct.

7    Q.  It's not actually looking at the bids that are deeper down;

8    right?

9    A.  That's correct.

10   Q.  And you didn't give any context about the bids that were

11   deeper down on these earlier days; right?

12   A.  Could you repeat the question.

13   Q.  Sure.

14        You didn't do your same analysis of below the 12.50

15   level for any of the days during the week of the ANC election;

16   correct?

17   A.  In relation -- I'm sorry, in relation to these -- could you

18   repeat the question.

19   Q.  Why don't I ask it a little bit differently.

20        At the 12.50 level on your chart --

21   A.  Yup.

22   Q.  -- at DX 2055 --

23   A.  Yup.

24   Q.  -- it's about $535 million?

25   A.  That's right.

1  Q.  And if you look over at Government Exhibit 629, the lines

2  that happen at around 12:00 are about 500 million or so each

3  day; correct?

4  A.  That's correct.

5  Q.  And that would be the apples to apples comparison, right,

6  because the chart on the right is only focused on bids at 12.50

7  or above; correct?

8  A.  Well, again, this comes to the whole thing of looking where

9  the dollar/rand exchange rate is, right.  At this point, if you

10  look, for example, on December 21st, okay, the dollar/rand was

11  at 12.75.  So naturally, there would be more bids above 12.50.

12          In this example here, what you have is that the

13  dollar/rand is closer, it's 12.60, so naturally, you would have

14  fewer bids above 12.50 with the exchange rate being roughly

15  one percent lower.

16  Q.  Mr. Newman, let me ask it really simply.

17          Did you plot out any bids at 12.50 or below for

18  December 19th?

19  A.  For December 19th, I looked at -- we looked at all the

20  bids.

21  Q.  You looked at all the bids.  But you didn't make a chart

22  like this for the bids on December 19th?

23  A.  I did not.

24  Q.  You didn't do it for December 20th; right?

25  A.  I did not.

NANGphi4                          Newman – Recross

1   Q.  You didn't do it for December 22nd; right?

2   A.  I did not prepare a chart.

3   Q.  And remember how you were asked how there were not many

4   bids before midnight, before the Archbishop's sermon, do you

5   remember you were asked that on redirect?

6   A.  Yup.

7   Q.  It was Sunday; right?

8   A.  Let me just get my days straight.  Christmas Eve was

9   Sunday, yes.

10           MR. BURNETT:  Nothing further.

11           THE COURT:  Anything further?

12           MR. GOPSTEIN:  Nothing further, your Honor.

13           THE COURT:  You are excused as a witness.

14           Let me see the parties at sidebar.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

NANGphi4

1                (At sidebar)

2                THE COURT:  Anything further expected on the defense

3    case?

4                MR. HECKER:  I think we have a stipulation to read,

5    which moves in some exhibits, and then we're resting.

6                THE COURT:  And does the government expect any

7    rebuttal case?

8                MS. FLETCHER:  I think the only rebuttal case would be

9    the audio that's the subject of the motions on which your Honor

10   has reserved.

11               THE COURT:  So you are still pushing the admissibility

12   of that, notwithstanding the way in which the testimony was

13   addressed?

14               MS. FLETCHER:  We actually have not had a chance to

15   discuss it.  If we could, once the defense rests, I think we

16   could give the Court a position.

17               THE COURT:  So what we're going to do is offer

18   everything that remains in your case, the defense will.  The

19   defense will not formally rest.  I will then give the jury a

20   break.  I'm going to make inquiry of the defendant about his

21   decision not to testify.  I will also hear any argument from

22   the government with respect to a rebuttal case.

23               And then, on the assumption that the defendant

24   maintains his position, he's not going to testify and --

25   regardless of my decision with respect to the tape -- we will

NANGphi4

1    probably have the jury come back in, either there will be the

2    rebuttal case or there won't be the rebuttal case.  And I would

3    let them go for the day.  You will then have lunch off, and

4    we'll reconvene some point in the afternoon to go through the

5    charge conference.

6              Acceptable to the defense?

7              MR. HECKER:  Yes, thank you.

8              THE COURT:  To the government.

9              MR. THOMAS:  Yes.

10             (Continued on next page)

NANGphi4

1              (In open court; jury present)

2              THE COURT:  What's next from the defense?

3              MR. GOPSTEIN:  Your Honor, at this point, the defense

4    would like to read in a stipulation and mark some exhibits.

5    The stipulation is marked defense Exhibit 3000, and after the

6    introductory paragraph, it says that defense Exhibits 702 and

7    704 and any subparts consist of true and accurate copies of

8    recorded calls maintained by Glen Point Capital, Glen Point.

9    Defense Exhibits 702-M and 704-M contain metadata associated

10   with recordings for the recorded calls in defense Exhibits 702

11   and 704.  The date and participants are set forth in annex A.

12             It is further stipulated and agreed that no party will

13   raise any objection under Federal Rules of Evidence 901 with

14   respect to any exhibit referenced.

15             It is further stipulated and agreed that this

16   stipulation may be received into evidence at trial.

17             The annex, annex A, refers to defense Exhibit 702 and

18   provides a date and time of December 18th, 2017, 8:23:50, with

19   participants Neil Phillips and Phillip Costa.  Defense

20   Exhibit 704 has a date and time of December 18th, 2017 and

21   12:53:52, and again, participants Neil Phillips and Phillip

22   Costa.

23             And the stipulation is signed by the parties.

24             The defense, at this time, would move in defense

25   Exhibit 3000, 503, 506, 517, 600, 608, 623, 635, 702, 704 and

NANGphi4

1    Government Exhibits 109-A and 109-M.

2              THE COURT:  Any objection to those, Mr. Burnett?

3              MR. BURNETT:  No objection.

4              THE COURT:  Those are all received.

5              (Defendant's Exhibits 3000, 503, 506, 517, 600, 608,

6    623, 635, 702 and 704  received in evidence)

7              (Government Exhibits 109-A and 109-M received in

8    evidence)

9              MR. GOPSTEIN:  And defense Exhibit 702-M and 704-M,

10   which are referenced in 3000 are also being moved in.

11             MR. BURNETT:  No objection.

12             THE COURT:  Those are received.

13             (Defendant's Exhibits 702-M and 704-M received in

14   evidence)

15             THE COURT:  Any other exhibits to offer?

16             MR. GOPSTEIN:  No, your Honor.

17             THE COURT:  Members of the jury, we're going to take a

18   brief break now.  There are some legal matters I need to

19   discuss with the parties.  I expect a 10 or 15-minute break, so

20   short break, and then we will take lunch at 1:00.  Short break,

21   don't talk about the case amongst yourselves or with anybody

22   else.

23             (Continued on next page)

24

25

NANGphi4

<pre>
 1                (In open court; jury not present)
 2                THE COURT:  I understand that the defendant has
 3     decided not to testify in this case in his own defense.  I'm
 4     going to have some questions for Mr. Phillips about that
 5     decision to make sure that he is making that decision of his
 6     own free will and that he understands that it is his decision
 7     and his decision alone to make.  After I engage in that
 8     colloquy with him, I will invite counsel from both sides to
 9     suggest any additional questions they believe that I need to
10     ask.
11                So, Mr. Phillips, am I correct that you have made the
12     decision not to testify in this case in your own defense?
13                THE DEFENDANT:  Correct, sir.
14                THE COURT:  And do you understand that you have the
15     absolute right to testify in your own defense in this case?
16                THE DEFENDANT:  I do, your Honor.
17                THE COURT:  And do you understand that even if prior
18     to this moment you decided that you didn't want to testify, you
19     could change your mind right now and decide that you want to
20     testify?
21                THE DEFENDANT:  I understand.
22                THE COURT:  Has anybody forced you not to testify?
23                THE DEFENDANT:  Nobody.
24                THE COURT:  Are you making this decision of your own
25     free will?
</pre>

NANGphi4

1          THE DEFENDANT:  I am, your Honor.

2          THE COURT:  And are you making this decision after

3    having consulted with counsel?

4          THE DEFENDANT:  I have spoken to them, your Honor,

5    yes.

6          THE COURT:  And do you understand that, even if your

7    counsel advised you not to testify, it would be your decision

8    and your decision alone whether to testify?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Even after hearing from me that it is your

11    decision and your decision alone to testify, is it still your

12    decision not to testify in this case?

13          THE DEFENDANT:  It is my decision not to testify in

14    this case, your Honor.

15          THE COURT:  Does the defense believe there are any

16    additional questions I should ask?

17          MR. HECKER:  No, your Honor.

18          THE COURT:  Does the government believe there are any

19    additional questions I should ask?

20          MS. FLETCHER:  No, your Honor.

21          THE COURT:  I am satisfied that the defendant has made

22    his decision of his own free will and without anybody forcing

23    him otherwise not to testify in this case.

24          Thank you, Mr. Phillips.  You may be seated.

25          Does the government need a minute to confer?

NANGphi4

1          MS. FLETCHER:  We don't, your Honor.  We have

2     conferred.  We have no rebuttal case.

3          THE COURT:  While we're all here, Mr. Hecker, are you

4     renewing your motions?

5          MR. HECKER:  We are, your Honor.

6          THE COURT:  Those motions are deemed renewed.

7          So I will bring the jury back in.  The defense will

8     rest, and then the government will indicate that it has no

9     rebuttal case.  And then we'll let the members of the jury go

10    until 9:00 tomorrow morning.  I will inform them that they

11    don't have the case yet, that it is particularly important at

12    this stage that they not talk to anybody about the case and

13    that they not talk to one another and that they not do any

14    further research and that tomorrow, they will have the closing

15    statements of the parties and jury instructions.

16         So let's bring in the jury.

17              (Continued on next page)

18

19

20

21

22

23

24

25

NANGphi4

1          (In open court; jury present)

2          THE COURT:  Mr. Hecker.

3          MR. HECKER:  Yes, your Honor.  At this time, the

4    defense rests.

5          THE COURT:  Does the government have any rebuttal

6    case?

