**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

v.

NEIL PHILLIPS,

*Defendant*.

No. 22-cr-00138 (LJL)

---

**MEMORANDUM OF LAW IN SUPPORT OF NEIL PHILLIPS'**
**MOTION FOR A JUDGMENT OF ACQUITTAL**
**OR, IN THE ALTERNATIVE, A NEW TRIAL**

Dated: December 8, 2023

**KAPLAN HECKER & FINK LLP**
Sean Hecker
Jenna M. Dabbs
David Gopstein
Anne R. Yearwood
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883

*Attorneys for Neil Phillips*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 7

   I.   The Indictment and Arrest .......................................................................................7

   II.   The Trial.....................................................................................................................7

   III.  Mr. Phillips' Rule 29 Motion..................................................................................12

   IV. The Jury Verdict .....................................................................................................13

RULE 29 MOTION ................................................................................................................ 13

   I.   The Government Failed to Prove that Mr. Phillips Was Guilty of Commodities
      Fraud Beyond a Reasonable Doubt.......................................................................13

      A.   Applicable Law ...........................................................................................13

   II.   The Government Failed to Prove the Required Connection to the United States. ............15

      A.   Domestic Application .................................................................................16

      B.   The Government Did Not Prove a Direct and Significant Connection to
           Activities in U.S. Commerce Under Section 2(i) of the CEA. ...................25

   III. No Reasonable Juror Could Have Found Criminal Intent Beyond a Reasonable
      Doubt.......................................................................................................................45

      A.   Legal Standard ...........................................................................................45

      B.   Jury Charge ................................................................................................46

      C.   The Government Offered Insufficient Evidence to Prove Fraudulent Intent. ............47

      D.   Viewed in Its Totality, The Evidence was At Least as Consistent with
           Innocence as with Guilt. ............................................................................56

   IV. No Reasonable Jury Could Have Found That Mr. Phillips' Intent Would Have
      Been Material to a Decision of the Counterparty to the One Touch Option. ...................57

RULE 33 MOTION ................................................................................................................ 63

   I.   In the Alternative, the Court Should Order a New Trial to Prevent Manifest
      Injustice...................................................................................................................63

      A.   Applicable Law...........................................................................................63

B.    Analysis...........................................................................................................64

CONCLUSION........................................................................................................... 71

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
 600 U.S. 412 (2023) ................................................................. 16

*Abramski v. United States*,
 573 U.S. 169 (2014) ................................................................. 31

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
 677 F.3d 60 (2d Cir. 2012) ....................................................... 42

*Anderson News, L.L.C. v. Am. Media, Inc.*,
 899 F.3d 87 (2d Cir. 2018) ....................................................... 19

*Bersch v. Drexel Firestone, Inc.*,
 519 F.2d 974 (2d Cir. 1975) ..................................................... 37

*CFTC v. Gorman*,
 No. 21 Civ. 870, 2023 WL 2632111 (S.D.N.Y. Mar. 24, 2023) ...................... 19, 23, 26, 44

*Chadbourne & Parke LLP v. Troice*,
 571 U.S. 377 (2014) ................................................................. 62

*Charisma World Wide Corp., S.A. v. Avon Prod. Inc.*,
 243 F. Supp. 3d 450 (S.D.N.Y. 2017) ........................................ 27

*SIFMA v. CFTC*,
 67 F. Supp. 3d 373 (D.D.C. 2014) ........................................... 31

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
 368 F. Supp. 3d 681 (S.D.N.Y. 2019) ...................................... 39

*In re Allied Cap. Corp. Sec. Litig.*,
 No. 02 Civ. 3812; 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003) ................ 18

*In re Alstom SA*,
 406 F. Supp. 2d 346 (S.D.N.Y. 2005) ...................................... 28

*Jackson v. Virginia*,
 443 U.S. 307 (1979) ................................................................. 63

iii

*Jada v. Costco Wholesale Corp.*,
    2023 WL 5672198 (E.D.N.Y. Sept. 1, 2023) ................................................ 19

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013) ................................................................................. 37

*Laydon v. Cooperatieve Rabobank U.A.*,
    55 F.4th 86 (2d Cir. 2022) .......................................................... 18, 20, 24

*Liparota v. United States*,
    471 U.S. 419 (1985) ................................................................................. 69

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014) .................................................................... 42

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ......................................................................... *passim*

*Murray v. Carroll*,
    346 F. App'x 651 (2d Cir. 2009) ............................................................ 18

*Napue v. Illinois*,
    360 U.S. 264 (1959) ................................................................................. 70

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006) .................................................... 28

*Nestlé USA, Inc. v. Doe*,
    141 S. Ct. 1931 (2021) ...................................................................... 16, 37

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) .............................................................. 23, 24

*Petroleos Mexicanos v. SK Eng'g & Const. Co.*,
    572 F. App'x 60 (2d Cir. 2014) .............................................................. 43

*Prime Int'l Trading, Ltd. V. BP P.L.C.*,
    937 F.3d 94 (2d Cir. 2019) ...................................................................... 17

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007) .................................................... 46

*United States v. Alston*,
    899 F.3d 135 (2d Cir. 2018) .................................................................... 70

*United States v. Archer,*
    977 F.3d 181 (2d Cir. 2020) ........................................................................ 63, 64

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000) ........................................................................ 48, 56

*United States v. Berry,*
    2022 WL 1515397 (S.D.N.Y. May 13, 2022) .................................................. 15

*United States v. Bogucki,*
    2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) .................................................. 14

*United States v. Canova,*
    412 F.3d 331 (2d Cir. 2005) ............................................................................ 64

*United States v. Cassese,*
    290 F. Supp. 2d 443 (S.D.N.Y. 2003) .............................................................. 14

*United States v. Cassese,*
    428 F.3d 92 (2d Cir. 2005) .............................................................................. 13

*United States v. Citron,*
    783 F.2d 307 (2d Cir. 1986) ............................................................................ 70

*United States v. Contorinis,*
    692 F.3d 136 (2d Cir. 2012) ............................................................................ 60

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012) .............................................................................. 46

*United States v. Cote,*
    544 F.3d 88 (2d Cir. 2008) .............................................................................. 64

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994) ....................................................... 13, 45, 48, 57

*United States v. Doud,*
    2023 WL 2185844 (S.D.N.Y. Feb. 23, 2023) .................................................. 15

*United States v. Ferguson,*
    49 F. Supp. 2d 321 (S.D.N.Y. 1999) ................................................................ 64

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001) ......................................................... 4, 63, 64, 70

*United States v. Finnerty*,
  474 F. Supp. 2d 530 (S.D.N.Y. 2007)..................................................... 14, 51, 62

*United States v. Gotti*,
  457 F. Supp. 2d 403 (S.D.N.Y. 2006)........................................................... 14

*United States v. Guiliano*,
  644 F.2d 85 (2d Cir. 1981)........................................................................ 70

*United States v. Jones*,
  420 F. Supp. 3d 242 (S.D.N.Y. 2019)........................................................... 15

*United States v. Kwan*,
  2003 WL 22973515 (S.D.N.Y. Dec. 17, 2003) ................................................ 14

*United States v. Landesman*,
  17 F.4th 298 (2d Cir. 2021) ...................................................................... 64

*United States v. Levy*,
  594 F. Supp. 2d 427 (S.D.N.Y. 2009)........................................................... 64

*United States v. Lopac*,
  411 F. Supp. 2d 350 (S.D.N.Y. 2006)........................................................... 70

*United States v. Lorenzo*,
  534 F.3d 153 (2d Cir. 2008)...................................................................... 56

*United States v. McLellan*,
  959 F.3d 442 (1st Cir. 2020)..................................................................... 62

*United States v. Miller*,
  116 F.3d 641 (2d Cir. 1997)...................................................................... 48

*United States v. Mulheren*,
  938 F.2d 364 (2d Cir. 1991)........................................................... 13, 45, 57, 62

*United States v. Pauling*,
  256 F. Supp. 3d 329 (S.D.N.Y. 2017)....................................................... 15, 46

*United States v. Rodriguez*,
  392 F.3d 539 (2d Cir. 2009)...................................................................... 13

*United States v. Sanchez*,
  969 F.2d 1409 (2d Cir. 1992)................................................................ 63, 64

*United States v. Schulte,*
    2023 WL 5561141 (S.D.N.Y. Aug. 29, 2023) ........................................................ 15

*United States v. Scott, (ER),*
    2023 WL 6064329 (S.D.N.Y. Sept. 14, 2023) ....................................................... 40

*United States v. Siembida,*
    604 F. Supp. 2d 589 (S.D.N.Y. 2008) .................................................................. 14

*United States v. Taylor,*
    464 F.2d 240 (2d Cir. 1972) ................................................................................. 46

*United States v. Tomasetta,  (PAC),*
    2012 WL 2064978 (S.D.N.Y. June 6, 2012) .............................................. 14, 37

*United States v. Valle,*
    301 F.R.D. 53 (S.D.N.Y. 2014) .......................................................................... 15

*United States v. Valle,*
    807 F.3d 508 (2d Cir. 2015) .......................................................................... 15, 46

*United States v. Walker,*
    289 F. Supp. 3d 560 (S.D.N.Y. 2018) ................................................................ 64

*WesternGeco LLC v. ION Geophysical Corp.,*
    138 S. Ct. 2129 (2018) ....................................................................................... 17

*Wickard v. Filburn,*
    317 U.S. 111 (1942) ........................................................................................... 33

## STATUTES

7 U.S.C. § 2(i)(1) .......................................................................................... 25, 28, 29

7 U.S.C. § 9(1) ....................................................................................................... 45

15 U.S.C. § 77v(c) .................................................................................................. 30

15 U.S.C. § 78aa(b) ................................................................................................ 30

N.Y. Stat. § 1376 .................................................................................................... 30

## FEDERAL RULES

Fed. R. Crim P. 29(a) ....................................................................................... 12, 13

Fed. R. Crim P. 29(c) .................................................................................................... 13

Fed. R. Crim P. 33(a) .................................................................................................... 63

Fed. R. Crim P. 401 ...................................................................................................... 16

## OTHER AUTHORITIES

Cross-Border Application of the Registration Thresholds and Certain Requirements
  Applicable to Swap Dealers and Major Swap Participants,
  85 Fed. Reg. 56,924 (Sept. 14, 2020) .......................................................... 32, 41

Gary Gensler, CFTC Chairman, Opening Statement: Open Meeting to Consider Cross-Border
  Guidance and Exemptive Order (July 12,
  2013), https://www.cftc.gov/PressRoom/SpeechesTestimony/genslerstatement071213 .... 44

## PRELIMINARY STATEMENT

No reasonable jury could have found that this case—where all the relevant conduct occurred abroad—belonged in a U.S. courtroom.  Or that Neil Phillips would not have traded as he did—consistent with a legitimate investment strategy—but for an intent to send a "false signal" to Morgan Stanley.  Or that the "false signal" was material to Morgan Stanley—which, consistent with industry norms, traded in much the same way, to manage its risk.  The absence of nearly any evidence to establish jurisdiction and the substantial evidence entirely consistent with innocence are more than sufficient, on their own, to satisfy the requirements of Federal Rule of Criminal Procedure 29.  But here, the gaping evidentiary holes were compounded by the government's highly misleading presentation at trial.  Given that presentation—and the likelihood that the jury convicted an innocent defendant—it would be a manifest injustice to let this verdict stand.  The Court should enter a not guilty verdict on Count Two or, in the alternative, order a new trial for four reasons.

*First*, no reasonable jury could have found—under any standard, let alone beyond a reasonable doubt—that there was extraterritorial jurisdiction under the CEA.  The evidence of a "domestic application" was so lacking that, after the close of the government's case, the Court asked the parties to be prepared to discuss whether there was sufficient evidence introduced for that issue to go to the jury.  (*See* Email from Liman Chambers to Parties (Oct. 16, 2023).)  The government said there was, but essentially abandoned it in its two-hour closing argument. And for good reason: none of the "relevant conduct . . . essential . . . to the charged scheme" occurred in the United States.  (Tr. 1363:25-64:1.)[1]

---

[1] Citations to the trial transcript are marked herein as (Tr.).  *See* Trial Transcripts, *United States v. Phillips*, No. 22 Cr. 138 (LJL) (S.D.N.Y.), ECF 78–93.

The evidence of a "significant and direct" connection to activities in U.S. commerce was no stronger.  Here, the government relied on a collection of (i) pre-existing circumstances that were not even "activities" in commerce, let alone activities that were part of the conduct at issue (*e.g.* the existence of a Glen Point New York office); (ii) quintessentially incidental and ancillary facts that had neither a direct nor significant connection between, on the one hand, Mr. Phillips' exclusively foreign conduct and, on the other hand, activities in U.S. commerce (*e.g.* the location of Bloomberg servers in the United States); and (iii) downstream payments that were made *after* the alleged scheme was complete and that were caused by multiple intervening acts unknown to Mr. Phillips (*e.g.* the payment by a Morgan Stanley entity located in the United States).  The fact that the government abandoned any attempt to establish a direct and significant *effect* on U.S. commerce on the eve of closing arguments reflects just how tenuous any ties to the United States are.  Indeed, if the evidence in this case were sufficient to satisfy the CEA's jurisdictional requirements *beyond a reasonable doubt*, then it would be only the rarest of cases without a single U.S. touchpoint that would fall beyond the U.S. government's reach.  That is not what Congress intended or enacted.  And the jury instructions in this case required far more.

**Second**, no reasonable jury could have found that Mr. Phillips would not have traded as he did but for an intent to send a "false signal" to Morgan Stanley.  This was the unusual case where there was only one plausible conclusion or inference that could be drawn from much of the evidence.  For example, viewed in any light, the only reasonable conclusion from the evidence was that Glen Point and Mr. Phillips prepared and maintained daily risk reports; those risk reports monitored delta and included only a selection of positions in Glen Point's portfolio; the last risk report that Mr. Phillips received before the Boxing Day trades listed delta of $759 million for the One Touch Option; Mr. Phillips' Boxing Day trades almost perfectly replaced that delta; Mr.

Phillips took on $725 million of real risk on Boxing Day and held that risk in a highly volatile exchange rate for more than two full days; and the actual gain from payment on the One Touch Option was nowhere near $20 million—the One Touch Option always had real value and could have been sold for a substantial profit.

*Third*, no reasonable jury could have found that Mr. Phillips' alleged intent to trigger the One Touch Option was material to a decision by the counterparty to the swap. The entirety of the evidence on this element consisted of the testimony of two witnesses. Neither established materiality. First, the government called a Morgan Stanley employee (who had no involvement in the conduct at issue), who testified that, *in the context of entering into an option*, Morgan Stanley would generally want to know if a counterparty intended to manipulate the underlying exchange rate. This testimony was entirely irrelevant and could not have supported a finding of materiality. The government did not charge Mr. Phillips with fraud in connection with entering into the One Touch Option in October 2017; it charged him with fraud in connection with triggering the option in December 2017. By definition, any "decision" by Morgan Stanley relating to that conduct had to occur *after* that conduct happened. There was zero evidence on that point. This is not surprising: Morgan Stanley expected its counterparty to sell USD/ZAR as the barrier approached; it too engaged in precisely the same type of spot trading as Glen Point (but in larger quantities); it determined on its own that the barrier had been triggered; and its own training manual permitted trading to trigger the barrier unless the trader's sole intent was to trigger the barrier. In other words, only in certain limited circumstances did Morgan Stanley itself consider trading to trigger the barrier impermissible (to say nothing of whether it was *criminal*). In short, there was no evidence that Mr. Phillips' intent was material to any decision Morgan Stanley made in connection with the triggering of the option.

Faced with a counterparty that did not factor in Mr. Phillips' intent in making any decision, the government tried to prove materiality through Glen Point's prime broker, J.P. Morgan. J.P. Morgan did not buy or sell the One Touch Option. It was an intermediary that held no risk. And yet, the government called a J.P. Morgan employee—who, again, had no involvement in the transactions at issue and did not even work in J.P. Morgan's prime brokerage business—to testify that hypothetically, it "could" matter to J.P. Morgan as one of multiple "important factor[s]," in its role as prime broker, if it knew that a party traded with the intent to trigger the option. This speculative statement from an employee of a different division of J.P. Morgan than the one that held only indirect risk on the One Touch Option was insufficient to prove materiality beyond a reasonable doubt. It also did not address the relevant question: under what circumstances "could" it matter? As the extensive pre-trial briefing and argument in this case made clear, the question of *when* it is permissible to intend to trigger a barrier is far from clear. Would J.P. Morgan care if a trader intended to trigger the option but also had another, entirely legitimate purpose? Likely not. But there was no evidence upon which a jury could answer that question. And thus, there was insufficient evidence upon which it could find beyond a reasonable doubt that Mr. Phillips' intent to trigger the One Touch Option was material to a decision by a counterparty to the swap.

**Fourth**, even if the Court does not enter a not guilty verdict, it should order a new trial pursuant to Rule 33 because it would be a manifest injustice to let this verdict stand. The evidentiary flaws were compounded by a misleading presentation of the evidence that, together, resulted in a verdict for which there is "a real concern that an innocent person may have been convicted." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The government made numerous misleading arguments to the jury: the government argued in closing (1) that the delta replacement explanation was a cover-up story created by the defense lawyers, notwithstanding

4

that, weeks before trial, the defense team informed the government that both Mr. Phillips and his co-chief investment officer had provided that very explanation for the trading four years earlier, in the context of an internal investigation that followed a CFTC inquiry, conducted by experienced in-house and outside counsel who all credited the explanation at the time; (2) that Glen Point's SEC and CFTC registrations, and both Glen Point's and Mr. Phillips' National Futures Association ("NFA") registrations, supported jurisdiction, even though those facts have no legal significance; and (3) that Mr. Phillips could not actually have been considering delta replacement on the One-Touch Option because Glen Point "deleted" delta on its risk reports, an argument which had literally no factual support and was counter to the undisputed evidence about how Mr. Phillips actually considered risk. Additionally, the government offered the jury a timeline of purportedly key events that either omitted—or, remarkably, deleted—facts that did not fit the government's narrative. And the government presented a misleading and at times simply inaccurate picture of the South African presidential election—an election whose outcome was central to Mr. Phillips' legitimate investment strategy. Each of these issues on their own were concerning. Together, they resulted in a verdict that will constitute a manifest injustice if permitted to stand.