7          MR. BURNETT:  No, your Honor.

8          Although, just for the record, the exhibit that did

9    not have a number when I was doing cross-examination was

10   Government Exhibit 882.

11         (Government Exhibit 882 received in evidence)

12         THE COURT:  Members of the jury, that concludes the

13   presentation of the evidence in this case.

14         I'm going to let you go now for the rest of the day.

15   You are to come back here before 9:00 tomorrow morning so that

16   we can get started promptly at 9:00.

17         Tomorrow, you will hear the closing statements of the

18   parties, and then you will receive my instructions on law, and

19   then you will retire to deliberate.  It is particularly

20   important at this point that you not have any discussions

21   either amongst yourselves or with anybody else about this case,

22   about the facts of the case, about the issues in the case,

23   about the personalities in this case, anything having to do

24   with the case.  It's also particularly important that you not

25   do any research of your own into the case.  The case has not

NANGphi4

1    yet been submitted to you for your deliberations and your

2    decision.  You are to keep an open mind.

3              Please come back here shortly before 9:00 tomorrow

4    morning, and then we will proceed as I indicated.  Have a good

5    afternoon, everybody, and a good evening.

6              (Continued on next page)

NANGphi4

1          (In open court; jury not present)

2          THE COURT:  We will let the alternates go after I have

3     given the instructions and before the jury retires to

4     deliberate.

5          How much time do the parties want to consider the jury

6     charge before they come back here for the charge conference?

7          Mr. Hecker.

8          MR. HECKER:  I think, with the Court's permission, I

9     believe it's a joint request, if we could have the lunch hour

10    to review the charge and potentially narrow issues and then do

11    the charge conference after lunch.

12         THE COURT:  That's fine with me.  Why don't we

13    reconvene at 2:15.

14         Does that work for you, Mr. Hecker?

15         MR. HECKER:  It does, your Honor.  Thank you.

16         THE COURT:  Does that work for the government?

17         MR. THOMAS:  It does, your Honor.

18         THE COURT:  One observation to make, we are going into

19    a stage of the case where, at some point, somebody is going to

20    be disappointed -- and I don't know who it is going to be --

21    but I would like to remark right now at the professionalism and

22    the excellence of the advocacy in the case.  I have really been

23    impressed by both sides at the work that you each have done,

24    and so it's been very helpful to the Court.  I think it's been

25    very helpful to the jury, in terms of presentation.  You all

NANGphi4

1    should commend yourselves at the really fine work that you have

2    done.  I don't expect this vigorous advocacy or the

3    disagreements to end.  I'll see you at 2:15.

4                  (Luncheon recess)

5                  (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          AFTERNOON SESSION

                             (2:15 p.m.)

          THE COURT:  All right.

          The way in which I would ordinarily do this is to go

through the charge section by section.  I don't know if the

parties have had a chance to meet and confer.  Maybe there's a

limited number of objections they each have.

          What is the government's view?

          MS. FLETCHER:  Your Honor, we have been able to confer

on a number of issues.  We just didn't get all the way through.

I suspect that even on the non-,  -- what I would call the

nonsubstantive issues that we have not been able to confer,

that it is unlikely to take too much of the Court's time to

resolve them.

          There are, though, a couple of substantive issues,

obviously the extraterritoriality section, and then a couple of

issues with some of the language that was recently added.

          So I think we are happy to do it in whatever order the

Court would prefer.

          THE COURT:  Why don't I just go through it section by

section.  That way we have a clean record.  What I am going to

do is just, for each section, first ask if the government has

any exceptions or objections and then the defense.

          So on Section I, 1, "Function of the Court, Role of

the Jury" anything from the government?

1          MS. FLETCHER:  No, your Honor.

2          THE COURT:  From the defense?

3          MS. DABBS:  Your Honor, we just had one note on the

4   Court's instruction.  It is in the paragraph that begins, "In

5   determining the facts."

6          Towards the end of that paragraph, your Honor, after

7   the statement only the answers are evidence, it then says, "You

8   may not consider any answer that I directed you to disregard or

9   that I directed struck from the record."

10         I don't think we are aware of any examples of the

11  Court directing answers to be struck from the record.  That

12  clause we think can come out.

13         THE COURT:  That seems appropriate to me.  Does the

14  government agree?

15         MS. FLETCHER:  We agree.

16         THE COURT:  I, 2.

17         Anything from the government?

18         MS. FLETCHER:  No, your Honor.

19         THE COURT:  From the defense?

20         MS. DABBS:  No, your Honor.

21         THE COURT:  In I, 3, anything from the government?

22         MS. FLETCHER:  No, your Honor.

23         THE COURT:  From the defense?

24         MS. DABBS:  No, your Honor.

25         THE COURT:  I, 4, anything from the government?

1           MS. FLETCHER:  No, your Honor.

2           If it's helpful, I think the government's first item

3      is I, 8.

4           THE COURT:  All right.  That is helpful.

5           Anything from the defense on I, 4.

6           MS. DABBS:  No, not until I, 8 as well.

7           THE COURT:  Okay.  So we'll go to I, 8.

8           Okay.

9           From the government, do we need I, 8?

10          MS. FLETCHER:  We do not.

11          THE COURT:  Does the defense agree on that?

12          MS. DABBS:  We do.

13          THE COURT:  Okay.  So I, 8 will be struck.

14          What is the next thing the government has?

15          MS. FLETCHER:  I, 9.

16          THE COURT:  Okay.  What do you have on I, 9.

17          MS. FLETCHER:  In I, 9 as it's currently drafted,

18     there is an explanation of stipulations of fact.  There was

19     also a stipulation of testimony in the case, so the government

20     has some proposed language to add with respect to that.

21          THE COURT:  Have you gone over that language with the

22     defense?

23          MS. FLETCHER:  Yes.

24          THE COURT:  Okay.

25          Does the defense agree with it?

1          MS. DABBS:  We do, Judge.

2          THE COURT:  Why don't you tell me what it is, and then

3     you will hand it up to me.

4          You have a copy I assume for me?

5          MS. FLETCHER:  I do I actually have an e-mail with

6     some additional language to be added for a different

7     instruction.  If it's okay, I can hand up the same one for

8     multiple instructions.

9          THE COURT:  Okay.

10          MS. FLETCHER:  So the proposed addition with respect

11     to I, 9, is that, "A stipulation of testimony is an agreement

12     among the parties that, if called, a witness would have given

13     certain testimony.  You must accept as true the fact that the

14     witness would have given the testimony.  However, it is for you

15     to determine the effect to be given that testimony."

16          THE COURT:  Okay.  I will give that instruction.

17          All right.

18          I assume there's nothing else from the defense on I,

19     9.

20          MS. DABBS:  No, Judge.

21          THE COURT:  What's the next one for the government?

22          MS. FLETCHER:  Your Honor, I think our next one I

23     believe the defense actually has the next one, which is in, I

24     believe, I, 14.

25          THE COURT:  Okay.  I take it you don't have anything

1    before I, 14?

2              MS. FLETCHER:  We do not.  We understand that your

3    Honor deleted the instruction with respect to materials

4    obtained pursuant to a search, which is fine with the

5    government.

6              THE COURT:  Okay.

7              From the defense on I, 14?  Anything before I, 14.

8              MS. DABBS:  Nothing before I, 14.

9              In the very last paragraph of that section that

10   begins, "If you have a reasonable doubt" we just wanted to

11   modify the framing so that it matches within the paragraph to

12   say "if you have a reasonable doubt as to the defendant's

13   guilt, you should not hesitate for any reason to return a

14   verdict of not guilty."

15             We thought that finding a verdict of acquittal, given

16   the form that they will actually have, might be a little bit

17   confusing as a framing.

18             Then it will roughly match the end of that paragraph

19   where the jury is instructed not to hesitate because of

20   sympathy to render or return a verdict of guilty.

21             THE COURT:  Any objection to that edit from the

22   government?

23             MS. FLETCHER:  No, your Honor.  To the extent that the

24   second sentence still includes this "render" word, we would

25   just propose that that word be changed to "return" so that the

1    sentences run in parallel.

2              THE COURT:  Okay.

3              I will do all of that.

4              Okay.  Now we are on to II.  Let me go through this

5    piece by piece.

6              Anything on II from the government?

7              MS. FLETCHER:  Yes, your Honor, two things.

8              With respect to the last line on page 10 of the

9    redline under II, there is a sentence that begins, "The fact

10   that a defendant."

11             THE COURT:  Okay.

12             MS. FLETCHER:  We have conferred on this point and

13   agree that it should say, "The fact that the defendant."

14             THE COURT:  Okay.

15             Anything else on II?

16             MS. FLETCHER:  Yes, your Honor.

17             We see that you include in the second paragraph an

18   indication that you will send back a copy of the indictment to

19   the jury.

20             As your Honor may recall, the indictment as returned

21   by the grand jury in this case has four counts.  So what we

22   were contemplating doing -- and we've sent a proposed draft to

23   defense -- is essentially removing the speaking portion and

24   removing the charging language with respect to Counts Three and

25   Four and essentially sending back to the jury a proposed

1    indictment that just has the charging language of the statutory

2    allegations for Counts one and two.

3                THE COURT:  Okay.

4                What is the defense view?

5                MS. DABBS:  Conceptually we that think works just

6    fine.  Ms. Fletcher had just sent it to us while we were

7    conferring before the Court took the bench.  We will take a

8    look at it, Judge.  Obviously if we have an issue with the way

9    that it's prepared, we will discuss among ourselves and let you

10   know if there's any dispute there.

11               THE COURT:  Okay.  So I am not going to change

12   anything that second paragraph under II.

13               Anything from the defense on II?

14               MS. DABBS:  No, your Honor.

15               THE COURT:  Okay.  III.

16               Anything from the government?

17               MS. FLETCHER:  Yes, your Honor.  In the second

18   paragraph, where it describes Count One, the first sentence --

19   well, it is actually, I guess, one sentence long.

20               Where the sentence says that the defendant is charged

21   with conspiring to commit commodities fraud by manipulating the

22   dollar/rand exchange rate, the government would propose

23   removing the clause that immediately follows that and just

24   saying the "dollar/rand exchange rate, fraudulently triggering

25   a barrier option contract."