Finally, it is worth stepping back and considering what this case was actually about, the context in which it was brought, and its ramifications for the future. The government has repeatedly taken the position that there was nothing novel about this case. (*See, e.g.*, Gov't Opp'n to Def.'s Mot. to Dismiss ("MTD Opp'n"), at 40 (May 26, 2023), ECF 24 ("Phillips claims that all of the Counts are unconstitutionally novel and vague, in violation of the Fifth Amendment. This challenge is baseless. Phillips is charged with violating well-established legal rules prohibiting fraud and deception; rules that he clearly understood as a sophisticated trader registered with the CFTC."). That it was just another fraud case about cheating to make money. (Tr. 44:8-

19, 54:12-17.)  If there is one thing that the parties may agree on after this trial, it should be that this case was anything but ordinary.  Mr. Phillips currently stands convicted of a criminal offense for trades in an unregulated market that were expected, permissible, and caused no loss.  Glen Point and Morgan Stanley placed a similar volume of orders and bids, at the same time, with the same effect on the likelihood that the barrier would trigger, and with the same knowledge—and indeed, expectation—that their counterparty would do the same thing.  Years ago, Morgan Stanley told the government that the line between permissible and impermissible trading around the barrier is "[s]ubtle."  (*See* 3501-004 at 2.)  It was right.  And it was talking about its internal compliance polices—not the criminal law.  This case is an unfortunate example of why the criminal law requires far clearer lines.

The ramifications of this case will extend beyond its devastating impact on Mr. Phillips.  There can be little doubt that market participants will be required to change their internal policies as a result of this case.  And there is perhaps no better example of this than the purported victim, Morgan Stanley.  Remarkably, the conduct for which Mr. Phillips currently stands convicted would not necessarily violate Morgan Stanley's internal compliance policy about trading around the barrier.  In our view, Morgan Stanley's policy has it right.  But if market participants need to change their policies—not just their practices, but their *policies*—to comply with the criminal law, it begs the question of whether the line between criminal and permissible was clear at the time of the charged conduct and at the time this criminal prosecution was initiated.  The answer to that question is a resounding no.  And against that backdrop, it would be a manifest injustice to allow this verdict to stand.

For these reasons, and those set forth in detail below, the Court should enter a verdict of not guilty on Count Two or, in the alternative, order a new trial.

## FACTUAL BACKGROUND

### I.   The Indictment and Arrest

On March 3, 2022, Neil Phillips, a U.K. citizen and resident who was born in South Africa, was indicted on four counts relating to his trading in the FX spot market on December 26, 2017. (Indictment, ECF 2.)  The indictment charged commodities fraud, wire fraud, and conspiracies to commit the same.  Over five months later, on August 28, 2022, Mr. Phillips was arrested in Spain pursuant to a Red Notice while on vacation with his children.  He spent almost a month in a Spanish jail before being released on bond pending extradition.  He voluntarily consented to extradition and was arraigned on January 5, 2023.  (*See* ECF 11.)

Less than three weeks before trial, the government informed the Court and the defense that it would not proceed on the wire fraud counts (Counts Three and Four) on the grounds that "the jury and the Court may well find" Mr. Phillips not guilty on those counts.  (*See* Gov't Letter to Court (Sept. 25, 2023), ECF 37.)  The trial thus proceeded only on Counts One and Two.

### II.   The Trial

At trial, the government argued that Mr. Phillips bought $725 million in rand on December 26, 2017 in order to lower the USD/ZAR exchange rate below 12.50, and thereby trigger a $20 million payment from Morgan Stanley pursuant to an option contract (the "One Touch Option"). The defense argued, consistent with what Mr. Phillips and others at Glen Point have stated since Glen Point and its outside counsel conducted a 2018 internal investigation of the Boxing Day trading, that Mr. Phillips sought to buy rand on December 26, 2017 in order to capitalize on the downward exchange rate movement that he predicted was imminent.  And, specifically, he sought to buy roughly the amount required to replace his existing exposure to price movement—his delta—represented by the One Touch Option.

In a typical case, viewing the facts in the light most favorable to the government, as is required by the Rule 29 standard, necessitates credibility determinations. But here, many of the key facts are largely undisputed. The government's own witnesses repeatedly confirmed that Mr. Phillips' approach to trading, referred to at trial as delta exchange or delta replacement, reflects a common approach to portfolio management, and one that Mr. Phillips employed. Former Glen Point employees familiar with Mr. Phillips' trading practices testified that Glen Point used delta to track risk exposure to the dollar-rand currency pair in 2017. David Coratti, a government witness and former Glen Point trader, testified that Glen Point tracked delta, exchanged delta, and replaced delta to seek investment returns. (Tr. 538:6-540:23.) Mr. Coratti also testified that presenting delta only for select positions in regular reports relied upon for trading and portfolio management was a standard strategy and "rational" risk management. (*Id*.) For example, Mr. Coratti testified that, as of December 2017, on more than one occasion Glen Point did not depict the delta for certain options positions in its reports because that risk was "less relevant" to its investment decisions at that time. (Tr. 539:1-540:23.) Nicholas Croix, a government witness and former Glen Point analyst, unequivocally supported this testimony. He explained that Glen Point, led by Mr. Phillips, maintained its long rand position through strategic spot acquisitions. (Tr. 222:5-13.) Mr. Croix also testified that Glen Point re-marked certain options positions to "focus on . . . other aspects of [its] portfolio" to avoid the "psychological toll" of the books reflecting "profit and loss . . . moving up and down significantly." (Tr. 231:8-233:5.)

Defense expert witness Andrew Newman, based on his over 30 years of FX trading experience, and his review of months of trading data, testified that Glen Point's Boxing Day trading was consistent with "a delta replacement strategy for the anticipation of the expiration" of the One Touch Option. (Tr. 966:1-5.)

8

Other government fact witnesses outside of Glen Point endorsed the legitimacy of the delta replacement strategy. Graeme Henderson, the broker who sold Glen Point the option at issue, explained that hedge funds differ from banks in risk appetite and trade to "make money if spot goes up or down." (Tr. 115:20-116:2.) Mr. Henderson agreed without qualification that if a hedge fund wanted to maintain exposure to a currency pair it could "go back into the spot market and take back the exposure that [it] would lose once the option was triggered." (Tr. 135:21-136:4.) Samer Oweida, the Global Head of FX and Emerging Markets at Morgan Stanley—the purported victim—similarly testified that, as of 2017, he understood that hedge funds might have investment ideas that would lead them to take on risk, rather than remain risk neutral. (Tr. 454:5-15.)

Even the government's expert witness, Professor Richard Lyons, agreed that hedge funds may seek to maintain currency exposure by monitoring delta. He acknowledged that Glen Point regularly measured delta and agreed that, on Boxing Day 2017, Mr. Phillips successfully replaced delta with precision. Professor Lyons acknowledged that in general, "a trader . . . [is] interested in the total risk that they face, and they're trying to manage the risk and return in the[ir] total position." (Tr. 717:1-5.) And in order to keep this delta constant, he agreed that when traders transact with market makers, they will engage in strategies such as delta exchanges of "the same delta" to do so. (Tr. 736:6-13.) When presented with data from Mr. Phillips' trades on Boxing Day 2017, Professor Lyons testified that the trades "[kept] delta roughly constant" and that Mr. Phillips "may have had some sense for the likelihood of [the barrier] getting met." (Tr. 805:22-806:11.)

With respect to the element of materiality, the government introduced no evidence that Mr. Phillips' trading would have impacted a decision relating to the One Touch Option by an entity in the shoes of his counterparty. The government called one witness from Morgan Stanley, the U.S.-

based parent company of the U.K. subsidiary that was Glen Point's counterparty on the One Touch Option, and one from J.P. Morgan N.A., Glen Point's prime broker on the Option.  Neither witness had any involvement in any of the facts underlying this case.  The government's Morgan Stanley witness, Samer Oweida, was, at the time of trial, the Global Head of FX and Emerging Markets; in 2017, he was in a sales function, as Head of FX and Emerging Markets Sales in the Americas. He had never been a trader for Morgan Stanley.  (Tr. 410:15-22, 413:5-6.)  Mr. Oweida testified that as a one touch option counterparty, Morgan Stanley does not expect the option holder to trade with the intent to move the spot rate to trigger the barrier.  (Tr. 427:17-28:7.)  He testified that it would be important to Morgan Stanley to know if a counterparty had engaged in trading designed to trigger the option, because the bank does not "price in" that conduct at the outset.  (Tr. 428:19-23.)  Mr. Oweida also testified that Morgan Stanley understands that the counterparty to options it sells will manage their own risk, and that, in particular, a hedge fund counterparty on an option might manage risk by transacting in a way that could affect the price of the underlying currency pair.  (Tr. 453:3-55:22.)  He did not testify regarding anything the bank could have or would have done differently with the One Touch Option it held had it learned that its counterparty had traded to trigger the option.

Further, Morgan Stanley engaged in trading that substantially mirrored Mr. Phillips' own trading, reflecting its own need to manage risk around a barrier event.  Indeed, on Boxing Day, Morgan Stanley sold $300 million of rand to Glen Point (via Nomura).  (Tr. 1004:8-23.)  And Mr. Phillips made those purchases from Morgan Stanley by "hitting bids," meaning at the price that Morgan Stanley was willing to transact.  (Tr. 537:13-24 (Coratti testimony that to "hit the bids" means to "transact at the price at which someone is willing to sell now"); Tr. 768:5-7 (Professor Lyons explaining that bids "are actionable prices" in the order book).)

10

The government also called Krista Santoro, the Chief Compliance Officer for J.P. Morgan's U.S. Swaps Dealer and the North America Head of Currencies and Emerging Markets Compliance.  Ms. Santoro was also not involved in the underlying facts of this case and did not work at the prime brokerage that brokered the One Touch Option.  However, she testified that it would be important to J.P. Morgan to know if a counterparty on an option it brokered had engaged in trading designed to trigger a barrier event because it "could" affect the willingness of the FX options desk to pay a settlement amount.  (Tr. 818:1-4.)

Finally, with respect to establishing the required connection to the United States, the evidence at trial established that Mr. Phillips, a U.K. citizen and resident, engaged in the trading at the heart of the alleged scheme while located in South Africa, through a trader at Nomura in Singapore, and that his counterparty on the One Touch Option was the U.K-based subsidiary of Morgan Stanley.  (Tr. 132:22-33:1; 323:15-18, GX 514 at 21, 25; GX 570 at 1; GX 701 ¶ 1.)  J.P. Morgan's London-based branch served as prime broker on the One Touch Option, and J.B. Drax, based in the U.K., served as the intermediary firm that brokered the deal.  (GX 514 at 21; Tr. 87:22-88:10, 126:14-22, 140:12-15).

Despite the fact that every core aspect of the charged scheme occurred abroad, the government sought to establish sufficient U.S. contacts to justify the exercise of U.S. jurisdiction. In doing so, the government elicited largely tangential ties to the U.S. unrelated to the conduct at the center of this case or that which is the focus of the Commodity Exchange Act ("CEA").  First, the government established that Mr. Phillips and Glen Point are registered with the NFA, and Glen Point is registered with the CFTC and SEC.  (Tr. 208:25-09:03, 1243:5-20.)  Second, the evidence introduced at trial showed that Glen Point had an office in New York, a Delaware-based feeder fund, and some U.S. institutional clients.  (Tr. 200:10-11, 208:12-09:17, 1243:12-44:3.)

The only ties to the United States with any connection to the core conduct underlying the charges were incidental, attenuated, or occurred after completion of the purported scheme. Mr. Phillips' counterparty on the One Touch Option was Morgan Stanley's U.K.-based subsidiary; but Morgan Stanley subsequently internally transferred its risk on the Option to one of the bank's U.S. entities. (Tr. 439:24-40:22.) J.P. Morgan Chase Bank N.A. served as Glen Point's prime broker for the One Touch Option; but the entire transaction was facilitated through its London office, whose address appears on the confirmation agreement. (Tr. 483:14-17, 816:9-22.) Some of Mr. Phillips' trades on Boxing Day passed through a server located in the United States, and his trading instructions to Nomura, using the Bloomberg platform, ended up on a server in the United States, as all Bloomberg messages are "replicated or copied" across the company's data centers in New York and New Jersey. (Tr. 299:8-13, 302:10-19, 466:24-67:7.) Finally, settlement payments after the alleged scheme ended were sent to Glen Point and Quantum Partners bank accounts located in New York; the transfers were initiated from J.P. Morgan's account in London and were transferred to J.P. Morgan's U.S. account before being sent to Glen Point's and Quantum Partners' respective New York-based accounts. (Tr. 487:23-25, 491:19-492:4, 492:2-493:7, 497:25-498:9.)

### III.   Mr. Phillips' Rule 29 Motion

At the close of the government's case-in-chief, Mr. Phillips moved for a judgment of acquittal on both counts pursuant to Rule 29(a). (Tr. 938:2-48:22.) The Court reserved on the motion, noting it would "come to a conclusion depending, maybe, on what the jury does, based upon the evidence that has been submitted in the government's case." (Tr. 948:23-49:2.) At the close of the defense case, Mr. Phillips renewed his Rule 29 motion. (Tr. 1113:3-6.)

## IV.     The Jury Verdict

On October 25, 2023, the jury returned a verdict of not guilty on conspiracy to commit commodities fraud (Count One) and a verdict of guilty on commodities fraud (Count Two).  (ECF 71.)

## **RULE 29 MOTION**

## I.     **The Government Failed to Prove that Mr. Phillips Was Guilty of Commodities Fraud Beyond a Reasonable Doubt.**

The government failed to introduce sufficient evidence from which any reasonable jury could have found the elements of commodities fraud established beyond a reasonable doubt. Accordingly, the Court should set aside the jury verdict on Count Two and grant a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

### A.     **Applicable Law**

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Under Rule 29, the court may set aside a guilty verdict entered by a jury after the close of evidence and enter an acquittal in its place. Fed. R. Crim. P. 29(a), (c).  Although a defendant's burden to demonstrate the insufficiency of the evidence is a heavy one, it is "not insurmountable."  *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). Where a "rational trier of fact could [not] have found the essential elements of [a] crime beyond a reasonable doubt," a Rule 29 motion must be granted.  *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2009) (citation and quotation marks omitted).  It is not enough for the government to have introduced evidence "at least as consistent with innocence as with guilt."  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

There is "always some evidence of guilt" in a criminal trial. *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). But the government's burden in a criminal case is higher. The district court must satisfy itself that a "jury could *reasonably* find" the defendant guilty "beyond a reasonable doubt." *Id.* at 513. If the trial "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," that means a "reasonable jury must necessarily entertain a reasonable doubt," and the district court must grant a judgment of acquittal. *Id.* Similarly, while inferences must be drawn in the government's favor in a Rule 29 motion, inferences that are "specious" are "not indulged," for that would permit a conviction of a defendant who is "*probably* guilty." *Id.*

Though a demanding standard, where the government has failed to meet its burden of proof, district courts will not hesitate to enter a judgment of acquittal. *See, e.g.*, *United States v. Bogucki*, No. 18 Cr. 21, 2019 WL 1024959, at *1 (N.D. Cal. Mar. 4, 2019) (Breyer, J.) (granting Rule 29 motion in wire fraud prosecution for failure to prove the making of materially false promises or representations); *United States v. Tomasetta*, No. 10 Cr. 1205, 2012 WL 2064978, at *3-5, *9 (S.D.N.Y. June 6, 2012) (Crotty, J.) (granting Rule 29 motion in securities fraud prosecution for failure to prove venue); *United States v. Cassese*, 290 F. Supp. 2d 443, 457 (S.D.N.Y. 2003) (Sweet, J.) (granting Rule 29 motion in insider trading prosecution), *aff'd*, 428 F.3d 92 (2d Cir. 2005); *United States v. Kwan*, No. 02 Cr. 241, 2003 WL 22973515, at *11 (S.D.N.Y. Dec. 17, 2003) (Batts, J.) (granting Rule 29 motion in interstate transportation of stolen goods prosecution); *United States v. Gotti*, 457 F. Supp. 2d 403, 410 (S.D.N.Y. 2006) (Scheindlin, J.) (granting Rule 29 motion in criminal RICO prosecution); *United States v. Finnerty*, 474 F. Supp. 2d 530, 547 (S.D.N.Y. 2007) (Chin, J.) (granting Rule 29 motion in securities fraud prosecution), *aff'd*, 533 F.3d 143 (2d Cir. 2008); *United States v. Siembida*, 604 F. Supp. 2d 589,

602 (S.D.N.Y. 2008) (Castel, J.) (granting Rule 29 motion in wire fraud prosecution), *aff'd*, 374 F. App'x 189 (2d Cir. 2010); *United States v. Valle*, 301 F.R.D. 53, 115 (S.D.N.Y. 2014) (Gardephe, J.) (granting Rule 29 motion on conspiracy charge), *aff'd in relevant part*, 807 F.3d 508 (2d Cir. 2015); *United States v. Pauling*, 256 F. Supp. 3d 329, 343 (S.D.N.Y. 2017) (Oetken, J.) (granting Rule 29 motion in narcotics trafficking prosecution), *aff'd*, 924 F.3d 649 (2d Cir. 2019); *United States v. Jones*, 420 F. Supp. 3d 242, 256 (S.D.N.Y. 2019) (Koeltl, J.) (granting Rule 29 motion in narcotics trafficking prosecution); *United States v. Berry*, No. 20 Cr. 84, 2022 WL 1515397, at *12 (S.D.N.Y. May 13, 2022) (Nathan, J., sitting by designation) (granting Rule 29 motion in murder through use of a firearm prosecution); *United States v. Doud*, No. 19 Cr. 285, 2023 WL 2185844, at *8 (S.D.N.Y. Feb. 23, 2023) (Daniels, J.) (granting Rule 29 motion in narcotics trafficking prosecution); *United States v. Schulte*, No. 17 Cr. 548, 2023 WL 5561141, at *7 (S.D.N.Y. Aug. 29, 2023) (Furman, J.) (granting Rule 29 motion as to obstruction of justice charge).