NANNPHI5                    Charge Conference

1        THE COURT:  And then continuing on?

2        MS. FLETCHER:  Yes.

3        THE COURT:  Okay.

4        Anything else on III before I ask the defense for

5   their views?

6        MS. FLETCHER:  No, your Honor.

7        THE COURT:  Does the defense have any objection to

8   that?

9        MS. DABBS:  We are fine with that change, Judge.

10        THE COURT:  Okay.  I will make that change.

11        Anything else from the defense on III?

12        MS. DABBS:  No.

13        THE COURT:  IV, anything from the government?

14        MS. FLETCHER:  No, your Honor.

15        THE COURT:  What about from the defense?

16        MS. DABBS:  No, your Honor.

17        THE COURT:  V.  Do I need to give that instruction?

18        MS. FLETCHER:  We would request that your Honor give

19   it just given the Christmas Boxing Day time zones issues, just

20   to avoid any confusion on that point.

21        THE COURT:  Is there any objection to the language in

22   V?

23        MS. FLETCHER:  From the government, no, your Honor.

24        THE COURT:  All right.

25        Anything from the defense on V?

1                MS. DABBS:  It is fine as the Court has it, Judge.  We

2     weren't sure that it was required, but we don't have an issue

3     if the government would like to keep it in with that language.

4                THE COURT:  Okay.

5                VI.  Anything from the government?

6                MS. FLETCHER:  No, your Honor.

7                THE COURT:  From the defense?

8                MS. DABBS:  No, your Honor.

9                THE COURT:  Okay.

10               VII.  Anything from the government?

11               MS. FLETCHER:  Yes, your Honor.  With respect to the

12    sentence that your Honor added.

13               THE COURT:  I don't have the blackline in front of me.

14    I am looking at my clean version.  So you will have to tell me

15    which is the sentence that you have an issue on.

16               MS. FLETCHER:  Yes, your Honor.  It is the last

17    sentence of VII.

18               THE COURT:  Okay.

19               MS. FLETCHER:  So, I will confess, your Honor, we've

20    talked amongst ourselves and with some supervisors and we have

21    never actually seen language like this any charge.

22               THE COURT:  About considering the counts in that

23    order?

24               MS. FLETCHER:  Yes.  In cases where I have seen that

25    language, your Honor, it's where the verdict on one count

1    depends on the verdict in the other.

2           In this case, at least as we understand it, the jury

3    is permitted to take the counts in whatever order they see fit.

4    One count doesn't depend on the verdict of the other.  So we

5    are not aware of any law that says this is wrong, but it's

6    unlike any instruction we've seen.  It wasn't clear to us where

7    it was coming from or what the Court's thinking was.

8           THE COURT:  I mean, I can tell you what my thinking

9    is, but I am also not wedded to the language.

10          My thinking is that it's generally easier for the jury

11   when they have instructions to then, you know, use those

12   instructions in filling out the verdict form, and that the

13   logic in terms of treating Count Two before one treats Count

14   One with respect to the conspiracy charge would also apply to

15   the jury's deliberations.  So that struck me as just trying to

16   be jury friendly, but I did not base it upon any decision.

17          MS. FLETCHER:  That's well understood, your Honor.

18          I think if that's the goal what we would propose is

19   maybe instead of saying "you will consider the counts in that

20   order" saying "you may consider them in that order."  We just

21   want to avoid a situation where the jury thinks they have to

22   tackle them in any particular order.

23          THE COURT:  Okay.  That seems fine to me, but let me

24   ask the defense.

25          MS. DABBS:  Sure, Judge.  We think it is a logical way

1  for them to proceed, and we do perceive it as jury friendly,

2  but certainly making it permissive and an option that they may

3  elect to proceed in that way is fine with defense.

4          THE COURT:  Anything else from the defense on VII?

5          MS. DABBS:  No.

6          THE COURT:  Okay.

7          VIII.

8          Before we get to Section 1, anything from the

9  government?

10         MS. FLETCHER:  No, your Honor.  I understand that the

11  defense has some proposed revisions which we are okay with.

12         THE COURT:  Okay.  Let me hear there the defense.

13         MS. DABBS:  Just to track the language in those three

14 segments.  So in (b) Judge, "made an untrue statement of a

15 material fact or omitted to state a material fact which made

16 what was said" I think there's just a word missing there.

17         THE COURT:  Yes.

18         MS. DABBS:  And for (c), "engaged in an act, practice,

19 or course of business that operated or would operate as a fraud

20 or deceit upon any person or entity" is just the language

21 pulled from the relevant section.  So we would ask that that be

22 included there as well, recognizing that we're broadly

23 operating in a different subsection as the charge continues.

24         THE COURT:  I will make those changes.  Okay.

25         MS. DABBS:  Thank you.

1          THE COURT:  Anything else, Ms. Dabbs, on VIII before

2     we get to Section 1?

3          MS. DABBS:  No, your Honor.

4          THE COURT:  Section 1, under VIII, the first element.

5          Anything from the government?

6          MS. FLETCHER:  Yes, your Honor.

7          So we see that over the last version your Honor added

8     one sentence at the end of the second to last paragraph of that

9     section.

10          The sentence begins, "A transaction also is not

11     manipulative if it was done for a purpose other than to deceive

12     or defraud."  Your Honor, the concern we have with that

13     sentence is that there's some tension between the language of

14     that sentence and the final sentence of the section that could

15     cause the jury to be confused or struggle to understand how

16     those two sentences work together.

17          Just before your Honor came out, we were discussing

18     ways to modify the sentence.  I think from the government's

19     perspective, it would be accurate to add the word "only" after

20     the word "done" because that would make clear that if there was

21     no intent to deceive, meaning there was only an intent to

22     transact for a legitimate purpose, that that would not be

23     manipulative.

24          I understand that Ms. Dabbs does not like that

25     addition, but we're sort of struggling with how to capture what

1    your Honor was trying to do in a way that is mutually agreeable

2    and not confusing.

3             THE COURT:  All right.  I get the point.

4             Let me hear from Ms. Dabbs.

5             Let me actually ask, is there anything else on that

6    Section 1 from the government?

7             MS. FLETCHER:  No, Your honor.

8             THE COURT:  Okay.

9             Ms. Dabbs.

10            MS. DABBS:  Certainly recognizing, your Honor, that

11   what I may or may not like will not and should not carry the

12   day here, I think what the Court has proposed here in that

13   sentence is absolutely accurate, and we think it's critically

14   important that the jury is instructed and understands that

15   legitimate trades may affect prices in the market.

16            And certainly it is accurate to say that a transaction

17   is not manipulative if it was done for a purpose other than to

18   deceive or defraud.  There's nothing problematic or inaccurate

19   about that framing.  We don't see it as in tension with any

20   other portion of the Court's instruction.

21            THE COURT:  All right.

22            Well, I think there is a bit of a tension, but I am

23   not sure that I am happy with what the government has

24   suggested.  Because I assume the government's point is that, if

25   there was a purpose other than to deceive or defraud others,

1    but also a purpose to deceive and defraud others that was the

2    but-for cause, then there is manipulation, and the sentence

3    doesn't quite capture that notion.

4              I take it that's the government's point, is that

5    right?

6              MS. FLETCHER:  That is exactly right, your Honor.

7              I think if your Honor wanted to say that transactions

8    that affect prices in the market are not necessarily

9    manipulative unless done for a purpose other than to deceive or

10   to defraud or something like that -- I would have to write it

11   out and confirm that that's capturing what your Honor is trying

12   to accomplish here -- I think that might eliminate, or some

13   framing of that might eliminate the tension.

14             THE COURT:  Give me the beginning part of what you

15   said.

16             MS. FLETCHER:  I knew your Honor what was going to ask

17   that.  If a transaction -- well, maybe the way to say it is a

18   transaction that affects prices in the market is not

19   necessarily manipulative unless it was done -- unless the

20   purpose of the transaction was to deceive or defraud.

21             I mean, the problem with that framing is it implies

22   that there's only one purpose.  So I'm struggling with a way to

23   frame it that doesn't create this issue.

24             May I have a moment to confer?

25             THE COURT:  Yes.  I am going to think about it also

1    while you are doing that.

2          Why don't you tell me what you have got.  I've got

3    some thoughts on language.

4          MS. FLETCHER:  Okay.  So, your Honor, the proposal I

5    think requires us to break this into two sentences.

6          THE COURT:  Yes.

7          MS. FLETCHER:  So what we would propose is that,

8    instead of the sentence that begins "a transaction," just

9    remove that sentence entirely.

10         THE COURT:  Yes.

11         MS. FLETCHER:  And say, first sentence, "Keep in mind

12   that the mere fact that a transaction affected market prices

13   does not render it manipulative".

14         Second sentence:  "What matters is that the

15   transactions were designed to deceive or defraud as I have

16   instructed you."

17         THE COURT:  The transactions were conceived or

18   designed?  Is that what you said?

19         MS. FLETCHER:  Transactions were designed to deceive

20   or defraud.

21         THE COURT:  All right.

22         Let me give Ms. Dabbs a moment.

23         MS. DABBS:  Your Honor, I am trying to modify the

24   framing that we just heard from the government to see if we

25   might land in a place that's comfortable for all.  The starting

1  point was, "Keep in mind that the mere fact a transaction

2  affected market prices does not render it manipulative."

3            I think what would follow that would have to be what

4  matters is whether the transaction or transactions were only

5  conducted -- hang on one second, Judge.

6            I am trying to make sure that that component ties into

7  the Court's framing of the but-for language that concludes this

8  section, because we think it is important that the framing that

9  appears in this point is not some lesser burden than that.  I

10  think that's what we are attempting to identify, and the

11  wording becomes a little bit involved.

12            But we think that that is what it has to add up to

13  essentially, I can't say something less than -- so, for

14  example, the framing "designed to deceive or defraud," we think

15  that's not adequate.  We think it needs to tie back into the

16  Court's language at the end of the section, which is, "but for

17  an intent to deceive the transactions would not have occurred

18  at the time and in the amounts that they did."