## II.   The Government Failed to Prove the Required Connection to the United States.

No reasonable juror could have found that the government proved beyond a reasonable doubt that Mr. Phillips' conduct had the required connection to the United States under the CEA. The government could prove the requisite relationship in one of two ways.  First, the government could prove a domestic application of the CEA, namely that "the relevant conduct," meaning "actions taken by the defendant . . . to manipulate the USD/ZAR exchange rate in order to fraudulently trigger a $20 million payment under the barrier option contract and defraud the counterparties to that contract," "occurred in the United States."  (Tr. 1363:12-17.)[2]  Second, the government could meet its burden by proving a direct and significant connection to activities in

---

[2] Because the jury found Mr. Phillips not guilty of conspiracy, the conduct of alleged co-conspirators is not relevant to this analysis.  In any event, there was no evidence of any conduct by any alleged co-conspirator in the United States.

U.S. commerce under Section 2(i) of the CEA, namely, that "an activity of the defendant . . . outside the United States related to the barrier option contract had a direct and significant connection with activities in commerce of the United States." (Tr. 1364:5-8.) The government proved neither beyond a reasonable doubt.

### A.    Domestic Application

#### 1.    Applicable Law

Domestic application of the CEA requires the government to establish that "[r]elevant conduct . . . essential . . . to the charged scheme" occurred in the United States. (Tr. 1363:25-64:1.) When considering the domestic application of a statute, courts do not search for any possible domestic touchpoint to the United States. After all, the presumption against extraterritoriality "would be meaningless if *any* domestic conduct could defeat it." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419 (2023) (emphasis added) (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010)); *see also Morrison*, 561 U.S. at 266 ("[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States."). Courts thus undertake a threshold "filtering role," *Abitron*, 600 U.S. at 419 (citing *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937 (2021)), to identify the core "activity that matters" for a domestic application, *id.* (citing *Morrison*, 561 U.S. at 266).

This threshold task of identifying "activity that matters" (*i.e.*, relevant conduct essential to the charged scheme) is not a boundless inquiry into evidentiary relevance in some generic sense. *Compare* Fed. R. Evid. 401. For conduct to be relevant in this particular context, it must pertain to the focus of the commodities fraud statute: "rooting out manipulation and ensuring integrity in swaps markets." (Tr. 1363:19-20.) Other considerations—*e.g.*, the FX spot market, counterparty risk management, or the purported value of the U.S. dollar—are not the focus of the CEA and cannot form the basis of relevant conduct for purposes of a domestic application. *See, e.g., Abitron*,

16

600 U.S. at 419 (requiring strict consideration of "'conduct relevant to the statute's focus'" (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018)).[3]

Here, to find a domestic application of the CEA, the jury was required to find that conduct pertinent to the CEA's anti-manipulative and market integrity focus occurred domestically. *See id.* (citing *WesternGeco LLC*, 138 S. Ct. at 2137); *Prime Int'l Trading, Ltd. V. BP P.L.C.*, 937 F.3d 94, 102 (2d Cir. 2019). And those domestic acts must be significant to the charged offense. The jury could not rest its finding on "incidental" conduct, even if it was a "necessary characteristic of the scheme." (Tr. 1363:22-64:1.) *Cf. Morrison*, 561 U.S. at 266 ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."). Instead, for a domestic application of the CEA, the government had to prove, beyond a reasonable doubt, that conduct occurred in the United States that was so core to the scheme that the conduct itself provided a basis for criminal prosecution. (Tr. 1363:20-64:3; *see also* Tr. 1363:23-25 ("[L]iability must be premised on the conduct that occurred in the United States").) No reasonable juror could have made this finding beyond a reasonable doubt. Indeed, the government's evidence in support of a domestic application was so weak that it all but abandoned it in its closing argument.

### 2. The Government Failed to Prove a Domestic Application.

The Court defined the relevant conduct as the alleged manipulation of "the USD/ZAR exchange rate . . . [to] trigger a $20 million payment under the barrier option contract." (Tr. 1363:14-16.) The government's evidence confirmed what was apparent well before trial: this conduct occurred abroad.

---

[3] (*See* Tr. 1149:3-7 ("Don't I need to give the jury instructions about what the focus is of the commodities fraud statute, particularly in a case like this, where they could think that the focus is on the manipulation in the FX spot market, which I think would be wrong.").)

In sum, the "relevant conduct" involved a foreign national (United Kingdom),[4] trading from a foreign location (South Africa)[5] and through a foreign intermediary (Singapore)[6] of a foreign bank (Japan),[7] based on his assessment of a foreign political election (South Africa),[8] for the alleged purpose of deceiving his foreign counterparty (United Kingdom),[9] on an option brokered by a foreign intermediary (United Kingdom),[10] for which a foreign branch served as prime broker (United Kingdom).[11]  Almost nothing relevant to the charged offense occurred in the United States.  And certainly nothing that could form the basis of a commodities fraud conviction occurred in the United States.  This "predominantly foreign" conduct did not come close to what is required for a domestic application, *see Laydon v. Cooperatieve Rabobank U.A.*, 55 F.4th 86, 96 (2d Cir. 2022) (quoting *Prime*, 937 F.3d at 106), under any standard—let alone under the reasonable doubt standard applicable here.

The Second Circuit's recent decision in *Laydon* reinforces the point.  There, a U.S.-based plaintiff brought a commodities fraud claim against 20 foreign banks and brokers, alleging that the foreign entities manipulated two benchmark rates: the Yen-LIBOR and Euroyen TIBOR.  *See id.* at 92–93.  Affirming dismissal of the commodities fraud claim, the Second Circuit found that the plaintiff failed to allege facts sufficient for a plausible domestic application of the CEA—even at the pleading stage in a civil case, where all reasonable inferences were drawn in the plaintiff's favor.  *See id.* at 101.[12]  It did not matter that the plaintiff purchased a futures contract, tied to the

---

[4] (*See* GX 514 at 25.)
[5] (*See* GX 701 ¶ 1.)
[6] (*See* Tr. 369:13-15.)
[7] (*See* Tr. 308:13-14.)
[8] (*See* DX 102, 106, 407-08, 600, 608.)
[9] (*See* Tr. 446; GX 570.)
[10] (*See* Tr. 126:16-22.)
[11] (*See* GX 555 at 4 ("The Office of JP Morgan for this Transaction is London."); Tr. 482:18–25.)
[12] Naturally, a finding of implausibility serves as authority to find a jury verdict unreasonable, as the two logically go hand-in-hand.  An implausible result is necessarily an unreasonable one, and vice versa.  *See, e.g.*, *Murray v. Carroll*, 346 F. App'x 651, 652 (2d Cir. 2009) (finding plaintiff's theory "implausible" and therefore that no "reasonable jury"

value of a manipulated futures rate, on "a U.S.-based exchange" or that a foreign defendant "sent an email" while traveling in Las Vegas. *Id.* at 97. What mattered was where the manipulation occurred. On that point, the Second Circuit found dispositive that the manipulation occurred on "foreign trade desks" and targeted a financial instrument "tied to the value of a foreign asset." *Id.* at 96-97. And on those facts, a domestic application of the CEA was not plausible. So too here: Mr. Phillips traded from a foreign location, in the decentralized and unregulated global FX spot market, involving exclusively parties located abroad.[13] As a result, there could be no domestic application of the CEA.

At the Charge Conference, the Court asked the government what, if any, evidence supported a domestic application instruction. As discussed below, the government pointed to three isolated U.S. touchpoints—all undertaken by persons other than Mr. Phillips. (*See* Tr. 1151:17-53:2; 1363:13 ("Relevant conduct means the actions taken by the defendant")); *see also Prime*, 937 F.3d at 105 (similar). None come close to proving a domestic application beyond a reasonable doubt. Indeed, the government appears to have essentially conceded as much in its closing argument—although it argued for the domestic application instruction to remain in the final jury charge, extending the length of the jury instruction and resulting in an even more complex

---

could find for him); *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 102 (2d Cir. 2018) (finding evidence of alleged unlawful agreement "implausible," and searching for an alternative rationale for jury verdict); *Jada v. Costco Wholesale Corp.*, No. 21 Civ.194, 2023 WL 5672198, at *6 (E.D.N.Y. Sept. 1, 2023) (requiring "not merely" a "plausible theory" but "evidence from which a reasonable jury could draw the [necessary] inference" (citation and quotation marks omitted)); *In re Allied Cap. Corp. Sec. Litig.*, No. 02 Civ. 3812, 2003 WL 1964184, at *6 (S.D.N.Y. Apr. 25, 2003) (Lynch, J.) ("The fleeting dip in Allied's share price thus does not provide a plausible basis on which a reasonable jury could conclude that investors actually considered the alleged overstatements material.").

[13] It does not matter that the USD/ZAR exchange rate involves the U.S. dollar. The mere reference to the U.S. dollar is not enough for a domestic application. *See CFTC v. Gorman*, No. 21 Civ. 870 (VM), 2023 WL 2632111, at *12 (S.D.N.Y. Mar. 24, 2023) (emphasizing that although the financial instrument referred "to the price of the U.S. dollar Ten-Year Swap Spreads . . . that link is far too tenuous to support extraterritoriality"). In addition, it cannot be the case that a U.S. reference currency exchange rate results in a finding of a domestic application of the CEA because it would bring almost all activity in the global FX market within reach of U.S. regulators—the U.S. dollar is far and away the most traded currency and is referenced in the overwhelming majority of FX transactions. Such an expansive application would defeat the policies underlying the presumption against extraterritoriality.

instruction going to the jury, it barely addressed it in closing.  Specifically, the government in its closing expressly argued that it had proved a "direct and significant" connection." (Tr. 1242-43.) In rebuttal, the government then, incredibly, told to the jury that "almost every aspect of this crime occurred in the United States, and a lot of it occurred in New York." (Tr. 1320:21-24.)  Because the government did not actually argue, apart from that incredible, conclusory and totally unsupported representation, a domestic application to the jury, we instead address the three arguments the government made to the Court in support of its request for the charge.

### a.  FastMatch Engine

First, the government noted that some Boxing Day trades matched on a FastMatch engine located in the United States. (*See* Tr. 1151:23-24.)  The location of a matching engine, which is merely a machine that facilitates the electronic matching between parties elsewhere, in the United States does not approach what is required to transform this case into a matter of domestic concern. The CEA focuses "on rooting out manipulation and ensuring market integrity—not on the *geographical coordinates of the transaction*." *Prime*, 937 F.3d at 107 (emphasis added).  The fact that certain trades in the *unregulated* spot market happen to have matched in the United States, therefore, is plainly "not sufficient" to trigger a domestic application of the CEA. *Id.* at 106; *see also Laydon*, 44 F.4th at 97 (finding "meritless" a claim of domestic application based on the "purchase[] of a Euroyen TIBOR futures contract on . . . a U.S.-based exchange.").  What matters is the locus of the defendant's allegedly manipulative conduct; there must be "domestic—not extraterritorial—*conduct by Defendants* that is violative of a substantive provision of the CEA, such as Section 6(c)(1)." *Prime*, 937 F.3d at 105 (citation omitted)).  There was none in this case.

Especially given the government's repeated emphasis on the location of a FastMatch matching engine, it is worth noting just how inadequate the location of an engine is along the

continuum of what could establish a domestic application.  With regard to domestic application, the Court instructed the jury that "it is not sufficient that the conduct is a necessary characteristic of the scheme or that it has an effect in the United States.  Rather, liability must be premised on the conduct that occurred in the United States."  As a preliminary—and dispositive—matter, liability was not and could not be premised on the location of a FastMatch engine.  And the government has never contended otherwise.  But the location of the FastMatch engine fails to prove a domestic application for several additional distinct and independently sufficient reasons.

First, the placing of an order on FastMatch was not an "action[] taken by the defendant." (Tr. 1363:13.)  Mr. Phillips did not place any orders on FastMatch.  He did not have access to FastMatch.  And he did not know what platform(s) Nomura used to execute the relevant trades. The trial record is devoid of any evidence that Mr. Phillips had access to, or even awareness of, the platforms Nomura selected to execute its trades.  (*See* GX 446 (no reference to the platform used to execute trades); Tr. 788:5-14 (Professor Lyons' direct testimony indicating that "[n]othing that I had, no data that I saw would suggest that he could see the order book," nor "which platform, Refinitiv or FastMatch, the Nomura trader was trading on his behalf").)  What actions did Mr. Phillips actually take?  While in South Africa, he asked a Singapore-based salesperson at a Japanese bank to place orders for him.  Those were the actions taken by Mr. Phillips.  And they did not occur in the United States.

Second, the placing of certain orders that matched on FastMatch was not even a "necessary characteristic of the scheme" (which, of course, would still not be sufficient for a domestic application).  There is no dispute that all of the Boxing Day trades executed on the Refinitiv platform matched in London, and only some of the FastMatch trades matched in the United

States.[14]   But those particular FastMatch trades were not "necessary" for the scheme.   The government repeatedly argued that the *entirety* of the scheme was the sending of "false signals" to Morgan Stanley.   (*See, e.g.*, Oral Argument on Mots. in Lim., Tr. 6:22 (Oct. 10, 2023); *see also* Gov't Opp'n to Defs.' Mots. In Limine at 16-18, 25-26, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Oct. 7, 2023), ECF 48; MTD Opp'n at 7, 43, 48, *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. May 26, 2023), ECF 24; Oral Argument on Mot. to Dismiss, Tr. 42:3-8, 12-19 (Aug. 1, 2023).)   But those signals were sent regardless of whether or not certain trades were executed on FastMatch.   In sum, the location of a FastMatch server was the quintessential "incidental" fact.   It was nowhere near sufficient to warrant a domestic application of the CEA.

Third, it is worth considering how the vast majority of the FastMatch trades actually came to pass.   Before trial, the government's expert witness, Professor Lyons, opined that Mr. Phillips' trading was not economically rational because it switched from Refinitiv to FastMatch, which was a less liquid platform.   (*See* Expert Disclosure – Professor Richard Lyons ¶ 15(b), *United States v. Phillips*, No. 22 Cr. 138 (S.D.N.Y. Sept. 30, 2023), ECF 43-6 (emphasizing that "Nomura traded on FastMatch despite better pricing being available on Refinitiv").)   Upon receiving Professor Lyons' opinion, we obtained records from Refinitiv that confirmed what we expected: the purported "switch" from Refinitiv to FastMatch was the result of a "credit anomaly" that prohibited further trading between Nomura and Morgan Stanley.   (*See* Tr. 472:24-73:11, 474:12-18.)   Unsurprisingly, at trial, Professor Lyons did not offer his previously disclosed—and patently incorrect—opinion about Mr. Phillips' purportedly irrational decision to switch to FastMatch.   It was an opinion that fit the government's theory of the case but that was fundamentally at odds with what actually happened.   In reality, a bilateral credit limit between Nomura and Morgan

---

[14] $300 million of Mr. Phillips trades matched on a Refinitiv server located in London.   (Tr. 469:1-25, 749:9-12.)

Stanley resulted in Nomura transferring from one trading platform to another, and that trading platform just happened to have one of its servers located in the United States.[15]  This decision had nothing to do with Mr. Phillips.  The location of the server had nothing to do with Mr. Phillips.  And the argument that the location of the server somehow supports a domestic application of the CEA—beyond a reasonable doubt—strains credulity.

### b.  Price Signals

Second, the government claimed that unnamed persons or entities in the United States received a false price signal due to Mr. Phillips' trading, and that the potential receipt of price signals somewhere in the United States satisfied the domestic application standard.  (*See* Tr. 1152:13-16.[16])  The government's position contradicts Second Circuit law.  *See Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 201, 216 (2d Cir. 2014) (finding no domestic application where defendant's false statements, made abroad, "were . . . accessible in the United States" and "may have been intended to deceive investors worldwide"); *see also CFTC v. Gorman*, No. 21 Civ. 870 (VM), 2023 WL 2632111, at *12 (S.D.N.Y. Mar. 24, 2023) (finding no domestic application where defendant's conduct influencing the "price of U.S. Swap Spreads" would appear on U.S. computer screens).  As the Court stated at the Charge Conference, "[y]ou might have a misleading statement that is prepared outside of the United States but then, because of the operation of the internet, it is available to people in the United States . . . .  I don't think [Judge Friendly and the like] would have said that that would be enough to ground jurisdiction in

---

[15] The fact that the credit anomaly occurred immediately upon the trades between Morgan Stanley and Nomura reaching exactly $300 million strongly suggests there was a credit limit in place that prevented trading beyond that amount.  (Tr. 964.)

[16] The government introduced only one piece of evidence in support of the notion that parties involved in the One Touch Option received the purported false price signal: an email in which Glen Point confirms with its intermediary firm, J.B. Drax, who held no risk on the Option whatsoever, that the rate was triggered.  (*See* GX 420.)  Each recipient of this email was a U.K.-based person or entity.  *See id.*  The government chose not to introduce into evidence emails from individuals at Morgan Stanley and J.P. Morgan confirming the 12.5 rate was triggered, likely because all individuals who sent and received those emails were also located in the U.K.

the United States." (Tr. 1154:13-22.) The Court's observation was consistent with both common sense and Second Circuit law. Perhaps unsurprisingly, the government, yet again, abandoned this argument in closing.