19            THE COURT:  All right.  Let me tell you what I have in

20  mind.  I agree with the government that that sentence as

21  drafted is not accurate and should be struck.

22            I will try to go slowly.

23            "An intent to deceive or defraud others is not

24  sufficient to establish that the transaction is manipulative.

25  If there are two purposes for a transaction, one of which is

1    legitimate, and the transactions would have been done for the

2    legitimate purpose, it is not manipulative, even if the

3    defendant also had an intent to mislead or deceive the market.

4    However, if the transactions would not have been done except

5    for the intent to mislead, the transactions are or would be

6    manipulative."

7            So what I've tried to do in those sentences is to give

8    a balanced charge that gives both sides of the coin.

9            Does the government have a view?

10           MS. FLETCHER:  May I have a moment, your Honor?

11           THE COURT:  Yes.

12           MS. FLETCHER:  So, your Honor, I think the issue with

13   the language that your Honor just proposed is that, as I heard

14   it, it's an instruction that maps what follows in the next

15   paragraph, but just using slightly different words.  So it

16   seems likely to the government to create the same type of

17   confusion as was in the sentence initially.

18           To the extent that the sentence your Honor initially

19   added was meant to convey to the jury that price movement or an

20   effect on prices is not necessarily manipulative, we think that

21   the Court could accomplish that with the first sentence in my

22   initial proposed revision, "keep in mind the mere fact that a

23   transaction affected market price does not render it

24   manipulative."

25           Then your Honor could just stop there and keep the

1    instruction that's contained in the next paragraph exactly as

2    it was.

3            THE COURT:  So let me ask you a follow-up question:

4    Do you have an issue if I put the language that I indicated

5    into the last paragraph right before "but for the intent to

6    deceive"?

7            MS. FLETCHER:  I'm sorry.  When you say the language

8    that your Honor added, do you mean the language that you just

9    read --

10            THE COURT:  Yes.

11            MS. FLETCHER:  -- or the language that was in the

12    redline?

13            THE COURT:  The language that I just read.

14            "If there are two purposes for a transaction, one of

15    which is legitimate, and the transaction would have been done

16    for the legitimate purpose, it is not manipulative, even if the

17    defendant also had an intent to mislead.  On the other hand, if

18    the transaction would not have been done except for the intent

19    to mislead, it is manipulative.  Thus, if but for an intent to

20    deceive" it would go "the defendant would not have conducted

21    transactions in the dollar/rand foreign exchange market at the

22    times and amounts he did, then those transactions were

23    manipulative."

24            It just gives a little bit more of an explanation.

25            MS. FLETCHER:  May I have a moment, your Honor?

1          THE COURT:  Yes.

2          I don't want to hear from the defense while the

3    government is conferring.

4          MS. DABBS:  Fair enough.

5          MS. FLETCHER:  Thank you, your Honor.

6          So I think the government's view is that the paragraph

7    as written, including with the additional sentence that your

8    Honor has added prior to the circulating the new version over

9    the weekend, is clear and makes clear to the jury what they

10   need to find.

11         To the extent that your Honor wants to add additional

12   explanatory language, we would just request that that language

13   track the language that's in the last sentence of this

14   paragraph and make clear that the inquiry is not just about the

15   fact of having two intents, but requires the jury to examine

16   the manner in which the trades were conducted.

17         There was a sentence that your Honor said that didn't

18   capture that, and that was what gave me some pause.

19         THE COURT:  Got it.  Okay.  I get that point.

20         Let me hear from the defense first with respect to the

21   notion of adding in lieu of the sentence that is now the last

22   sentence of the second-to-last paragraph the language proposed

23   by the government: "Keep in mind that the fact that a

24   transaction affected market prices does not render it

25   manipulative."  And then putting in further explanatory

1  language along the lines that I suggested, but with

2  Ms. Fletcher's point that it does need to capture the notion of

3  times and amounts right before the last sentence in the last

4  paragraph.

5          MS. DABBS:  I think that we could be comfortable with

6  that, your Honor.  What the Court proposed in terms of some

7  further explanation we did not have an issue with, but wanted

8  to make sure that the concept of just the fact of a price

9  impact standing alone is not, you know, does not constitute or,

10 you know, does not render it manipulative.  So incorporating

11 both of those, we are comfortable with that.  We tend to think

12 that the added explanation that the Court went through is in

13 fact helpful to the jury.

14         THE COURT:  Okay.  All right.

15         I will tweak the language, and you will see something

16 in the revisions I send around later today or tonight.

17         All right.  Section 2 of VIII.

18         Anything from the government?

19         MS. FLETCHER:  No, your Honor.

20         THE COURT:  Anything from the defense?

21         MS. DABBS:  Just one small requested adjustment,

22 Judge.  There is a sentence that begins, "agreements that

23 require payment" -- sorry it is actually the sentence after

24 that, where the Court has, "It is not sufficient that you find

25 that the defendant engaged," we would just ask that that read,

1    "It is not sufficient if you find that the defendant engaged in

2    a manipulative scheme in the foreign exchange spot market, you

3    must also find" as the next sentence continues.

4              THE COURT:  Ms. Fletcher, I can't see an objection to

5    that.

6              MS. FLETCHER:  No objection.

7              THE COURT:  Okay.  All right.

8              Section 3, "Commodities Fraud, Third Element."

9              Anything from the government?

10             MS. FLETCHER:  No, your Honor.  If it's helpful, to be

11   more efficient, I don't think the government has anything until

12   we get to "Relationship to the United States."

13             THE COURT:  Okay.  All right.

14             Let me hear from the defense.

15             Anything up to "Relationship to the United States"?

16             MS. DABBS:  Yes, in Section 3, the third element of

17   commodities fraud, where the Court has defined willfully, your

18   Honor, we would ask that the definition read, "To act willfully

19   means to act voluntarily and with a wrongful purpose such that

20   the defendant was aware that his conduct was unlawful."

21             There are a number of Second Circuit cases that

22   support that sort of framing, and we think in the context of

23   this case it's particularly important.

24             There are compliance policy documents from Glen Point

25   that are in evidence in this case.  General wrongfulness we

NANNPHI5                    Charge Conference

 1    think injects some uncertainty that's not warranted and, that

 2    could create some confusion.

 3              THE COURT:  Anything else in that Section 3?

 4              MS. DABBS:  Yes.

 5              So in the paragraph that follows, "To act with intent

 6    to defraud," in the second sentence where the Court has, "Here

 7    it is not sufficient that the defendant knew," we would just

 8    ask that read here, "It is not sufficient if you find that the

 9    defendant knew" and then continue with the sentence there.

10              THE COURT:  I don't think I am going to give "if you

11    find" but I am comfortable with, "It is not sufficient if the

12    defendant knew his transactions" --

13              MS. DABBS:  Sure that accomplishes the same.

14              Thank you.

15              THE COURT:  Let me hear from the government with

16    respect to general wrongfulness of his acts.

17              MR. THOMAS:  Yes, your Honor.

18              This was actually the subject of the letters.  So if

19    the Court would refer back to the government's letter before

20    the Court circulated its preliminary charge, I think it was

21    last Monday, you will see us bring up citations that answer

22    this question.  This wrongfulness language is acceptable in the

23    circuit and we encourage the Court to continue it.

24              THE COURT:  Okay.  I will take another look back at

25    this point.  If I don't adopt the defense's view, the defense

1  will have their exception.

2          Okay.  What else does the defense have before we get

3  to relationship to the United States?

4          MS. DABBS:  In Section 2, under the -- sorry, Judge,

5  let me just get it.

6          Where we are talking about conspiracy, the second

7  element of conspiracy, so this is in the clean version of the

8  Court's charge, it begins at the bottom of page 19.

9          THE COURT:  Okay.

10          MS. DABBS:  It's the third paragraph, "In deciding

11  whether the defendant was," as that sentence continues the

12  Court has "consider whether that defendant," which I think

13  should just be "the defendant."

14          THE COURT:  Yes.  Good.  Thank you.

15          MS. DABBS:  I guess we also had some question about

16  whether certain details of the manner in which the Court is

17  instructing on the second element are actually applicable in

18  this case, just given the framing of, you know, the defendant

19  and his role in it.

20          So the part about that immediately follows where I was

21  just reading from, Judge, "It is not necessary for the

22  government to show the defendant was fully informed as to all

23  the details," I am not sure that's a framing that's happened in

24  the case such that that is warranted.

25          And the paragraph that follows, "The duration and

1    extent of defendant's participation has no bearing," that also

2    sort of stood out to us as not a particular match to the

3    allegations and the nature of the proof in the case.

4            And I guess similarly -- well, I'll leave it at those

5    two parts.

6            THE COURT:  Okay.  I take it your view is that I don't

7    need to charge the jury with the paragraph that says, "It is

8    not necessary" or with the paragraph that says, "The duration

9    and extent"?

10           MS. DABBS:  With one exception for that first

11   paragraph, your Honor, which is at the very end of that "it is

12   not necessary" paragraph, there is language about, "It's not

13   necessary for the defendant to have received any monetary

14   benefit."  I would expect the government would want to retain

15   that language, and we certainly don't have an issue with that,

16   which obviously could be an argument that one would make in

17   connection with this particular case.  But the notion of, you

18   know, the defendant not being fully informed, not having

19   knowledge of the full extent doesn't seem to be a match for the

20   evidence as it's come in here in terms of what's going to be

21   argued to the jury.

22           THE COURT:  That seems fair to me, but let me hear

23   from the government.

24           Just so everybody is clear what the proposal is, it

25   would be to strike everything in the third full paragraph on

1   page 20 of the clean version from, "It is not necessary" all

2   the way down to the sentence that begins, "In fact," and then

3   to pick up with, "It is not necessary for the defendant to have

4   received any monetary benefit," and then to strike the

5   paragraph after that in its entirety.

6        MR. THOMAS:  So, your Honor, with respect to the "it's

7   not necessary" paragraph, I think we would propose to keep the

8   first sentence.  There was cross-examination, for example,

9   about the defendant's limited understanding of the manner in

10  which Mr. Kamath executed trades or switched between FastMatch

11  and Refinitiv and the significance, if any, to that.