### c.   American Banks

Third, the government cited the conduct of U.S. banks in transactions related to the One Touch Option as a basis for a domestic application. This is incorrect as well. First, it was Mr. Phillips' conduct—not the conduct of others—that matters. (*See* Tr. 1363:13 ("Relevant conduct means the actions taken by the defendant")); *see also Prime*, 937 F.3d at 105 (similar). The involvement of a U.S. person or entity in conduct related to—or even resulting from—the relevant conduct does not change that standard. *See Laydon*, 55 F.4th at 96-97 (affirming dismissal of CEA claim, even though a U.S.-based investor purchased the manipulated product). Second, the scheme was the sending of allegedly false signals—not payments that were made after those signals were sent. In other words, those payments were not "essential" to the charged scheme and thus could not form the basis of a domestic application.

*   *   *

Permitting the exercise of U.S. jurisdiction in a criminal case on these facts, based on a domestic application of the CEA, would convert the presumption against extraterritoriality into a "craven watchdog." *Morrison*, 561 U.S. at 266; *Parkcentral*, 763 F.3d at 216 (noting the "obvious" potential for "regulatory and legal overlap and conflict" in cross-border financial investigations). The presumption means much more than that. And no reasonable jury could have found that it was overcome in this case.

24

**B.      The Government Did Not Prove a Direct and Significant Connection to Activities in U.S. Commerce Under Section 2(i) of the CEA.**

Section 2(i)(1) provides that the CEA's provisions relating to swaps "shall not apply to activities outside the United States unless those activities . . . have a direct and significant connection with activities in, or effect on, commerce of the United States." 7 U.S.C. § 2(i)(1). After arguing at every opportunity—at the motion to dismiss stage, in connection with the motions in limine, and in its written and oral arguments relating to its proposed jury instructions—that there was sufficient evidence to prove a "direct and significant" effect on commerce of the United States,[17] the government finally abandoned this argument the day before closing arguments.[18]

_____

[17] The government's position on what would be sufficient to satisfy the jurisdictional requirement—either by establishing a domestic application of the statute or meeting the "direct and significant" threshold for jurisdiction under Section 2(i)—has shifted over the course of this prosecution. In opposition to Mr. Phillips' motion to dismiss, the government argued that a domestic application could be satisfied by conduct in or "directed at" the United States, (*see* MTD Opp. at 18), and that the "direct and significant" standard under 2(i) was satisfied by any violation of Section 6(c)(1) involving swaps, (Oral Argument on Mot. to Dismiss, Tr. 42:3-8, 12-19 (Aug. 1, 2023)). When it came to the Requests to Charge, the government argued that the standard under Section 2(i) was comparable to the Commerce Clause threshold: "The reason Congress has the ability to pass a statute like the Hobbs Act to regulate the way it does is because, in the aggregate, the type of activity that it's regulating could have a substantial effect on commerce." (Oct. 13 Tr. 53:18-22.) The government also reiterated its view that any manipulative conduct relating to swaps that has a direct connection to activities in U.S. commerce necessarily meets the "direct and significant" standard, without any requirement to independently demonstrate that the activities have a "significant" connection. (Oct. 13 Tr. 53:22-54:8.) Then at trial, the government abandoned its earlier argument that Mr. Phillips' conduct had a direct and significant effect on U.S. commerce. (Tr. 1145:8-17.) And the government argued to the jury that the "scheme had a connection to the United States, a direct and significant connection to commerce"—an incomplete version of the standard, which requires a direct and significant connection between activities abroad and activities in commerce of the United States. (Tr. 1242:22-24.)

[18] Just as it is solely within the government's discretion to decide what charges to bring and which arguments to advance, it is also the government's prerogative to decide to drop counts or theories of liability. In this case, the government dropped two of its four counts three weeks before trial and the "direct and significant" effects argument the day before closing arguments. The government not only brought charges it should not have, but then repeatedly defended them to the Court. And when it very belatedly dropped the wire fraud counts before trial, it did so on the purported grounds that the Court and jury might not find Mr. Phillips guilty. That possibility, of course, applies in every single criminal case. The government should be held to a higher standard. The same goes for the "direct and significant effects" argument. Time and time again, the government argued that this standard was met. And then, without any explanation, it finally dropped that theory too. The government has not—and could not—cite anything that changed in the record that caused it to reverse course on these critical issues in a criminal case. And the apparent ease with which the government brought and then dropped charges and theories in this case—in which a person's liberty is at stake—falls far below the standards to which the Department of Justice purports to, and should, hold itself. Indeed, the government's theory for dropping the wire fraud counts—that it might not *win*—is consistent with the Court's observation during the trial that it was proper for the defense to seek to establish, "given what was presented to the jury," that judgment relating to presentation of a summary exhibit "was exercised by a party that has a stake in the outcome of this case regardless of what justice may have said about the government's interest being in the right outcome rather than a victory." (Tr. 908.)

Thus, the government had to prove that the manipulative swap-related conduct abroad had a "direct and significant connection with activities in" U.S. Commerce. The government did not prove this connection, and no reasonable jury could have found that it did beyond a reasonable doubt.

1. Swap-Related Activities

At the outset, it is important to define which of Mr. Phillips' foreign "activities" relate to the barrier option contract. As the Court instructed the jury, the relevant "activities outside the United States" in this case are those that "related to the barrier option contract." (Tr. 1363:4-10.) And in order to be relevant, the activities must be those that form the basis of the offense. *See, e.g.*, *Gorman*, 2023 WL 2632111, at *10 (concluding that, for Rule 180.1(a)(2) charge alleging false statements, the direct-and-significant inquiry focused "solely on the statements" that constitute the offense under the rule). It is these activities—those that form the basis of the offense—that must have had a "direct and significant connection" with activities in U.S. commerce. Moreover, only activities undertaken by the defendant are considered. Unlike the jury instruction with respect to venue, which allows for a finding of proper venue where any "act in furtherance of each of the charged crimes occurred within the Southern District of New York" even if the act was not "taken by the defendant," (Tr. 1365:3-5, 19-20), the "direct and significant" analysis under Section 2(i) looks to the "activity of the defendant or his co-conspirators outside the United States," (Tr. 1364:5-6). Because the jury found Mr. Phillips had no co-conspirators, his conduct alone may be considered.

The government alleged a scheme in which Mr. Phillips manipulated the FX spot market in order to send a false price signal to his counterparty to the One Touch Option, in order to trigger a $20 million payout to Glen Point. The core activity is thus the conduct that the government

claims sent a false price signal to his counterparties—his trading, to the extent that it sent a false pricing signal to his counterparty.

Mr. Phillips, a U.K. resident sitting in South Africa, gave trading directions to a salesperson at Nomura located in Singapore.  That salesperson passed those directions to a trader, also located in Singapore, to execute the trade.  (Tr. 309:12-20 (Srin Iyer testimony describing order and execution process at Nomura); 369:13-15 (Srin Iyer testimony confirming that "someone on the trading desk in Singapore executed the trades that are discussed in the [Boxing Day] chat").)  The trader then selected a trading platform (or in this case, more than one trading platform) to execute the trades—in this case, by "hitting bids" in the order book on those platforms.  These actions constitute the entirety of the charged scheme.

Importantly, the government elected not to argue that relevant activities outside the United States had a direct and significant *effect* on U.S. commerce and expressly waived instruction on that prong of Section 2(i).  (Tr. 1145:8-17.)  Evidence relating to "effects" of the scheme on U.S. commerce, rather than to a connection between the scheme and "activities" in U.S. commerce, should therefore not be considered in determining whether a reasonable jury could have found that the government's evidence established the requisite connection under Section 2(i).  This includes any economic effect of the counterparties to the One Touch Option transferring risk from entities abroad to U.S. entities, and the payouts made under the One Touch Option into bank accounts located in the United States.  *Cf. Charisma World Wide Corp., S.A. v. Avon Prod. Inc.*, 243 F. Supp. 3d 450, 455 (S.D.N.Y. 2017) (collecting cases distinguishing domestic activity from the "substantial *effect* on United States commerce" required for extraterritorial application of the Lanham Act (emphasis added)).  Financial gains and losses are consistently treated as "effects" by courts performing extraterritoriality analyses.  *See, e.g.*, *Charisma World Wide*, 243 F. Supp. 3d at

456-58 (analyzing financial benefit and harm of copyright infringement scheme as effects on U.S. commerce and collecting cases); *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 261-62 (S.D.N.Y. 2006) (analyzing financial impact under "effects test" rather than "conduct test"); *In re Alstom SA*, 406 F. Supp. 2d 346, 369-72 (S.D.N.Y. 2005) (analyzing financial harm to shareholders in assessing extraterritorial application of RICO statute under "effects" test borrowed from securities law, while analyzing "acts" that furthered fraudulent scheme under the "conduct" test). Activities relating to payments made after the scheme was complete should therefore not be considered.

2. "Direct and Significant Connection" to Activities in Commerce of the United States

To sustain Mr. Phillips' conviction for commodities fraud, the government must have introduced sufficient evidence for a reasonable jury to find beyond a reasonable doubt that his activities relating to the One Touch Option had a "direct and significant connection" to activities in commerce of the United States. 7 U.S.C. § 2(i)(1). It is not enough for a connection to be *either* direct *or* significant. It must be both direct "and" significant. Here, the "connections" relied on by the government were neither.

For a connection to be "direct," it must be "immediate;" "[a] connection to an activity in commerce of the United States is direct if the activity outside the United States directly and immediately affected activity in commerce of the United States, without deviation or interruption." (Tr. 1364:9-13.) An "indirect, remote, or attenuated connection to commercial activity that occurs in the United States is not sufficient." (Tr. 1364:13-15.) "Significant in this context means meaningful or consequential." (Tr. 1364:17-18.) "For activity outside the United States to have a significant connection with activity in commerce of the United States, the relationship between the activity outside the United States to the commercial activity in the United States must be of

28

importance." (Tr. 1364:18-22.) "It is not sufficient if the relationship . . . is random, fortuitous, attenuated, or merely incidental;" the conduct must be "integral, rather than ancillary." (Tr. 1364:22-1365:1.)

### a. *Enactment History*

The Court relied on principles of international comity and the Supreme Court's decision in *Morrison*, among other cases, in crafting the jury charge with respect to Section 2(i). As the Court noted, "Section 2(i)(1) was passed in the immediate aftermath of the Supreme Court's decision in *Morrison* . . . and that word 'significant' that the Congress used in reaction to the decision in *Morrison* and in disagreement with it, harks back to language the United States government used in proposing a test for the regulation by the United States of conduct that is transnational in the *Morrison* case." (Tr. 1179:8-15.)

In *Morrison*, the government had proposed a test for extraterritorial application of the Exchange Act providing that a transnational fraud is subject to Section 10(b) "when the fraud involves significant conduct in the United States that is material to the fraud's success." *Morrison*, 561 U.S. at 270 (internal quotation marks omitted). The Supreme Court rejected that test, and instead adopted a requirement that a fraud involve, at minimum, "the purchase or sale [of a security] in the United States, or . . . a security listed on a domestic exchange" in order to apply the Exchange Act to conduct abroad. *Id.* at 269-70. The decision supplanted the "conduct and effects" test that had previously been used by courts to determine when unlawful activities had a sufficient connection to the United States to overcome the presumption against extraterritoriality. Pursuant to this test, courts had allowed for extraterritorial application of domestic statutes where "the wrongful conduct had a substantial effect in the United States or upon United States citizens," or where "the wrongful conduct occurred in the United States." *Id.* at 257.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376, enacted in 2010 shortly after the decision in *Morrison*, expressly incorporated language mirroring the pre-*Morrison* conduct and effects test specifically for cases brought by the SEC under the Exchange Act and the Securities Act. *See* Securities Act § 22(c), 15 U.S.C. § 77v(c) (federal courts "shall have jurisdiction" over any action brought by the SEC involving "(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States"); Exchange Act § 27(b), 15 U.S.C. § 78aa(b) (same). However, Congress chose different language for Section 2(i) of the CEA, providing for extraterritorial application of only the CEA provisions that relate to swaps and requiring that activities abroad relating to swaps have a "direct and significant connection with activities in, or effect on, commerce of the United States."

Section 2(i) thus incorporates both a "conduct" (or "activities") prong and an "effects" prong, but imposes a different standard than the pre-*Morrison* conduct and effects test. Under Section 2(i)'s "activities" prong, a "direct and significant connection" between activities abroad and those in "commerce of the United States" is required; by contrast, the pre-*Morrison* conduct test requires the mere presence of conduct that had a "substantial effect" on or occurred in the United States, regardless of significance to U.S. commerce overall.

### b.   *Systemic Risk*

Numerous sources—including courts, regulators, and commentators—have concluded that Section 2(i) was designed to allow the CEA's swap-related provisions to reach swap-related conduct abroad that is connected to activities in U.S. commerce in a manner that implicates

systemic risks to the United States.  In other words, fraudulent swap-related conduct abroad falls

within the ambit of the CEA only when it is connected in an important way, and not merely an

incidental or attenuated way, to activities in U.S. commerce, and the nature of that connection must

implicate systemic risks to the U.S. financial system.

The large-scale impact to U.S. financial institutions during the 2008 financial crisis of high-

risk, swap-related activities undertaken by their subsidiaries abroad sheds light on the type of risks

with which Congress was concerned when it drafted Section 2(i):

> Several poster children for the 2008 financial crisis demonstrate the impact that
> overseas over-the-counter derivative swaps trading can have on a U.S. parent
> corporation.  American International Group ("AIG") nearly failed because of risks
> incurred by the swaps trading operations in the London branch of its subsidiary,
> AIG Financial Products ("AIGFP").  Significant losses on credit default swaps
> entered into by AIGFP, and "guaranteed" by AIG, triggered collateral calls the
> companies could not meet and a liquidity crisis for both companies.  Similarly,
> Lehman Brothers Holding Inc.—a corporation that had over 3000 corporate
> affiliates worldwide—guaranteed the nearly 130,000 derivative contracts held by
> one of its London-based subsidiaries.  When Lehman Brothers filed for bankruptcy
> in September 2008—at that time the largest bankruptcy in history with claims
> exceeding $300 billion—its derivative book lost over $50 billion in value.

*SIFMA v. CFTC*, 67 F. Supp. 3d 373, 387 (D.D.C. 2014) (citations omitted).  The 2008 financial

crisis was exacerbated by activities undertaken by U.S. financial institutions abroad on a huge

scale that led to financial insolvency of U.S. financial institutions and resulting systemic risk to

U.S. commerce.  It is this type of impact that Dodd-Frank's swap-related provisions aimed to

address.

As Mr. Phillips has argued previously, both Congress and the CFTC have made clear that

Section 2(i) is focused on bringing conduct that poses systemic risk to the U.S. financial system

within the jurisdiction of U.S. regulators.  (*See* Def.'s Mem. of Law in Supp. of Requests to Charge

("Def.'s RTC Br.") at 10-18 (Oct. 13, 2023), ECF 57.)  Although not binding, *see Abramski v.*

*United States*, 573 U.S. 169, 191 (2014) (declining to defer to agency interpretation of a criminal

statute because "criminal laws are for courts, not the Government, to construe"), the CFTC's own interpretation of "direct and significant" imposes a high standard on the "activities" prong of Section 2(i).  *See* Cross-Border Application of the Registration Thresholds and Certain Requirements Applicable to Swap Dealers and Major Swap Participants, 85 Fed. Reg. 56,924 (Sept. 14, 2020)*.*  In adopting its final rule under this provision, the CFTC construed the "activities" prong of Section 2(i) as applying the swap-related provisions of the CEA "to activities outside the United States that have . . . a direct and significant connection with activities in U.S. commerce, *and through such connection present the type of risks to the U.S. financial system and markets that Title VII directed the Commission to address*."  85 Fed. Reg. at 56,929-30 (emphasis added).  The CFTC thus recognized that the connection between activities abroad and those in the United States must pose the type of systemic risk that Dodd-Frank was enacted to address.  *See id.* at 56,929 ("[A] primary purpose of Title VII of the Dodd-Frank Act is to address risk to the U.S. financial system created by interconnections in the swap market.  Title VII of the Dodd-Frank Act gave the Commission new and broad authority to regulate the swap market to address and mitigate risks arising from swap activities that could adversely affect the resiliency of the financial system in the future." (citation omitted)).  Further, even though the CFTC has taken the position that it has authority over swap activities abroad that do not, on their own, meet the required threshold so long as those activities as a class pose a systemic risk to the U.S. financial system, it also has provided that "in exercising its authority with respect to swap activities outside the United States, the Commission will be guided by international comity principles and will focus its authority on potential significant risks to the U.S. financial system."  *Id.* at 56,928.  There is no question that the principles animating that focus have even more force in a criminal case.[19]

---

[19] Moreover, as the court has noted, (*see* Oral Argument on Mot. to Dismiss, Tr. 42:20-45:11 (Aug. 1, 2023)), the aggregation approach proposed by the CFTC, if interpreted to allow a single swap between two sophisticated

In its draft jury charge, with respect to the "effects" prong of Section 2(i), the Court rightly gave as an example an effect that "poses a risk to the financial health of the impacted United States entity that, in turn, would have a meaningful effect on the United States financial system." (Draft Jury Charge at 25 (Oct. 21, 2023).) Although that portion of the jury charge was omitted because the government ceded any argument under the "effects" prong (and, by extension, any consideration of effects on U.S. commerce in determining whether the standard has been met in this case), the "activities" prong must be interpreted in a similar light. It cannot be the case that the systemic risk threshold applies to only effects but not activities; two disparate standards within a single extraterritoriality provision would sweep in conduct that is broader than was intended and ignore the comity considerations Congress carefully considered in drafting the statute. The "activities" prong requires that activities abroad have the type of connection to activities in the United States that would be important to not only a U.S. entity but the U.S. financial system more broadly.