12       I think this is an accurate statement of the law.  We

13  are happy to drop the remaining sentences, which we agree may

14  be superfluous, but just to get ahead of any suggestion to the

15  jury that 100 percent total knowledge of all steps taken in the

16  conduct of a scheme is required, we think the first sentence

17  would work.

18       THE COURT:  What about the sentence that says "the

19  duration and extent," the paragraph that says "duration and

20  extent"?

21       MR. THOMAS:  The only thing that gives me pause about

22  agreeing to its deletion, at least to that first sentence, is

23  that if there were an argument that the jury should factor in

24  the length of this particular scheme in its assessment of

25  whether a scheme or a conspiracy existed.  Similarly, I would

1    propose that we keep just the first sentence and then delete

2    "need not have joined at the outset" and delete the "may have

3    joined at any time in progress" sentence, I guess the remaining

4    sentences there.

5            THE COURT:  Okay.

6            Ms. Dabbs?

7            MS. DABBS:  That's fine, Judge.

8            THE COURT:  Okay.  So I'm going to strike from the

9    third full paragraph the sentences that say, "To have guilty

10   knowledge" and the sentence that begins, "Similarly, it is not

11   necessary."

12           I am also going to strike from the paragraph after

13   that everything that comes after the sentence that says, "The

14   duration and extent."

15           MS. DABBS:  Judge, just one other piece that I hadn't

16   mentioned when I first flagged those two sections.  The Court's

17   instruction has language in the paragraph that begins, "I want

18   to caution you, however, and this is sort of mere presence at

19   the scene of the alleged crime."

20           THE COURT:  Yes.

21           MS. DABBS:  I think we also thought that maybe wasn't

22   an ideal fit for the nature of this case, and our proposal

23   would be that the Court modify that so that it reads, "I want

24   to caution you, however, that mere association with one or more

25   members of the conspiracy" just picking up with the Court's

1   language a little further down in that paragraph, we think that

2   that would be an appropriate adjustment, just given the nature

3   of the case and the proof.

4           THE COURT:  So it would be to strike the sentence that

5   talks about mere presence?

6           MS. DABBS:  Correct.

7           MR. THOMAS:  No objection to that, Judge.

8           THE COURT:  Okay.  Good.  I will do that.

9           All right.  What is next from you, Ms. Dabbs?

10          MS. DABBS:  Your Honor, in Section 3, so on page 22 of

11  the Court's charge, the Court begins the third element by

12  stating, "The third element, and last element."

13          That is certainly fine, Judge.  We thought that the

14  Court might say, "The third and last element" in the spirit of

15  just flagging words you might trip over when reading it out

16  loud.

17          THE COURT:  Thank you.  Very much appreciated.

18          What's next after that before "Relationship to the

19  United States"?

20          MS. DABBS:  Nothing else from the defense before

21  "Relationship to the United States."

22          THE COURT:  Okay.  Let me hear from the government

23  with respect to "Relationship to the United States" and then

24  from the defense.

25          MR. THOMAS:  Sure.  I am happy to have the honor to

1    address this most favored topic I think by us all.

2              Here, the government's approach here, recognizing the

3    Court has rejected our original proposal, is to try to keep in

4    mind the Supreme Court cases in Prime International that the

5    Court directed us to review while also not overinstructing the

6    jury on elements that we think are not actually going to come

7    up.

8              So, with that in mind, and maybe to start with

9    probably the least controversial things and work backwards, we

10   propose to cut all of the language that relates to the "direct

11   and significant effect" part of the charge.

12             We will not argue to the jury that there was a direct

13   and significant effect in our summation.  So that would leave

14   only two bases for the jury to, you know, find on this element

15   domestic and the connection element.  We think that we can

16   spare the jury the remaining text about effect, so slice

17   that --

18             THE COURT:  Let me see whether the defense has any

19   objection to me striking the stuff about effect?

20             MS. DABBS:  Just one moment, Judge.

21             THE COURT:  Okay.

22             MS. DABBS:  Judge, if that is not going to be an

23   argument made by the government, then we don't object to that

24   framing.

25             THE COURT:  I wouldn't think you would have an

1    objection to that.

2            Let me hear the more controversial stuff.

3            MR. THOMAS:  Now we are going to escalate in

4    controversy, I am sure.  At least in the copy that I have, on

5    page 24, the paragraph that begins, "For a connection or a

6    theft to be direct," there is a final sentence that reads, "It

7    is not sufficient that any activity outside the United States

8    causes a ripple effect or downstream consequences in the United

9    States."

10            We suspect the Court was drawing that language from

11    Prime International.

12            THE COURT:  I was actually drawing it from the -- I

13    think it's the Ninth Circuit case that is discussed in Loetz

14    that applies the Foreign Sovereign Immunities Act and talks

15    about what is not a direct effect.

16            The Second Circuit seems to accept that as a correct

17    notion of "direct" in the Foreign Sovereign Immunities Act

18    context.  In Loetz, the Court is dealing with language that

19    talks about direct and reasonably foreseeable and adopts a

20    reasonably proximate causal relationship test because of the

21    need to give the word "direct" some meaning in the presence of

22    a statute, in a statute that also has the words reasonably

23    foreseeable.

24            So that's where I got it from, is from the citation in

25    Loetz.  I did not make up that language.  I am drawing it from

1    something that the Second Circuit quoted.

2            MR. THOMAS:  Understood, your Honor.  I may have

3    misunderstood which part.  We saw language like that in Prime

4    International and thought maybe it would be a better fit for

5    the domestic instruction here in explaining what I think the

6    Court was getting at, at the end of page 23.  So we were going

7    to propose to move it from where it currently is, in the

8    Connection section, over to page 23 as part of a proposed edit

9    to the domestic instruction.

10            THE COURT:  Okay.

11            MR. THOMAS:  And then with respect to -- just so the

12    Court has our full thinking --

13            THE COURT:  Yes.

14            MR. THOMAS:  -- with respect to the domestic

15    instruction, up to the part where the Court says, "The focus of

16    the commodities statute is rooting out manipulation and

17    ensuring integrity in the swaps markets," we don't have any

18    proposed edits, but we think the sentences that follow are

19    sentences that actually describe holdings of the Second Circuit

20    or Supreme Court that really bear on a private right of action

21    analysis that is present in a number of these cases and then

22    don't actually describe what it means here for an application

23    of the statute to be domestic.

24            THE COURT:  Just tell me, I'm sorry, where you are

25    looking.

NANNPHI5                    Charge Conference

1          MR. THOMAS:  On page 23, the final full paragraph that

2    begins, "First, the government can meet its burden."

3          THE COURT:  Yes.

4          MR. THOMAS:  In the center of that paragraph, there

5    are two sentences that have footnotes, the second of which is,

6    "The focus of the commodities fraud statute."  Up to there, we

7    thought that would be a natural place for the Court to add this

8    ripple effect language.  It is not enough that it, you know, be

9    a ripple effect, and that the Court then strike the remaining

10   sentences, which in Abitron and in Prime appear to us

11   respectively to address, first, part of the Lanham Act that

12   just isn't in issue here.  There is no characteristic of this

13   other than the manipulative device, like, central scheme

14   itself.  We are not talking about a perceived effect in the

15   United States that is different than the focus of the statute.

16         And then with respect to Prime, we thought that the

17   analysis of Section 22, I think, really had to do with private

18   right of action and it is in that private right of action

19   analysis that this kind of essential incidental or primacy

20   concept materializes.  And that just isn't, in our view,

21   describing 6(c)(1) or what makes it domestic here.

22         THE COURT:  Let me pause and just make sure I

23   understand the argument.  I take it you don't disagree with the

24   proposition that for conduct to be considered relevant it must

25   be relevant to the focus of the commodities fraud statute?

1    That is drawn from Abitron.

2         MR. THOMAS:  We accept that, yes.

3         THE COURT:  Don't I need to give the jury instructions

4    about what the focus is of the commodities fraud statute,

5    particularly in a case like this, where they could think that

6    the focus is on the manipulation in the FX spot market, which I

7    think would be wrong.  Frankly, I think it would give you an

8    issue on appeal on the assumption that there is a conviction

9    here.

10        MR. THOMAS:  Understood, your Honor.  We are happy to

11   keep the "focus of the commodities fraud statute" sentence.

12        THE COURT:  Okay.  Got it.

13        MR. THOMAS:  It is just the sentences that follow we

14   think speak to two issues that aren't actually present here in

15   an analysis of whether the statute is being applied

16   domestically.

17        THE COURT:  How do I give them a sense of what

18   "relevant to the conduct" is?

19        It struck me in reading Abitron that the Court in

20   considering "relevant to the focus," which was a big addition,

21   that was a change in the law that I think they made.  They had

22   "relevant to the focus."  I need to give some meaning to that

23   concept of "relevant to the focus."  In some ways anything

24   could be relevant to the focus.

25        MR. THOMAS:  Sure.

1          Well, I think there is value to parsimony, even, you

2    know, in this world, especially when we could easily end up in

3    a situation where one might need to be a lawyer specializing in

4    extraterritoriality to, you know, like, dive into all of this.

5          But I think maybe a way to do that is to do two

6    things:  One, the Court could add a sentence that refers back

7    to the "in connection with" or provides some more directed

8    application of the statute to these facts that tells the jury

9    that here the forbidden thing, if they find it, is that there

10   is a scheme in connection with the swap.

11         Then the Court can also add the kind of effect that we

12   are talking about is not some sort of ripple effect, like that

13   language from Prime International.

14         THE COURT:  So let me just push you a little bit more

15   in terms of what you think is an incorrect statement of the

16   law.  Is what you are saying that the language about necessary

17   characteristic and liability must be predicated and essential

18   rather than incidental?

19         I take it you are not disputing that for conduct to be

20   relevant to the focus it is not sufficient that it has an

21   effect in the United States?  Or are you?

22         MR. THOMAS:  Well, no, I don't think so, your Honor.

23   I am just trying to think that through in terms of whether

24   having an effect is itself, standing alone, sufficient.