Finally, although Congress imposed a different threshold than the pre-*Morrison* conduct-and-effects test, case law applying the "conduct" test pre- and post-*Morrison* is nonetheless instructive in assessing which activities should be considered under each prong, and what sort of activities may have a direct and significant connection to activities in U.S. commerce. That case law provides that "significant conduct" at the core of a scheme must have occurred in the United

---

counterparties to suffice merely because a hypothetical scheme involving an enormous volume of such swaps *could* have a systemic impact, would render Section 2(i) entirely meaningless: every individual swap with any connection to the United States, no matter how small, would be covered by the CEA, depriving the phrase "direct and significant connection" of any meaning. The aggregation approach appears to mirror, and perhaps be derived from, the Supreme Court's approach to Congress's legislative authority under the Interstate Commerce Clause. *See Wickard v. Filburn*, 317 U.S. 111, 127-28 (1942) ("That [Filburn's] own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial."). That standard states the outer boundary of how far Congress can go in regulating domestic activity without violating the Constitution. It does not state the test for how to understand the reach of a particular statute's use of more demanding language like "direct and significant," especially in the context of extraterritorial applications of the law.

States.  *Morrison*, 561 U.S. at 257.  Indeed, the jury was instructed that in order to meet the "direct and significant" standard under Section 2(i) under the activities prong, "[t]he conduct in the United States must be integral rather than ancillary."  (Tr. 1364:25-1365:1.).

> 3. There Was Insufficient Evidence of a Direct and Significant Connection to Activities in U.S. Commerce.

Mr. Phillips conducted his trading on Boxing Day from South Africa, through a salesperson and trader located in Singapore, to allegedly trigger the One Touch Option and receive a $20 million payout from his U.K. counterparty, of whose identity he was unaware, although he purchased the position through a U.K. intermediary firm and used a U.K. bank branch as his prime broker.  Only activities integral to the charged scheme should be considered in determining whether Mr. Phillips' swap-related activities have a direct and significant connection to activities in U.S. commerce.  The government has conceded that it has not asserted a theory that Mr. Phillips defrauded any party into entering into the Option, so the formation of the One Touch Option is also irrelevant (and in any case, all activities relevant to formation took place in the U.K.).  Finally, as the government has repeatedly asserted, Mr. Phillips did not have to succeed in defrauding his counterparties to trigger payment: the creation of the scheme and accompanying intent is itself the crime.  (*See, e.g.*, Gov't Letter to Court at 3 (Oct. 12, 2023), ECF 56 (arguing the government need not prove success of the scheme); MTD Opp'n at 30 (arguing that "intent—not success—is all that must accompany manipulative conduct" to support liability); Gov't Mots. in Lim. at 8 (Sept. 29, 2023), ECF 41 (arguing that "neither reliance nor harm are elements of the charged offenses," and there is therefore "no relevance to evidence" relating to victim's reaction to a scheme).)  The government no doubt agrees that under its theory, even if Morgan Stanley had refused to pay anything when the One Touch Option triggered, Mr. Phillips could have been charged with the

same crime.  Therefore, any payments made in connection with the One Touch Option should not be considered part of the scheme.

Evidence the government presented at trial in an effort to prove a direct and significant connection to activities in U.S. commerce fell under three categories: (1) Glen Point's general contacts with the United States unrelated to the One Touch Option or the trading in this case; (2) the incidental use of wires and servers in the United States for communications between parties located abroad; and (3) the U.S. ties of Glen Point's counterparty and prime broker.  None came close to proving a direct and significant connection to activities in U.S. commerce beyond a reasonable doubt.

The first category—Glen Point's general contacts with the U.S.—is legally irrelevant.  The fact that Glen Point had a New York office is not even an "activity," let alone an activity of Mr. Phillips, that was (i) related to the allegedly fraudulent foreign conduct related to the swap, *and* (ii) that had a direct *and* significant connection with activities in U.S. commerce.  If Congress intended for the United States to exercise jurisdiction over individuals employed by entities with New York offices, it could have done so.  Plainly, it did not.  The government's reliance on this category of evidence was a red herring, one that spoke volumes about the strength of its jurisdictional evidence.

The second category—the use of wires and servers—fares no better.  Here, the government relied exclusively on the location of certain Bloomberg and FastMatch servers in the United States.  Mr. Phillips' foreign conduct related to these servers had neither a direct nor significant connection to activities in U.S. commerce.  Indeed, it is difficult to conceive of connections more "random, fortuitous, attenuated, or merely incidental."  (Tr. 1364:24-25.)  Or conduct that could more easily turn Section 2(i) into a provision that provides U.S. courts with virtually limitless jurisdiction over

foreign conduct—so long as, for example, people anywhere around the world use Bloomberg, which, of course, they do.

The third category—Morgan Stanley and J.P. Morgan's ties to the U.S.—again fails to meet either the "direct" or "significant" requirements, let alone both.   All of Mr. Phillips' interactions with Morgan Stanley were indirect, as he was not even aware of the identity of his option counterparty.   And his counterparty was Morgan Stanley's U.K. subsidiary, a separate entity from the U.S. parent, making Mr. Phillips' interactions with the bank doubly attenuated.   Mr. Phillips' interactions with J.P. Morgan were solely with its U.K. branch, and the risk that branch held on the Option was itself indirect.

We address all three categories in more detail below.

### a.   Glen Point's General U.S. Contacts

In its closing argument, the government cited the following evidence that it claimed proved that Mr. Phillips' foreign activities related to the swap had a "direct and significant connection" with activities in U.S. commerce: (i) Glen Point was registered with the CFTC and SEC, and both Glen Point and Mr. Phillips were registered with the NFA; (ii) Glen Point had a New York Office; (iii) Glen Point had a U.S. "domestic feeder fund;" and (iv) Glen Point managed money for certain U.S. based funds.   (See Tr. 200:10-11, 208:13-19, 209:8-17, 843:23-25, 846:21-47:2, 1223:7-16, 1243:5-1244:3.)

As a preliminary matter, none of these are "activities" of anyone, let alone of Mr. Phillips. They are simply general, pre-existing connections between Glen Point and the United States that are largely the result of how Glen Point (and virtually all hedge funds) structure their operations if they anticipate ever investing on behalf of U.S. clients.   And there was no evidence that Mr. Phillips' foreign conduct had any connection to these pre-existing circumstances, let alone a direct

and significant connection to "commercial activity" in the United States.  There was no evidence that these pre-existing circumstances (again, they are not "activities,") directly facilitated or were "integral" to the conduct that violated the CEA.  No evidence that they were used in executing the Boxing Day trades.  No evidence that Mr. Phillips relied on or made use of these ties in connection with the One Touch Option at all.  And no evidence that his foreign conduct led to any domestic activity relating to these ties.[20]  The Supreme Court has made clear that "'mere corporate presence'" or "general corporate activity" cannot provide for a domestic application.  *Nestlé*, 141 S. Ct. at 1937 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 125 (2013)).  Corporations are "present in many countries" and it reaches "too far to say that mere corporate presence suffices" to confer U.S. jurisdiction.  *Kiobel*, 569 U.S. at 125.  The principle limiting domestic application applies with at least as much force, if not more, to theories of "direct and significant" connections to activities in U.S. commerce.

Indeed, it is difficult to see how this evidence was relevant to any element at issue in this case.  And even if there was some marginal relevance, it was nowhere close to sufficient to prove, beyond a reasonable doubt, the requisite direct and significant conduct.  These ties do not support the exercise of U.S. jurisdiction under Section 2(i).  *Cf. United States v. Tomasetta*, No. 10 Cr. 1205 (PAC), 2012 WL 2064978, at *4, *9 (S.D.N.Y. June 6, 2012) (granting Rule 29 for improper venue where only "preparatory" acts not part of the charged offense occurred within the Southern District of New York).

---

[20] Even under the more permissive pre-*Morrison* conduct and effects test, "merely preparatory activities" in the United States are insufficient to bring fraudulent conduct abroad within U.S. jurisdiction.  *Morrison*, 561 U.S. at 258 (quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 992 (2d Cir. 1975)).  And none of Glen Point's pre-existing ties can even be said to have been preparatory of the scheme, let alone have a direct and significant connection to the swap-related activities abroad that are the focus of this case.

*b.  Use of Wires and Servers in the United States*

Next, the government introduced evidence showing the location of servers through which certain electronic communications passed.  Specifically, there was evidence of Bloomberg servers and a FastMatch data platform in the United States.  A Bloomberg witness testified that all Bloomberg messages sent from anywhere in the world "get[] replicated or copied across both of our data centers, in New York and in New Jersey," which would, unbeknownst to him, include Mr. Phillips' trading instructions sent via Bloomberg on Boxing Day.  (Tr. 303:16-19.)  And a witness from EuroNext indicated that at least some of Mr. Phillips' Boxing Day trades, which were placed by a trader at Nomura without any communication to Mr. Phillips as to which platform would be used, matched via an electronic machine that sits in Secaucus, New Jersey.  (Tr. 462:5-11, 465:5-466:15.)

These are unquestionably tangential activities that do not have a direct or significant connection to activities in U.S. commerce.

*i.  Direct*

Mr. Phillips' conviction rests entirely on the notion that he gave trading directions to a salesperson at Nomura in a manner intended to send a false price signal to his One Touch Option counterparty.  There is no connection between Mr. Phillips' conduct and any activities in U.S. commerce that can be characterized as "direct" relating to the execution of those trades.

As discussed above, *see supra* p.11, Mr. Phillips, a U.K. resident sitting in South Africa, gave trading directions to a salesperson at Nomura located in Singapore.  That salesperson passed those directions to a Nomura trader, also based in Singapore, who executed the trades on available trading platforms, including both Refinitiv and FastMatch.  One of those two platforms, FastMatch, has servers in several countries, one of which is the United States, and some of the

trades executed by the Nomura trader passed through the U.S.-based FastMatch server.  Finally, the Bloomberg chat messages that Mr. Phillips sent to direct the Nomura salesperson to have his trading desk execute various trades were replicated on a Bloomberg server located in the U.S.

The connection between activities abroad and activities in U.S. commerce as it relates to the use of servers in the United States is definitionally indirect.  The jury was instructed that in order for a connection to be direct, "the activity outside the United States" must have "directly and immediately affected activity in commerce of the United States without deviation or interruption." (Tr. 1364:10-13.)  The fact that Mr. Phillips' Bloomberg chats were captured on a server in the United States does not constitute a connection to commercial activities in the United States at all. The presence of Bloomberg servers in the United States is not "commercial activity," it merely facilitates the commercial activity of communicating parties located elsewhere.  (*Id.*)  In any event, there was zero evidence about what happened between when Mr. Phillips hit his keyboard in South Africa and his messages were ultimately "replicated" in the United States.  (Tr. 303:16-19.)  Did those messages take a direct or indirect route to the United States?  The fact that this is even a potentially relevant question in a criminal case underscores the irrelevance of this evidence.

Finally, Mr. Phillips' conduct did not "directly and immediately" connect to any activity relating to the FastMatch platform.  Instead, he directed a Nomura salesperson to make certain trades, and that person, in turn, directed his trading desk to execute those trades as they saw fit. This sort of "indirect or attenuated connection . . . is not sufficient to satisfy" the "direct" requirement of Section 2(i), even if the mere presence of a matching engine could constitute "commercial activity."  *Cf. Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 710-11 (S.D.N.Y. 2019) (dismissing RICO claim predicated on wire fraud as "impermissibly extraterritorial" where plaintiff alleged the defendants used wires to submit

manipulated Canadian Dollar Offered Rates ("CDOR") to Thomson Reuters, which then transmitted the rate throughout the U.S., traded CDOR-based derivatives with U.S. counterparties and on U.S. exchanges from abroad, and sent trade confirmations based on manipulated rates to counterparties within the U.S., but all relevant conduct occurred abroad).

### ii.  Significant

Even if the incidental location of servers could support the "direct" prong of Section 2(i), the connection here lacks the "importance" required to meet the "significant" prong.  (Tr. 1364:9-22.)  Allowing the government to rely on the entirely incidental and passive use of U.S. wires as "activities" in U.S. commerce, let alone ones with a direct and significant connection to the activities that were core to the scheme, would stretch the meaning of Section 2(i) too far.  *Cf. United States v. Scott*, No. 17-cr-630 (ER), 2023 WL 6064329, at *12 (S.D.N.Y. Sept. 14, 2023) ("[A] fraud carried out entirely outside the United States, with absolutely no domestic nexus except a tangential and limited use of some U.S. wires, is insufficient for domestic application of wire fraud.").

With respect to Bloomberg, any connection between Mr. Phillips' conduct and the server in the United States was entirely incidental.  In fact, the government's witness testified that every message sent on the platform anywhere on earth "gets replicated or copied" across Bloomberg's two data centers in New York and New Jersey.  (Tr. 303:16-19.)  If chatting on Bloomberg satisfies Section 2(i), then the entire global financial industry is now subject to U.S. jurisdiction by virtue of those two data centers.  The involvement of FastMatch's U.S.-based matching engine was similarly incidental—FastMatch has matching engines in New York, London, Singapore, and Tokyo, and the result of the trade matching would be the same regardless of which server Nomura's trades happened to pass through.

The defense has not found any case where such incidental ties are considered sufficient to support extraterritorial application of a statute, and the Court should not find them sufficient here. *See* App'x 5 – Statement of Commissioner Dawn D. Stump Overview, 85 Fed. Reg. 57,010 ("The law does not say that CFTC rules govern derivatives market activities around the world if there is *any* linkage or tie to the United States and should not be interpreted and abused as such.").

### c. *U.S. Ties of One Touch Option Counterparty and Prime Broker*

Finally, the government relies on the United States connections of the counterparty to the One Touch Option, Morgan Stanley, and Glen Point's prime broker on the Option, J.P. Morgan. The government introduced two types of evidence on this point: (1) evidence relating to the locations of the Morgan Stanley and J.P. Morgan entities that were involved in the One Touch Option transaction, and (2) evidence relating to the payments made after the scheme was completed. Neither met the requirements of Section 2(i) beyond a reasonable doubt.

### i. *Uninvolved U.S. Parent Entities*

With respect to Morgan Stanley, the Bank's U.S. entity had no direct connection to any of Mr. Phillips' allegedly manipulative activities relating to the One Touch Option, let alone a significant one. Mr. Phillips' trading is the only conduct that constitutes the basis of the charged scheme. Formation of the One Touch Option and the location of the risk held by counterparties is not part of the extraterritoriality analysis.

But even if the Court were to consider aspects of contract formation and risk ownership, the relevant activities abroad do not have a direct connection to activities in U.S. commerce. The contract was entered into by Morgan Stanley's U.K. subsidiary, and Morgan Stanley subsequently chose to transfer its risk on the option to a U.S. entity. (Tr. 440:5-441:3.) This is precisely the sort of "attenuated connection to commercial activity that occurs in the United States" that is insufficient to satisfy the requirements of Section 2(i). (Tr. 1364:14-16.) With respect to J.P.

Morgan, although the bank's U.S. entity name appears on the confirmation agreement with Glen Point, Mr. Phillips dealt only with its office in London, England, and that address appears on the confirmation agreement.  (*See* GX 555, GX 556.)  All of the "activities" that occurred in connection with J.P. Morgan's role as prime broker on the One Touch Option occurred in London. Whether there are any downstream effects that resulted from J.P. Morgan's U.S. entity holding any amount of risk—a risk that is itself attenuated from the core focus of the scheme, as J.P. Morgan was not the counterparty required to pay the notional amount when the option triggered— is not relevant to the "activities" prong of Section 2(i) and is insufficiently "direct" to meet the requisite threshold.  *See Loginovskaya v. Batratchenko*, 764 F.3d 266, 274 (2d Cir. 2014) ("[A] party's residency or citizenship is irrelevant to the location of a given transaction." (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012)).

### ii.   Post-Conduct Payments

With respect to the various payment-related transactions that occurred after the scheme was complete, those downstream impacts are not part of the "activities" that form the basis of the charged scheme and are, if anything, merely effects of the conduct.  As noted above, courts consistently analyze losses or improper gains from a criminal scheme as effects, rather than activity or conduct.  *See supra* pp.27-28.

Each word of a statute must be given meaning.  Here, Congress chose to use the word "significant" to limit extraterritorial application to only that conduct occurring abroad that has an important connection to activities in U.S. commerce, such that the conduct abroad poses a systemic risk to the U.S. financial system as a result of that connection.  *See supra* pp.30-33.  To the extent the Court considers activities relating to the payments made to U.S. bank accounts of Glen Point and Quantum Partners in its analysis, the connection between those *activities* and the conduct that

Mr. Phillips undertook abroad is not significant regardless of whether the *effects* were (which, as evidenced by the government's decision to drop the "effects" test the day before closing arguments, they plainly were not). And "activities" must be given some meaning that differs from "effects." Here, the conduct that occurred abroad had no connection to activities that took place, as opposed to effects that occurred or were felt in the United States—every aspect of the scheme that can fairly be described as commercial activity took place abroad. This cannot support a finding of a "direct and significant" connection to activities in U.S. commerce. *Cf. Petroleos Mexicanos v. SK Eng'g & Const. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (affirming dismissal of wire fraud-based RICO claim as impermissibly extraterritorial where there were only "three minimal contacts" with the U.S., including that "financing [for the scheme] was obtained here, the invoices were sent to the bank for payment, and the bank issued payment," because "[t]he activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took place outside of the United States").

Even if the payments did constitute commercial activities, any connection between Mr. Phillips' conduct abroad and the payments is indirect. Mr. Phillips, sitting in South Africa, sent trading directives to a salesperson in Singapore, who passed the directives to a trader in Singapore to execute, who then placed orders. The alleged crime was complete when those steps were taken. According to the government, the purpose of Mr. Phillips' trading was to trigger an option sold to him by a U.K. intermediary firm that he *did not know* had the U.K. subsidiary of an American financial institution as the counterparty. Viewing the facts in the light most favorable to the government, the U.S. parent of his prime broker, J.P. Morgan, held attenuated risk in the unlikely event that Morgan Stanley refused to pay.