25         No, we don't disagree with that proposition.  I guess

1    what we are focused on is this necessary characteristic, which

2    we take the Court to be deriving from Abitron, relates to a

3    description in Abitron about the aftereffects of the scheme,

4    you know, causing confusion for the market and commerce.

5        Here, I don't think there's any need to talk about

6    characteristics of the statute.  There's not going to be any

7    way the jury will know about something that is analogous to

8    confusion in the United States with respect to the use of the

9    mark.  Here the jury will just be told that the statute

10   prohibits manipulation.  The Court can educate the jury further

11   that this particular type of manipulation here must connect to

12   a swap.  I don't think there's meaning to instructing the jury

13   about the characteristic, but it just isn't an issue in the

14   case, and I am not even sure exactly how we on would analogize

15   back to Abitron with respect to that dimension of the Court's

16   reasoning.

17       THE COURT:  Let me ask you a further question before I

18   go to the defense.

19       What is the evidence that the government believes is

20   sufficient to support a jury verdict that there was conduct in

21   the United States that may help frame our discussion.

22       MR. THOMAS:  Sure.

23       Your Honor, first and foremost, we think that the

24   trading that matched in the United States is manipulative.

25       THE COURT:  The trading that matched in the United

1    States?

2              MR. THOMAS:  Correct, your Honor.  I think that

3    squarely distinguishes this fact pattern from the allegations

4    in Prime International, where Judge Sullivan went out of his

5    way to note that there were no allegations that the trades

6    occurred in the United States before launching into this

7    analysis.

8              We think that that alone would be sufficient for the

9    jury to return a verdict because it is the defendant reaching

10   in to do the very thing that the statute has forbidden and that

11   thing occurring here in the United States.

12             But at least two other features we think are fair game

13   to argue, and we plan to argue.  One is that the resulting

14   price signal is sent to and received in United States.  There

15   is testimony about FastMatch being available, you know, on that

16   interdealer market by U.S. banks.

17             So the effect that is this has, the conduit by which

18   it is getting to the swap counterparties is by publishing the

19   false price signal in the United States.

20             And then, third, here there is obviously testimony

21   that the American counterparties to the swap were part of both

22   funding the creation of the swap and then ultimately in getting

23   the defendant the proceeds from the scheme in its culmination.

24             We think that too, you know, basically him taking his

25   profit when the scheme succeeds, is something that within the

1  context of this statute enables us to argue that it is a

2  domestic act.

3          THE COURT:  Let me give you a hypothetical.

4          Let's assume that was an options contract entirely

5  between a Singapore entity and a UK entity.  The prime broker

6  relationship is in the UK.  The transaction was entirely

7  negotiated between the Singapore and the UK, and it was not

8  settled in the United States.

9          Let's further assume that no part of the option is

10  based on the U.S. dollar.  It is the euro against the rand.

11  But there's manipulation in the spot market that would, you

12  know, it's worldwide, because we have heard the testimony that

13  the market is worldwide.

14          In your view, that would be enough to bring the fact

15  that the UK entity defrauded the Singapore entity into a United

16  States court on a criminal case?

17          MR. THOMAS:  Well, I think if the manipulative trading

18  occurred in the United States FX spot market, yes, we would,

19  and I think that Congress expressly made that calculation when

20  it included in connection with the swap as one of the criteria

21  that would be a dimension to the statute's application, you

22  know, when a scheme ties back to the FX markets.

23          THE COURT:  Isn't that in a way tantamount to saying

24  that what Congress' focus was, was manipulation in the FX spot

25  market?

1          MR. THOMAS:  I don't think so, your Honor.  I think it

2     is saying that anytime that that manipulation, you know, is in

3     connection with the swap -- obviously, we have now had a lot of

4     back and forth about the swap and what kind of manipulation

5     would be meaningful to a swap, that that was Congress' focus.

6     I think that that view is further buttressed by the fact that

7     Congress also went out of its way to extend extraterritoriality

8     to swaps in particular, so I think it is fair to say that it

9     had a broad sense of the reach of its own statute with respect

10    to swap regulation.

11         THE COURT:  The other analogy that occurs to me is

12    outside of the commodities context, but frequently in the

13    securities context the markets are worldwide markets.  You

14    might have a misleading statement that is prepared outside of

15    the United States but then, because of the operation of the

16    internet, it is available to people in the United States who

17    trade on it, you know, to boost up the market, etc.

18         I mean, the wonderful thing about this case is it has

19    us to some extent looking back to all of those wonderful

20    opinions by Henry Friendly and the like.  I don't think they

21    would have said that that would be enough to ground

22    jurisdiction in the United States.

23         MR. THOMAS:  In the 10(b) context, part of the reason

24    why they wouldn't is because there may not be a purchase and

25    sale that is occurring here, and there's no similar requirement

1    of purchase and sale.  It's just that "in connection with the

2    swap" language that we are working with here.

3           But in the analogous wire fraud circumstance, I think

4    the cases do permit if the wire is, you know, of significance

5    to the scheme, foreign-located, foreign-dominated criminal

6    conduct can be the basis for the local prosecution when the

7    wire occurs here and the wire matters to the conduct.  I think

8    what we are urging the Court to do here is both sensible in

9    light of what Congress was trying to achieve, but also fair in

10   light of the facts that are presented.

11          Just to add to the list of things that I've pointed

12   out before, I mean, it should not be lost on anyone that the

13   actual, you know, conveyed criminal commands in our view, you

14   know, those passed through New York too, via Bloomberg.

15          So giving an instruction here that tells the jury that

16   it can apply what we think is a fair statement of the law from

17   Abitron without also telling it about dimensions to the

18   extraterritorial decisions that really speak to private right

19   of action and other, like, fine details we think would be

20   right.

21          (Continued on next page)

22

23

24

25

NANGphi6

1      THE COURT:  Let me hear from the defense, and then

2  I'll hear on the direct and significant language.

3      Ms. Dabbs, just on the conduct in the United States.

4      MS. DABBS:  Judge, this is obviously a topic that the

5  parties have briefed extensively, and we have argued

6  extensively.  Our view is that there is not an evidentiary

7  basis in this case to instruct the jury on a domestic

8  application of the statute.  We think that the court's framing

9  and the case law citations in support of it are correct and

10  defensible and appropriate and, frankly, emphasize that point.

11      What Mr. Thomas is talking about, his reference to

12  wire fraud examples and that wires can be adequate, when you

13  are talking about a wire fraud, the wires are the focus of the

14  statute.  It's just a different -- I don't think you can make

15  that comparison.  I think that Prime and Abitron are clear

16  about what is the focus -- or that the question is what is the

17  focus of the relevant statute.  And I think what the court has

18  tried to do here is further define what that means and how the

19  jury should think about that, absolutely grounded in the

20  applicable case law.  The notion that -- it reads almost like a

21  venue analysis, Judge, as opposed to what we think that this

22  analysis has to consist of under the law.

23      Mr. Thomas talked about the fact that you can be

24  anywhere in the world and send Bloomberg messages and chats and

25  they're going to come through a server in New York, because we

NANGphi6

1    heard a gentleman from Bloomberg explain that that's how their

2    systems are set up.  The fact that one of the trading engines

3    that was used -- not at Mr. Phillips' selection, but by someone

4    else -- has a server, among several servers, one located here

5    in the United States are precisely the sort of things that are

6    incidental, ripple effect types of things.  They are not the

7    focus of the statute at issue here.  They don't have the sort

8    of primacy or conduct going to the heart of what's at issue in

9    the case that we think the case law clearly requires, and it

10    requires it for good reason.

11        It's essentially a binary question of where did the

12    core conduct happen here.  And without question, it's clear

13    that in this case the core conduct happens outside of the

14    United States.

15        Mr. Thomas referred to the matching of trades in the

16    US and that being an example of the defendant reaching into the

17    US.  Respectfully, on these facts, it shows no such thing.  And

18    if it's conceptualized that way, it's misleading, given the

19    nature of the evidence in the case that has come in.

20        And what the government has said, essentially, is

21    going to be true in any case, that if you are talking about a

22    market that has global reach or that members, individuals all

23    over the globe have access to, then essentially, the government

24    is framing it as, if it involves a swap, it can be tried in the

25    United States, that's domestic, that's a domestic application.

NANGphi6

1    And I just don't think that Prime says that, I don't think

2    Abitron says that.  I think it's quite clear that there's a

3    distinction between conduct that relates to the focus of the

4    statute and if you call it conduct or other things that are

5    incidental or that are ripple effects, that is the divide.  And

6    respectfully, I think what the government cites in support of

7    domestic application are all in that second incidental

8    category.  We don't think that they're enough for the Court to

9    give this instruction in this case.

10        THE COURT:  Do you have any exceptions to the

11   languages that I have written on 23 and onto 24 about relevant

12   conduct occurring in the United States?

13        MS. DABBS:  We do not have any -- well, I guess, the

14   only thing, your Honor, that we have flagged was the desire to

15   add the word "allegedly" in a couple places.  So not to the

16   heart of this legal question.  And I can flag what those are to

17   the Court.  That was the only other modification.

18        THE COURT:  Why don't you flag those just so I have

19   everybody's points.

20        MS. DABBS:  Sure.  It's on page 23, the third

21   paragraph that begins, "First, the government can meet its

22   burden," the second sentence of that paragraph, we would just

23   ask be phrased "relevant conduct means actions allegedly taken

24   by the defendant or his alleged coconspirators."  That was the

25   only --

NANGphi6

1          THE COURT:  I don't particularly think that I need to

2     do that because they're going to have to find that the actions

3     are taken by the defendant or his coconspirators.

4          What else do you have?

5          MS. DABBS:  In that section on domestic application,

6     we did not have anything else, your Honor.

7          If you want me to address the balance of the charge,

8     I'm happy to.

9          THE COURT:  Not until I hear from Mr. Thomas.  I'm

10    going to take this under advisement, I have heard both of your

11    arguments.

12         Let's get to the direct and significant connection

13    with activities in the commerce of the United States.