43

The statute does not require simply a significant connection to activities in the United States, but to activities in *commerce* of the United States. This phrase, too, must have independent meaning. And the government has not introduced any evidence that Mr. Phillips' conduct abroad had a direct and significant connection to activities important enough to be meaningful to U.S. commerce. As discussed above, *see supra* pp.30-33, it is clear that Congress had systemic financial risk in mind when it enacted Section 2(i), and it cannot be the case that a "direct and significant connection" to activities in "commerce of the United States" means conduct that occurred abroad relating to a single financial transaction between two private foreign entities, each of whom hedged any financial risk they took on. "Commerce of the United States" is plainly designed to capture the systemic concerns that Congress had in mind when enacting Dodd-Frank. *See CFTC v. Gorman*, No. 21 Civ. 870 (VM), 2023 WL 2632111, at *9 n.9 (S.D.N.Y. Mar. 24, 2023); *see also* Gary Gensler, CFTC Chairman, Opening Statement: Open Meeting to Consider Cross-Border Guidance and Exemptive Order (July 12, 2013), https://www.cftc.gov/PressRoom/ SpeechesTestimony/genslerstatement071213 (discussing concerns that when a foreign affiliate or branch of a U.S. financial institution "gets into trouble" and there is a "run" on the bank, the "risk comes crashing right back to our shore, and stating there is "no question to me . . . that the words of Dodd-Frank addressed this (i.e., risk importation) when they said that a direct and significant connection with activities and/or effect on commerce in the United States covers these risks that may come back to us").

\*     \*     \*

There have been obvious jurisdictional defects with this prosecution from its inception—defects there are good reasons to think international partners, such as the U.K., would have questioned. It is particularly telling that the U.S. Attorney's Office, after obtaining an indictment

on March 3, 2022, kept that indictment under seal for five months, while Mr. Phillips continued to reside in London and conduct his business from there, only unsealing the indictment and effecting his arrest when he traveled to Spain on vacation in August 2022. It is not difficult to infer that the government specifically sought to avoid having to overcome the U.K.'s extradition precedent, in light of the fact that the conduct in this case so clearly centers on activity in or relating to the U.K., and having the most tenuous of connections connection to the United States, and certainly not connections that rise to the level of the "direct and significant" connection to activities in U.S. commerce standard that applies in this case.

Because the government failed to establish the requisite relationship to the United States beyond a reasonable doubt, the Court should set aside the verdict and enter a judgment of acquittal on Count Two.

## III. No Reasonable Juror Could Have Found Criminal Intent Beyond a Reasonable Doubt.

No reasonable juror could have found that the government proved that Mr. Phillips possessed the requisite intent under 7 U.S.C. § 9(1), the CEA's antifraud provision. Specifically, there was insufficient evidence to prove beyond a reasonable doubt that, but for a desire to trigger the option, Mr. Phillips would not have traded as he did on December 26, 2017. Rather, a faithful consideration of the evidence, even when viewed in the light most favorable to the government, was consistent with—and in fact supported—a theory of innocence.

### A. Legal Standard

"[T]he government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" *D'Amato*, 39 F.3d at 1256 (quoting *Mulheren*, 938 F.2d at 372). "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must

45

necessarily entertain a reasonable doubt." *United States v. Pauling*, 256 F. Supp. 3d 329, 334 (S.D.N.Y. 2017) (quoting *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015)); *see also United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012). And if the trial judge "concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion." *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972) (Friendly, J.).

### B.    Jury Charge[21]

The Court charged the jury on what was required to find that the government proved Mr. Phillips employed a manipulative device, scheme, or artifice to defraud beyond a reasonable doubt. (*See* Tr. 1349:22-1352:4.) Specifically, the charge explained that "an act is manipulative if it is designed to deceive or defraud others by sending a false pricing signal to the market." (Tr. 1350:20-22.) However, "a transaction is not manipulative when the market is fully aware of the terms of and purposes behind a transaction." (Tr. 1350:22-25.) Nor is a transaction rendered manipulative by "the mere fact that a transaction affected market prices." (Tr. 1350:25-1351:2.)

The charge further explained what activity could be considered manipulative when "conducted on the open market or through ordinary market activity." (Tr. 1351:3-14.) In that context, a defendant's intent may be "all that distinguishes legitimate trading from manipulative trading," and in considering whether trading activity was manipulative, the Court instructed the jury to "plac[e] the activity in context and consider[] whether it is part of a pattern of trading activity." (*Id.*) In light of these principles, the charge directed the jury to ask "whether the defendant acted with the intent to deceive or defraud others by sending a false pricing signal into

---

[21] Mr. Phillips preserves each of his objections to the jury instructions, including that the jury should have been charged that (i) the government had to prove the existence of—and Mr. Phillips' ability to cause—an artificial price, and (ii) it could find that Mr. Phillips acted with specific intent *only if* a non-investment purpose was the sole reason for his trading. (Def.'s RTC Br. at 2-6.); *see also SEC v. Masri*, 523 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2007) (requiring sole intent because such a standard avoids criminalizing "otherwise legal activity" in market manipulation charges); *United States v. Tuzman*, No. 15 Cr. 536 (PGG) (S.D.N.Y. Jan. 11, 2018), ECF 706.

the market." (Tr. 1351:14-17.)  Importantly, however, the charge instructed the jury that this intent

alone was insufficient to satisfy this element.  The government must prove more:

> If there are two purposes for a transaction, one of which is legitimate, and if the
> transaction would have been done at the same time and in the same manner for
> the legitimate purpose, it is not manipulative *even if the defendant also had an*
> *intent to deceive or to send a false price signal into the market.*

(Tr. 1351:17-22 (emphasis added).)

Accordingly, to establish that a defendant employed a manipulative device, scheme, or

artifice to defraud, the government had to prove beyond a reasonable doubt that (1) the defendant

acted with the intent to deceive or defraud others by sending a false pricing signal into the market;

and (2) the defendant would not have traded at the same time and in the same manner except for

that intent to defraud.  (*See id.*)

### C.    The Government Offered Insufficient Evidence to Prove Fraudulent Intent.

The government did not offer sufficient evidence that, but for Mr. Phillips' alleged

fraudulent intent, he would not have conducted transactions at the same time and in the same

manner as he did.  Rather, the evidence, viewed in the light most favorable to the government,

established each of the following points: (1) replacing or exchanging delta is a common risk

management practice that Mr. Phillips employed; (2) Mr. Phillips used delta risk reports to manage

risk; (3) Glen Point regularly customized those delta reports to focus on certain option positions;

(4) Mr. Phillips almost perfectly replaced his delta on Boxing Day; (5) uncertainty surrounding the

ANC election prevailed going into the Christmas weekend; (6) the Archbishop of Cape Town's

Christmas sermon represented an important event in the election; and (7) Mr. Phillips purchased

another $100 million in rand *after* the option triggered.

Each of these points was established through the government's case and there was virtually

zero evidence to the contrary.  Thus, the evidence on these points—each of which supports Mr.

Phillips' delta replacement rationale for the trading—was conclusive even viewed in the government's favor.  And while the government did offer some evidence permitting an inference of guilt, that evidence "viewed not in isolation but in conjunction," *United States v. Miller*, 116 F.3d 641, 676 (2d Cir. 1997), with the conclusive evidence on these points was insufficient "to allow the jury to reasonably infer that . . . the crime charged has been proven beyond a reasonable doubt," *D'Amato*, 39 F.3d at 1256.  Instead, the evidence—"consider[ed] . . . in its totality," *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)—gives equal or nearly equal circumstantial support to a theory of innocence: Mr. Phillips traded with a legitimate purpose to replace the delta on his One Touch Option, and he would have conducted the transactions on December 26, 2017, at the same time and in the same manner for this purpose.

       1.   Replacing or Exchanging Delta was a Common Risk Management Practice Employed by Mr. Phillips.

The evidence showed that managing risk by exchanging or replacing delta is a common risk management practice, and one that Mr. Phillips regularly employed.

- Professor Richard Lyons, the government's expert witness, testified that exchanging delta is a very common practice.  (Tr. 736:6-13, 755:20-756:10.)  He also testified that traders maintain exposure to an option that has triggered by replacing delta in the spot market.  (Tr. 760:10-17.)

- Graeme Henderson, who brokered the One Touch Option, agreed that a hedge fund that wanted to maintain exposure to an option could unwind the option and exchange delta, or, if it thought the option would trigger, "go back into the spot market and take back the exposure that [it] would lose once the option was triggered."  (Tr. 135:13-136:4; *see also* Tr. 176:10-19 (accepting that delta replacement, as a concept, functions to maintain long exposure).)

- David Coratti, a Glen Point trader, testified that Glen Point, led by Mr. Phillips, tracked delta, exchanged delta, and replaced delta as part of its trading strategy.  (Tr. 516:5-519:16, 523:24-525:3, 538:6-539:14.)

- Andrew Newman, the defense expert witness, testified that, based on his over 30 years of FX trading experience and a review of relevant trading data, Glen Point's December 26, 2017 trading was consistent with a delta replacement strategy.  (Tr. 994:10-13, 1028:19-1030:6.)

- Samer Oweida, the global head of FX and emerging markets at Morgan Stanley, testified that delta exchange was commonplace, and used by parties to manage risk. (Tr. 417:10-419:5, 448:15-449:5.)

There was no evidence to the contrary that delta exchange or replacement is not a common risk management strategy.  Nor was there any evidence that Glen Point and Mr. Phillips did not regularly employ this strategy.

### 2.  Mr. Phillips Used Delta Risk Reports to Manage Risk.

The evidence showed that Glen Point generated risk reports.  (*See* Tr. 214:22-216:9, 235:5-11, 513:10-18, 516:15-23, 540:18-20, 575:7-10), *see also, e.g.*, GX-1121, 1123, 1063-A.)  Each risk report focused on the delta associated with certain positions in Glen Point's portfolio.  (*See* Tr. 524:25-525:3, 540:18-23; *see also, e.g.*, GX-1123.) These delta reports were sent to Mr. Phillips.  (*See* GX-1121-GX-1123.)  And Glen Point traders, including Mr. Phillips, used these reports to track delta and manage risk.  (*See* Tr. 516:10-22, 575:2-10, 576:9-13.)  These points were established through the government's case, and there was no evidence to the contrary.

### 3.  Glen Point Regularly Customized Delta Risk Reports to Focus on Certain Positions.

The evidence showed that Glen Point maintained a consistent, intentional, and rational practice of generating customized delta reports to include only certain option positions:

- Coratti testified that "remov[ing] the noise," *i.e.*, removing the delta from lower strike and more remote options, was a standard strategy—"a rational thing"—that Glen Point employed on several occasions.  (Tr. 540:11-23, 573:25-574:15, 576:9-13.)  For example, Coratti testified that, as of December 2017, on more than one occasion Glen Point had removed certain options' delta from its reports because that risk was "less relevant" to its investment decisions.  (Tr. 539:1-540:23.)

- Nicholas Croix, then a Glen Point analyst and now a trader, testified that remarking and removing delta of certain options to "reduce the distractions associated with the option portfolio" was a common practice employed by traders.  (Tr. 231:8-233:5.)  Croix explained further that removing these distracting assets alleviated the "psychological toll" from watching "your profit and loss [] mov[e] up and down significantly."  (Tr. 232:7-16.)

49

- Professor Lyons acknowledged that traders can and do segregate, or "turn off," certain risk positions in their reports.  (Tr. 791:23-794:6.)

Consistent with this practice, in early December 2017, Mr. Phillips "remarked [Glen Point's] options in zar" and "t[ook] out a lot of the deltas."  (GX-404 (Jonathan Fayman, Glen Point's co-CIO, agreeing that remarking made sense, in part, because "[t]he deltas really r noise"); *see also* GX-403 (Matt Garnett, Glen Point's Trading & Risk Manager, noting that certain ZAR options were remarked and locked).)  In other words, Mr. Phillips directed that his delta risk reports include only certain option positions.  (*See* Tr. 573:25-574:15.)

The documentary and testimonial evidence showed what Glen Point actually did; what information Mr. Phillips actually received; and what traders consider(ed) common practice.[22] There was no evidence offered to the contrary.  And so, even viewing the evidence *in the light most favorable to the government*, there exists only one conclusion that can be drawn: Mr. Phillips tracked delta and managed risk using delta risk reports that were customized for legitimate portfolio management reasons.

And yet, in its zeal to discredit the delta replacement explanation for the Boxing Day trades, the government repeatedly argued that Mr. Phillips was not considering the delta displayed on his customized risk reports and that delta had somehow been "deleted."  (*See e.g.*, Tr. 722:22-723:7 (Professor Lyons, suggesting that "the crossed out [deltas in the accounting reports] are not there anymore, so there is no delta associated with them"); Tr. 725:2-23 (Lyons, describing delta as

---

[22] Professor Lyons could not say whether or not focusing risk reports on certain positions was considered "common practice."  (Tr. 793:2-4.)  But his opinions on Mr. Phillips' decision to focus on the risk associated with only certain positions is (i) irrelevant, because there is no dispute as to what Mr. Phillips actually did; (ii) inconsistent with all of the evidence to the contrary, including the testimony of actual industry participants; and (iii) of minimal probative value given that Professor Lyons has never been a trader.  Moreover, when Nicholas Croix testified about the commonplace practice of remarking options to focus on certain aspects of a portfolio, he testified both as to his experience at Glen Point (where he served as a research analyst) and in his current role at another hedge fund (where he is now a trader).  (*See, e.g.*, Tr. 231:24-232:16 ("I should say that it takes a little bit of a psychological toll on you if your profit and loss is moving up and down significantly.").)

being "zeroed out"); Tr. 1230:1-9 (arguing in summation that Mr. Phillips "deleted the deltas for most of the options in his [USD/ZAR] portfolio" and that, as a result, "[h]e couldn't even see the deltas on the positions"); Tr. 1236:21-1238:1 ("All that testimony about zeroing out deltas was important because it shows you this delta replacement thing is totally made up.").)  But no witness testified that Mr. Phillips did not consider the delta on his risk reports; the testimony that came in was decidedly to the contrary.  (*See, e.g.*, Tr. 231:24-233:4, 269:8-11, 516:5-517:14, 539:15-540:23, 569:25-570:7, 573:25-574:15, 575:2-10, 576:9-13, 578:20-23.)  And the only reasonable inference from the delta risk reports sent directly to Mr. Phillips—sometimes several times a day—was that they were sent for a reason, *i.e.*, for him to consider when trading and managing risk.

Further, there was no evidence that delta was "deleted" from any report, as opposed to the customary practice described above.  Undeterred, the government peddled this fictional "deleted delta" theory to the jury, relying on Glen Point accounting spreadsheets with over 700 rows reflecting Glen Point's entire book.  (*See* Tr. 524:2-24 (reviewing GX-1051A)).  These accounting spreadsheets, according to David Coratti, would never have been used when trading and managing risk.  (Tr. 575:2-10, 576:9-13.)  In short, the government's arguments about "deleted delta" were, viewed in the light most favorable to the government, unsupported "speculation and surmise."  *See Finnerty*, 474 F. Supp. 2d at 536-37.  In reality, it was just a red herring, an effort to make a legitimate practice that was consistent with the theory of the defense seem, in and of itself, like something nefarious.

4.  Mr. Phillips Almost Perfectly Replaced His Delta on Boxing Day.

The evidence showed that Mr. Phillips' Boxing Day trades resulted in an almost perfect replacement of his delta.  The end-of-day delta risk report Mr. Phillips saw on Friday, December 22—the last delta risk report, according to the uncontroverted evidence introduced at trial, that Mr. Phillips received prior to the Boxing Day trading—stated that the delta on the One-Touch Option

was $759 million.  (GX-1123; *see also* Tr. 578:20-23 (Coratti, testifying that going into the weekend and thinking about managing risk, he, in his role as a trader, would have been focused on the end-of-day delta report).)  And through his spot trades on Boxing Day, Mr. Phillips acquired $725 million of USD/ZAR, almost perfectly replacing the delta.  (*See* Tr. 805:22-806:11.)  This is not in dispute.

Thus, the evidence established that Mr. Phillips regularly replaced or exchanged delta as a risk management strategy; he tracked delta on customized risk reports; the final delta report before Boxing Day reported a delta of $759 million for the One Touch Option; and he replaced almost that exact amount through spot trades on Boxing Day.[23]

5.  Uncertainty About the ANC Election Results Prevailed Going into the Christmas Weekend.

The evidence showed that a politically uncertain environment prevailed in South Africa after the ANC elective conference (which took place from December 16 to 20) as to whether and when the incumbent president, Jacob Zuma, would cede power.  That uncertainty stemmed from (i) a split in the "Top Six" ANC leadership positions between the Zuma faction and the reform Ramaphosa faction, and (ii) a vote-counting issue that cast doubt on whether the initially reported election results would stand.

- On December 18, the election returned a split Top Six among the ANC's top officials: A win for Ramaphosa as President and two of his supporters as National Chair and Treasurer General; and wins for three Zuma supporters as Deputy President, Secretary General, and Deputy Secretary General.  (*See* DX-506; GX-407.)

- This split Top Six affected the USD/ZAR market.  (*See* DX-506 (Deutsche Bank report, describing how the "ZAR immediately rallied toward [] 12.50 against the

---

[23] There was further evidence in the record supporting the inference that Mr. Phillips was focused on managing and replacing the $759 million delta on the One Touch Option.  Minutes after Mr. Phillips stopped trading on Boxing Day, Phillip Costa, unprompted, forwarded Mr. Phillips his end-of-day delta report from December 22.  (*See* GX-1124.) That Mr. Costa sent the delta report—rather than, *e.g.*, a PnL report—supports the inference that, at the time of the trades at issue, Mr. Phillips was in fact focused on delta.

greenback on the back of the CR announcement but retraced almost as quickly as the top 6 were digested (mixed structure despite CR victory)"; asking whether "the market [will] start pricing in a recall of JZ [Jacob Zuma]?"; and noting the "[r]umours that ANC is meeting amid concerns over vote counting and allocation of top 6 positions").)