14         Mr.  Thomas.

15         MR. THOMAS:  Your Honor, as I said earlier, we had

16    proposed to move that "it's not sufficient that an activity"

17    sentence to go earlier, but otherwise, we don't have any other

18    proposals in this section, Judge.

19         THE COURT:  Do you have an objection to the concept of

20    ripple effects or downstream consequences not being direct?

21         MR. THOMAS:  Not conceptually, Judge, no.

22         THE COURT:  I just want to make sure, you don't think

23    it's an incorrect statement of the law.  I understand the

24    concept of placement, but you don't say it's an incorrect

25    statement of the law with respect to what direct means?

NANGphi6

1          MR. THOMAS:  No, your Honor.

2          THE COURT:  Ms. Dabbs.

3          MS. DABBS:  We think that that is an accurate

4     description of what direct means and we think, therefore, that

5     it does belong precisely where the Court has it in the proposed

6     charge.

7          THE COURT:  So I will keep in mind that point about

8     the ripple effects and will let you know.  And what I'm going

9     to do is revise this charge to get rid of the language about

10    affect on commerce of the United States.  That will be an

11    interesting question for some other case.

12         Let's move to venue.  Actually, why doesn't the

13    government tell me whatever it has remaining in the charge.

14         MS. FLETCHER:  Yes, your Honor.

15         Our first proposed edit would be to Roman XIII,

16    consideration of defendant's decision to testify, right not to

17    testify.

18         THE COURT:  And does the defense have anything before

19    that?

20         MS. DABBS:  We have just a couple of requests on

21    venue.

22         THE COURT:  Okay.

23         MS. DABBS:  The paragraph that begins, the government

24    does not have to prove, your Honor, about halfway through that

25    paragraph, in the sentence that begins "With respect to both

NANGphi6

1    Count One and Count Two" -- actually, I'm sorry, Judge -- the

2    last sentence in that paragraph, I apologize, "And the act need

3    not have been taken by the defendant so long as the act was

4    part of the" -- we would ask that it read "alleged crime," as

5    opposed to "crime that you find he committed."

6            THE COURT:  I'll think about that.

7            MS. DABBS:  And in the next paragraph, your Honor,

8    that begins, "I should note that on this issue," in the middle

9    of that paragraph, the sentence beginning "the preponderance of

10   the evidence," we would ask where the Court has "in furtherance

11   of the crime," we would ask that it read "in furtherance of the

12   alleged crime."

13           THE COURT:  Anything else that you have before we get

14   to the issue of defendant's decision not to testify?

15           MS. DABBS:  Yes.

16           In the credibility of witnesses section, your Honor --

17   I'm just trying to find the right page to refer you to in the

18   clean version -- on page 28, the second full paragraph that

19   states, "You have heard evidence that at some earlier time, the

20   witnesses have said or done something that counsel argues is

21   inconsistent with their trial testimony," and there are three

22   paragraphs that follow that relate to prior inconsistent

23   statements --

24           THE COURT:  Do we have any prior inconsistent

25   statements in this case from the defense perspective?

NANGphi6

1          MS. DABBS:  Our sense was that we did not, which is

2     why our inclination was to remove those four paragraphs from

3     the charge.

4          THE COURT:  Let me hear from the government, if the

5     government has a view with respect to "alleged" on venue or

6     prior inconsistent statements.

7          MS. FLETCHER:  So with respect to venue, your Honor,

8     we don't have anything.

9          On the prior inconsistent statements, Mr. Thomas and I

10    were just conferring for a moment, I think there were some

11    inconsistencies between Mr. Newman's testimony and some of the

12    charts that he prepared in advance of his testimony.  The one

13    that comes to mind is the issue of the anticipated profits from

14    the spot trades.  And so I think there were inconsistencies

15    that would make these instructions applicable at least with

16    respect to those.

17         MS. DABBS:  Judge, the government obviously is going

18    to be able to argue in closing whatever they like about

19    consistency between testimony and charts.  But that is a very

20    different animal from the standard instruction on impeaching

21    someone with a prior inconsistent statement.  We don't think

22    that this instruction applies.  It certainly doesn't describe

23    even the backdrop that Ms. Fletcher just articulated.

24         THE COURT:  Ms. Fletcher, I'm inclined to strike those

25    four paragraphs, unless you have a very strong argument to the

NANGphi6

1    contrary, because in looking at it, it does have me saying,

2    supporting the notion that there was a prior inconsistent

3    statement.  I didn't admit anything as a prior inconsistent

4    statement.

5            MS. FLETCHER:  That's true, your Honor.

6            THE COURT:  I'm not sure whether I'm going to add

7    alleged or not.  I'm going to read through the instructions as

8    a whole.

9            In consideration of the defendant's decision to

10   testify, I'm obviously striking Roman XIV because the defendant

11   did not testify.  What does the government have on Roman XIII?

12           MS. FLETCHER:  Striking the portion of the heading.

13           THE COURT:  I don't, by the way, intend to give the

14   headings, but I will strike that portion, because it will go

15   back to the jury.

16           MS. FLETCHER:  And then, obviously, the "if

17   applicable" portion.  And then we would agree with striking

18   Roman XIV.

19           THE COURT:  Okay.

20           MS. FLETCHER:  Nothing else to the content of Roman

21   XIII.

22           THE COURT:  What about from the defense, anything on

23   consideration of defendant's decision not to testify?  I can

24   put it as defendant's right not to testify and just change the

25   heading outright.

NANGphi6

1          Anything --

2                MS. DABBS:  Nothing on that from the defense, Judge.

3                THE COURT:  What's the next thing that the government

4    has?

5                MS. FLETCHER:  So Roman XIV, we just mentioned, we

6    would propose deleting that, obviously.  Same for Roman XV,

7    presence of counsel.

8                THE COURT:  Any disagreement by the defense?

9                MS. DABBS:  No disagreement, Judge.

10               THE COURT:  Roman XV will be dropped.

11               MS. FLETCHER:  And then our next item to flag is Roman

12   XIX.

13               THE COURT:  In the government's view, is there reason

14   to give Roman XVI for coconspirator statements?

15               MS. FLETCHER:  I think so, your Honor.  We did discuss

16   this amongst ourselves.  There were not any 801(d)(2)(E)

17   statements offered, but there were acts taken by Phillip Costa,

18   for example.  The one that comes to mind is the communication

19   to JB Drax that the option was triggered, so that is a

20   statement of a coconspirator that is attributable to the

21   defendant.

22               THE COURT:  What is the next one that the government

23   has?

24               MS. FLETCHER:  XIX, your Honor.

25               THE COURT:  Anything from the defense up to XIX?

NANGphi6

1              MS. DABBS:  No, your Honor.

2              THE COURT:  So XIX from the government.

3              MS. FLETCHER:  When I say XIX, I think it's the old

4    XIX, the heading that was compliance policies.  It actually was

5    deleted from the prior version to this version, there was an

6    instruction on compliance policies.  And to be clear, the

7    government isn't suggesting that instruction should go back in.

8    But my understanding is that your Honor deleted this because we

9    wound up not introducing the compliance policies of the other

10   financial institutions, but I did want to flag for the Court

11   that there are compliance policies in evidence, they're just

12   Glen Point's policies.

13             THE COURT:  I think you are right.  I maybe should add

14   that back in.  The government, I take it, has no objection to

15   me doing that.

16             MS. FLETCHER:  No, your Honor.

17             THE COURT:  Ms. Dabbs, do you wish me to add that back

18   in?

19             MS. DABBS:  We do, Judge.  And I think it's as simple

20   as saying -- because the jury won't have heard about it, I

21   guess, until closing -- but evidence has been introduced

22   regarding Glen Point's compliance policies and then continuing

23   with the instruction that the Court had before, the language of

24   which was acceptable to the defense.

25             THE COURT:  What is the next thing from the

NANGphi6

1  government?

2          MS. FLETCHER:  With respect to Roman XX, the use of

3  charts or summaries.

4          THE COURT:  Anything from the defense before we get to

5  use of charts and summaries?

6          MS. DABBS:  No, your Honor.

7          THE COURT:  Ms. Fletcher.

8          MS. FLETCHER:  So I think there are a couple of

9  different iterations of this instruction that I have seen.  One

10  of them includes a sentence that we would propose adding here

11  related to the use of demonstratives.  Certain of the charts

12  and summaries -- and the sentence could read something like

13  this:  "Certain of the charts and summaries were offered to you

14  as demonstratives and were not admitted into evidence," just to

15  reference the fact that there are certain charts they saw.  And

16  then the rest of that instruction is fine.

17          THE COURT:  Any objection to adding that language?

18          MS. DABBS:  No objection, Judge.

19          THE COURT:  Anything from the defense on the use of

20  charts and summaries?

21          MS. DABBS:  No, your Honor.

22          THE COURT:  Ms. Fletcher, what's next?

23          MS. FLETCHER:  On that instruction, but I think

24  perhaps more importantly with respect to the next one, the

25  government is interested in what your Honor's practice is with

1    respect to transcripts.  I know that some judges give this

2    instruction and nothing more and others inform the jury that if

3    they want to review the audio with the benefit of the

4    transcripts that were offered as an aid or to review any other

5    demonstrative, they can do that in the courtroom, meaning they

6    can return from the jury room and essentially we can play the

7    audio while they read the transcripts.  Taking guidance from

8    your Honor, I think we would prefer that they be allowed to do

9    that if they so request.

10            THE COURT:  Anything from the defense on that?

11            MS. DABBS:  Judge, this is a case in which we take

12   issue with the content of the transcripts.  There's no

13   stipulation with respect to the accuracy of their contents

14   among the parties and we don't think that they should go back

15   to the jury.  Obviously, the jury will have the recordings, and

16   they can play them.

17            THE COURT:  That is not what Ms. Fletcher is

18   suggesting.  What Ms. Fletcher is suggesting is that, if they

19   would like to listen to the recordings with the benefit of the

20   transcripts, they can do it in the courtroom.  And I'm inclined

21   to consider that, but not actually make a decision right now on

22   it.  But let me hear from the defense.