- On December 19, Mr. Phillips discussed the vote-counting issue with Mr. Fayman and predicted that the ANC would "go thru every[th]ing now forensically." (GX-407.)[24]

- Local reporting from South Africa on December 19 and 20 described a push from Zuma supporters "call[ing] for 'a rerun of *the entire top six*'." (DX-807 (emphasis added) (quoting an ANC premier that Dlamini-Zuma supporters "say they are going to call for re-vote on everything"); *see* DX-808 (describing Ramaphosa's call on delegates to not let the elective conference "'degenerate into controversy and huge legal suits that will nullify the result' of the election of the party's top six").)

- On December 20, Mr. Phillips and Phil Costa discussed whether Zuma would remain in government. (*See* GX-101 (Mr. Phillips, noting that Mr. Costa's update on the ANC conference was "quite bad" because "it sounds like Zuma wants to stay for a long time.").)[25]

- Croix testified that, after the election, there remained uncertainty in the market about whether Zuma would cede power. (*See* Tr. 266:5-25.)

- Coratti testified about the term "Zumxit" (or "Zumexit"), a term that was used to describe Zuma leaving office and was discussed often at Glen Point. (*See* 567:22-568:20 (reviewing DX-511, the December 23 *Sunday Times* news article from South Africa, discussing Zumxit and negotiations among ANC leaders); *see also* DX-811 (Bloomberg, on December 24, reporting on the ANC leadership's discussions concerning a "conflict-free exit" for Zuma).)

This evidence overwhelmingly established that there was post-election uncertainty about both whether Zuma would cede power, and when. There was no evidence to the contrary.[26]

---

[24] On the morning of December 19, after Mr. Phillips identified the possibility that the ANC would review the election results "forensically," he unwound certain USD/ZAR options (including two in-the-money digital options), sold a $10 million USD/ZAR one touch option, and purchased $1.5 billion in seagull option spreads to reduce risk. (*See* GX-409; GX-410; GX-430; Tr. 241:10-243:7, 1064-67; *see also* DX-200 (Glen Point's 2017 trade blotter).)

[25] The evidence was undisputed that Neil Phillips was an expert on South Africa. (*See, e.g.*, Tr. 132:1-133:13, 263:17-264:2.)

[26] Unfortunately, this lack of contrary evidence did not stop the government from arguing that any uncertainty demonstrated by post-election events was the "defense cherry-picking . . . for a cover story." (Tr. 1185, 1189, 1198, 1232.).

6. The Archbishop of Cape Town's Christmas Sermon was an Important Event.

The Archbishop of Cape Town, Thabo Makgoba, used his sermon on Christmas Eve to exert pressure on the ANC leadership to oust Zuma.  In the sermon, the Archbishop said that Mr. Ramaphosa "and the new leadership will need to cut the umbilical cord which ties them to the Zuma era, quickly and decisively," and that the newly elected leaders of the ANC must "act boldly and quickly to replace Mr. Zuma as President of the country, and to follow that up with a carefully targeted Cabinet reshuffle."  (DX-812 at 2-3.)  The evidence showed that the Archbishop's sermon was an important and highly publicized event that decreased post-election uncertainty and signaled Zuma's sooner-than-expected exit.

- On December 23, Peter Montalto, an investment research analyst focused on South Africa (Tr. 581:3-13, 586:8-17), forwarded Mr. Phillips a December 23 Sunday Times article describing, *inter alia*, reports from "[c]hurch insiders" that the Archbishop was "expected to exert pressure on Ramaphosa to force Zuma out" in his Christmas sermon.  (DX-511.)

- On December 24, approximately 43 minutes after the Archbishop's sermon was published online, Morgan Stanley placed $2 billion of bids for USD/ZAR.  These represented almost all the bids placed for USD/ZAR that day—a holiday when all markets were closed.  (*See* Tr. 1023:3-1025:11; DX-2053; DX-2054; DX-2055; DX-2056.)

- On December 25, the South African Broadcasting Corporation reported on the Archbishop's sermon, which targeted ANC leadership and threatened ANC's political dominance: "If Mr[.] Ramaphosa wants the ANC to get a new lease of life, [Ramaphosa] and the new leadership will need to cut the umbilical cord which ties them to the Zuma era, quickly and decisively."  (DX-812 (Archbishop Makgoba stated that he "cannot see how the ANC will make a clean break with the past and set us on a new course unless the new leaders . . . act boldly and quickly to replace Mr. Zuma as President of the country. . . . *If they don't . . . they will lose power*.") (emphasis added).)

- On December 26, Croix described the events over the Christmas weekend, which included the Archbishop's sermon, as "good news" portending "zumexit."  (*See* GX-421.)  And in testimony about this description, he stated that he recalled "very positive news" regarding the Anglican Church's call for Zuma to step down and hasten the transfer of power to Ramaphosa.  (*See* Tr. 266:5-268:20.)  He also

testified that news about Zuma's potential exit would strengthen the rand against the dollar.  (*See* Tr. 254:19-255:9, 267:2-268:20.)

- Coratti, reviewing the December 23 Sunday Times article about the Archbishop's sermon, described news about the Archbishop's plan to exert pressure on the ANC to oust Zuma as the kind of news that "[Mr. Phillips] would have been very focused on" in determining how to manage the risk around Glen Point's rand investment. (*See* Tr. 569:4-570:7; *see also* Tr. 264:2-10.)

In sum, the evidence established that the Archbishop's sermon was an important event in the ANC election; it was covered by South African economic analysts; it was covered in the press; it was discussed at Glen Point; it was considered an important event by Glen Point employees; and immediately after it was made public, Morgan Stanley placed a massive bid for USD/ZAR.  Once again, there was no evidence to the contrary.

### 7. Mr. Phillips Sold $100 Million USD/ZAR After the One Touch Option Triggered.

Mr. Phillips continued trading *after* the One Touch Option triggered.  Specifically, after selling $625 million of USD/ZAR, Mr. Kamath told Mr. Phillips that USD/ZAR was "bid at the figure [and] we just sold 10 there" and that the "low print has been 12.5000 we gave 10 there but reuters not showing that yet."  (GX-446.)  That is, Mr. Kamath told Mr. Phillips that they sold $10 million at 12.5000: as of that moment, the One Touch Option triggered, and its exposure disappeared from Glen Point's portfolio.  Rather than stop trading, though, Mr. Phillips sold another $100 million of USD/ZAR.  (*See id.*)  This trade—another $100 million of real money with a real counterparty and real risk—had literally no impact on the One Touch Option.  What it did do, however, was increase Mr. Phillips' exposure to the rand and bring him closer to almost perfectly replacing the delta that he had just lost.[27]  Put another way, this evidence showed that he would have traded at the same time and in the same manner absent an intent to trigger the option.

---

[27] The government argued throughout its summation that Mr. Phillips thought the option needed to trade *through* 12.50 to trigger.  (*See, e.g.*, Tr. 1203:4-9 ("Need to get it through 50.  Now.  4990.  That means get it through 12.50 now to

### D.       Viewed in Its Totality, The Evidence was At Least as Consistent with Innocence as with Guilt.

The government's opposition brief will undoubtedly respond with numerous quotes from and citations to the Boxing Day chat.  We maintain that the government's interpretation of the chat is incorrect and that, when viewed in the appropriate context and with an understanding of how these markets actually work, the chat is entirely consistent with Mr. Phillips' legitimate trading strategy.  Viewed in the light most favorable to the government, though, the chat permits an inference of guilt.  But that evidence cannot support the jury's verdict when "consider[ing] the evidence in its totality."  *Autuori*, 212 F.3d at 114.  Each of the points discussed above was established by evidence virtually free from dispute—they were subject to neither interpretation nor credibility determinations.  And those points, even when viewed in the light most favorable to the government, firmly support a theory of innocence: Mr. Phillips traded with a legitimate purpose to maintain exposure to the rand and replace the delta on his One Touch Option, and he would have conducted those trades at the same time and in the same manner in service of that purpose. The government, unable to offer competing evidence or to challenge its own witnesses on these points, asked the jury to dismiss most or all of them as part of a delta replacement "cover story." In other words, to ignore competent evidence.

The government also asked the jury to draw irrational conclusions from the undisputed evidence, namely that Mr. Phillips would (i) take on $725 million of real risk on Boxing Day;

---

12.4990."); Tr. 1209:9-10 ("Remember the defendant keeps saying trade through in this chat, get it to 12.4990.").) But everyone knew that one touch options need only touch the strike price to trigger.  (*See* Tr. 96:3-5, 101:20-102:2 (Henderson); Tr. 218:3-8, 242:7-13 (Croix); Tr. 414:16-415:2 (Oweida); Tr. 529:7-11 (Coratti); Tr. 607:14-16, 695:4-9 (Lyons); Tr. 968:8-21 (Newman); *see also* GX-570.)  And it is inconceivable that everyone but Neil Phillips—a 30-year veteran in this market and a seasoned portfolio manager—knew that fact, or that Mr. Phillips believed that a *one touch* option needed to trade *through* the strike price.  The inference was entirely unreasonable and cannot support a guilty verdict.  *See United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) ("[S]pecious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." (cleaned up)).

(ii) hold that risk in an "extremely volatile" exchange rate for *more than two full days*—an eternity in this market (Tr. 578:24-579:1; *see also* Tr. 146:5-147:7); and (iii) repeatedly broadcast his intent to trigger the option in a recorded chat with over a dozen participants and a salesperson he never met—all to realize a profit of $20 million.  But that was not what happened, and those inferences make no sense.  Importantly, Glen Point's gain was not even close to $20 million: the One Touch Option always had value; Glen Point always carried it on its books at market value; and, in the days before Boxing Day, the Option's value always far exceeded the premium paid for it.[28]  Put simply, no reasonable juror could have reached the government's proposed conclusions.

*       *       *

"[T]he government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'"  *D'Amato*, 39 F.3d at 1256 (quoting *Mulheren*, 938 F.2d at 372).  It did not do so here.  No reasonable jury could have found criminal intent beyond a reasonable doubt.

## IV.   No Reasonable Jury Could Have Found That Mr. Phillips' Intent Would Have Been Material to a Decision of the Counterparty to the One Touch Option.

The Court instructed the jury that to find Mr. Phillips guilty of commodities fraud, it must have found that the scheme was "material to a decision by a counterparty to the swap, which means that the scheme must have the natural tendency to influence or be capable of influencing the counterparties to the swap."  (Tr. 1352-53.)  The scheme must have been "at least capable of affecting that counterparty's conduct or decision with respect to the swap."  (Tr. 1353.)  And the standard is objective; the jury had to find that the scheme "would be significant to a reasonable market participant in the position of the counterparty to the swap."  (*Id.*)

---

[28] There's no one, definitive way to calculate an option's dynamic value. But even the government's own calculation established that on December 22, the One Touch Option was worth over $10 million based on a 12.64 spot rate.  (*See* GX-248.)  And the spot rate dropped even lower than that on December 22.  (*See* GX-601; GX-610.)

After arguing that it need not prove materiality at all, the government attempted to meet its burden through the testimony of two employees, one from Morgan Stanley and the other from J.P. Morgan.  Neither witness had any involvement in the conduct at issue in this case.  Neither had first-hand knowledge of the transactions.  And neither provided testimony from which a reasonable juror could have found that an intent to trigger the option had the "natural tendency" of influencing a counterparty's decision, let alone that the intent to trigger would be "significant" to any such decision.

This is not surprising: banks like Morgan Stanley recognize that parties routinely trade in ways that are likely to cause (or prevent) a barrier from triggering as it approaches.  And that is precisely what both Morgan Stanley and Glen Point did here.  Consistent with this routine industry practice, banks—like Morgan Stanley—also recognize that trading with an intent to trigger a barrier may be perfectly permissible.  Indeed, Morgan Stanley's own policy states that trading activity "designed to deliberately trigger or defend a . . . barrier option" is only prohibited "in the absence of legitimate hedging activity."  (GX-0572 at 4.)  It follows naturally, then, that trading in a way that is consistent with a bank's internal policy would not be material to any decision made by that bank.  And for the reasons set forth below, it was not.

*First*, there was no evidence about whether or how Mr. Phillips' intent on Boxing Day could influence a decision by Morgan Stanley.  Instead, there was generic testimony that, in *pricing an option*, Morgan Stanley would want to know if its counterparty intended to trigger the option.  Of course, the decision to price the One-Touch Option happened months before Boxing Day.  It was before the alleged scheme began.  It was not a decision made "in connection with" the Boxing Day trades.  And it could not have been influenced by trades that happened two months later.[29]

---

[29] The government has effectively conceded on more than one occasion that the purchase of the One Touch Option is not at issue.  First, in opposition to the argument in Mr. Phillips' motion to dismiss that Section 6(c)(1) is focused on

***Second,*** even if the pricing of the option were relevant—and it was not—the Morgan Stanley witness, Mr. Oweida, readily acknowledged that Morgan Stanley factors into its pricing decision the expectation that counterparties will trade in order to manage risk and, as a result, affect the likelihood of a barrier event occurring. (T. 454:5-55:22.) In other words, the premium that Morgan Stanley charges is based on its assessment of the likelihood that a barrier will be triggered, and that analysis assumes that counterparties will trade in ways that make a barrier event more likely.[30]

***Third,*** consistent with what Mr. Phillips argued in his motion to dismiss, there was no evidence of a decision that Morgan Stanley made—or could make—in connection with Mr. Phillips' intent and trading on Boxing Day. *See* Def.'s Mot. to Dismiss, at 11-12 (Apr. 28, 2023), ECF 22 (stating that the Indictment alleges no misstatement "of any kind—let alone statements that were material to Bank-1's decision to enter into the Option or to pay its notional value when triggered"). In denying our motion, the Court ruled that the issue of materiality went to "the sufficiency of the Government's evidence." (Op. & Order on Def.'s Mot. to Dismiss, at 26 (Sept.

---

[30] the purchase or sale of a swap, rather than any activity relating to a swap, the government argued that its reach sweeps more broadly, without any assertion that the purchase or sale of the One Touch Option is in fact at issue in this case. (MTD Opp'n at 12.) The Court's opinion on the motion to dismiss reflects the parties' shared understanding that the purchase of the One Touch Option was not alleged to be part of the scheme. (Op. & Order on Def.'s Mot. to Dismiss, at 25-26 (Sept. 1, 2023), ECF 36.) Second, in response to Mr. Phillips' motion in limine seeking to preclude any argument based on a fraudulent inducement theory in connection with the formation of the One Touch Option, the government stated that it would not make any argument "that Phillips deceived or intended to deceive counterparties to the OT Option at the time it was adopted." (Gov't Opp'n to Def.'s Mots. in Lim., at 13 (Oct. 7, 2023), ECF 48.) The Court thus denied Mr. Phillips' motion as moot. (Op. & Order on Mots. in Lim., at 17 (Oct. 10, 2023), ECF 55.) Mr. Oweida's testimony about the pricing of an option was similarly moot—and could not have been relied upon to prove materiality.

[30] When asked whether Morgan Stanley expected its counterparties to trade with an intent to trigger an option, Mr. Oweida said no. (Tr. 428:12-14.) This testimony is difficult, if not impossible, to reconcile with Morgan Stanley's internal policies, which explicitly acknowledge that trading with an intent to trigger an option can, in certain circumstances, be entirely permissible. (GX-0572 at 4.) As noted above, the question of how to draw the line between permissible and impermissible trading is one that Morgan Stanley representatives told the government was "[s]ubtle." (*See* 3501-004 at 2.) But this entire criminal case was based on that subtle distinction. It was, of course, critical to the question of intent. But it was also critical to materiality—and the government failed to offer any evidence on that point.

1, 2023), ECF 36; *see also id.* at 32 (emphasizing that, at trial the standard for materiality is "beyond a reasonable doubt").)  The trial confirmed what was always readily apparent: Morgan Stanley determined that the barrier was hit on its own; it made its decision to pay, as it was obligated to do, based on that determination; it did not know that Glen Point was its counterparty; and Mr. Phillips' subjective intent while sitting in South Africa did not—and could not—have influenced any *decision* that followed.