23            MS. DABBS:  We would object to using the transcript

24   even in that context, Judge.  We think that it's misleading.

25   But obviously, understand the Court's perspective on it.

NANGphi6

1          THE COURT:  Ms. Fletcher, I actually just have one

2     question with respect to that.  I understand your request with

3     respect to transcripts.  With respect to demonstratives, it's

4     actually a rather awkward instruction to give to the jury

5     because demonstratives are used in connection with testimony.

6     So while I might be inclined to give the transcript bit, I'm

7     not inclined with respect to demonstratives.

8          MS. FLETCHER:  Understood, your Honor.

9          I think the way that I have seen the instruction

10    written with respect to demonstratives is to include a line

11    that says something to the effect of, demonstratives are not

12    evidence and do not go back with you to the jury room, but you

13    can request testimony regarding the demonstratives if you wish,

14    or something like that, which, under the circumstances, would

15    be appropriate here.

16         THE COURT:  I've got that request.

17         What is the next thing that the government has?

18         MS. FLETCHER:  Roman XXIII.

19         THE COURT:  False exculpatories.

20         MS. FLETCHER:  Yes.

21         THE COURT:  Can I strike that?

22         MS. FLETCHER:  From the government's perspective, yes.

23    And same with XXIV as well.

24         THE COURT:  Let me hear from the defense.

25         MS. DABBS:  We agree on both.

NANGphi6

```
 1                THE COURT:  Anything from the defense up to 24 that we
 2     haven't covered?
 3                MS. DABBS:  No, your Honor.
 4                THE COURT:  Anything on section XXV from the
 5     government?
 6                MS. FLETCHER:  May we have just a moment, your Honor.
 7                THE COURT:  Of course.
 8                MS. FLETCHER:  Nothing on XXV.
 9                THE COURT:  What's the next thing that the government
10     has?
11                MS. FLETCHER:  The next thing is, at the very end of
12     the subheading alternate jurors.
13                THE COURT:  And it should be two now, instead of
14     three?
15                MS. FLETCHER:  Exactly.
16                THE COURT:  Do you have anything else -- I guess
17     nothing else, that takes us to the end of the charge -- from
18     the government's perspective?
19                MS. FLETCHER:  Yes, your Honor.  May I just have one
20     moment.
21                THE COURT:  Sure.
22                (Conferring)
23                MS. FLETCHER:  That's all, your Honor.
24                THE COURT:  What about from the defense?
25                MS. DABBS:  Your Honor, in section XXV, the conclusion
```

NANGphi6

1    section.

2            THE COURT:  Yes.

3            MS. DABBS:  In the first paragraph, we would ask that

4    the Court add a phrase so that it reads, "Your function now is

5    to weigh the evidence in this case and to determine if the

6    government has sustained its burden of proof with respect to

7    each element of each count of the indictment."

8            THE COURT:  What else do you have?

9            MS. DABBS:  In the section duty to deliberate,

10   unanimous verdict, which begins "You will now retire to decide

11   the case," we would ask that the second sentence read "Your

12   function is to weigh the evidence in this case and to determine

13   whether the government has proved beyond a reasonable doubt" --

14           THE COURT:  I'm sorry, tell me again where you are.

15           MS. DABBS:  Sorry, Judge.  It's page 36.

16           THE COURT:  Yes.

17           MS. DABBS:  Number three, duty to deliberate,

18   unanimous verdict.

19           THE COURT:  Okay.

20           MS. DABBS:  The second sentence in that first

21   paragraph, we would ask that sentence read, "Your function is

22   to weigh the evidence in this case and to determine whether the

23   government has proved beyond a reasonable doubt the guilt of

24   the defendant with respect to each count."

25           The sentence that then follows there, that you must

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NANGphi6

1  base your verdict solely on the evidence, we certainly have no

2  issue with that.  But it's a repeat of the sentence that

3  appears on the page immediately prior.  So we weren't sure

4  that -- it may be that the Court wanted to do that point in

5  both sections.  It's the second paragraph under the conclusion

6  section.

7            THE COURT:  I see it.  That's helpful.

8            MS. DABBS:  And then in that same section, section

9  three, at the bottom of page 36, there's a paragraph that

10  begins, "Again, your verdict must be unanimous."  The final

11  sentence in that paragraph, which reads, "No juror shall

12  surrender his or her conscientious beliefs solely for the

13  purpose of returning a unanimous verdict," we would just ask

14  that the word "solely" be removed.  Of course, no juror should

15  surrender their conscientious beliefs for the purpose of

16  returning a unanimous verdict.  We didn't think that that

17  modifier was necessary.

18            And we had, of course, the same revision under

19  alternate jurors that the government has flagged for the Court.

20            And nothing further on the charge from the defense.

21            THE COURT:  Let me tell you what my inclinations are

22  with respect to those, and I'll hear from the government.

23            With respect to sustains its burden of proof with

24  respect to each element of each count of the indictment, I will

25  have already instructed them that they have to find that the

NANGphi6

government has sustained its burden of proof with respect to

each element of each count of the indictment, and so I don't

think that that suggestion is necessary, and I think it has an

effect of being potentially unbalanced.  So I'm not inclined to

give that.

         I am inclined to accept the defense suggestion that

section three on page 36 of the clean version says "to

determine whether the government has proven the guilt of the

defendant with respect to each count charged in the

indictment," so I'm inclined to accept that.

         And I'm inclined also to accept the striking of the

word "solely."

         Anything further from the government on the charge?

         MS. FLETCHER:  No.  Thank you, your Honor.

         THE COURT:  Anything further from the defendant on the

charge?

         MS. DABBS:  No.  Thank you, your Honor.

         THE COURT:  Now, next topic is the verdict form.

         The government had suggested a general verdict.

That's what I have sent to the parties.

         The defense suggested interrogatories with respect to

extraterritoriality.

         If the defense has an objection to the general

verdict, I'll hear from the defense with respect to that.

         MS. DABBS:  We don't have an objection to the general

NANGphi6

```
1    verdict, your Honor.  We would ask, though, as folks at our

2    table often do, that the options for the jury read left to

3    right; not guilty, guilty, since that's the direction that

4    people read, and we assume the government will not have any

5    issue with that.

6               THE COURT:  From the government.

7               MS. FLETCHER:  No issue, your Honor.

8               THE COURT:  We'll make that change.

9               Summations, how long does the government anticipate

10   for its summation?

11              MS. FLETCHER:  Your Honor, we understand from our

12   colleague, who is not here, who is delivering the summation,

13   that it should be about an hour and a half to an hour and 45

14   minutes or so.

15              THE COURT:  And the defense.

16              MR. HECKER:  I'm thinking I should be back at my

17   office preparing like Mr. Burnett.  If I had to estimate, I

18   would say probably an hour and 45 to two hours.

19              THE COURT:  I'll either give the jury a nice stretch

20   break or have them go back.

21              And then, I take it, Mr. Thomas, you are going to do

22   the rebuttal.

23              MR. THOMAS:  Yes, your Honor.  I'm expecting

24   Mr. Hecker to land some blows, so I'll be there.

25              THE COURT:  Do you have a sense how long your rebuttal
```

NANGphi6

1    will be?

2              MR. THOMAS:  30 to 35 minutes.

3              THE COURT:  Listen, it's a complicated case, I think

4    tht wht you all have suggested is reasonable.  You all know how

5    to do summations, so I don't have any problem with respect to

6    those time periods.

7              I'll get you the revisions on the charge tonight.

8              Is there anything else from the government?

9              MS. FLETCHER:  Only if your Honor would like me to

10   hand up the language --

11             THE COURT:  I would.

12             MS. FLETCHER:  I'll go ahead and do that.

13             Other than that, no, your Honor.

14             THE COURT:  Anything further from the defense?

15             MR. HECKER:  No, your Honor.

16             THE COURT:  Mr. Hecker, go back and prepare.

17             Not to burden you while you are preparing your

18   summations, but we do need, sometime tonight, a combined

19   exhibit list that can go to the jury, as well as a witness list

20   that can go to the jury.

21             MS. FLETCHER:  Your Honor, one additional question on

22   that.  How would your Honor like the exhibits themselves; thumb

23   drive, hard copies?

24             THE COURT:  You mean for me, as opposed to for the

25   jury?

NANGphi6

1          MS. FLETCHER:  I meant for the jury, actually.

2          THE COURT:  I don't propose to send the exhibits into

3     the jury, but just to give them the instruction that if they

4     want an exhibit, they can call for it.

5          MS. FLETCHER:  In which case, we should have them here

6     in hard copy?

7          THE COURT:  Yes.

8          See you all tomorrow.

9          (Adjourned to October 24, 2023 at 9:00 a.m.)

10                              *  *  *

1                        INDEX OF EXAMINATION

2    Examination  of:                              Page

3     ANDREW NEWMAN

4    Direct By Mr. Gopstein . . . . . . . . . . . 994

5    Cross By Mr. Burnett . . . . . . . . . . . .1031

6    Redirect By Mr. Gopstein . . . . . . . . . .1100

7    Recross By Mr. Burnett . . . . . . . . . . .1103

8                        GOVERNMENT EXHIBITS

9    Exhibit No.                             Received

10    Slides 4, 5, and 6   . . . . . . . . . . .1058

11    849   . . . . . . . . . . . . . . . . . . .1071

12    868   . . . . . . . . . . . . . . . . . . .1073

13    807   . . . . . . . . . . . . . . . . . . .1076

14    808   . . . . . . . . . . . . . . . . . . .1077

15    809   . . . . . . . . . . . . . . . . . . .1079

16    109-A and 109-M   . . . . . . . . . . . . .1111

17    882   . . . . . . . . . . . . . . . . . . .1115

18                        DEFENDANT EXHIBITS

19    Exhibit No.                             Received

20    309, 315, 318, 319, 320, 321, . . . . . . . 994

21            322, 817, 2053, 2054, 2055,

22            and 2056

23    3000, 503, 506, 517, 600, . . . . . . . . .1111

24            608, 623, 635, 702 and 704

25    702-M and 704-M   . . . . . . . . . . . . .1111