**Fourth,** the generic testimony of a J.P. Morgan representative that it "could" be important to a prime broker to know that its client traded to trigger a barrier does not come close to proving that Mr. Phillips' intent was material to a decision by an objective option counterparty.  As a preliminary matter, J.P. Morgan was a prime broker; it was not the counterparty to the Option.[31] It did not receive the premium that Glen Point paid for the option, and it was not the true risk-taking counterparty on the One Touch Option.  (Tr. 483:14-25 (Maria Silveira testimony that JPMorgan serves as an "intermediary" in such transactions).)  Ms. Santoro's generic testimony

---

[31] The government has, at various times, referred to "counterparties" to the One Touch Option.  (Tr. 545:9–10 ("JPMorgan is, like Morgan Stanley, one of the counterparties to this multiparty option transaction."); Tr. 1152:21– 23 (arguing that "the American counterparties to the swap were part of both funding the creation of the swap and then ultimately in getting the defendant the proceeds from the scheme in its culmination"); Tr. 1327:4–5 ("[T]he notion that the price level would not matter to the counterparties to these options is ridiculous"); Tr. 1332:10-11 ("[Mr. Phillips] deceived the counterparties to the option and he got the payout."); MTD Opp'n ("Phillips engaged in a deceptive scheme to trigger the OT Option by driving the USD/ZAR exchange rate below 12.50, then failing to disclose to the relevant counterparties that the OT Option had been triggered by his own, manipulative trading activity.").)  But just as there was only one party who bought the option (Glen Point), there was only one party who sold it (Morgan Stanley).  They were the two counterparties to the One Touch Option.  Consistent with this common-sense definition of "counterparty," the government has repeatedly characterized Morgan Stanley as *the* counterparty to the One Touch Option—*i.e.*, the entity who had to pay the notional amount when it triggered.  (*See, e.g.*, Indictment ¶ 11 ("Hedge Fund-1 and Bank-1 were not aware of the identity of their respective counterparties to the $20 Million One Touch Option contract."); Op. & Order on Mots. in Lim., at 11 (Oct. 10, 2023), ECF 55 ("As the Government stated at oral argument, it is the Government's theory that Defendant intended to deceive Bank-1, as the counterparty to the One Touch Option."); *see also* Tr. 127:5-10 (Graeme Henderson testimony characterizing Glen Point and Morgan Stanley as the counterparties to the One Touch Option).)  And in limiting the testimony of Ms. Santoro, the Court indicated that she could testify to whether Mr. Phillips' intent "would . . . have been important to . . . JPMorgan, *if JPMorgan was a counterparty.*"  (Tr. 707:18-20 (emphasis added).)  Viewing Morgan Stanley as the only counterparty also makes sense in the context of materiality, which addresses whether something would be important to a reasonable market participant "in making an investment decision," *United States v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012)—not merely whether an intermediary would be willing to broker an option in which another party ultimately bears the risk.

that trading designed to trigger an option "could" be important to a determination of whether to facilitate settlement of an option on which it is the prime broker told the jury nothing about the circumstances under which such trading "could" be important, or whether the actual trading that occurred in this case would *in fact* have been important to J.P. Morgan or any market participant in a similar position. (Tr. 817:22-18:4.) This distinction is critical. As noted above, this entire case hinged on the question of when trading to trigger a barrier is permissible. And the answer to the question depends on who you ask; it is a "[s]ubtle" distinction. (*See* 3501-004 at 2.) The government failed to ask the follow-up question—it is difficult to understand why without acknowledging the nuance inherent in the "[s]ubtle" distinction and the possibility that the answer might not have been consistent with what the government needed to prove.

*       *       *

The absence of evidence proving materiality contrasted starkly with the extensive evidence that market participants fully anticipate that counterparties will manage their risk, including by engaging in trading around the barrier that may have the effect of causing the barrier to be breached. As described above, Mr. Oweida testified that Morgan Stanley "understands that the counterparty to the option is itself going to be managing its risk," and that he "assume[s]" the party on the other side of an option would enter into transactions to manage its risk in a manner "that could have an effect on the price of the underlying FX pair." (Tr. 453:17-55:5.) Mr. Henderson of J.B. Drax similarly testified that it was common and expected that option counterparties would trade in large quantities as a barrier rate approached in order to hedge their risk. (Tr. 161:1-65:7.) And a Glen Point employee, Nicholas Croix, testified that it was "very likely that the counterparty to the [One Touch Option] would be in the market making very chunky bids right above the 12.50 level," that anyone placing trades near the 12.50 barrier would expect to find a willing counterparty

due to risk management activity, and that "that dynamic is entirely predictable to people . . . who transact in these options." (Tr. 270:6-72:16.)

The expectation of counterparty trading activity as the barrier approaches is not just hypothetical. It is exactly what happened here. Morgan Stanley anticipated precisely the sort of trading Mr. Phillips engaged in, and aggressively traded in a manner that made it less likely that the 12.5 threshold would be reached. (*See* Tr. 1007:6-13:7 (defense expert Andrew Newman testifying that Morgan Stanley hedged its risk in anticipation of trading up to and at the 12.5 rate, including entering hundreds of millions of dollars in bids at the 12.5 rate which it cancelled immediately after the first Morgan Stanley transaction at that rate; *see also* Tr. 255:2-4 (Nicholas Croix testifying on direct regarding the "high likelihood that banks were sitting just above the 12.50 level to buy back dollar/rand to prevent that barrier from hitting.").)

In sum, there was insufficient evidence upon which a reasonable jury could find, beyond a reasonable doubt, that the Boxing Day scheme was material to any decision by the counterparty. *See United States v. McLellan*, 959 F.3d 442, 458-59 (1st Cir. 2020) ("[T]he alleged fraud must reach a certain threshold of materiality to be deemed made 'in connection with' a transaction in securities." (citing *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387-88 (2014))); *see also United States v. Finnerty*, 474 F. Supp. 2d 530, 538-45 (S.D.N.Y. 2007) (granting Rule 29 motion where the government failed to introduce evidence that conduct was inconsistent with customer expectations and rejecting argument that violation of general industry or internal rules is sufficient to show customers were deceived), *aff'd*, 533 F.3d 143 (2d Cir. 2008); *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991) (reversing convictions that were "based on evidence that is 'at least as consistent with innocence as with guilt,' and 'on inferences no more valid than others equally supported by reason and experience.'" (citations omitted)).

<u>**RULE 33 MOTION**</u>

I.    **In the Alternative, the Court Should Order a New Trial to Prevent Manifest Injustice.**

"[I]n our system . . . the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Jackson v. Virginia*, 443 U.S. 307, 317 n.10 (1979). A jury does not have the "power to enter an unreasonable verdict of guilty." *Id.* Courts have the power to grant a new trial where there is "a real concern that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134. The government's prosecution of the case against Mr. Phillips presents precisely that concern.

A.    **Applicable Law**

Federal Rule of Criminal Procedure 33 provides "broader discretion" to grant relief than "a motion for judgment of acquittal under Rule 29." *Ferguson*, 246 F.3d at 134 (citing *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)); *see also id.* at 139 n.1 (Walker, C.J., concurring in part and dissenting in part) ("[A] guilty verdict might survive a Rule 29(c) motion . . . but fail to meet the Rule 33 standard . . . ."). Rule 33 permits a new trial "if the interest of justice so requires," Fed. R. Crim. P. 33(a), thereby vesting district courts with "'broad discretion . . . to set aside a jury verdict . . . to avert a perceived miscarriage of justice.'" *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1413)).

The "ultimate test" for a Rule 33 motion is "whether letting a guilty verdict stand would be a manifest injustice." *Id.* (citing *Sanchez*, 969 F.2d at 1414). This may occur where the trial evidence "preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (citing *Sanchez*, 969 F.2d at 1414). The district court thus must satisfy itself that "'competent, satisfactory and sufficient evidence' in the record supports the jury verdict.'" *Ferguson*, 246 F.3d

63

at 134 (quoting *Sanchez,* 969 F.2d at 1414)).  It "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  *Id.* (citing *Sanchez*, 969 F.2d at 1414).  The district court, of course, may not "'usurp the role of the jury.'" *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021) (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005).  But it should nonetheless "'weigh the evidence and credibility of witnesses,'" *Landesman*, 17 F.4th at 330 (quoting *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008)), and is "'not required to review the evidence in the light most favorable to the prosecution,'" *United States v. Walker*, 289 F. Supp. 3d 560, 567 (S.D.N.Y. 2018) (quoting *United States v. Levy*, 594 F. Supp. 2d 427, 435 (S.D.N.Y. 2009)).  If "the only evidence supporting" an aspect of the jury charge is "vague, suspect testimony of an interested witness," then a Rule 33 motion may properly be granted.  *Archer*, 977 F.3d at 189 (discussing *United States v. Ferguson*, 49 F. Supp. 2d 321, 328-29 (S.D.N.Y. 1999), *aff'd*, 246 F.3d 129 (2d Cir. 2001)).

**B.   Analysis[32]**

This is precisely the "extraordinary" case in which a new trial is warranted.  *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).  The government began trial with an unusual perspective—it received a detailed preview of Mr. Phillips' defense, one he had maintained consistently for five years.  That is because three weeks before trial, we took the unusual step of requesting a meeting with the U.S. Attorney's Office to ask them to reconsider whether this case should proceed to trial.  We did so not because we thought the government would not win at trial, but rather because we knew they could.  And we strongly believed that would not be the right result.  And so, we told the government, in detail, our understanding of why Mr. Phillips traded the way he did on Boxing Day.  In other words, just before trial, we told the government our

---

[32] All arguments made with respect to Mr. Phillips' Rule 29 motion are hereby incorporated in his Rule 33 motion by reference.

defense.  We did so because we had faith that, as Your Honor noted during trial, the mission of the U.S. Department of Justice is to do Justice—not to win, but to get the right and just outcome, whatever it may be.  (Tr. 908:24-09:1.)

But notwithstanding what Justice might require, at numerous steps, the government became an interested party in this case.  And, in so doing, it achieved a verdict that, if allowed to stand, would be a manifest injustice.

1.  The "Deleted Delta"

After we told the government our theory of the defense before trial, the government apparently spent the remaining weeks seeking to find ways to refute Mr. Phillips' delta replacement defense.  The government, of course, is entitled to its position that delta replacement was not the reason for the trades.  And it is entitled to argue that position to the jury.  But consider how it chose to make the argument.  Notwithstanding that (i) every Glen Point witness the government called testified that it was common for Glen Point to segregate positions from its risk report in order to manage near-term risk (*see* Tr. 231:8-33:5, 540:10-23, 573:1-77:20); (ii) there is no dispute that Glen Point, in fact, did just that (*see* GX-403, GX-404); and (iii) there is no dispute that Glen Point's actual risk report before the Boxing Day trades listed $759 million as the measure of delta for the One Touch Option (GX-1123), the government called Professor Richard Lyons, who has never traded or managed a portfolio, to opine that in his view it would have been better for Glen Point to include all of its positions on its risk reports.  Maybe Professor Lyons is right.  More likely, as with the rest of his testimony, he is somewhere between uninformed and wrong.  But what matters is that that is not what Glen Point actually did.  And yet the government repeatedly argued to the jury about "missing," "deleted," or "zeroed out" deltas, (*see* Tr. 1229:18-30:9, 1237:1-38:1), creating an air of nefariousness around what the government knew was routine

practice at Glen Point. This was an effective argument—"deleting" delta sure sounds improper. But, as described above, there was simply no basis for it.

### 2. The "Cover Up"

In its closing argument, the government repeatedly told the jury that the delta replacement theory and the significance of the Christmas weekend events in South Africa were lawyer-created cover stories. (*See* Tr. 1185:6-9, 1198:11-22, 1229:18-21, 1232:14-23, 1234:15-36:20, 1242:12-13, 1323:20-22.)[33] This was not true. A few weeks before trial, we asked the government to obtain the results of an internal investigation Glen Point's counsel conducted in 2018—something the government had never requested. And that investigation showed that years ago—before the government had even opened its investigation—both Neil Phillips and his co-chief CIO said that the purpose of the trades was delta replacement. (*See* 3527-004 at 5; 3527-005 at 3 (notes of interview with co-chief CIO Jonathan Fayman saying, "Think no chance this is not going to touch").)[34] Again, the government is entitled not to believe that. The government is entitled to argue to the jury that it is not true. But to suggest to the jury that it is a *lawyer-created* cover story took it one important step too far. (*See* Tr. 1185:7-9 ("[T]his delta replacement theory that you have been hearing throughout trial from the defense, the one about the archbishop speech, is a cover story . . . ."); Tr. 1198:16-17 ("That's the defense cherry-picking a news article for a cover story."); Tr. 1232:15-20 (arguing that the defense expert "had the archbishop's speech spoonfed

---

[33] The government argued to the jury that the fact that Mr. Phillips tracked deltas in his portfolio to manage his risk was an "argument from the defense lawyers," (Tr. 1229:18), even though it was confirmed by the government's own witnesses, *see supra* p.8. The government told the jury that "what the defense lawyers are arguing to you now" was inconsistent with "what the defendant was saying back then," (Tr. 1241:23-24), even though the government knew that Mr. Phillips and others at Glen Point provided the same explanation years ago. The government argued that the importance of the Archbishop's speech was just the defense "cherry-picking a news article for a cover story," (Tr. 1198:16-17; *see also* 1232:19-23), even though its own witnesses admitted the events of Christmas weekend were important and would impact the value of the rand, *see supra* p.54.

[34] Notes of Mr. Phillips' interview by in-house and outside counsel were produced to the government but not subsequently produced to the defense or introduced at trial. We are happy to provide the Court with copies upon request.

to him . . . and told you it was important," which "was literally a cherrypicked news article for a cover story").)  The government knew that this was not a lawyer cover story.  But they told the jury that anyway.

### 3.  Misleading Arguments about Extraterritoriality

In closings, the government argued that extraterritoriality was not a close call because, among other things, Glen Point is registered with the CFTC and SEC, and both Mr. Phillips and Glen Point are registered with the NFA, (Tr. 1243:5-20; *see also* Tr. 208:25-09:3), and because Glen Point had an office in New York, a Delaware-based feeder fund, and managed money for some funds located in New York, (Tr. 200:10-11, 208:13-17, 209:8-17; 1243:12-1244:3).  The government also argued that Mr. Phillips' Boxing Day trades "changed the value of the United States dollar."  (Tr. 1320:15-16.)  These arguments may have been persuasive, but they were legally irrelevant, factually impossible, or both.  For the reasons described above, registration with U.S. regulatory agencies is irrelevant to the extraterritoriality analysis. *See supra* pp.36-37.  And the government cannot seriously believe that Neil Phillips's trades affected the value of the U.S. dollar.  Certainly, no evidence or testimony was introduced to support the conclusion that Mr. Phillips' conduct/trading affected the value of the U.S. dollar.  But that was what the government argued as evidence that this case belonged in a U.S. court.  The government even went so far as to say in its rebuttal closing that "almost every aspect of this crime occurred in the United States, and a lot of it occurred in New York."  (Tr. 1320:23-24)  It made that argument after ignoring the domestic application standard entirely in its main closing, and having said the day before that only a handful of incidental or attenuated aspects of the case occurred in the United States: the presence of the FastMatch engine in the United States, the fact that the allegedly false price signal may have

been received by individuals in the United States, and the post-scheme payments that went through U.S. bank accounts.  (Tr. 1151:17-53:2.)

### 4.  Misleading Demonstrative

The government presented a patently misleading demonstrative through Bruno Salemme, an FBI agent who had absolutely no knowledge of any of the facts of the case.  The demonstrative removed or omitted any reference to the uncertainty that surrounded the 2017 election of Cyril Ramaphosa as leader of the African National Congress ("ANC") and, remarkably, omitted four words from the end of a sentence in a Bloomberg chat that indicated an election recount of high-level ANC positions was ongoing.  (Tr. 899:4-900:9.)  The government has not said whether it intentionally removed those four words or if it was, somehow, a mistake.  And while we highlighted the slide's glaring omissions during cross-examination, it was still nevertheless presented to the jury as part of the government's case, and the government never wavered from its argument to the jury that the information conveyed in the slide was accurate.  The presentation of that slide by the government—which it fought to admit into evidence as a summary exhibit—was a manifest injustice.  And so too would be a verdict based on it.

### 5.  Misleading Arguments about the South Africa Election

Finally, the government never acknowledged that there was any election uncertainty in South Africa at all, despite recounts, reports of irregularities, and other disruptive events of which the government was well aware.  In fact, the government argued to the jury that the election was a "slam dunk for Ramaphosa" and that any uncertainty demonstrated by post-election events was the "defense cherry-picking . . . for a cover story."  (Tr. 1189:10, 1198:16-17; *see also* Tr. 1185:6-9, 1232:19-23.)  *See also supra* pp.52-54.  Given what the government knows from its review of

all the evidence and from its own witnesses, it is difficult to understand how the government was comfortable making this argument to the jury.

6.   Interest of Justice

Finally, this case was unusual at a more fundamental level.  We are aware of no criminal case where there are so many significant unresolved legal questions, that the parties *jointly* request a *pre-trial* charge conference to clarify what the government has to prove at trial.  Nor are we aware of a criminal case where the Court had to draft from scratch an instruction on one of the key elements that the jury had to find beyond a reasonable doubt.  Going forward, every commodities fraud case that involves extraterritoriality will look to this case as precedent for what the government must prove under Section 2(i).  And every participant in the binary options market will reevaluate—and no doubt revise—their policies and practices to be on the right side of the government's newly drawn criminal line.  Given the press coverage that this case has received, it is fair to assume that market participants are now on notice as to where that line has shifted, and the potentially criminal consequences of crossing it.  If this verdict is permitted to stand, they will also be on notice that, no matter where they are in the world and no matter how minimal or incidental their contact is with the United States, the U.S. government will likely have jurisdiction over them.  Due process, the rule of lenity, and the interests of justice required that Mr. Phillips receive this notice before the government indictment.  *See Liparota v. United States*, 471 U.S. 419, 427 (1985) (explaining that the rule of lenity is essential to ensuring that "criminal statutes . . . provide fair warning concerning conduct rendered illegal").  He did not.  And it would be a manifest injustice to let this verdict stand.

*      *      *

The government's case included numerous misleading arguments to the jury on both the law and the facts.  Many of these tactics, on their own, warrant a new trial.  *See United States v. Citron*, 783 F.2d 307, 318 (2d Cir. 1986) (awarding new trial based on "arbitrary" figure in summary chart); *United States v. Lopac*, 411 F. Supp. 2d 350, 368–69 (S.D.N.Y. 2006) (awarding new trial based on "misleading" summary chart); *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (observing in context of a Rule 33 motion that "[t]he government 'may not knowingly use false evidence, including false testimony, to obtain a tainted conviction'" (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)); *United States v. Guiliano*, 644 F.2d 85, 89 (2d Cir. 1981) (ordering new trial even after finding "evidence sufficient to support the . . . conviction" because of the risk that the jury had been "influenced in its disposition" by improper evidence and allegations).  But taken together and viewed as a whole, they raise "a real concern that an innocent person may have been convicted."  *Ferguson* at 134.

## **CONCLUSION**

For the reasons set forth above, the Court should enter a judgment of acquittal on Count

Two or, in the alternative, order a new trial.


Dated: December 8, 2023                         Respectfully submitted,

_____

Sean Hecker
Jenna M. Dabbs
David Gopstein
Anne Yearwood
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
shecker@kaplanhecker.com
jdabbs@kaplanhecker.com
dgopstein@kaplanhecker.com
ayearwood@kaplanhecker.com

*Attorneys for Neil Phillips*