UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                               :

UNITED STATES OF AMERICA,          :

               -v-                 :         22-cr-138 (LJL)

                               :

NEIL PHILLIPS,                   :        OPINION AND ORDER

                    Defendant.     :

                               :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/27/2024__

LEWIS J. LIMAN, United States District Judge:

    Defendant Neil Phillips ("Phillips") moves for a judgment of acquittal pursuant to

Federal Rule of Criminal Procedure 29, or, in the alternative, for a new trial pursuant to Federal

Rule of Criminal Procedure 33.  Dkt. No. 94.  For the following reasons, the motion is denied.

## BACKGROUND

    On March 3, 2022, a grand jury sitting in the Southern District of New York returned a

four-count indictment against Phillips.  Dkt. No. 2 (the "Indictment").  The Indictment alleged

that Phillips was the co-founder and co-Chief Investment Officer of a hedge fund in the United

Kingdom, Glen Point Capital ("Glen Point"), that purchased a "one touch" digital barrier option

(the "One Touch Option") for the United States dollar ("USD")/South African rand ("ZAR")

currency pair.  *Id.* ¶¶ 3, 10.  Under the One Touch Option, Glen Point would be entitled to a $20

million payment if the USD/ZAR exchange rate fell below 12.50 at any point prior to January 2,

2018.  *Id.* ¶ 10.  According to the Indictment, while located in South Africa, Phillips fraudulently

triggered the One Touch Option by directing a large number of spot trades (the "Boxing Day

Trades") between shortly before midnight on December 25, 2017, and the early morning of

December 26, 2017, in which he sold $725 million USD for ZAR.  *Id.* ¶¶ 18, 20.  Count One

charged Phillips with conspiracy to commit commodities fraud under Title 7, United States

Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1, in violation of Title 18, United States Code, Section 371. *Id.* ¶¶ 30–32. Count Two charged him with commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1. *Id.* ¶¶ 33–34. Count Three charged Phillips with conspiracy to commit wire fraud under Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 371. *Id.* ¶¶ 38–39. Count Four charged him with wire fraud in violation of Title 18, United States Code, Section 1343. *Id.* ¶¶ 38–39. Phillips pleaded not guilty to all four counts on January 5, 2023. Dkt. No. 11.

On April 28, 2023, Phillips moved to dismiss the Indictment. Dkt. No. 21. He argued that the allegations in the Indictment did not support the charged offenses, Dkt. No. 22 at 6, and that the Government's novel interpretation of the commodities fraud statute violated due process, *id.* at 26. The Government opposed Phillips's motion. Dkt. No. 24. On September 1, 2023, the Court denied Phillips's motion to dismiss "without prejudice to [Phillips] making a Rule 29 motion for judgment of acquittal after the close of the Government's evidence and, if the Rule 29 motion is not granted then, after the close of all evidence." Dkt. No. 36 at 1.

The Government filed a letter on September 25, 2023 "inform[ing] the Court and the defense that it d[id] not intend to proceed at trial on Counts Three and Four of the Indictment." Dkt. No. 37 at 1. Although the Government maintained that "it could adduce evidence sufficient to support a guilty verdict" on the conspiracy to commit wire fraud and wire fraud counts, the Government "acknowledge[d] that the jury and the Court may well find otherwise." *Id.* Consequently, the parties proceeded to trial solely on Counts One and Two.

After voir dire and jury selection on October 16, 2023, the Court held a six-day trial. The Government called the following witnesses in its case-in-chief: Graeme Henderson, a foreign-

exchange ("FX") derivatives salesperson at JB Drax Honoré, Trial Transcript ("Trial Tr.") 85:7, 87:21; Jeffrey Gourdji, a staff operations specialist at the FBI, *id.* at 117:15; Nicholas Croix, a former analyst at Glen Point, *id.* at 198:11, 203:1; Mahesh Narayanan, an engineer manager at Bloomberg, *id.* at 298:1; Srinivasan Iyer, a former FX salesperson at Nomura, *id.* at 308:17–20; Samer Oweida, the global head of FX and emerging markets at Morgan Stanley, *id.* at 409:19–21; Nicholas Burrlock, the head of liquidity management at Euronext FX, the successor company to the foreign exchange FastMatch, *id.* at 457:10–458:4; Richard Gerbasi, manager of the FX matching engine Refinitiv, *id.* at 648:24–469:23; Maria Silveira, executive director of the FX operations department at JPMorgan, *id.* at 475:21–476:10; David Coratti, former head trader at Glen Point, *id.* at 505:6–9; Richard Lyons, the Government's expert witness, *id.* at 592:11; Krista Santoro, chief compliance officer for JPMorgan's swap dealers and the North America head of currencies and emerging markets compliance, *id.* at 815:1–3; Jennifer Sunu, compliance director for the National Futures Association, *id.* at 838:24–25; and Bruno Salemme, a special agent with the FBI, *id.* at 852:21.

At the close of the Government's case-in-chief, Phillips moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). *Id.* at 938:5–7. He argued that there was insufficient evidence that he would not have placed the Boxing Day Trades but for an intent to manipulate the USD/ZAR exchange rate. *Id.* at 938:11–25. According to Phillips, the evidence instead showed that he had placed those trades "to replace the delta"—i.e., exposure to ZAR—"that he was losing on the one-touch that would have otherwise expired on January 2nd." *Id.* at 939:5–6. Phillips also argued that the Government impermissibly sought to apply the commodities fraud statute extraterritorially, as the evidence neither established a domestic application of the statute nor satisfied the statutory requirements for regulating foreign activities.

*Id.* at 946:23–947:2.  The Court reserved decision on Phillips's motion, pursuant to Federal Rule of Criminal Procedure 29(b).  *Id.* at 948:23–949:2.  Phillips subsequently called his sole witness: Andrew Newman, the expert for the defense.  *Id.* at 952:8.  The parties then delivered their summations to the Jury, after which the Court charged the Jury on the governing law and the Jury retired for deliberations.

The following day, the Jury returned a verdict, finding Phillips not guilty of conspiracy to commit commodities fraud on Count One, *id.* at 1390:9, and guilty of commodities fraud on Count Two, *id.* at 1390:5.  Phillips filed the instant motion on December 8, 2023.  Dkt. No. 94. The Government opposed the motion on January 19, 2024, Dkt. No. 102, and Phillips replied on February 5, 2024, Dkt. No. 104.  The Court heard oral argument on Phillips's motion on March 15, 2024.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that "on the defendant's motion" a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "[A] district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Berry*, 2022 WL 1515397, at *3 (S.D.N.Y. May 13, 2022) (Nathan, J.) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)).  As the Second Circuit has explained, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict."  *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).  "The Court affirms a conviction as long as '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Scales*, 2022 WL

673258, at *1 (S.D.N.Y. Mar. 7, 2022) (emphasis in original) (quoting *Jackson v. Virginia*, 443

U.S. 307, 319 (1979)), *aff'd*, 2023 WL 8643279 (2d Cir. Dec. 14, 2023).  Consequently, "[a]

judgment of acquittal can be entered 'only if the evidence that the defendant committed the

crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a

reasonable doubt.'"  *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (quoting *United

States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)); *see also United States v. Autuori*, 212 F.3d

105, 114 (2d Cir. 2000) ("If the court concludes that either of the two results, a reasonable doubt

or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." (cleaned

up)).  By contrast, "if there is no evidence upon which a reasonable mind might fairly conclude

guilt beyond a reasonable doubt, the motion must be granted."  *United States v. Temple*, 447 F.3d

130, 137 (2d Cir. 2006) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

"[T]he evidence must be viewed in conjunction, not in isolation," *United States v. Persico*, 645

F.3d 85, 104 (2d Cir. 2011) (quoting *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)),

"since one fact may gain color from others," *Berry*, 2022 WL 1515397, at *3 (quoting *United

States v. Tramunti*, 500 F.2d 1334, 1338 (2d Cir. 1974)).

　　　Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court

may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R.

Crim. P. 33(a).  "Generally, the trial court has broader discretion to grant a new trial under Rule

33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule

33 authority 'sparingly' and in 'the most extraordinary circumstances.'"  *United States v.

Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409,

1414 (2d Cir. 1992)).  "In the exercise of its discretion, the court may weigh the evidence and

credibility of witnesses.  At the same time, the court may not wholly usurp the jury's role."

*Autuori*, 212 F.3d at 120 (citation omitted). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F.3d at 134). Accordingly, "the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation, keeping in mind that the ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021) (quoting *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018)).

## DISCUSSION

### I.      Motion for Judgment of Acquittal

Phillips contends that the Court must enter a judgment of acquittal on Count Two because no reasonable jury could find beyond a reasonable doubt: that his actions supported a domestic application of the commodities fraud statute, Dkt. No. 94 at 17; that his conduct had a sufficient connection to activities in commerce of the United States, *id.* at 26; that he acted with the requisite intent, *id.* at 45; or that the charged scheme would have been material to a reasonable market participant in the position of a counterparty to a swap, *id.* at 57. The Government contests each of those assertions. Dkt. No. 102 at 1–3.

#### A.      Domestic Application

According to Phillips, the evidence at trial does not establish a domestic application of the commodities fraud statute because "[a]lmost nothing relevant to the charged offense occurred in the United States." Dkt. No. 94 at 18. In response, the Government avers that there was ample evidence for the jury to find a domestic application of the statute, because Phillips's "scheme involved manipulative trading in the United States; manipulative orders placed over a

server in the United States; a false price signal sent to a bank in the United States; and the consummation of the fraud through the receipt of $20 million at a bank account in the United States."  Dkt. No. 102 at 11.

The current test for when United States law governs financial frauds involving foreign conduct is of a relatively recent vintage.  Prior to 2010, the Second Circuit applied a "conduct test" and an "effects test" to determine "whether there [was] sufficient United States involvement to justify the exercise of jurisdiction by an American court."[1]  *Itoba Ltd. v. Lep Grp. PLC*, 54 F.3d 118, 122 (2d Cir. 1995) (internal quotation marks omitted).  The conduct test was "met whenever (1) 'the defendant's activities in the United States were more than "merely preparatory" to a . . . fraud conducted elsewhere' and (2) the 'activities or culpable failures to act within the United States "directly caused" the claimed losses.'"  *SEC v. Berger*, 322 F.3d 187, 193 (2d Cir. 2003) (quoting *Itoba*, 54 F.3d at 122); *see Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1337 (2d Cir. 1972) (Friendly, J.).  Under the effects test, courts applied United States law to "wrongful conduct [abroad that] had a substantial effect in the United States or upon United States citizens."  *Berger*, 322 F.3d at 192; *see Schoenbaum v. Firstbrook*, 405 F.2d 200, 208 (2d Cir. 1968), *modified on other grounds*, 405 F.2d 215 (1968) (en banc); *see also Consol. Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261–62 (2d Cir. 1989) ("The anti-fraud laws of the United States may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United States.").  Yet these tests were not mutually exclusive, as "an admixture or combination of the two" could also demonstrate that United States law applied.  *Itoba*, 54 F.3d at 122.  Although developed in the

---

[1] Although "'[j]urisdiction' is a chameleon word" with several possible meanings, the Court uses jurisdiction in this Opinion to describe "prescriptive[] jurisdiction," i.e., "the reach of a nation's (or any political entity's) laws."  *United States v. Prado*, 933 F.3d 121, 132–33 (2d Cir. 2019).

context of securities law, the Second Circuit used those same tests to assess the reach of the

United States's prohibition on commodities fraud.  *See Psimenos v. E.F. Hutton & Co.*, 722 F.2d

1041, 1045 (2d Cir. 1983); *see also Societe Nationale d'Exploitation Industrielle des Tabacs et

Allumettes v. Salomon Bros. Int'l*, 928 F. Supp. 398, 403 (S.D.N.Y. 1996) ("The principles

governing extraterritorial jurisdiction of the securities laws are applicable in deciding the same

issue under the commodities laws.").  The conduct and effects tests proved seminal, as Courts of

Appeals across the country adopted the Second Circuit's framework.[2]

    But the Supreme Court repudiated the conduct and effects tests in *Morrison v. National

Australia Bank Ltd.*, 561 U.S. 247 (2010).  Addressing the extraterritorial reach of the United

States's proscription on securities fraud under Section 10(b) of the Securities Exchange Act of

1934, the *Morrison* Court criticized the conduct and effects tests as depending on judicial policy

judgments regarding whether Congress would have "wished the precious resources of United

States courts and law enforcement agencies to be devoted to [transnational frauds] rather than

leave the problem to foreign countries."  *Id.* at 257 (quoting *Bersch v. Drexel Firestone, Inc.*, 519

F.2d 974, 985 (2d Cir. 1975) (Friendly, J.)).[3]  The Court viewed the Second Circuit's tests as

being "unpredictable and inconsistent" in application and difficult to administer, *id.* at 259–260;

*see also Cavello Bay Reins. Ltd. v. Shubin Stein*, 986 F.3d 161, 166 (2d Cir. 2021), and having

---

[2] *See, e.g.*, *SEC v. Kasser*, 548 F.2d 109, 116 (3d Cir. 1977); *Robinson v. TCI/US W. Commc'ns
Inc.*, 117 F.3d 900, 906 (5th Cir. 1997); *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 667 (7th
Cir. 1998); *Cont'l Grain (Austl.) Pty. Ltd. v. Pac. Oilseeds, Inc.*, 592 F.2d 409, 421–422 (8th Cir.
1979); *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 424–425 (9th Cir. 1983); *Zoelsch v. Arthur
Andersen & Co.*, 824 F.2d 27, 32 (D.C. Cir. 1987); *see also Tamari v. Bache & Co. (Leb.) S.A.L.*,
730 F.2d 1103, 1107 (7th Cir. 1984) (applying the conduct and effects tests to commodities
fraud).
[3] The Supreme Court elsewhere described the Second Circuit as having ruled that the reach of
the federal securities laws extends to all matters over which the United States had prescriptive
jurisdiction.  *Morrison*, 561 U.S. at 256–57.

eschewed the presumption against extraterritoriality, *Morrison*, 561 U.S. at 261; *see also*

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 219 (2d Cir. 2014)

(Leval, J., concurring).  The Supreme Court therefore abrogated the entirety of conduct and

effects jurisprudence as "judicial-speculation-made-law," and adopted a new test based on a

presumption or "canon of construction" that "Congress ordinarily legislates with respect to

domestic, not foreign matters," and that "'legislation of Congress, unless a contrary intent

appears, is meant to apply only within the territorial jurisdiction of the United States.'"

*Morrison*, 561 U.S. at 255, 261 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248

(1991)).  As the Court later expressed it, the *Morrison* presumption against extraterritoriality

"rests on 'the commonsense notion that Congress generally legislates with domestic concerns in

mind.'"  *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 412 (2018) (quoting *Smith*

*v. United States*, 507 U.S. 197, 204 n.5 (1993)).  It also "reflects concerns of international comity

insofar as it 'serves to protect against unintended clashes between our laws and those of other

nations which could result in international discord.'"  *Yegiazaryan v. Smagin*, 599 U.S. 533, 541

(2023) (quoting *Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 115 (2013)).  In *Morrison*, the

Court emphasized that those concerns are particularly acute in the context of financial frauds,

because "the regulation of other countries often differs from ours as to what constitutes fraud,

what disclosures must be made, . . . and many other matters."  561 U.S. at 269.  Indeed, the

United Kingdom, France, and Australia each filed amicus briefs in *Morrison* "complain[ing] of

the interference with foreign securities regulation that application of § 10(b) abroad would

produce."[4]  *Id.*

---

[4] Phillips argues that the circumstances of his arrest demonstrate the risk of interference with
foreign law in this case:  "It is particularly telling that the U.S. Attorney's Office, after obtaining
an indictment March 3, 2022, kept that indictment under seal for five months, while Mr. Phillips

There are two ways a case can overcome *Morrison*'s presumption against extraterritoriality:  First, "[i]f Congress has provided an unmistakable instruction that the provision is extraterritorial, then claims alleging exclusively foreign conduct may proceed, subject to 'the limits Congress has (or has not) imposed on the statute's foreign application.'" *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 418 (2023) (quoting *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337–38 (2016)).  Second, "[i]f the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco*, 579 U.S. at 337.  Courts typically consider these inquiries in that order, but they "have the discretion to begin" with the second. *WesternGeco*, 585 U.S. at 413; *see also Force v. Facebook, Inc.*, 934 F.3d 53, 74 n.28 (2d Cir. 2019).  The Court exercises that discretion here.

Although *Morrison* addressed the extraterritorial reach of the proscription on securities fraud, the Supreme Court's rejection of the conduct and effects tests also upended the Second Circuit's commodities law jurisprudence, since the Circuit had applied those same tests to transnational commodities frauds.  *See Psimenos*, 722 F.2d at 1045; *see also Starshinova v. Batratchenko*, 931 F. Supp. 2d 478, 485 (S.D.N.Y. 2013).  Consequently, in *Prime International Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019), the Second Circuit abandoned its pre-*Morrison* precedent and instead articulated the focus of the commodities fraud statute, 7 U.S.C. § 9(1), namely: "rooting out manipulation and ensuring market integrity . . . in commodities markets," 937 F.3d at 107; *see* 7 U.S.C. § 5 ("[I]t is further the purpose of this chapter to deter

---

continued to reside in London and conduct his business from there, only unsealing the indictment and effecting his arrest when he traveled to Spain on vacation in August 2022.  It is not difficult to infer that the government specifically sought to avoid having to overcome the U.K.'s extradition precedent, in light of the fact that the conduct in this case so clearly centers on activity in or relating to the U.K."  Dkt. No. 94 at 44–45.

and prevent price manipulation or any other disruptions to market integrity . . . to ensure the financial integrity of all transactions subject to this chapter.")  In doing so, the Circuit contrasted the commodities fraud statute with the antifraud provision of the securities laws.  Whereas the Securities Exchange Act of 1934 "is focused on 'purchases and sales of securities in the United States,'" *Prime Int'l*, 937 F.3d at 107 (quoting *Morrison*, 561 U.S. at 266), the commodities fraud statute is "not [focused] on the geographical coordinates of the transaction," *id.*  Thus, under the commodities fraud statute, "[t]he ultimate question is whether sufficient 'manipulative conduct . . . [occurred] in the United States.'"  *United States v. Bankman-Fried*, 2023 WL 4194773, at *11 (S.D.N.Y. June 27, 2023) (quoting *Prime Int'l*, 937 F.3d at 108).

If all of the manipulative conduct occurred abroad, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  *Prime Int'l*, 937 F.3d at 107–08 (quoting *WesternGeco*, 585 U.S. at 414).  A more complex analysis is required, however, when some of the relevant conduct took place in the United States while other relevant conduct transpired outside United States territory.  In that scenario, the Court must decide whether the domestic or foreign conduct has "primacy for the purposes of the extraterritoriality analysis."  *Bascuñán v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019) (quoting *WesternGeco*, 585 U.S. at 414).  The domestic conduct cannot be "merely incidental," *id.* (quoting *WesternGeco*, 585 U.S. at 414), or "simply a necessary characteristic" of the statutory violation, *Abitron*, 600 U.S. at 23.

The Government resists this interpretation of binding precedent and instead suggests that a court must find a domestic application whenever "conduct relevant to the focus of the [statute] is not 'entirely foreign.'"  Dkt. No. 102 at 13 (quoting *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 268 (2d Cir. 2023)).  But the Government's reliance on *Platinum* is

misplaced.  While the Second Circuit in *Platinum* distinguished *Prime International* as a case in

which all of the relevant conduct took place abroad, 61 F.4th at 268, the Circuit did so in

*Platinum* only after articulating the governing inquiry as whether "the conduct . . . [was] 'so

*predominantly foreign* as to render the claims impermissibly extraterritorial,'" *id.* at 267

(emphasis added) (quoting *Prime Int'l*, 937 F.3d at 107); *see Parkcentral*, 763 F.3d at 216

(concluding the securities fraud "claims in this case are so predominantly foreign as to be

impermissibly extraterritorial"); *see also Morrison*, 561 U.S. at 266 ("[I]t is a rare case of

prohibited extraterritorial application that lacks *all* contact with the territory of the United States.

But the presumption against extraterritorial application would be a craven watchdog indeed if it

retreated to its kennel whenever *some* domestic activity is involved in the case." (emphasis in

original)).  And the Circuit sustained the complaint against a challenge that it was impermissibly

extraterritorial only after concluding that "much of the alleged manipulation [charged in the

complaint] was domestic."  *Platinum*, 61 F.4th at 268.

Based on the Supreme Court's domestic application framework and the Second Circuit's

recent elucidation of the purpose of the commodities fraud statute, the Court provided—without

objection from Phillips, *see* Trial Tr. 1156:8–10—the following instruction to the Jury:

> [T]he Government can meet its burden [to show a sufficient relationship to the
> United States] by proving that the relevant conduct occurred in the United States.
> Relevant conduct means the actions taken by the defendant—or his co-
> conspirators—to manipulate the USD/ZAR exchange rate in order to fraudulently
> trigger a $20 million payment under the barrier option contract and defraud the
> counterparties to that contract.  For conduct to be considered relevant, it must be
> relevant to the focus of the commodities fraud statute.  The focus of the
> commodities fraud statute is rooting out manipulation and ensuring integrity in
> swaps markets.  For conduct to be relevant to that focus, it is not sufficient that the
> conduct is a necessary characteristic of the scheme or that it has an effect in the
> United States.  Rather, liability must be premised on the conduct that occurred in
> the United States.  Relevant conduct in the United States must be essential, rather
> than merely incidental, to the charged scheme.  Put differently, the relevant conduct
> in the United States must have primacy.

*Id.* at 1363:11–1364:3.

Phillips argues that no rational jury applying this instruction could find that his actions supported a domestic application of the commodities fraud statute.  Dkt. No. 94 at 18.  He contends that the relevant conduct here was overwhelmingly foreign:  The One Touch Option involved several foreign actors.  Glen Point, a hedge fund based in the United Kingdom, *id.* at 369:10, entered into that option with the United Kingdom office of JPMorgan, acting as prime broker, *id.* at 482:23–24; Gov. Ex. 555 at 4; Gov. Ex. 556 at 5.  Functionally, JPMorgan served as an intermediary for the One Touch Option, as JPMorgan also entered into an offsetting option with the United Kingdom-based Royal Bank of Scotland ("RBS") that same day.  Trial Tr. 483:9–25; Gov. Ex. 551.  JB Drax Honoré, yet another United Kingdom financial institution, Trial Tr. 126:16–22, executed a further offsetting option with Morgan Stanley & Co. International PLC ("Morgan Stanley International"), a United Kingdom entity, through JB Drax Honoré's account at RBS, Gov. Ex. 570; *see also* Trial Tr. 424:8–14 (explaining the purpose for using JB Drax Honoré's "give-up account" at RBS was to ensure that "if JB Drax Honoré went out of business, the credit risk and the make-whole function on this [option] . . . would lie with RBS").  Moreover, Phillips's conduct that triggered the option's barrier all occurred outside the United States.  Phillips, a resident of the United Kingdom, Gov. Ex. 514 at 25, placed the Boxing Day Trades while in South Africa, Trial Tr. 865:6–7, on behalf of Glen Point, based in the United Kingdom, *id.* at 369:10.  To effectuate those transactions, he sent instructions to a salesperson in Singapore, *id.* at 369:12, who worked for Nomura, a Japanese bank, *id.* at 308:14.  Nomura then executed those trades from its Singapore trading desk.  *Id.* at 369:15.  Thus, Phillips asserts that "[t]his predominantly foreign conduct did not come close to what is required for a domestic application."  Dkt. No. 94 at 18 (internal quotation marks omitted).

Phillips is correct that the conduct occurring in the United States did not enjoy primacy over that occurring abroad.  The ties to the United States are too meager and attenuated to establish that Phillips's fraud occurred "within the territorial jurisdiction of the United States." *Morrison*, 561 U.S. at 255 (quotation omitted).  Although the Government stresses several aspects of Phillips's scheme that involved the United States, each is precisely the kind of factor that the Second Circuit once found meaningful under the conduct and effects tests but that no longer suffices in the wake of *Morrison*.  Adopting the Government's domestic application theory would therefore be tantamount to resurrecting the conduct and effects tests that formerly governed commodities fraud actions, under the guise of a capacious interpretation of relevant conduct.

First, the Government argues that Phillips's "manipulative trading took place in the country—specifically, on FastMatch."  Dkt. No. 102 at 15.  The evidence before the Jury showed that the FX spot market is decentralized, as parties transact over several digital platforms that match trades in locations throughout the world.  *See* Trial Tr. 460:25–461:24, 469:7–25.  After Phillips instructed the salesperson at Nomura to purchase ZAR "thru the market," Gox. Ex. 446 at 11, Nomura executed some of the Boxing Day Trades on the foreign exchange FastMatch through its servers located in Secaucus, New Jersey, Trial Tr. 462:5–11, 463:10–466:1; *see* Gov. Ex. 200A.  Nomura's use of trading servers in the United States establishes a domestic application here, according to the Government, just as it would in a securities- or wire-fraud case.  Dkt. No. 102 at 16.

The Government's argument, however, misstates the focus of the Commodity Exchange Act ("CEA") and confuses the market which was the object of Congress's concern with the market which was the means through which Phillips perpetrated his fraud.  The domestic

application inquiry under the CEA looks to where conduct relevant to Congress's "focus . . . on rooting out manipulation and ensuring market integrity" occurred. *Prime Int'l*, 937 F.3d at 107. Congress's focus was not, as in the securities fraud statute, the "purchases and sales of securities in the United States," *Cavello Bay Reins.*, 986 F.3d at 166 (quoting *Morrison*, 561 U.S. at 266); *see also Williams v. Binance*, --- F.4th ----, 2024 WL 995568, at *4 (2d Cir. Mar. 8, 2024), or, as in the wire fraud statute, the use of "wires [of the United States] in furtherance of a scheme to defraud," *Bascuñán*, 927 F.3d at 122 (emphasis omitted). Moreover, the market in which Congress determined to root out manipulation was the swap market, not the FX spot market where the trades on FastMatch occurred. The Government has conceded that "the spot trades, on their own, were [not] criminal." Dkt. No. 24 at 10. Indeed, Congress made a considered decision to exclude FX spot transactions from regulation under the United States commodities laws, *see* 7 U.S.C. § 2(c)(1)(A); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *17 (S.D.N.Y. Sept. 20, 2016), so manipulation of the USD/ZAR spot market does not in itself violate United States law. Accordingly, what makes the FX spot trades relevant here is not that they deceived participants in the FX spot market but rather that they were used as a means to deceive participants in the swap market, specifically the counterparties to the One Touch Option. Dkt. No. 24 at 10. As those trades "sent a false signal about the supply and demand [that] artificially moved the price [of ZAR] to trigger the barrier" under that option, Dkt. No. 32 at 31:14–16, they communicated a false price signal to Morgan Stanley and JPMorgan in their capacities as counterparties to the One Touch Option, *see also id.* at 31:9–13 ("Glen Point was not the only one that was looking at this exchange rate to make a barrier determination, there was also the counterparty to the option that was also looking at the barrier, as was the intermediary who was the one that set up the transaction.").

It thus cannot be that the happenstance that some of the trades that transmitted a false price signal occurred over FastMatch servers in the United States is sufficient to show that the conduct relevant to Congress's focus occurred primarily in the United States. To the contrary, the conduct relevant to rooting out fraud in the swap market occurred primarily abroad. Phillips engaged in deceptive conduct when he sent the instructions to engage in manipulative trades from South Africa to a Nomura salesperson in Singapore, thereby transmitting a false price signal that would eventually travel via the FX spot market to the counterparties to the One Touch Option. Nomura's use of FastMatch's servers in New Jersey was merely incidental to the fraud here. Indeed, when Nomura followed Phillips's directions to purchase ZAR through the market, some of the Boxing Day Trades matched on servers in London. *See* Trial Tr. 467:5–7. The fact that the trades Phillips placed occurred partially in the United States thus is too slender a reed to support the conclusion that the relevant conduct in the United States has "primacy." *WesternGeco*, 585 U.S. at 416 (quoting *Morrison*, 561 U.S. at 267). Were it enough that the false price signal arose from trades in the United States, then any transaction between two foreign nationals (even between foreign nationals residing in the same country), with no other contacts to the United States, would fall within the reach of the CEA based solely on the transmission of a misrepresentation through the United States. *Cf. Cavello Bay Reins. Ltd. v. Stein*, 2020 WL 1445713, at *9 (S.D.N.Y. Mar. 25, 2020), *aff'd*, 986 F.3d 161. That result might make sense and comport with congressional intent if Congress had intended to regulate the FX spot market in the United States. It also might make sense if Congress intended to regulate the use of servers in the United States to perpetrate a fraud, much as Congress regulates the use of the mails and the wires in the United States under other statutes. But the Government charged

Phillips with commodities fraud under the CEA and Congress's relevant focus in the CEA was on fraud in the swaps market and not in the FX spot market.

Thus, Nomura's use of FastMatch servers in the United States merely establishes that "United States [FX] markets were used to consummate the alleged fraud." *Psimenos*, 722 F.2d at 1047. Under the pre-*Morrison* conduct test, the Second Circuit concluded that where "[t]rading activities on United States commodities markets were significant acts without which" the victim's losses could have not occurred or the fraud could not have been committed, United States law would apply, even if "most of the fraudulent misrepresentations alleged in the complaint occurred outside the United States." *Id.* at 1044, 1048. The Circuit reached that conclusion by inferring that "Congress . . . did [not] want United States commodities markets to be used as a base to consummate schemes concocted abroad." *Psimenos*, 722 F.2d at 1046; *see also IIT, an Int'l Inv. Tr. v. Cornfeld*, 619 F.2d 909, 1018 (2d Cir. 1980) (Friendly, J.) (reasoning that Congress did not intend "to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners"). Perhaps, as these prior cases suggest, there are sound policy reasons for Congress to prohibit "schemes concocted overseas and consummated by . . . acts transpiring in this country." *In re Alstom SA*, 406 F. Supp. 2d 346, 383 (S.D.N.Y. 2005). But in abrogating the conduct and effects tests, the Supreme Court admonished that that determination was for Congress, not the courts. *Morrison*, 561 U.S. at 261. Consequently, no matter what Congress hypothetically might think about the role of FastMatch's servers in the Boxing Day Trades, that policy consideration cannot alter the focus of the commodities fraud statute that Congress in fact enacted.

Second, the Government stresses that Phillips "sen[t] his manipulative commands" via messages in a Bloomberg chat that "traveled through Bloomberg's servers in the United States."

Dkt. No. 102 at 19.  That theory also lacks a meaningful limiting principle.  At trial, Narayanan

testified that "every message that gets sent [though Bloomberg's] system gets replicated or

copied across both of our data centers, in New York and in New Jersey.  So this had to be true

for every message" that Phillips sent in his Bloomberg chat with the Nomura salesperson.  Trial

Tr. 303:16–19.  Yet Narayanan's testimony does not indicate that Phillips's Bloomberg chat

messages were sent *through* the servers in the United States to the Nomura salesperson.  Instead,

Narayanan stated that those messages were merely duplicated onto Bloomberg's servers.  That

incidental and ancillary process does not render Phillips's manipulative conduct predominantly

domestic.  Courts have held that fraudulent communications made on websites and other digital

platforms based in the United States directly to victims in the United States fall within domestic

applications of the commodities fraud statute.  *See Barron v. Helbiz Inc.*, 2023 WL 5672640, at

*7 (S.D.N.Y. Sept. 1, 2023); *Bankman-Fried*, 2023 WL 4194773, at *11; *CFTC v. Reynolds*,

2021 WL 796683, at *4 (S.D.N.Y. Mar. 2, 2021).  However, the Second Circuit has maintained

that fraudulent statements made abroad that are merely "accessible in the United States . . . [or]

repeated here" are insufficient to alter the nature of an otherwise "predominantly foreign"

transaction.  *Parkcentral*, 763 F.3d at 201; *see also Laydon v. Coöperatieve Rabobank U.A.*, 55

F.4th 86, 97 (2d Cir. 2022) (holding a conspiracy to place false bids from foreign trading desks

did not support a domestic application of the commodities manipulation statute notwithstanding

"several instances of communications that were made from or went through the United States").

It follows that the mere duplication of Bloomberg chats that were not intended for the United

States onto servers here is inadequate.  Given the ubiquity of Bloomberg chat in the global

financial industry, *see* Dkt. No. 94 at 40, treating the copying of chat messages on Bloomberg's

servers in the United States as sufficient to support a domestic application of the commodities

fraud statute would subvert the "basic premise of our legal system that, in general, 'United States law governs domestically but does not rule the world.'" *RJR Nabisco*, 579 U.S. at 335 (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)).  Doing so would leave little or no room for foreign regulators to craft and apply their own rules, creating precisely the clash of regulatory regimes that *Morrisons*'s presumption against extraterritoriality seeks to avoid.

At oral argument, the Government asserted that the use of American services like Bloomberg is simply "[t]he way that modern finance works," Oral Argument Transcript ("Oral Arg. Tr.") 47:8, and suggested that the importance of those services for the global financial system supports the conclusion that Congress intended to keep them free of fraud, even when a perpetrator acts abroad, *see id.* at 57:2–58:9.[5]  Again, the Government's theory echoes the Second Circuit's pre-*Morrison* case law.  The thrust of the conduct test was to ensure that "foreign citizens and corporations" could not "use this country" in order "to further fraudulent . . . schemes." *Psimenos*, 722 F.2d at 1048 (quoting *Hotz*, 712 F.2d at 425); *see also IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir. 1975) (Friendly, J.).  However, the *Morrison* Court rejected the notion that courts should consider whether a defendant had used "the United States as a 'base' for fraudulent activities in other countries," reasoning that this factor was simply too indeterminate "to administer."  561 U.S. at 258 (quoting *Vencap*, 519 F.2d at 1017–18). *Morrison* mandates what the Court viewed as a more straightforward inquiry: whether conduct relevant to the statute's focus was predominantly domestic.  *See Cavello Bay Reins.*, 986 F.3d at 166 (observing the *Morrison* Court "opted instead for a bright-line rule").  Since the duplication of Phillips's Bloomberg chats onto servers in the United States is plainly insufficient under that

---

[5] However, the Government disclaimed the similarly expansive theory that "that because this was a dollar-based transaction, jurisdiction is appropriate here."  Oral Arg. Tr. 81:2–3.

standard, the Court cannot apply United States law to Phillips's scheme merely because he made use of the United States to further a fraud.

Third, the Government avers that Phillips's narrative of the One Touch Option's serpentine path from Glen Point to JPMorgan, RBS, JB Drax Honoré, and Morgan Stanley International is incomplete.  Dkt. No. 102 at 20.  While Morgan Stanley International was the immediate counterparty to JB Drax Honoré, it also entered into a further offsetting option with Morgan Stanley Capital, an entity based in the United States, such that Morgan Stanley Capital ultimately held the risk from the One Touch Option with Glen Point.  Trial Tr. 440:3–441:3. Consequently, the Government argues a reasonable jury could find that Phillips's fraud fell within a domestic application of the commodities fraud statute because the Boxing Day Trades sent a "false price signal" that went to Morgan Stanley Capital in the United States when Phillips triggered the One Touch Option.  Dkt. No. 102 at 20–21.  That theory too is insufficient to sustain the Jury's verdict.  As explained above, Phillips engaged in fraudulent conduct abroad when he placed the Boxing Day Trades from South Africa via trading instructions to the Nomura salesperson in Singapore.  Once Phillips had generated a false price signal by sending the trading instructions with an intent to defraud the counterparties to the One Touch Option, he had committed fraud.  His transmission of the trading instructions therefore fell squarely within the commodities fraud statute's focus "on rooting out manipulation and ensuring market integrity." *Prime Int'l*, 937 F.3d at 107; *see Abitron*, 600 U.S. at 423 ("Because Congress has premised liability on a specific action . . . , that specific action would be the conduct relevant to [the statute's] focus.").  By contrast, Morgan Stanley Capital's *receipt* of the resulting false price signal was unnecessary.  The fact that Phillips's falsehood successfully reached its intended target undoubtedly supports the conclusion that Phillips traded in order to defraud the

counterparties to the One Touch Option; however, Morgan Stanley Capital need not have relied upon or been deceived by that signal. *See* Trial Tr. 1352:2–4. Indeed, even if Morgan Stanley Capital had somehow failed to observe the USD/ZAR exchange rate when Phillips drove it through the 12.5 barrier, his actions would have implicated the anti-manipulation focus of the commodities fraud statute all the same. Thus, notwithstanding Morgan Stanley Capital's eventual receipt of a false price signal, Phillips engaged in the relevant fraudulent conduct abroad.[6]

The Government asserts that Morgan Stanley Capital's receipt of a false price signal nevertheless supports a domestic application because "[s]ending the false price signal to the relevant parties—one of which was Morgan Stanley in the United States—was central to the crime." Dkt. No. 102 at 21. But the Second Circuit has rejected the premise that a foreign fraud becomes domestic whenever an individual abroad acts for the purpose of deceiving persons in the United States. In *Parkcentral*, the plaintiffs alleged that the defendants had made false statement in Germany "intended to deceive investors worldwide," including within the United States. 763 F.3d at 216. The Circuit deemed that allegation insufficient, however, since "the relevant actions in this case [remained] predominantly German" for purposes of "the presumption against extraterritoriality." *Id.* (citing *Morrison*, 561 U.S. at 266). So too here:

---

[6] In urging the Court to adopt an expansive conception of relevant conduct that encompasses the impact of Phillips's actions on Morgan Stanley Capital, the Government analogizes to the rule that "venue lies both in the district where a . . . communication in furtherance of a crime was made and where it was received." *United States v. Lange*, 834 F.3d 58, 70 (2d Cir. 2016); *see* Dkt. No. 104 at 21. But that analogy is inapt because venue determinations depend not only on "the site of the defendant's acts," but also on "the locus of the *effect* of the criminal conduct." *Lange*, 834 F.3d at 71 (emphasis added) (quoting *United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008)); *see also Royer*, 549 F.3d at 894 ("We have stated that 'venue is proper in a district where . . . the defendant intentionally or knowingly *causes* an act in furtherance of the charged offense to occur.'" (emphasis added) (quoting *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003))).

Although Phillips's placed the Boxing Day Trades from South Africa in order to generate a false price signal that would reach the counterparties to the One Touch Option—including Morgan Stanley Capital—the conduct relevant to the focus of the commodities fraud statute was still "so predominantly foreign as to be impermissibly extraterritorial." *Id.*

Indeed, the Government's theory would resurrect the pre-*Morrison* effects test, under which "[t]he anti-fraud laws of the United States [were] given extraterritorial reach whenever a predominantly foreign transaction ha[d] substantial effects within the United States." *Consol. Gold Fields*, 871 F.2d at 261–62. Courts developed the effects test to vindicate Congress's presumed interest in "protect[ing] domestic investors and domestic markets from foreign [financial] frauds." *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 366 (S.D.N.Y. 2005). Notably, the Government asserted at oral argument that Phillips's false price signal implicated that very concern. *See* Oral Arg. Tr. 54:22–55:2 (contending the "false price signal" was "core to United States interests . . . [in] regulating fraud that involves the victim here, ultimately the Morgan Stanley entity that was in the U.S."). Applying the commodities fraud statute here based on the receipt by Morgan Stanley Capital in the United States of the "injurious" false signal that the Boxing Day Trades created would surely further the effects test's laudable goal. *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 562 (S.D.N.Y. 2008) (quoting *Schoenbaum*, 405 F.2d at 206). Yet the Supreme Court in *Morrison* criticized the view that courts should apply United States law whenever a foreign fraud has "*some* effect on American [financial] markets or investors." 561 U.S. at 257 (emphasis added). The *Morrison* Court warned that the effects test had permitted courts to deem mere byproducts of foreign actions sufficient to extend United States law, based on nebulous notions of what "was 'necessary to protect American investors.'" *Id.* at 256 (quoting *Schoenbaum*, 405 F.2d at 206).

The Government's argument regarding Morgan Stanley Capital's receipt of the false price signal thus shares the same features of the effects test that the *Morrison* Court deemed unacceptable judicial policymaking.

Finally, the Government argues that it proved a domestic application of the commodities fraud statute because, by triggering the One Touch Option, Phillips's fraud resulted in payments to "bank accounts in the United States."  Dkt. No. 102 at 21.  While the Government asserts without a supporting citation that *Phillips* received those payments, *see id.* ("Receiving the payments in the United States was also the defendant's conduct."), even if the Court were to attribute the receipt of those payments to Phillips personally, the acceptance of bank transfers was not "manipulative conduct," *Bankman-Fried*, 2023 WL 4194773, at *11 (quoting *Prime Int'l*, 937 F.3d at 108).  To the contrary, when Phillips received those payments, his fraud was already complete, as explained above.  *See* Trial Tr. 1352:2–4 (instructing the Jury that commodities fraud "does not require proof that the counterparty to the swap was actually deceived or lost money or property as a result of the scheme").  The payments were therefore consequences, rather than components, of Phillips's manipulative conduct.  That distinction is fatal to the Government's argument.  Mere "'ripple effect[s]' or chain[s] of events that resemble[] a falling row of dominoes commencing" with manipulative actions taken abroad, *Prime Int'l*, 937 F.3d at 108, are too "attenuated" to support a domestic application of the commodities laws, *id.* at 106.  Otherwise, in an era of interconnected financial markets, victims distantly removed from a foreign fraud could thrust American law onto overwhelmingly foreign transactions.  *Cf. Parkcentral*, 763 F.3d at 215–16 ("[I]t would subject to U.S. securities laws conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchange."); *WesternGeco*, 585 U.S. at 412–13 (noting the "international

discord" that results from imposing United States law to foreign conduct subject to the laws of other nations (quoting *Arabian Am. Oil Co.*, 499 U.S. at 248)).

Under the pre-*Morrison* conduct test, courts were less concerned with extending United States law when "no relevant interest of the United States was [otherwise] implicated," so long as a case presented "some additional factor tipping the scales" in favor of applying American statutes. *Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 129 (2d Cir. 1998). And courts held that the use of "New York City bank accounts to receive [relevant] funds" was precisely such a factor. *Leonard v. Garantia Banking Ltd.*, 1999 WL 944802, at *6 (S.D.N.Y. Oct. 19, 1999), *aff'd*, 213 F.3d 626 (2d Cir. 2000). But *Morrison* was particularly critical of the Second Circuit's tip-the-scales inquiry, given "the difficulty of applying [that] vague formulation[]." 561 U.S. at 258. *Morrison* therefore demands that courts look to a statute's "exclusive focus," regardless of whether extraneous considerations suggest the application of United States law would be desirable. *Id.* at 268. As Phillips's receipt of payments in United States bank accounts falls beyond the focus of the commodities fraud statute, that factor cannot establish a domestic application.

Based on the evidence at trial, no reasonable jury could find that this case constituted a domestic application of the commodities fraud statute. For the sake of analytical clarity, the Court has addressed each of the domestic ties cited by the Government in order; however, those aspects remain insufficient when considered together, as they share a common flaw. None addresses the location where Phillips's manipulative conduct occurred. Instead, they depend on matters that were incidental or peripheral to Congress's focus of rooting out manipulation and ensuring the integrity of the swaps market. Those ties to the United States fit comfortably into the conduct and effects jurisprudence that once governed securities and commodities fraud cases

in this Circuit.  Yet *Morrison* abrogated those precedents in favor of a narrow inquiry that does

not incorporate the broader connections and interests the Government emphasizes here.  Thus,

because Phillips's conduct abroad relevant to the focus of the commodities fraud statute has

"primacy," *Bascuñán*, 927 F.3d at 122, the Government "failed to [prove] a proper domestic

application," *Prime Int'l*, 937 F.3d at 107.

> **B.   Extraterritorial Application**

As *Morrison* explained, a domestic application is not the only way to overcome the

presumption against territoriality, as that "principle represents a canon of construction, or a

presumption about a statute's meaning, rather than a limit upon Congress's power to legislate."

561 U.S. at 255.  The Court therefore must determine whether "Congress has provided an

unmistakable instruction that the [commodities fraud] provision is extraterritorial," *Abitron*, 600

U.S. at 418, and, if so, whether this case comports with "the limits Congress has (or has not)

imposed on the statute's foreign application," *RJR Nabisco*, 579 U.S. at 337–38.

In ruling on Phillips's motion to dismiss the Indictment, the Court held that the

commodities fraud statutes applies extraterritorially to swap-based conduct pursuant to 7 U.S.C.

§ 2(i)(1).  Dkt. No. 36 at 13.  Neither party invites the Court to revisit that ruling.  Section 2(i)(1)

provides:  "The provisions of this chapter relating to swaps that were enacted by the Wall Street

Transparency and Accountability Act of 2010 ["Dodd-Frank"] (including any rule prescribed or

regulation promulgated under that Act), shall not apply to activities outside the United States

unless those activities . . . have a direct and significant connection with activities in, or effect on,

commerce of the United States."  7 U.S.C. § 2(i)(1); *see Prime Int'l*, 937 F.3d at 103 n.6

(explaining "Dodd-Frank . . . amended the CEA to apply extraterritorially to certain swap-related

activities" in Section 2(i)(1)).  Dodd-Frank amended the commodities statute to add the antifraud

provision at issue here.  Pub. L. 111-203, 124 Stat. 1376, 1750 (2010) (codified at 7 U.S.C.

§ 9(1)); *see Prime Int'l*, 937 F.3d at 103 n.6.  By its terms, Section 2(i)(1) is disjunctive.  Swap-related activities outside the United States are subject to the commodities antifraud statute[7] when they have *either* "a direct and significant connection with activities in . . . commerce of the United States" *or* "a direct and significant . . . effect on[] commerce of the United States."  7 U.S.C. § 2(i)(1).  At the charge conference, the Government informed the Court that it did not intend to "argue to the jury that there was a direct and significant effect in [its] summation."  Trial Tr. 1145:12–13.  With Phillips's consent, *id.* at 1145:22–24, the Court eliminated that portion of its instruction.  Accordingly, the sole basis for applying the commodities fraud statute extraterritorially before the Jury in this case was if Phillips's activities had a direct and significant connection with activities in commerce of the United States.

At present, there is a paucity of precedent interpreting Section 2(i)(1).  *See* Gina-Gail S. Fletcher, *Foreign Corruption as Market Manipulation*, U. Chi. L. Rev. Online 1, 8 (Jan. 8, 2020) ("To date, the [commodities statute's] manipulation and fraud provisions have not been extended extraterritorially and, therefore, it remains to be seen how courts will respond.").  The Court therefore consulted several sources to illuminate Section 2(i)(1)'s meaning and develop an appropriate jury instruction.  *Cf.* William N. Eskridge, Jr. & Victoria F. Nourse, *Textual Gerrymandering: The Eclipse of Republican Government in an Era of Statutory Populism*, 96 N.Y.U. L. Rev. 1718, 1721 (2021) (arguing that "textualism" provides false promises with

---

[7] The Court is cognizant that Section 2(i)(1) also extends swaps-related jurisdiction to "a wide array of areas" beyond the antifraud provision, "including '[c]apital adequacy,' 'swap data recordkeeping,' 'margining . . . for uncleared swaps,' 'trade confirmation,' and 'external business conduct standards.'"  Dkt. No. 102 at 32 (alterations in original) (quoting Interpretive Guidance and Policy Statement Regarding Compliance with Certain Swap Regulations, 78 Fed. Reg. 45292, 45331–45336 (July 26, 2013)).

respect to predictability, neutrality, and the rule of law and urging courts to consider certain legislative evidence of meaning).

The Court first examined dictionaries to determine the plain meaning of both "direct," *see Direct*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/direct ("proceeding from one point to another in time or space without deviation or interruption"); *Direct*, Oxford English Dictionary, https://www.oed.com/dictionary/direct ("[s]traight; undeviating in course; . . . without intermediation or intervening agency; immediate"), and "significant," *see Significant*, Black's Law Dictionary (11th ed. 2019) ("[o]f special importance; momentous, as distinguished from insignificant"); *Significant*, Oxford English Dictionary, https://www.oed.com/dictionary/significant ("[s]ufficiently great or important to be worthy of attention; noteworthy; consequential, influential . . . ; noticeable, substantial, considerable"). The dictionary definitions of those terms, however, were not sufficient to give meaning to the statutory language.  They do not, for example, provide any measure for determining what is "significant" or when relations should be considered "direct."

Accordingly, the Court also considered Dodd-Frank's purpose and legislative history. *See Panjiva, Inc. v. U.S. Customs & Border Prot.*, 975 F.3d 171, 176 (2d Cir. 2020) (explaining a court may consult legislative history when the terms of a statute are "unclear" (quoting *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013))).  Congress added the relevant statutory language just three days after the Supreme Court decided *Morrison* and held that Congress must clearly express an affirmative intent to give a law extraterritorial effect.[8]  And the language Congress enacted in Section 2(i)(1) bears a striking resemblance to the test the Solicitor General

---

[8] *See* Michael Greenberger, *Too Big to Fail—U.S. Banks' Regulatory Alchemy*, 14 J. Bus. & Tech. L. 197, 209, 305 & n.344 (2019).

proposed in *Morrison* for assessing whether the antifraud provision of the securities laws applies extraterritorially:  "[A] transnational securities fraud violates Section 10(b) when the fraud involves *significant* conduct in the United States that is material to the fraud's success.  Under that standard, the United States . . . must be integral, rather than ancillary, to the fraud."  Brief for the United States as Amicus Curiae Supporting Respondents, *Morrison*, 561 U.S. 247 (No. 08-1191), 2010 WL 719337, at *16 (emphasis added).  It thus appears that Congress intended to reach at least some of the conduct that the executive branch considered sufficient to support the extraterritorial application of the federal securities laws but that the Supreme Court had rejected in *Morrison*.  *See* 561 U.S. at 270–72.

      The Court further consulted the language that Congress had used in the extraterritoriality provisions enacted in other statutes but chose not to use in Dodd-Frank on the presumption that "Congress knows how to draft broad provisions when it aims to do so."  *De Dandrade v. DHS*, 367 F. Supp. 3d 174, 191 (S.D.N.Y. 2019), *aff'd sub nom. Moya v. DHS*, 975 F.3d 120 (2d Cir. 2020).  For example, the Foreign Corrupt Practices Act extends jurisdiction to "any United States person [who] corruptly do[es] any act outside the United States in furtherance" of foreign bribery offenses, "irrespective of whether such United States person makes use of the mails or any means or instrumentality of interstate commerce."  15 U.S.C. § 78dd-2(i)(1).  Congress tellingly chose not to ground application of Dodd-Frank on United States nationality.  *See Vencap*, 519 F.2d at 1016 ("Although the United States has power to prescribe the conduct of its nationals everywhere in the world, Congress does not often do so." (citations omitted)).  Congress's approach in Dodd-Frank was relatively measured.  It demands a direct and significant nexus between foreign swap-related conduct and United States commerce, not that the conduct at issue be committed by a United States person.

The Court further assessed how courts interpret the cognate term "direct" as that term is used in other extraterritorial statutes on the understanding that the same terms used in other portions of the United States Code should be given the same or similar interpretation.  *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) (plurality) ("[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."); *Northcross v. Bd. of Ed. of Memphis City Sch.*, 412 U.S. 427, 428 (1973); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 512 (S.D.N.Y. 2021).  For example, the Foreign Sovereign Immunities Act states that a "foreign state shall not be immune from the jurisdiction of courts of the United States" when sued for "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Interpreting that provision, the Supreme Court has reasoned that "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity,'" and is not "too remote and attenuated."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992).  The Second Circuit has similarly observed that "[t]he common sense interpretation of a 'direct effect' is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption."  *Martin v. Republic of South Africa*, 836 F.2d 91, 95 (2d Cir. 1987) (quoting *Upton v. Empire of Iran*, 459 F. Supp. 264, 266 (D.D.C.1978)).  Another analogous extraterritorial provision can be found in the Foreign Trade Antitrust Improvements Act, which provides "Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce . . . with foreign nations unless such conduct has a direct, substantial, and reasonably foreseeable effect on trade or commerce which is not trade or commerce with foreign nations."  15 U.S.C. § 6a(1)(A).  Interpreting that provision, the Second

Circuit emphasized that the Supreme Court's Commerce Clause jurisprudence prior to its landmark decision in *Wickard v. Filburn*, 317 U.S. 111 (1942), also depended on "directness," and that those opinions had held "effects on interstate commerce" were inadequate when they "were merely 'incidental,' 'indirect', or 'remote.'"[9] *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014) (quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 230 (1948)).

As *Lotes Co.*'s survey of Commerce Clause precedent indicates, principles of interstate jurisdiction offer useful guidance for parsing statutes conferring international jurisdiction. Indeed, "[w]e normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Ryan v. Gonzales*, 568 U.S. 57, 66 (2013); *see United States v. Martin*, 974 F.3d 124, 139 (2d Cir. 2020). When states assert jurisdiction over out-of-state defendants, the Supreme Court has held jurisdiction is proper if a suit arises out of "contacts [that] proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (emphasis added) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Consequently, "a defendant [can]not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id.* (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)); *see also U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019); *Chang v. Gordon*, 1997 WL 563288, at *6 (S.D.N.Y. Sept. 8, 1997) (contrasting "random," "fortuitous," or "attenuated" contacts with "integral" ones for purposes of personal jurisdiction).

---

[9] While the Second Circuit ultimately interpreted Section 6a(1)(A) as demanding "a reasonably proximate causal nexus," it did so based on the statute's "the separate 'reasonabl[e] foreseeab[ility]' requirement" that is notably absent from the text of Section 2(i)(1). *Lotes Co.*, 753 F.3d at 411.

Finally, the Court drew from precepts of customary international law.  More than two centuries ago, the Supreme Court held that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."  *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804) (Marshall, C.J.).  That principle—known as the *Charming Betsy* doctrine—remains an essential guide when courts ascertain the territorial limits of United States law, based on the notion that what the United States does with respect to conduct occurring within the territory of another state, another state would be justified doing with respect to conduct occurring within the territory of the United States.  *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004); *In re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 144 n.8 (2d Cir. 2021).  Importantly, the *Charming Betsy* doctrine is a canon of statutory interpretation that illuminates when Congress has exercised prescriptive jurisdiction.  *See United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir. 1945) (L. Hand, J.) ("[W]e are not to read general words . . . without regard to the limitations customarily observed by nations upon the exercise of their powers . . . .  We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States."); *see also Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 128 (2d Cir. 2001).  It is not a substantive limitation on Congress's legislative power.  *See United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003); *United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983) ("If it chooses to do so, [Congress] may legislate with respect to conduct outside the United States, in excess of the limits posed by international law.  As long as Congress has expressly indicated its intent to reach such conduct, 'a United States court would be bound to

follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment.'" (quoting *Leasco*, 468 F.2d at 1334)).[10]

As an interpretive principle, the *Charming Betsy* doctrine must be distinguished from the presumption against extraterritoriality. Justice Scalia, the author of the majority opinion in *Morrison*, explained that the *Charming Betsy* doctrine is "'wholly independent' of the presumption against extraterritoriality." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (Scalia, J., dissenting in part) (quoting *Arabian Am. Oil Co.*, 499 U.S. at 264 (Marshall, J., dissenting)). Consequently, "even where the presumption against extraterritoriality does not apply, statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Id.*; *see also In re Maxwell Commc'n Corp. plc ex rel. Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996); *United States v. Garcia Sota*, 948 F.3d 356, 362 (D.C. Cir. 2020).

To discern the relevant principles of customary international law, this Court followed the Supreme Court in consulting the Third Restatement of Foreign Relations Law of the United States. *See F. Hoffmann-La Roche*, 542 U.S. at 164; *Hartford Fire Ins.*, 509 U.S. at 818 (Scalia, J., dissenting in part). Section 402(1)(c) of the Restatement articulates the general principle that "a state has jurisdiction to prescribe law with respect to . . . conduct outside its territory that has or is intended to have substantial effect within its territory."[11] Restatement (Third) of Foreign

---

[10] In denying Phillips's motion to dismiss the Indictment, the Court explained that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *United States v. Antonius*, 73 F.4th 82, 87 (2d Cir. 2023) (alteration in original) (quoting *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016)); *see* Dkt. No. 36 at 17. But, like his motion to dismiss, Phillips's instant motion does not raise a due process challenge "for lack of the required territorial nexus." Dkt. No. 36 at 18.

[11] The Third Restatement's disjunctive approach differs from the conjunctive view espoused in

Relations Law § 402(1)(c) (1987); *accord Yousef*, 327 F.3d at 91 n.24.  The Restatement also

includes a section on the specific context of securities and, as relevant here, commodities

regulation.  *See* Restatement (Third) of Foreign Relations Law § 416 cmt. c (1987).  That section

indicates a state can exercise prescriptive jurisdiction when "conduct has, or can reasonably be

expected to have, a substantial effect" on the financial holdings of "United States nationals or

residents" or when "the persons sought to be protected are United States nationals or residents."

*Id.* § 416(2); *see Banque Paribas London*, 147 F.3d at 129 n.15.  In either case, however, "such

exercise of jurisdiction [must be] reasonable in the light of § 403."  Restatement (Third) of

Foreign Relations Law § 416(2) (1987); *see also AVC Nederland B.V. v. Atrium Inv. P'ship*, 740

F.2d 148, 155 (2d Cir. 1984).  Under § 403, "[t]he 'reasonableness' inquiry turns on a number of

factors including, but not limited to," *Hartford Fire Ins.*, 509 U.S. at 818 (Scalia, J., dissenting in

part): "the extent to which the activity . . . has [a] substantial, direct, and foreseeable effect upon

or in the territory" and "the connections, such as nationality, residence, or economic activity . . .

between that state and those whom the regulation is designed to protect."  Restatement (Third) of

Foreign Relations Law § 403(2) (1987).  These background principles establish that, when an

individual engages in conduct abroad, the *ex ante* foreseeability of an impact on the United

States and the *ex post* consequences for United States persons are both relevant to whether

prescriptive jurisdiction is permissible.

   Drawing on these interpretive sources, the Court charged the Jury:

> [T]he Government can meet its burden [to show a sufficient relationship to the
> United States] by proving that an activity of the defendant or his co-conspirators[12]

---

earlier sources.  *See Aluminum Co. of Am.*, 148 F.2d at 444 (agreements in restraint of trade
violate United States law, "though made abroad, if they were intended to affect imports *and* did
affect them." (emphasis added)); Restatement (Second) of Foreign Relations Law § 18(b)(ii)–
(iii) (1965).

[12] The Jury acquitted Phillips of Count One, conspiracy to commit commodities fraud.  Trial Tr.

outside the United States related to the barrier option contract had a direct and significant connection with activities in commerce of the United States.

For a connection or effect to be "direct," it must be immediate. A connection to an activity in commerce of the United States is direct if the activity outside the United States directly and immediately affected activity in commerce of the United States, without deviation or interruption. An indirect or attenuated connection to commercial activity that occurs in the United States is not sufficient to satisfy this element of the test.

"Significant" in this context means meaningful or consequential. For activity outside the United States to have a significant connection with activity in commerce of the United States, the relationship between the activity outside the United States to the commercial activity in the United States must be of importance. It is not sufficient if the relationship between the conduct outside the United States and that inside the United States is random, fortuitous, attenuated, or merely incidental. The conduct in the United States must be integral, rather than ancillary.

Trial Tr. 1364:4–1365:1.

Phillips contends that no reasonable jury could find that the Government proved a direct and significant connection to activities in commerce of the United States beyond a reasonable doubt. Dkt. No. 94 at 26. In contesting that assertion, the Government revisits many of the same ties to the United States that it argues established a domestic application of the commodities fraud statute. But most of those links, whether viewed individually or collectively, are equally inadequate under Section 2(i)(1), as they are either indirect or insignificant. Though the Government emphasizes that a portion of the Boxing Day Trades matched on FastMatch's servers in New Jersey, Dkt. No. 102 at 33, the Court's conclusion that Nomura's use of those servers was merely incidental precludes the Government from proving a significant connection through such an ancillary nexus to commerce in the United States, *cf. Kashef v. BNP Paribas SA*, 442 F. Supp. 3d 809, 822 (S.D.N.Y. 2020) (Nathan, J.) ("The only connection between [defendant's] tortious conduct and the federal government is . . . clearing money through the

---

1390:9. Accordingly, the Court considers only the activities of Phillips and not those of any alleged co-conspirators.

United States.  But that alone does not mandate application of federal law.").  The trades could have matched on any number of servers, in any number of locations, with the same effect.  *Cf. Daou v. BLC Bank., S.A.L.*, 42 F.4th 120, 132 (2d Cir. 2022).

Likewise, the duplication of the trading instructions that Phillips sent the Nomura salesperson via Bloomberg chat onto servers in New York and New Jersey, *see id.* at 36, was not consequential or important enough to be significant or to establish an integral connection between Phillips's swap-related conduct and activities in the commerce of the United States, *see Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 590 (S.D.N.Y. 2017) (explaining the allegation that defendants "coordinated their manipulation of CHF LIBOR through Bloomberg terminal electronic communications transmitted through servers located in New York" was insufficient to confer jurisdiction because "[s]uch contacts would be merely random, fortuitous, or attenuated" (internal quotation marks omitted)); *see also Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015).  There is no evidence Phillips knew that the Bloomberg chats would be copied onto servers in the United States, and the fact that they were copied did not contribute to the fraud.  The fraud would have been committed in precisely the same manner if the Bloomberg chats had not been duplicated on servers in the United States.  Moreover, on the Government's theory, a foreign nation would be justified in regulating the conduct of two United States nationals occurring entirely in the United States, based on the mere unintended fortuity that the false communication from one United States citizen landed on a server located in the foreign nation before it reached the other United States citizen.  *See* Oral Arg. Tr. 52:22–54:1.

The Government contends that the transfer of settlement funds into New York bank accounts "satisf[ies] the 'direct and significant' test that this Court articulated for the jury."  Dkt.

No. 102 at 37.  But those bank transfers were indirect for purposes of Section 2(i)(1), because they followed the same winding path as the underlying options.  Morgan Stanley, with a London-based "internal party" account and New York-based "external party" account, transferred the payment to RBS's bank account in New York, Gov. Ex. 573; Trial Tr. 441:23–443:5.  That payout reached Phillips only after a JPMorgan account in London transferred funds to a JPMorgan account in New York and then further transmitted those funds to the accounts of Glen Point and its client in New York.  *Id.* at 491:25–492:4, 493:4–7.  No reasonable jury could find that this sinuous set of funds transfers constituted a direct connection sufficient to apply the commodities fraud statute to Phillips's swap-related activities abroad.  *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 350 (D.C. Cir. 2018) (Sentelle, J., dissenting) ("[Losses] flowed from the EIG Funds to EIG Sete Parent, to EIG Sete Holdings, to FIP Sondas, and only ultimately to Sete itself. . . .  This does not seem to comport with normal understandings of 'direct,' which is defined as 'stemming immediately from a source.'" (quoting *Direct*, Merriam-Webster Dictionary, http://www.merriamwebster.com/dictionary/direct)); *cf. Casio Comput. Co. v. Sayo*, 2000 WL 1877516, at *26 (S.D.N.Y. Oct. 13, 2000) ("[Defendants] opened bank accounts in the State of New York and wire transferred funds to, from, or through New York. . . .  [Although] the wire transfers reached bank accounts in the United States, such conduct by defendants does not satisfy the level of minimum contacts required to assert personal jurisdiction over them.").

Additionally, the Government asserts that Phillips's American clientele, including an entity that received a payout from the One Touch Option, and registration with the Commodity Futures Trading Commission ("CFTC") through the National Futures Association ("NFA") furnish a direct and significant connection between Phillips's swap-related conduct and activities

in commerce of the United States.  Dkt. No. 102 at 40.  That theory is deficient too.  Congress

tellingly did not extend jurisdiction under Section 2(i)(1) whenever the defendant is a United

States person, as it did in the Foreign Corrupt Practices Act.  Similarly, Congress could have

made all persons registered in the United States subject to the substantive provisions of the

CEA—no matter where the underlying conduct occurs—but it chose not to do so.  Instead,

Congress predicated jurisdiction on the existence and character of connections between the

activities abroad and those in the commerce of the United States.  The connections from

Phillips's American client and NFA registration are insufficient under that test.  Phillips's United

States client unquestionably benefitted from the aforementioned bank transfers.  *See* Gov. Ex.

553.  But this connection is simply an inversion of the Government's unavailing argument

regarding the fund transfers:  Some of the funds transmitted from Morgan Stanley went to

Phillips's client in the United States.  Yet just as the movement of funds from Morgan Stanley

into the United States bank accounts of Glen Point and Phillips's client was too remote from

Phillips's swap-related conduct to provide a direct connection, so too is the benefit Phillips's

client derived upon receiving those funds excessively attenuated to satisfy Section 2(i)(1).

Phillips's prior registration with the CFTC, by way of the NFA, is equally inadequate.  Gov. Ex.

513.  There was no immediate connection between Phillips's Boxing Day Trades in the

unregulated FX spot market and that registration.  And Phillips's registration with the CFTC

was, at most, ancillary to his fraud in connection with the One Touch Option.

      Whether viewed individually or collectively, these theories prove too much.  If accepted

they would expand United States swap regulations to a vast array of transactions around the

globe based on incidental and insubstantial ties to the United States.  Virtually any swap entirely

between foreign parties located abroad would be subject to United States law as long as it

involves or affects a United States person—even if the relationship to the United States was random and incidental. Congress does not lightly impinge on the interests of foreign nations in regulating conduct within their own borders. *See Morrison*, 561 U.S. at 269. And the text of Section 2(i)(1) demonstrates that Congress did not depart from that norm here.

The commodities fraud statute extends to Phillips's conduct, however, because the Jury could have found Section 2(i)(1) was satisfied based on two far more substantial ties between his activities abroad and activities in the commerce of the United States: namely, the connections between the Boxing Day Trades and the commercial activities of JPMorgan, as Glen Point's prime broker and formal counterparty, and Morgan Stanley Capital, as the substantive counterparty to the One Touch Option. Dkt. No. 102 at 37–38, 41.

First, the relationship between Phillips's conduct outside the United States and the conduct of JPMorgan in United States commerce was both "direct and significant." 7 U.S.C. § 2(i)(1). In connection with the Boxing Day Trades, Glen Point signed two agreements with JPMorgan, pursuant to which JPMorgan agreed to act as the seller to Glen Point of the One Touch Option. Gov. Exs. 555, 556. While JPMorgan transferred the investment position associated with the One Touch Option by entering into an offsetting option with RBS, Gov. Ex. 551—forging the first link in a chain of options that ultimately led to Morgan Stanley Capital— JPMorgan remained contractually bound to Glen Point on the One Touch Option. Consequently, when Phillips engaged in his manipulative trades triggering the barrier option, his conduct immediately impacted JPMorgan—a bank in the United States—by virtue of its obligations under the agreement with Glen Point. The connection to JPMorgan, as prime broker and counterparty, was also "significant." 7 U.S.C. § 2(i)(1). JPMorgan bore exclusive responsibility for providing the settlement payment from the One Touch Option to Glen Point and its client, *see*

Trial Tr. 500:19–501:7, and that payout was the aim of Phillips's fraudulent conduct.  As such, JPMorgan was integral to Phillips's swap-related activities.  And the relationship to JPMorgan here constitutes a "connection with activities in . . . commerce of the United States."  7 U.S.C. § 2(i)(1).  The One Touch Option contracts signed by Glen Point prior to the manipulative trading at issue here, specified that Glen Point's counterparty was "JPMorgan Chase Bank, N.A."  Gov. Exs. 555 at 2, 556 at 3.  Every page of those contracts stated, in bold print: "JPMorgan Chase Bank, National Association.  Organised under the laws of USA with limited liability.  Main Office: 1111 Polaris Parkway, Columbus, Ohio 43240 USA."  Gov. Exs. 555 at 2–6, 556 at 3–7.  Accordingly, from the plain terms of the One Touch Option contracts, the connection to the United States was manifest and foreseeable.  *See* Restatement (Third) of Foreign Relations Law § 403(2)(a) (1987).  Because JPMorgan Chase Bank, N.A.'s prime brokerage services and options transacting were both business activities and part of the United States economy, the bank's position as prime broker and counterparty here furnished a connection to activities in commerce of the United States.  Thus, based on JPMorgan's pivotal role in the One Touch Option whose barrier Phillips intentionally triggered through his trades, a reasonable jury could find that Phillips's swap-related conduct had a direct and significant connection with activities in commerce of the United States for purposes of Section 2(i)(1).

Phillips retorts that JPMorgan cannot satisfy Section 2(i)(1) in this case because the One Touch Option contracts stated that the relevant JPMorgan office for the transaction was in London, rendering any connection indirect.  Dkt. No. 94 at 42; *see* Gov. Exs. 555 at 4, 556 at 5.  But a bank's foreign branch office is not a separate entity from its parent.  *See Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649, 653 (S.D.N.Y. 1998) (Sotomayor, J.).  As a result, Phillips's

trades had an uninterrupted connection to JPMorgan's United States entity.[13]  Phillips also

suggests that the connection from JPMorgan's role as prime broker was insignificant "as

JPMorgan was not the counterparty required to pay the notional amount when the option

triggered."  Dkt. No. 94 at 42.  However, the evidence before the Jury established just the

opposite:  JPMorgan was the *only* formal counterparty to One Touch Option, Gov. Exs. 555, 556,

so it was the sole entity contractually obligated to pay Glen Point and its client when the option

triggered.  Indeed, the subsequent bank transfers made that conclusion even more apparent.

Morgan Stanley did not transmit funds directly to Glen Point and its client.  *See* Gov. Ex. 573.

JPMorgan did.  Trial Tr. 491:25–492:4, 493:4–7.  And Silveira, the executive director of FX

operations at JPMorgan, stated that the bank treated its right to payment from RBS and

obligation to pay Glen Point and its client "quite independently," *id.* at 500:25, such that

JPMorgan's obligation to Glen Point under the One Touch Option and its activities that were the

product of Phillips's manipulative trading were not contingent on the receipt of funds from RBS.

Phillips's attempt to minimize JPMorgan's direct and significant role in his swap-related fraud

therefore lacks merit.

Second, Phillips's conduct abroad had a direct and significant connection to the conduct

in United States commerce of Morgan Stanley Capital, the ultimate risk-bearing counterparty on

the One Touch Option.  Although Morgan Stanley Capital's receipt of the false price signal in

the United States was not itself domestic activity within the "focus" of the commodities fraud

---

[13] The formal unity of United States banks and their foreign branches also carries serious economic consequences.  For example, in 2012 JPMorgan suffered "a multi-billion dollar trading loss stemming in part from positions in a credit-related swap portfolio managed through its London Chief Investment Office.  The relationship between the New York and London offices of J.P. Morgan that were involved in the credit swaps that were the source of this loss demonstrates the close integration among the various branches . . . of U.S. financial institutions, which may be located both inside and outside the United States."  78 Fed. Reg. at 45924.

statute so as to make Phillips's conduct domestic, it is precisely the type of nexus that Congress had in mind when it extended the reach of the statute to conduct abroad that has a "direct and significant" connection with activities in the commerce of the United States.  As with JPMorgan, that connection was immediate since Phillips's Boxing Day Trades breached the barrier on Morgan Stanley Capital's One Touch Option.  The relationship between Phillips's conduct abroad and Morgan Stanley Capital's obligations under the One Touch Option was direct, rather than derivative, because Morgan Stanley Capital was Glen Point's ultimate counterparty on that option.  Phillips is thus incorrect when he contends that the connection to Morgan Stanley Capital was attenuated, since its interest in the One Touch Option derived from an internal "transfer [of] risk" from Morgan Stanley International.  Dkt. No. 94 at 41.  The testimony at trial establishes that the transaction between the two Morgan Stanley entities was not merely a matter of balance sheets.  Nor did it constitute a ripple effect of Phillips's trading.  To the contrary, Morgan Stanley's global head of FX—Samer Oweida—explained that when Morgan Stanley International entered into the option with JB Drax Honoré, before the manipulative trading, Morgan Stanley International also executed a "back-to-back trade" by entering into an identical, offsetting option contract with Morgan Stanley Capital.  Trial Tr. 440:5–21.  The "contract" between the Morgan Stanley entities is crucial.  *Id.* at 440:19.  Because the Boxing Day Trades directly triggered *that* option's barrier, Phillips's conduct had an uninterrupted connection to Morgan Stanley Capital's swap-related activities under the One Touch Option.

The connection to Morgan Stanley Capital was also significant.  It was not random, fortuitous, attenuated, or merely incidental.  The evidence established that Phillips traded in order to defraud the ultimate counterparty to the One Touch Option.  Accordingly, triggering the

One Touch Option's barrier was not, as Phillips suggests, an "incidental" byproduct of his actions, Dkt. No. 104 at 25, but rather their inextricable and integral purpose.

Unlike the activities of JPMorgan in United States commerce, there is no evidence that the conduct of Morgan Stanley Capital was foreseeable.  Phillips did not know the identity of the party who assumed the ultimate risk on the One Touch Option.  He therefore did not know that Morgan Stanley Capital bore that risk.  Nor is there evidence that such information was available to him.  The identity of Glen Point's ultimate counterparty was concealed through the layers of transactions involved in the One Touch Option.  However, the Court concludes that the unforeseeability of Morgan Stanley Capital is not fatal to the Jury's verdict.  The Court did not instruct the Jury that the activities in commerce of the United States must have been foreseeable to provide a basis for the application of United States law or to satisfy Section 2(i)(1).  While foreseeability is relevant, it is not a sine qua non to either the application of Section 2(i)(1) or prescriptive jurisdiction generally.  Section 2(i)(1) itself does not speak to foreseeability but rather to directness and significance.  Although those terms are reasonably understood to ensure that the activities abroad are sufficiently connected to activities in United States commerce such that the statute does not run afoul of principles of international law, international law does not limit the United States to regulating only that conduct abroad that has a foreseeable impact on the United States.  *See* Restatement (Third) of Foreign Relations Law § 402(1)(c) (1987).  States can regulate foreign conduct based on actual and intended domestic impacts alike.  *Id.*  And it is eminently reasonable to do so in cases like this one, where "those whom the regulation is designed to protect" have meaningful "connections, such as nationality, residence, or economic activity," to the United States.  *Id.* § 403(2)(b).  Thus, applying the statute to Phillips's conduct is faithful both to Congress's language and to the principles of customary international law it is

presumed to respect.  Simply put, Phillips acted to defraud the ultimate counterparty to One

Touch Option, whoever that may be, but the United States does not share his indifference to his

victim's identity.  Accordingly, the actual connection between the Boxing Day Trades and the

activities of Morgan Stanley Capital pursuant to the One Touch Option was significant under

Section 2(i)(1).

Phillips further argues that any ties to Morgan Stanley Capital cannot support the Jury's

verdict because "the arrival of an amorphous signal is not even an identifiable 'activity.'"  Dkt.

No. 104 at 24.  But that argument mistakes the connection for the connected.  The signal may not

itself be an activity—just as it was not "conduct relevant to the [commodities fraud] statute's

focus" for purposes of a domestic application.  *WesternGeco*, 585 U.S. at 414 (quoting *RJR*

*Nabisco*, 579 U.S. at 326).  However, that signal established a meaningful relationship between

Phillips's trading activities and the activities of JPMorgan and Morgan Stanley Capital.  By

triggering the One Touch Option's barrier, Phillips's Boxing Day Trades had a direct and

significant connection to the performance both by JPMorgan and Morgan Stanley Capital of their

contractual obligations under that option.  And as to Morgan Stanley Capital, just like JPMorgan,

its swap-related activities are clearly commercial.  Furthermore, because Morgan Stanley Capital

is a United States financial institution, Trial Tr. 440:23–441:3, its swaps business is part of the

United States financial sector and thus United States commerce.  By breaching the barrier of

Morgan Stanley Capital's One Touch Option, Phillips's conduct abroad therefore had a direct

and significant connection to activities in "commerce of the United States."  7 U.S.C.  2(i)(1).

The Government's narrower interpretation of Section 2(i)(1), based on the connections to

JPMorgan and Morgan Stanley Capital, also comports with Congress's purpose in enacting

Dodd-Frank: "[t]o promote the financial stability of the United States by improving

accountability and transparency in the financial system . . . , [to] protect the American taxpayer

by ending bailouts, [and] to protect consumers from abusive financial services practices."  124

Stat. at 1376.  Dodd-Frank pursued its stated goal, in part, by strengthening anti-fraud

enforcement because fraud in the United States financial sector jeopardizes the integrity and

stability of the wider United States economy; it diminishes the credibility of American markets

and inflicts unpredictable losses on United States businesses and individuals.  *See* Jacob J. Lew,

*Eight Years After the Financial Crisis: How Wall Street Reform Strengthened Our Financial*

*System and Laid the Foundation for Long-Run Growth*, 19 N.Y.U. J. Legis. & Pub. Pol'y 611,

618 (2016); Michael H. Hurwitz, *Focusing on Deterrence to Combat Financial Fraud and*

*Protect Investors*, 75 Bus. Law. 1519, 1543 (2020) ("[F]inancial fraud can—and often does—

have widespread repercussions, . . . shaking confidence in the fairness and even stability of the

financial markets."); *see also SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998) ("[T]he

deterrence of securities fraud . . . encourag[es] investor confidence, increas[es] the efficiency of

financial markets, and promot[es] the stability of the securities industry.").  As Congress

recognized in enacting Section 2(i)(1), those threats are not purely internal.  When sufficiently

proximate to and intertwined with American commerce, foreign activities can also subvert the

resiliency of the United States financial sector.  *See SIFMA v. CFTC*, 67 F. Supp. 3d 373, 388

(D.D.C. 2014).  A fraud orchestrated and conducted abroad, but perpetrated on a United States

prime broker or swap counterparty, undermines the soundness of the domestic markets for prime

brokerage services and swaps.  If individuals outside the United States can defraud their

American prime brokers and swap counterparties with impunity, then those markets will lack the

very accountability Dodd-Frank sought to ensure.  Neither the text of Section 2(i)(1) nor its

legislative context permits that dubious result.

### C.     Intent to Trigger the One Touch Option

As it went to the Jury, the commodities fraud charge of which Phillips was convicted required the Jury to find beyond a reasonable doubt the following elements: (1) that Phillips employed a manipulative device, scheme, or artifice to defraud; (2) that the scheme, untrue statement, act, practice, or course of conduct was in connection with a swap, in that it would be material to a decision by a counterparty to the swap; and (3) that Phillips acted knowingly, willfully, and with an intent to defraud and, in particular, with an intent to defraud a counterparty to the One Touch Option.  Trial Tr. 1349:8–21.

With respect to the first element, Phillips argues that that there was insufficient evidence to prove that an intent to affect the USD/ZAR exchange rate and thereby trigger the One Touch Option was the "but-for" cause of his Boxing Day Trades.  Dkt. No. 94 at 45.  He contends, to the contrary, that he "traded with a legitimate purpose to replace the delta on his One Touch Option."  *Id.* at 48.  The Government responds that Phillips's argument "hinges on ignoring crucial evidence of defendant's guilt . . . and drawing inferences that the jury had good reason, and certainly was entitled, to reject."  Dkt. No. 102 at 42.

When trading on the open market is manipulative presents a vexing issue of federal law. *See Markowski v. SEC*, 274 F.3d 525, 528 (D.C. Cir. 2001); Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 Harv. L. Rev. 503, 510 (1991).  The Supreme Court has explained that the term manipulation is "virtually a term of art," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976), that "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by affecting market activity," *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *see also Ernst & Ernst*, 425 U.S. at 199 (defining securities manipulation as "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price

45

of securities")  Yet manipulation is not limited to wash trades, matched orders, or rigged prices. Rather, it extends to "the full range of ingenious devices that might be used to manipulate [asset] prices," *Santa Fe Indus.*, 430 U.S. at 477, and occurs when a defendant "inject[s] inaccurate information into the marketplace," *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022); *see also SEC v. O'Brien*, 2023 WL 3645205, at *9 (S.D.N.Y. May 25, 2023).

The Second Circuit has therefore held that "a defendant may manipulate the market through open-market transactions."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021); *see SEC v. Vali Mgmt. Partners*, 2022 WL 2155094, at *2 (2d Cir. June 15, 2022) (summary order); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100–02 (2d Cir. 2007). However, the distinction between manipulative and legitimate open-market trading is not easily captured in words.  The Second Circuit has stated that a manipulative trade is one that misleads investors "to believe 'that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators,'" *ATSI*, 493 F.3d at 100 (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)), and has instructed courts to "ask whether a transaction sends a false pricing signal to the market," *id.*; *see also Set Cap.*, 996 F.3d at 77 ("Deception is the gravamen of a claim for market manipulation, and 'the market is not misled when a transaction's terms are fully disclosed.'" (quoting *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011)).  But whether a transaction sends a false price signal to the market would seem to be the effect of a manipulative act and not its defining characteristic. And whether the demand from a purchase order or the supply from a sell order is "natural" must depend on some antecedent (and undefined) determination of what, in a financial market, is natural and what is not.  To date, the Second Circuit has merely observed that it is not a defense that trades are "visible to the market and reflect[] otherwise legal activity," and that "[o]pen-

market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." *Set Cap.*, 996 F.3d at 77; *see Vali Mgmt. Partners*, 2022 WL 2155094, at *1; *see also SEC v. Hwang*, 2023 WL 6124041, at *13 (S.D.N.Y. Sept. 19, 2023) (concluding the SEC plausibly alleged manipulative intent based on the allegation that defendant "traded to increase the prices of names in which [it] held long positions and reduced the prices of securities in which [it] hel[d] short positions").

In ruling on Phillips's motion to dismiss the Indictment, the Court rejected his argument that the Boxing Day Trades could not be manipulative because they were made in the open market with willing participants. Dkt. No. 36 at 28. The Court explained that the Indictment alleged that "to accomplish his goal of breaching the 12.50 USD/ZAR exchange rate, [Phillips] engaged in what could be characterized as deceptive conduct": he traded in high volumes over a relatively short period of time on Christmas and Boxing Day when the market was particularly illiquid for the avowed purpose of moving the exchange rate below 12.50. *Id.* at 28–29. The Court determined that if the Jury ultimately found that Phillips placed those trades to move the market, his trades were akin to conduct that courts in the Circuit had deemed manipulative, such as "marking the close" by executing orders at the close of the market in order to affect prices. *Id.* at 29. After all, the relevant "transaction" must be understood broadly as including the amount and timing of the trade, since a transaction injects false information into the market "if the prohibited intent alters the trade in *any* material respect." *SEC v. Kwak*, 2008 WL 410427, at *4 n.10 (D. Conn. Feb. 12, 2008) (emphasis added); *cf. Royer*, 549 F.3d at 900 ("[D]efendants sought to artificially affect the prices of various securities by directing the AP site subscribers to trade . . . at times and in manners . . . that were dictated not by market forces, but by defendants'

desire to manipulate the market for their own benefit.  It would be hard to imagine conduct that

more squarely meets the ordinary meaning of 'manipulation.'").

  At the same time, however, the fact that a trade may "influence prices," *GFL Advantage*

*Fund, Ltd. v. Colkitt*, 272 F.3d 189, 204 (3d Cir. 2001), does not make it illegal, even if the trader

knows it will affect prices.  All trades reflect supply and demand and therefore send a price

signal to the market that can impact prices.  *See CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d

996, 1020–21 (N.D. Ill. 2015); *see also* F.A. Hayek, *The Use of Knowledge in Society*, 35 Am.

Econ. Rev. 519, 526 (1945) (explaining how "the price system" serves as "a mechanism for

communicating information").  Sophisticated traders are constantly aware that their transactions

will impact prices, and it is permissible for a trader to "rationally incorporate this effect into her

investment decisions." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539

n.167 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013).  It is for that reason that the Court

concluded that the appropriate test for whether a trade is "manipulative" is a "but for" one.  It is

not illegal for a trader to conduct a transaction for a genuine reason other than to send a price

signal, but with the knowledge that her trade will also have a price impact that increases the

value of other assets she holds.  "[O]nly intent, not knowledge, can transform a legitimate

transaction into manipulation." *Id.* at 539; *In re LIBOR-Based Fin. Instruments Antitrust Litig.*,

27 F. Supp. 3d 447, 470 (S.D.N.Y. 2014) (same).  Thus, a trader who wants to take a substantial

long position in an asset and believes an efficient way of acquiring that position is to buy in large

quantities before an anticipated price movement may do so, even if she knows that the effect of

her purchase will be to increase the value of assets already in her portfolio and she welcomes that

effect.  Her trades will not inject false information into the market.  Although the trader

welcomes the increase in the value of her preexisting portfolio, if she would have placed those

trades regardless of that effect on her portfolio, then her trades reflect the "natural interplay of supply and demand." *ATSI*, 493 F.3d at 100 (quoting *Gurary*, 190 F.3d at 45). On the other hand, if the trader would not have transacted but for the desire to harness that price effect to increase the value of her preexisting portfolio—i.e., if the overriding purpose of the trade is to send a price signal—then the presence of some other reason that would not have been a sufficient basis for the trader to engage in the transaction will not inoculate the trading activity. Regardless of the other objective, the trade will be a function of the intent to send a price signal, rather than the result of the natural interplay of supply and demand. The price signal it sends will be "false."

Accordingly, the Court concluded that the Judge Holwell aptly articulated the rule in *SEC v. Masri*: "in order to impose liability for an open market transaction, the [Government] must prove that *but for* the manipulative intent, the defendant would not have conducted the transaction." 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007) (emphasis in original).

In charging the Jury, the Court therefore provided the following instruction on manipulative intent[14]:

> Here, the defendant is accused of employing a manipulative device, scheme, or artifice to defraud. Manipulation is a term of art when used in connection with financial markets. Manipulation refers to intentional or willful conduct designed to deceive or defraud by controlling or artificially affecting some type of price, in this case, the dollar-rand exchange rate. Because market participants ordinarily assume that prices, such as exchange rates, are determined by the natural interplay of supply and demand—that is, the prices determined by available information and market forces—an act is manipulative if it is designed to deceive or defraud others by sending a false pricing signal to the market. Consequently, a transaction is not manipulative when the market is fully aware of the terms of and purposes behind a transaction, as that transaction will not mislead or deceive the market. Keep in

---

[14] Although it required the Jury to assess Phillips's intent in placing the Boxing Day Trades, this instruction technically concerned the *actus reus* of the charged commodities fraud. As explained *infra*, the Court provided the Jury with a separate instruction on the necessary *mens rea*. *See* Trial Tr. 1353:14–16 ("The third element of commodities fraud is that the defendant participated in the manipulative scheme knowingly, willfully, and with the intent to defraud.").

mind that the mere fact that a transaction affected market prices does not render it manipulative.

An act can be manipulative even if it is conducted on the open market or through ordinary market activity, such as by placing an order to buy or sell, or by actually buying and selling. In some cases a defendant's intent to manipulate a price is all that distinguishes legitimate trading from manipulative trading. Similarly, in some cases, the determination of whether an activity is manipulative can only be made by placing the activity in context and considering whether it is part of a pattern of trading activity. What matters is whether the defendant has an intent to inject a false price signal into the market or to mislead others by artificially affecting the price. The question you should ask is whether the defendant acted with the intent to deceive or defraud others by sending a false pricing signal into the market. If there are two purposes for a transaction, one of which is legitimate, and if the transaction would have been done at the same time and in the same manner for the legitimate purpose, it is not manipulative even if the defendant also had an intent to deceive or to send a false price signal into the market. On the other hand, if the transaction would not have been done at the same time and in the same manner, except for the intent to mislead, then the transaction is manipulative. Thus, if but for an intent to deceive, the defendant would not have conducted the transactions in the dollar-rand foreign exchange spot market at the times and in the amounts he did, then those transactions were manipulative.

Trial Tr. 1350:10–1352:3. Of course, as the Court also charged the Jury, in order to convict Phillips, it was not sufficient to find that he engaged in manipulative activity. *Id.* at 1349:20–21. The Jury would also have to conclude that acted with the requisite intent—namely, to defraud a counterparty to the swap. *See id.* at 1353:24–1354:4.

The Government adduced ample evidence at trial for a reasonable jury to find that Phillips would not have placed the Boxing Day Trades in USD/ZAR in the FX spot market but for an intent to generate a price signal that would trigger the One-Touch Option, and that Phillips's competing explanation of those trades—namely, that he traded as part of a "delta replacement" strategy—was spurious.[15] The evidence supported, and it was uncontested, that in

---

[15] At oral argument, Phillips remarked that the Government relied on "circumstantial" evidence to prove his intent to trigger the barrier. Oral Arg. Tr. 99:24–100:2, 104:23–25. However, "direct evidence is not required; in fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt." *United States v. Graziano*, 616 F.

entering the One-Touch Option Phillips was making a bet that a new leader, Cyril Ramaphosa, and his allies would prevail in the 2017 election to the leadership of the African National Congress ("ANC"), the dominant political party in South Africa, over the allies of the incumbent President Jacob Zuma and that the election of Ramaphosa would strengthen the ZAR against the USD. *See* Trial Tr. 239:12–240:4, 264:3–8.  On December 18, 2017, the ANC held an election for its top six leadership positions. *See id.* at 892:17–25.  Phillips's bet appeared to pay off as initial reports suggested that Ramaphosa and his allies were poised to win five of those six positions, Gov. Ex. 407 at 19, and the market reacted positively to the news, resulting in a surge in the price of ZAR, Def. Ex. 506 at 2.  But the USD/ZAR exchange rate did not reach the One Touch Option's 12.50 barrier in the immediate aftermath of the top-six election. *See* Trial Tr. 912:11–18 (explaining the exchange rate went to 12.52).  Moreover, once the votes were counted, the election results also proved less favorable to Ramaphosa than initially thought. While Ramaphosa won the position of President, Def. Ex. 506 at 2, Zuma's allies secured three of the other top six positions, producing a "stalemate," Trial Tr. 862:22–24.  On December 19, 2017, the ZAR depreciated and the exchange rate retreated from the 12.50 barrier.  Def. Ex. 506 at 2.

On Wednesday, December 20, 2017, the ANC held elections for its larger governing body, the National Executive Committee ("NEC"). *See* Trial Tr. 862:18–20.  The ZAR/USD exchange rate was still above the One-Touch Option's barrier level. *See* Gov. Ex. 610.  Phillips had a phone call with a Glen Point trader named Phillip Costa, Trial Tr. 122:15–16, 225:3–5,

---

Supp. 2d 350, 358 (E.D.N.Y. 2008) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)) (cleaned up), *aff'd*, 391 F. App'x 965 (2d Cir. 2010); *see also United States v. Gillon*, 2023 WL 8177113, at *2 (2d Cir. Nov. 27, 2023) (summary order) ("If competing inferences arise, we defer to the jury's choice, no matter whether the evidence under review 'is direct or circumstantial.'" (quoting *Persico*, 645 F.3d at 105)).

who confirmed that the USD/ZAR exchange rate was 12.5750, Gov. Ex. 103-T at 2.  After discussing how the market was still waiting for "ANC member results," Phillips replied:  "I might need you to start fucking around in Dollar-Rand tonight. . . .  So we're going to just try to offer it lower and see how much gets taken out. . . .  Maybe try to break it lower."  *Id.* at 2–3. Phillips added: "let's try and get this [unintelligible] fucking moving.  We've got enough time, we've got like fifteen days.  But it'd be really nice if we could get it done."  *Id.* at 3.  Though left unsaid, the approximately fifteen days corresponded with the date on which the One Touch Option expired, *see* Gov. Ex. 555 at 3, 556 at 4, at which point it would be irrelevant whether the exchange rate breached the barrier.  Referring explicitly to 12.50, the One Touch Option's barrier level, Phillips instructed Costa to try to get the exchange rate below that level if the opportunity presented itself:  "[L]et's just see where we—when we get NEC, what goes on, and what goes on [with] Dollar-Rand.  But if we get it through fifty-five . . . let's just go fucking lash it through fifty tonight."  *Id.*  Yet that opportunity eluded Phillips on December 20, as the exchange rate remained above 12.55 and the barrier was not breached.  *See* Gov. Ex. 610 (indicating the exchange rate reached 12.574).  At 3:00 A.M. on December 21, 2017, the NEC results were announced: Ramaphosa's allies had secured the balance of power.  Trial Tr. 862:18– 21.  Notwithstanding Ramaphosa's electoral victory, some feared that Zuma would refuse to cede control over the ANC to Ramaphosa.  *Id.* at 266:8–25.

Phillips's instructions via Bloomberg chat to the Nomura salesperson to place the Boxing Day Trades a few days later, on December 25, 2017, similarly evinced a manipulative intent.  At that point, there were eight days left before the One-Touch Option would expire and become worthless.  At 11:49 P.M. London time on December 25, 2017, Phillips asked the Nomura salesperson to sell $25 million USD for ZAR.  Gov. Ex. 446 at 10.  The salesperson did and told

Phillips that the exchange rate had dropped "down to a low of 12.5675." *Id.* at 12.  Phillips then gave an instruction that specifically referenced the figure of 12.50.  He directed the salesperson to sell another $50 million USD for ZAR and to "try [to] get thru 50 [i.e., 12.50] in[ ]5 mins." *Id.* at 12–13.  Phillips was explicit regarding his objective:  "My aim[ ]is to trade thru 50."  *Id.* at 13.  And he continued to be explicit about his goal of lowering the exchange rate.  Before the salesperson had finished selling the first $50 million, Phillips instructed Nomura to sell another $50 million USD for ZAR and repeated "Need to get it thru 50.  Now.  4990." *Id.*  As the salesperson completed those trades, he warned Phillips "[I] imagine there is much more depth on the bid the closer we get to 12.50."  *Id.* at 14.  Phillips asked "how much," and the sales person replied "[I']d say something like 150."  *Id.*  Phillips responded by directing the salesperson to sell "Up[ ]to 200" million USD, "Thru 50."  *Id.*  He reiterated:  "Need it to trade thru 50.  4990 is fine."  *Id.*  With $25 million left to sell within that limit, the Nomura salesperson told Phillips that "5075 is the low so far."  *Id.* at 15.  The Jury could have found Phillips was emphatic in his desire to move the exchange rate.  He instructed the salesperson to "Sell ano[ther] 100.  Get it thru."  *Id.*  The salesperson did, but the exchange rate only fell to 12.5050.  *Id.*  Phillips asked, "How much more u think to break 50," to which the salesperson replied "at least another 200." *Id.*  Phillips then directed Nomura to "Sell 100 pls.  Try[ to ]get it thru."  *Id.* at 16.  After the salesperson had sold $90 million of that order, Phillips inquired what the lowest trade was.  *Id.*  The salesperson answered "5025 is the low."  *Id.*  Phillips ordered Nomura to sell "Another 100" million USD.  *Id.*  The salesperson informed Phillips that he had sold $10 million USD at 12.5000 "but reuters not showing that yet."  *Id.* at 17.  Phillips said "Sell 100. . . .  Try to get it thru now."  *Id.*  Approximately one minute later, the salesperson wrote "we just sold at 4990." *Id.* at 18.  Phillips requested "pro[o]f of the print" and ordered Nomura to "[s]top" trading.  *Id.*

By that point, Phillips had sold a total of $725 million USD for ZAR in less than an hour.  *Id.* at 19.

The language from the chats is telling.  *See Koch v. SEC*, 793 F.3d 147, 154 (D.C. Cir. 2015); *cf. United States v. Brown*, 937 F.2d 32, 37 (2d Cir. 1991) ("Conceivably, the tape alone might have supported a jury's finding of . . . intent.").  The Jury could have found that Phillips's objective was not to acquire a particular amount of ZAR.  He started the chat with an instruction to sell $25 million.  It was only after being informed that the trade did not result in the exchange rate breaking the barrier and triggering the option that he then gave an instruction to sell an additional $50 million.  And Phillips continued to give instructions to sell USD and purchase ZAR only after being informed that prior transactions had not resulted in the exchange rate going below 12.50.  Finally, once the exchange rate broke the 12.50 barrier, Phillips stopped selling USD and buying ZAR.  That Phillips repeatedly asked the salesperson how much additional ZAR he would need to purchase to bring the exchange rate through that barrier, and at one point directed Nomura to sell "*Up*[ ]*to* 200" million USD, Gov. Ex. 446 at 14 (emphasis added), corroborates Phillips's stated goal of altering the exchange rate and suggests that he hoped to do so as inexpensively as possible.  The Jury readily could have found that Phillips's sole objective was to move the exchange rate, and not to acquire a particular position in ZAR.

The timing and structure of the Boxing Day Trades further support the inference that Phillips engaged in the trades not because of a trading strategy that involved the acquisition of ZAR but to send a price signal.  Phillips placed the trades between 11:49 P.M. on Christmas and 12:45 A.M. on Boxing Day.  *Id.* at 10, 18.  The evidence at trial established that due to those holidays, global FX markets were unusually illiquid.  *See* Trial Tr. 124:6–24 (explaining Boxing Day is a holiday in the United Kingdom and "if London is on a holiday most of the London

satellite currencies, i.e., emerging markets linked in the London time zone would be less liquid than they would be during a fully day in London"); *id.* at 252:12 ("Like most other holidays, there tends to be less liquidity.").  Indeed, the Nomura salesperson advised Phillips that "liquidity [was] very thin," as soon as Phillips began placing the Boxing Day Trades.  Gov. Ex. 446 at 10; *see also* Trial Tr. 331:13–25.  As the Government's expert testified, liquid markets are more difficult to manipulate because "in a liquid market I can go in and do a transaction and maybe even a large transaction and have no impact on price."  Trial Tr. 604:13–5.  Accordingly, a reasonable jury could conclude that the timing of the Boxing Day Trades indicated that Phillips traded with a manipulative intent.  *See Set Cap.*, 996 F.3d at 77; *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008) (Chin, J.) (explaining that executing purchase orders at or near the close of the market, when it is easier to affect prices, can constitute manipulation).

Moreover, Phillips's conduct shortly after the Boxing Day Trades reinforces the view that he placed those trades to momentarily move the exchange rate, rather than to acquire a position in ZAR.  Hours after placing the Boxing Day Trades, Phillips called Costa again.  Gov. Ex. 105T.  During their conversation, Phillips explained that he hoped to offload the ZAR he had just purchased: "[T]here's no liquidity now in dollar-rand because it's Boxing Day.  But . . . at some point we [are] going to have to start buying this shit back. . . .  If it starts coming down, we'll start talking about it.  I don't want to put any pressure on it."  *Id.* at 2–3.

Phillips did not immediately sell the ZAR he had just accumulated, but the Jury could have found that the only reason for his delay was to effect another manipulation of the exchange rate.  Glen Point held another one-touch option which would trigger a $10 million payout upon the exchange rate hitting the barrier rate of 12.25 before January 15, 2018.  Gov. Ex. 602; Trial

Tr. 719:23–720:2.  The sale of ZAR for USD would have raised the exchange rate even further above the barrier rate of 12.25.  *See* Gov. Ex. 105T at 3.  So Phillips did not sell ZAR before the barrier option could be triggered.  Instead, Phillips purchased ZAR before immediately selling it. *See* Trial Tr. 724:24–1; Gov. Ex. 603.  On December 28, 2017, Costa told Phillips that the exchange rate was 12.2678.  Gov. Ex. 108-T at 2.  Phillips responded:  "Okay.  We might have to do a job on it."  *Id.*  Phillips subsequently instructed Costa via Bloomberg chat to sell $100 million USD for ZAR.  Gov. Ex. 414 at 6.  Approximately a minute and a half later, with the exchange rate below 12.25, Phillips told Costa "stop . . . .  We thru."  *Id.*  Having triggered the 12.25 one-touch option, Phillips sold nearly all of the ZAR he had purchased through the Boxing Day Trades.  *See* Gov. Ex. 630.  In short, a reasonable jury could find that Phillips had no economic reason for the Boxing Day Trades other than to affect the exchange rate and trigger the One Touch Option.

Phillips denies that this considerable evidence is sufficient.  Instead, Phillips maintains that when he mentioned "fucking around in Dollar-Rand" on his December 20, 2017 call with Costa, Gov. Ex. 103-T at 2–3, he meant placing small trades to test market liquidity, Dkt. No. 104 at 38, that his chat messages on Boxing Day were inconsistent with an intent to move the market price to trigger the barrier option, Dkt. No. 94 at 56 n.27, and that he effected the Boxing Day Trades not to trigger the One Touch Option's barrier but for the innocent purpose of replacing the delta on the soon-expiring One Touch Option to maintain Glen Point's expose to ZAR, *id.* at 48.  The jury was not required to accept any, much less all, of that theory.  *See United States v. Mason*, 479 F. App'x 397, 399 (2d Cir. 2012) (summary order) ("Even assuming that Mason has posited a plausible counter-interpretation of the evidence, the jury was not compelled to accept it where, as here, there was sufficient evidence to support the government's

interpretation of the evidence."); *United States v. Todisco*, 667 F.2d 255, 261 (2d Cir. 1981) (per curiam) ("The court and jury were free to reject D'Angelo's 'innocent' interpretation of the telephone calls.").

Phillips's argument regarding the December 20 call was not based on the account of any witness to that call but on a strained reading of the testimony of a Glen Point trader, Coratti. On cross-examination, Coratti confirmed that it was common for Glen Point "to occasionally go into the market [and] place relatively small trades to try to see where the market was." Trial Tr. 563:9–12. He was then asked "Sometimes you might mess around with small trades and see where the buyers and sellers were actually in the market, yes?" *id.* at 563:15–16, and he answered "Yeah, I wouldn't use the term mess around, but you would trade to see liquidity," *id.* at 563:19–20. It was on that basis that Phillips asked the Jury to conclude that when he told Costa on December 20 he might need "to start fucking around in Dollar-Rand," all he meant was an exercise in price exploration. But not only did Coratti have no knowledge of the December 20 trades, he also was not asked to explain—and did not explain—why, if all Phillips was trying to do was price exploration, he would have mentioned trying to "break . . . lower" the 12.50 exchange rate, or the date of the expiration of the One Touch Option fifteen days later. Gov. Ex. 103-T at 2. The Jury plainly did not have to accept Phillips's argument and could have concluded that the December 20 call reflected an early formulation of Phillips's plan to move the exchange rate below 12.50 in order to trigger the One Touch Option.

Phillips's explanation of the Bloomberg chat messages with the Nomura salesperson on Boxing Day is no more persuasive. Phillips did not defend the language of those chats but instead argued that, if his real objective was to trigger the One-Touch Barrier option, he need not have traded through the 12.50 level with the increased cost and risk that would have created for

Glen Point but could simply have stopped once the exchange rate touched the 12.50 barrier.
Phillips asserts now, as he did to the Jury, that "it is inconceivable that everyone but Neil
Phillips—a 30-year veteran in this in this market and a seasoned portfolio manager—knew that
fact, or that Mr. Phillips believed that a one touch option needed to trade *through* the strike
price." Dkt. No. 94 at 56 n.27. And he highlights that during the Boxing Day Trades, after the
Nomura salesperson informed Phillips "its bid at the figure [i.e., 12.50] now we just sold 10
[million USD] there," Gov. Ex. 446 at 17, Phillips nevertheless directed Nomura to sell another
$100 million USD for ZAR, *id.* ("Sell 100. . . Try get it thru now."). According to Phillips, this
trade showed that he did not place the Boxing Day Trades in order to trigger the One Touch
Option and "that he would have traded at the same time and in the same manner absent an intent
to trigger the option." Dkt. No. 94 at 55.

From all of the evidence before it, however, the Jury could have concluded either that
Phillips had a mistaken understanding of when the option would be triggered or, more likely, that
he wanted to ensure that he had a trade that was "through the barrier" because there can be
uncertainty whether a barrier is triggered on a decentralized market like that for spot FX and,
with the stakes as high as they were, he wanted to avoid any objection that the option had not
been triggered. Recall that on his December 20, 2017 call with Costa, Phillips mentioned the
One Touch Option—and specifically cited its upcoming expiration date—yet said, "if we get it
through fifty-five . . . let's just go fucking lash it *through* fifty tonight." Gov. Ex. 103-T at 3
(emphasis added). Based on that call, a reasonable jury could conclude that Phillips's similar
insistence on trading through 12.50 in his Bloomberg chat messages to the Nomura trader also
reflected Phillips's interest in triggering the One Touch Option. Indeed, Phillips's emphatic
directives in those chats for Nomura to trade through 12.50, even though doing so required

purchasing $725 million of ZAR, followed by his subsequent sale of that position shortly thereafter, reveal that Phillips made the trades to trigger the option.  And when the salesperson apprised Phillips that Nomura had traded at 12.50, the salesperson observed that "low print has been 12.5000 we gave 10 there but reuters not showing that yet."  Gov. Ex. 446 at 17; *see also id.* at 15 (stating after a prior trade "bbg [i.e., Bloomberg] composite sho[wi]ng 4980 but that is wrong").  A reasonable jury could also determine that Phillips traded through the barrier because he held another one touch option with a barrier of 12.25, and once an exchange rate passes through one "technical level" like 12.50 it tends to quickly move to another technical level, like 12.25, where there is increased bidding.  *See* Trial Tr. 269:20–271:6.

More fundamentally, the Jury was not required to accept (and a reasonable jury could easily have rejected) Phillips's argument throughout trial that he placed the Boxing Day trades to replace the delta on the soon-expiring One Touch Option and maintain Glen Point's exposure to ZAR.  *E.g.*, *id.* at 66:4–13.  As noted above, an option's delta refers to the exposure to an asset the option creates; the delta accordingly fluctuates with changes in asset prices.  *See id.* at 115:3–14; *see also id.* at 233:22–25 ("Delta is a term in options which represents the equivalent exposure, if it was outright instead of an option.  The delta for an option is a function of many different variable at any given point in time, and it can change quite a lot.").  Phillips maintains that the evidence showed Glen Point regularly replaced delta on its options and tracked and managed the exposure from its various positions through risk reports.  Dkt. No. 94 at 47.  He further asserts that, by using Glen Point's risk report from December 22, 2017, he "almost perfectly replaced his delta on Boxing Day."  *Id.* at 47, 51.  He justifies his decision to trade on Boxing Day, rather than any other day leading up to the expiration of the One Touch Option, by stressing the "uncertainty surrounding the ANC election . . . going into the Christmas weekend,"

*id.* at 47, and arguing that a Christmas sermon by the Archbishop of Cape Town exhorting Ramaphosa to quickly replace Zuma "signaled Zuma's sooner-than-expected exit," *id.* at 53. Accordingly, Phillips avers that he placed the Boxing Day Trades when he did to capitalize on the favorable effect the sermon would have on the ZAR as markets reacted to Ramaphosa's clearer path to power.  Dkt. No. 104 at 34–35.

"[T]he government need not negate every theory of innocence."  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *Autuori*, 212 F.3d at 114); *see also United States v. Akefe*, 2010 WL 2899805, at *15 (S.D.N.Y. July 21, 2010) ("The presence of other possible inferences does not change the fact that the evidence presented by the Government was sufficient.").  And, despite Phillips's vigorous presentation of a competing interpretation of his actions, "this is not a case where the evidence 'gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence.'"  *Akefe*, 2010 WL 2899805, at *15 (quoting *United States v. Martinez–Sandoval*, 2003 WL 1442454, at *5 (S.D.N.Y. Mar. 6, 2003)).  The Jury could have easily rejected each part of his theory.  *See United States v. Soto*, 959 F.2d 1181, 1185 (2d Cir. 1992) (rejecting a sufficiency of the evidence challenge where there was evidence at trial that was "inconsistent with" defendant's theory of innocence); *see also United States v. Varanese*, 417 F. App'x 52, 54–55 (2d Cir. 2011) (summary order) ("[Although defendant] argues that different interpretations apply to the actions he took—this argument ignores that 'it is the task of the jury, not the court, to choose among competing inferences,' and moreover, that according to this court, the jury ultimately chose the more plausible ones." (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995))).

Phillips's argument that Glen Point had a practice of replacing delta is based on the testimony of Coratti, the former head trader at Glen Point, that Glen Point regularly "exchanged

delta" on its options. Dkt. No. 94 at 48. But, as the Government adduced and emphasized at trial, there is a critical difference between "delta exchange," the subject of that testimony, and "delta replacement," the theory of the defense. Coratti explained that delta exchange occurs when a party enters into an option with a bank and simultaneously conducts a spot trade with the same bank at an agreed-upon price that yields a delta equal to the option. Trial. Tr. 517:25–17. Delta replacement, according to the defense, involves "going into the market and buying a spot position because an option might be expiring," *id.* at 519:7–10; *see also id.* at 539:5–6 ("Q. Now you wouldn't call that delta exchange; correct? A. Yes."). Coratti stated that he could not recall any specific examples of Glen Point executing such a spot trade. *Id.* at 519:11–19. Phillips argues that the distinction Coratti drew between delta exchange and "delta replacement," elevates form over substance. Dkt. No. 104 at 28. Coratti acknowledged that the "concept" of the two strategies is the same—"taking on delta that you want to have in a context in which you might have just lost it." Trial Tr. 539:7–10. However, while the underlying concept might be the same, the strategies are not. Lyons, the Government's expert, testified that the transactions are "quite different" because with delta exchange the trader and bank remain risk neutral, *id.* at 760:2–7, whereas with delta replacement a party maintains its exposure to the risks and potential rewards of an asset at a particular point in time during the trade, *id.* at 760:10–17. There was no evidence presented at trial that Glen Point engaged in delta replacement. A reasonable jury could therefore find that delta replacement, unlike delta exchange, was not a common practice at Glen Point, such that Phillips's explanation of the Boxing Day Trades was less plausible.

Phillips further relies on evidence that Glen Point tracked its delta on risk reports that Phillips regularly received, Dkt. No. 94 at 49, and that the Boxing Day Trades "resulted in an almost perfect replacement" of the One Touch Option's $759 million delta described in the "last

delta risk report . . . Phillips received prior to the Boxing Day trading," *id.* at 51. But there were serious weaknesses to that argument as well. First, a reasonable jury would not have necessarily found the correlation between the $759 million delta listed on the risk report and the $725 million of ZAR Phillips purchased through the Boxing Day Trades as perfect or probative as Phillips suggests. Instead, such a jury could find that the $34 million discrepancy between those amounts casts serious doubt on the proposition that Phillips conducted the Boxing Day Trades simply to replace the delta on the One Touch Option. Second, the evidence showed that Phillips had altered Glen Point's risk reports, limiting them to reflect only the delta from certain options, so the Boxing Day Trades did not perfectly replace Glen Point's exposure to ZAR. In a December 8, 2017 Bloomberg chat to Jonathan Fayman, Phillips's co-Chief Investment Officer at Glen Point, Trial Tr. 156:4–7, Phillips wrote: "I've remarked all our options in zar . . . and I've taken out a[ ]lot of the deltas too." Gov. Ex. 404 at 15. Fayman responded that doing so "makes sense" since "the delta really [are] noise." *Id.* And Coratti explained that options with later expiration dates and more distant barrier levels have deltas that can distract from near-term investment decisions on more time-sensitive and likely to trigger barrier options. Trial Tr. 573:22–574:11. But Lyons testified that Phillips's removal of the delta from those options disguised the actual effect of the Boxing Day Trades on Glen Point's portfolio: a $400 million *increase* in delta. *Id.* at 731:19–733:12.[16] Consequently, a rational jury could find that Phillips's risk reports and purported delta replacement strategy did not create leave a reasonable doubt as to the purpose of the Boxing Day Trades.

---

[16] Phillips observes that Lyons's calculations relied on the mid-price, i.e., the midpoint between the best offer and best bid on the trading platform, rather than the transaction price. Dkt. No. 104 at 33; *see* Trial Tr. 782:18–21. But a reasonable jury could conclude that any deviation between those prices would not offset the significant discrepancy Lyons identified between the delta of Glen Point's portfolio as a whole and the delta disclosed in the modified risk reports.

Likewise, the Jury could have found that the defense never offered a plausible

explanation for the suspicious timing of the Boxing Day Trades.  Phillips contends that he traded

when he did because uncertainty regarding control of the ANC lingered after December 20,

2017, but a Christmas sermon by the Archbishop of Cape Town urging a swift transition of

leadership from Zuma to Ramaphosa and his allies "decreased post-election uncertainty" and

portended a strengthening of the ZAR.  Dkt. No. 94 at 54–55.  Of course, trading to profit from

the market's expected reaction to a material event is not manipulative.  *See CFTC v. Gorman*,

587 F. Supp. 3d 24, 41 (S.D.N.Y. 2022) (observing that "trading strategies intended to anticipate

and respond to prevailing market forces" are "legitimate" (quoting *Masri*, 523 F. Supp. 2d at

367)).  Yet Phillips tellingly fails to cite any evidence indicating that *he* thought the Christmas

sermon was important.  *See* Dkt. No. 94 at 54–55.  As explained above, his statements when

placing the Boxing Day Trades and expressing his desire to sell ZAR shortly thereafter strongly

suggest that Phillips's focus was triggering the One Touch Option, not capitalizing on the

market's expected reaction to a sermon.  *See United States v. Harry*, 2023 WL 4865829, at *1

(D. Conn. July 31, 2023) ("The evidence must be viewed in 'totality, not in isolation.'" (quoting

*United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008))).  Phillips nevertheless stresses

Coratti's testimony that Phillips "would have been very focused on something like" the

Christmas sermon.  Trial Tr. 570:6–7.  Coratti made that generic statement in reference to a

December 23, 2017 news article that a Nomura salesperson sent to Phillips, Fayman, Costa,

Coratti, and several other traders at Glen Point.  Def. Ex. 511.  However, the Jury could have

readily found that the article undermines Phillips's explanation for trading on Boxing Day.  First,

the article indicates that the public, and thus the market, was well aware of the substance of the

Archbishop's sermon before Christmas,[17] as the article stated that the Archbishop's sermon was "expected to exert pressure on Ramaphosa to force Zuma out." *Id.* at 2. Second, the article's lede—and headline—reported that, prior to the sermon, the ANC's leadership had planned "secret meetings . . . [for] after Christmas to discuss ways to manage Jacob Zuma's exit." *Id.* at 1. By December 23, Ramaphosa had already been elected president of the ANC, Def. Ex. 506 at 2, and his allies had won control of the NEC, Trial Tr. 862:18–863:1. As a result, the Jury could conclude the sermon was not a material political development because Ramaphosa's ascent and Zuma's resignation were assured. *See* Def. Ex. 511 at 2–3 ("Had Nkosazana Dlamini-Zuma been elected ANC president, Zuma would have been cushioned, but now his supporters accept that an early departure is inevitable.").

Finally, Phillips's emphasis on the Christmas sermon stands in tension with his delta replacement theory: If the sermon had dramatically altered the expected value of the ZAR, then it would make little sense for Phillips to rely on the risk report he received on December 22, 2017 to ascertain the delta he needed to replace. *See* Trial Tr. 148:25–149:2 (recognizing "delta increases as you get closer to the barrier of the option").

Thus, the evidence at trial was sufficient for a reasonable jury to find—as the Jury did here—that the but-for reason, if not the sole reason, that Phillips placed the Boxing Day Trades was to trigger the One Touch Option. Based on that evidence, the Jury easily could have concluded that the Government satisfied the first element of commodities fraud. *See United*

---

[17] In cross-examining Phillips's expert witness, the Government also introduced evidence that the Archbishop of Cape Town was a longstanding critic of Zuma, such that his Christmas sermon was not a significant development. Trial Tr. 1070:11–1074:6. As Phillips correctly observes, that evidence is irrelevant for purposes of his renewed Rule 29 motion, which challenges the sufficiency of the evidence in the Government's case-in-chief. Dkt. No. 104 at 35 n.24. But that evidence remains relevant to Phillips's Rule 33 motion for a new trial, discussed *infra*.

*States v. Kinney*, 211 F.3d 13, 18 (2d Cir. 2000) ("Assessing this evidence in the light most favorable to the government, as we must, we find it was sufficient to establish that defendant[] acted with the requisite criminal fraudulent intent.").

### D.   Materiality

Phillips's last Rule 29 challenge to the sufficiency of the evidence asserts that no reasonable jury could have found that his manipulative scheme was material to a decision by a counterparty to the swap.  Dkt. No. 94 at 57.  His argument is twofold:  First, Phillips contends that participants in the swap market "fully anticipate that counterparties will manage their risk, including by engaging in trading around the barrier that may have the effect of causing the barrier to be breached."  *Id.* at 61.  As that trading is both commonplace and expected, an objectively reasonable counterparty to the One Touch Option would not have deemed the Boxing Day Trades significant.  *Id.* at 61–62.  Second, even if the Boxing Day Trades would be important to a reasonable counterparty, Phillips argues that the Government failed to prove that they "could influence a *decision*" by that counterparty with respect to the One Touch Option.  *Id.* at 58 (emphasis added); *see also id.* at 60; Dkt. No. 104 at 41.  The Government retorts that the testimony at trial concerning the expectations of both JPMorgan and Morgan Stanley would enable a reasonable jury to find that Phillips's scheme was material beyond a reasonable doubt. Dkt. No. 102 at 59.

The Court instructed the Jury that Phillips's scheme had to be material to a counterparty to the One Touch Option in order to constitute a scheme "in connection" with that option. Interpreting a provision of the Securities Litigation Uniform Standards Act ("SLUSA") that applies to "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security," 15 U.S.C. § 78bb(f)(1), the Supreme Court held that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a

covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security,'" *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 386 (2014) (quoting § 78bb(f)(1)). SLUSA's language is remarkably similar to the commodities statute's prohibition on the use of a manipulative or deceptive device or contrivance "in connection with any swap." 7 U.S.C. § 9(1). Accordingly, the Court interpreted Section 9(1) as requiring Phillips's manipulative or deceptive device or contrivance to be material. *See* Dkt. No. 36 at 24–25.

Under a well-established definition of materiality, "[a] misrepresentation is material if it is capable 'of influencing the intended victim.'" *United States v. Johnson*, 945 F.3d 606, 614 (2d Cir. 2019) (quoting *Neder v. United States*, 527 U.S. 1, 24 (1999)). Or, in a related formulation, a deception is material if it "has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it [is] addressed.'" *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (alterations in original) (quoting *Neder*, 527 U.S. at 16). Materiality is an objective standard that depends on a deception's capacity to influence the decision of a reasonable person in the position of the relevant decisionmaker. *See United States v. Litvak*, 889 F.3d 56, 66 (2d Cir. 2018) ("[T]he determination of the materiality of a misstatement or omission 'is an objective one.'" (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976))); *United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017) (summary order). "Whether a given omission or misrepresentation is material 'is a mixed question of law and fact that the Supreme Court has identified as especially well suited for jury determination.'" *Landesman*, 17 F.4th at 340 (quoting *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015)).

Yet SLUSA and Section 9(1) also differ in a critical respect: while the former forbids frauds "in connection with *the purchase or sale* of a covered security," 15 U.S.C. § 78bb(f)(1)

(emphasis added), the latter extends more broadly to deceits "in connection with any swap," 7 U.S.C. § 9(1).  Consequently, the Court determined that Section 9(1) encompasses frauds that "reach beyond the formation of a swap to all events critical in the lifecycle of a swap, including those that trigger the swap."  Dkt. No. 36 at 25.

Thus, under Section 9(1), a manipulative or deceptive device or contrivance must be material to a counterparty's decision with respect to some aspect of the swap, though that decision need not concern the purchase or sale of that swap and can instead consist of a decision related to the triggering and payout of a swap.  As the Court instructed the Jury:

> Here, in order to be in connection with a swap, the scheme must be material to a decision by a counterparty to the swap, which means that the scheme must have the natural tendency to influence or be capable of influencing the counterparties to the swap.  That does not require proof that the counterparty to the swap was actually deceived or lost money or property as a result of the scheme, so long as there is proof that the scheme to defraud was conducted with the purpose of defrauding a counterparty to the swap and was at least capable of affecting that counterparty's conduct or decision with respect to the swap.  Materiality is an objective standard, so you need not decide that the scheme in fact influenced the counterparty.  Instead, you must find beyond a reasonable doubt that the scheme would be significant to a reasonable market participant in the position of the counterparty to the swap.

Trial Tr. 1352:23–1353:13.

According to Phillips, the Boxing Day Trades would be insignificant to a reasonable market participant because it is foreseeable that a party to a one touch option may trade near a barrier to manage risk and that those trades could trigger the option's barrier.  Dkt. No. 94 at 61. Indeed, in the agreements underlying the One Touch Option, JPMorgan disclosed that it could engage in hedging strategies such as "buying and selling, on a dynamic basis, exposure to the asset underlying the option in the spot, cash or derivatives markets," and that those strategies "have the potential to result in large and directionally unfavorable movements for our counterparties, particularly around the reference period, fixing period/window, our expiries of the option."  Gov. Exs. 555 at 4, 556 at 5.  JPMorgan included the same disclosure in the

offsetting option it entered into with RBS.  Gov. Ex. 551 at 3.  Likewise, Morgan Stanley's

option with JB Drax Honoré explained that Morgan Stanley "regularly trades in the foreign

exchange spot, forward, futures and options markets with respect to currencies included in the

Currency Pair, as part of its dealing activities with other customers and its market making and

hedging activities," and that those "activities may affect the Spot Exchange Rate, and thus the

probability that a Barrier Event will occur."  Gov. Ex. 570 at 3.  Witnesses who worked at

Morgan Stanley, Trial Tr. 453:3–21, JB Drax Honoré, *id.* at 162:23–163:24, and Glen Point, *id.*

at 270:6–19, also testified that participants in the FX swap market expected their counterparties

to trade near the barrier.  Consequently, Phillips contends that a reasonable counterparty to the

One Touch Option would have anticipated trading like the Boxing Day Trades and known that

those trades could affect the USD/ZAR exchange rate, so his trades were immaterial.  Dkt. No.

94 at 61.

      A key premise of Phillips's argument is that the purpose behind trades near a barrier is

irrelevant: if parties are expected to engage in hedging and trading strategies to control their

exposure to a one-touch option, there would be nothing particularly unusual or significant about

a party engaging in trading for the purpose of triggering the option as the exchange rate

approached the barrier.  But the Jury need not have accepted that premise in light of the contrary

testimony at trial.  Santoro, the Chief Compliance Officer for JPMorgan's swap dealers,

explained that she had been involved in discussions at JPMorgan regarding whether barrier

options had been triggered.  Trial Tr. 817:10–13.  She said that "[g]enerally" the decisive

question in those discussions was "whether or not the market has observably traded at [the

barrier] level."  *Id.* at 817:14–17.  But Santoro added that whether the market had traded at the

barrier level was not the sole consideration.  She stated that JPMorgan does not expect

counterparties to barrier options to trade in order to intentionally cause a barrier event to occur, *id.* at 817:18–21, and that it would be important for JPMorgan to know whether a counterparty to an option had done so, *id.* at 817:22–25.  Oweida, Morgan Stanley's global head of FX, similarly remarked that Morgan Stanley does not expect its counterparties to one-touch options to engage in trading with the intent to trigger barrier events.  *Id.* at 427:17–22.  He observed that Morgan Stanley does not "price in" the risk that a counterparty will place such trades when valuing one-touch options.  *Id.* at 428:19–23.  And Oweida testified that, when trading occurs at a barrier level, it would be important to Morgan Stanley to know if the counterparty to a one-touch option had engaged in trading that was intentionally designed to trigger that barrier.  *Id.* at 428:15–18. Henderson, an FX derivative salesperson at JB Drax Honoré, recognized that trading near a barrier for either a legitimate or illegitimate purpose could trigger an option, yet he differentiated between the two and suggested that the latter would be "problematic."  *Id.* at 163:5–7, 163:25–165:5.  Based on Santoro, Oweida, and Henderson's testimony, a jury could conclude that a reasonable counterparty to the One Touch Option would find it significant that Phillips placed the Boxing Day Trades to intentionally trigger the option's barrier.

Moreover, a jury could reasonably infer why the purpose behind a trade near a barrier would matter to a reasonable counterparty.  Any trading near a barrier can push the exchange rate toward or away from the barrier.  But, other things being equal, a counterparty to an option who trades in order to trigger a barrier is more likely to achieve that result than one who trades to hedge against risks or for other legitimate purposes.  Henderson testified that trading for a "legitimate" purpose would be "unlikely" to trigger a barrier, though he acknowledged it "could happen."  *Id.* at 164:21–165:5.  And the Boxing Day Trades themselves illustrate why transactions conducted for the purpose of triggering a barrier are more likely to do so.  Phillips

placed those trades at a time when liquidity was particularly low, such that his trades would have a greater effect on the exchange rate.  By contrast, a market participant engaging in foreseeable, legitimate trades may not have chosen such a high-impact moment to transact.  Additionally, when the exchange rate remained stubbornly above 12.50 despite Phillips's hundreds of millions of dollars in spot transactions, Phillips persisted in placing further orders until he traded through 12.50.  A reasonable jury could infer that Phillips's perseverance resulted from his intent to trigger the barrier, and that a party engaging in legitimate trades may not have traded in the same volume.  Consequently, while financial institutions often trade near the barriers of their FX options, market participants have a compelling reason to view trading *intended* to trigger a barrier as both distinct and significant.

The evidence therefore establishes that it would be important for a reasonable counterparty to the One Touch Option to know whether Phillips had engaged in manipulative trades in order to trigger the option's barrier.  Indeed, the Second Circuit has held that testimony similar to that of Santoro and Oweida—that a defendant's deception was important—supports a finding of materiality.  *See United States v. Gramins*, 939 F.3d 429, 446–47 (2d Cir. 2019); *Litvak*, 808 F.3d at 175–76.

But importance alone is insufficient.  *See United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007) ("'[R]elevance' and 'materiality' are not synonymous.").  Rather, as Phillips correctly notes, his scheme also had to be important to a counterparty's decision with respect to the swap.  Dkt. No. 94 at 57.  He asserts that the Government did not put forward any evidence indicating that his trades, even if significant to a reasonable counterparty, would be capable of affecting that counterparty's conduct or decision with respect to the One Touch Option.  Dkt. No. 104 at 41–42.

Phillips errs in suggesting that the evidence at trial failed to establish that his scheme was relevant to any decision related to the One Touch Option. *See id.* at 58. To the contrary, Santoro testified that whether a counterparty to a barrier option had traded to intentionally trigger the barrier would be an "important factor" for JPMorgan's "willingness . . . to pay a settlement amount" under that option. Trial Tr. 818:1–6. In response, Phillips simply denies that JPMorgan was a counterparty to the One Touch Option because Morgan Stanley, not JPMorgan, was "the true risk-taking counterparty" on that option. Dkt. No. 94 at 60. Regardless of the economic substance that resulted from the cascade of options between JPMorgan, RBS, JB Drax Honoré, and Morgan Stanley, the contracts between Glen Point and JPMorgan meant that as a formal matter JPMorgan was indeed Glen Point's counterparty. Gov. Exs. 555, 556. And under those agreements, JPMorgan had the contractual right to dispute Glen Point's determination that the barrier had been triggered and thereby initiate a dispute-resolution process in which three independent dealers would assess whether the option had been validly triggered. *See* Gov. Ex. 559 at 36. Consequently, a reasonable jury could find that Phillips's scheme was objectively material to JPMorgan's decision of whether to pay the One Touch Option's settlement amount or instead challenge the validity of the barrier event.

Oweida testified that when Morgan Stanley determines whether to pay the settlement amount on a one-touch option, the fact that trading has occurred at the barrier level is "very important." Trial Tr. 428:4–7. But he clarified that Morgan Stanley's position was premised on its expectation that those trades will be conducted for legitimate purposes, rather than to intentionally trigger an option. *Id.* at 428:8–14. From these statements, it would be reasonable for a jury to infer that whether a barrier has been intentionally triggered through trading could affect the willingness of a reasonable party in Morgan Stanley's position to validate that

triggering event and pay the resulting settlement amount. Santoro's testimony regarding JPMorgan's willingness to pay under similar circumstances lends further support to that inference, given the objective nature of the materiality inquiry. *See id.* at 818:1–6. Moreover, under its option agreement with JB Drax Honoré, Morgan Stanley was the "Barrier Determination Agent," so it had the "sole and absolute discretion" to declare a triggering event and that declaration would "be conclusive in the absence of manifest error." Gov. Ex. 570 at 2. As a result, the testimony of Oweida and Santoro indicates that Phillips's scheme was "capable of affecting" Morgan Stanley's decision to declare that the option had been triggered and make a corresponding settlement payment. Trial Tr. 1353:6–7. Thus, there was sufficient evidence for a reasonable jury to find that the Government proved the materiality of Phillips's scheme for a swap counterparty in Morgan Stanley's position beyond a reasonable doubt.

Because the evidence at trial supported the Jury's conclusion that Phillips's scheme was material, Phillips is not entitled to a judgment of acquittal on that element. *See United States v. Bilzerian*, 926 F.2d 1285, 1299 (2d Cir. 1991) ("Since the question of materiality is especially well suited for jury determination, and defendant has not demonstrated a lack of sufficient evidence to support that body's conclusion, there is no basis to set aside the . . . fraud convictions.").

## II.    Motion for a New Trial

Alternatively, Phillips urges the Court to grant a new trial under Federal Rule of Criminal Procedure 33, contending that several purported errors rendered his prosecution "precisely the 'extraordinary' case in which a new trial is warranted." Dkt. No. 94 at 64 (quoting *Ferguson*, 246 F.3d at 134). The Government responds that Phillips has not established a "manifest injustice," so his motion for a new trial must be denied. Dkt. No. 102 (internal quotation marks omitted).

Phillips begins his motion for a new trial with a footnote stating that "[a]ll arguments made with respect to [his] Rule 29 motion are hereby incorporated in his Rule 33 motion by reference." Dkt. No. 94 at 64 n.32. Although "a Rule 33 motion may properly be granted even where a Rule 29 motion is denied," when a defendant contests the weight of the evidence "the Rule 33 inquiry requires an objective evaluation of the evidence and an assessment of whether the evidence preponderates heavily against the verdict." *Landesman*, 17 F.4th at 331. Considering the "reliable trial evidence as a whole" and "defer[ring] to the jury's resolution of conflicting evidence," the guilty verdict here was not a "manifest injustice." *United States v. Archer*, 977 F.3d 181, 188–89 (2d Cir. 2020). As the Court's resolution of Phillips's Rule 29 motion makes clear, the weight of the evidence supported the Jury's finding that Phillips committed commodities fraud beyond a reasonable doubt. *See United States v. Sterling*, 2023 WL 3765005, at *8 (E.D.N.Y. June 1, 2023); *United States v. Kissi*, 2022 WL 4103640, at *6 (S.D.N.Y. Sept. 8, 2022), *aff'd*, 2024 WL 658622 (2d Cir. Feb. 16, 2024). Through vigorous advocacy at trial, Phillips presented a competing theory of the evidence. However, despite that alternative explanation, the Court is "left with the unmistakable conclusion" that the Jury adopted the correct interpretation of Phillips's conduct. *Archer*, 977 F.3d at 190. And even if the Court found Phillips's theory more persuasive, "the preponderates heavily standard does not permit a district court to elevate its own theory of the evidence above the jury's clear choice of a reasonable competing theory." *Id.* at 197. As a result, Phillips's motion for a new trial based on the weight of the evidence lacks merit.

Second, Phillips suggests that the Government gained an unfair advantage at trial because "it received a detailed preview of [his] defense" when he met with the Government, presented his position, and urged the Government "to reconsider whether this case should proceed to trial."

Dkt. No. 94 at 64.  But defendants not infrequently meet with prosecutors to explain their

understanding of the evidence and seek to persuade the prosecutors to forgo enforcement actions,

particularly in cases involving complex financial crimes like the scheme at issue here.  *See*

Robert S. Bennett et al., *Internal Investigations and the Defense of Corporations in the*

*Sarbanes-Oxley Era*, 62 Bus. Law. 55, 84 (2006).  Those dialogues are salutary, as they

encourage expeditious resolutions of cases and fairer and better-informed exercises of

prosecutorial discretion.  In agreeing to hear a defendant's version of events, however, the

Government does not forego its right to reject the defense's position and proceed to trial on its

own competing understanding of the facts.  Penalizing the Government for meeting with Phillips

here would also disincentivize the Government from participating in similar discussions in the

future and thus disserve the defendants who would otherwise benefit from the opportunity to

present their cases to prosecutors.  As sophisticated defense counsel like Phillips's attorneys here

are undoubtedly aware, voluntary presentations to prosecutors entail strategic risks:  "If these

tactics are unsuccessful, of course, the defense will be disadvantaged . . . since they eliminate the

element of surprise and allow the prosecutors to prepare their witnesses, legal arguments and

evidence to blunt the anticipated defense."  Lawrence S. Goldman & Jill R. Shellow-Lavine,

*Pre-Indictment Representation in White-Collar Cases*, Champion, June 2000, at 18, 21.

Accordingly, in deciding whether to present a client's case to the prosecution, counsel must

exercise the kind of strategic discretion that defines the role of a criminal defense attorney.  *See*

*generally Strickland v. Washington*, 466 U.S. 668, 689 (1984) (emphasizing "the wide latitude

[defense] counsel must have in making tactical decisions").  The mere fact that the meeting

between Phillips's attorneys and the Government had downside risk for Phillips does not negate

the voluntariness of that presentation or the fairness of the Government's use of any insights

from that meeting at the subsequent trial:

> It may be true, as [defendant] argues, that prosecutors gained a tactical advantage
> from getting a preview of his lawyers' take on the evidence.  But . . . this cannot be
> considered unfair.  If [defendant] did not want the government to know how he
> would defend the charge pending against him, his lawyers should not have
> discussed their contentions with the prosecutors.

*United States v. Novak*, 2014 WL 3882963, at *3 (N.D. Ill. Aug. 7, 2014).

In his third challenge, Phillips contends that the Government unfairly "argued to the jury

about 'missing,' 'deleted,' or 'zeroed out' deltas, creating an air of nefariousness around what

the government knew was routine practice at Glen Point."  Dkt. No. 94 at 65–66.  The evidence

at trial demonstrated that Phillips, in his own words, "t[ook] out a[ ]lot of the deltas" from ZAR

options on Glen Point's risk reports.  Gov. Ex. 404 at 15.  As a result, the Government's

references to missing, deleted, or zeroed out deltas on certain ZAR options at Glen Point were

"literally true and therefore unobjectionable."  *United States v. Waldman*, 240 F.2d 449, 451 (2d

Cir. 1957); *see also United States v. Lumiere*, 249 F. Supp. 3d 748, 764 (S.D.N.Y. 2017).

Unsurprisingly, the Government argued that the omission of these deltas from Glen Point's risk

reports was consistent with the Government's theory of guilt.  *See, e.g.*, Trial Tr. 1230:1–7.  Just

as predictably, Phillips contended that this practice was both commonplace and sensible.  *See,

e.g.*, *id.* at 1297:4–20.  Far from revealing a manifest injustice warranting a new trial, the parties'

countervailing characterizations of Phillips's elimination of the deltas of certain options from the

risk reports illustrate the fair opportunity both sides had to present their case to the Jury.

Fourth, according to Phillips, the Government engaged in misconduct in its closing

argument when it "told the jury that the delta replacement theory and the significance of the

Christmas weekend events in South Africa were lawyer-created cover stories."  Dkt. No. 94 at

66.  As an initial matter, while the Government noted that the Phillips's attorneys had presented

those explanations at trial and argued that they were a cover story for his crime, the Government did not describe the explanations as the inventions of Phillips's lawyers.  *See, e.g.*, Trial Tr. 1185:6–9 ("[T]his delta replacement theory that you have been hearing throughout trial from the defense, the one about the archbishop speech, is a cover story[;] it's made up after the fact."). And the Government's argument in its summation that the theory of innocence Phillips expounded at trial was fabricated was permissible advocacy, since the Government was "entitled to respond to the evidence, issues, and hypotheses propounded by the defense."  *United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982); *see also United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003) ("The government has broad latitude in the inferences it may reasonably suggest to the jury during summation." (quoting *United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993))); *United States v. Taubman*, 2002 WL 548733, at *13 (S.D.N.Y. Apr. 11, 2002), *aff'd*, 297 F.3d 161 (2d Cir. 2002).  Moreover, even if the Court were to conclude that the Government's repeated characterizations of Phillips's theory of innocence as a cover story constituted prosecutorial misconduct, Phillips has not shown that those comments were so prejudicial as to warrant a new trial.  *See United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) ("[T]he misconduct alleged must be so severe and significant as to result in the denial of [his] right to a fair trial. . . .  [I]t must cause substantial prejudice to result in a new trial." (internal quotation marks omitted)).  "In other words, this is not the 'rare case in which [alleged] improper comments in a prosecutor's summation are so prejudicial that a new trial is required.'"  *United States v. Willis*, 14 F.4th 170, 187 (2d Cir. 2021) (alteration in original) (quoting *United States v. Rodriguez*, 968 F.2d 130, 142 (2d Cir. 1992)).

Fifth, Phillips contends that, in its summation, the Government improperly emphasized irrelevant considerations—such as his registration with the CFTC, Glen Point's New York office

and United States clients, and the effect of the Boxing Day Trades on the value of the USD—

when urging the Jury to find an extraterritorial application of the commodities fraud statute.  Dkt.

No. 94 at 67.  For the reasons articulated in connection with Phillips's Rule 29 motion, the Court

agrees that those factors do not satisfy the "direct and significant connection" requirement of 7

U.S.C. § 2(i)(1) in this case.  But Phillips emphasized that he was a foreign businessman who

had acted abroad from the outset of the trial.  *See, e.g.*, Trial Tr. 59:5–9 ("[T]his case has next to

nothing to do with the United States.  Mr. Phillips is South African.  He lived and worked in

London.  Neither the placing of the trades nor any of the chats you will see, nor even the

purchase of the option at issue took place in the U.S.").  As a result, "[t]he prosecutor's

comment[s] w[ere] not improper because [they] merely responded to defense counsel's theory of

the evidence."  *United States v. Johnson*, 659 F. App'x 674, 679 (2d Cir. 2016) (summary order).

Furthermore, the Government admonished the Jury in its summation to follow the Court's

instructions on the law.  Trial Tr. 1183:19–21 ("Now, Judge Liman, after we are done speaking,

is going to instruct you on the law, and what he says goes.  You follow his instructions, not what

I say on this."); *see United States v. Ortega*, 2023 WL 6140929, at *10 (S.D.N.Y. Sept. 20,

2023).  Immediately after the parties' closing arguments, the Court instructed the Jury on the law

and explained that the summations were neither evidence, Trial Tr. 1335:22–1336:5; *see United

States v. Monegro*, 205 F.3d 1326 (2d Cir. 2000), nor controlling statements of the law, Trial Tr.

1334:2–5; *see United States v. Turner*, 720 F.3d 411, 428 (2d Cir. 2013); *United States v.

Azzara*, 132 F. App'x 923, 925 (2d Cir. 2005) (summary order).  And the Jury is presumed to

have followed the Court's instructions.  *See United States v. Green*, 2021 WL 2667129, at *3

(S.D.N.Y. June 29, 2021), *aff'd sub nom. United States v. Johnson*, 2024 WL 254118 (2d Cir.

Jan. 24, 2024); *see also Zafiro v. United States*, 506 U.S. 534, 540–41 (1993).  Thus, the

Government's references to Phillips's general business contacts with the United States in its summation do not necessitate a new trial. *See United States v. Truman*, 581 F. App'x 26, 31 (2d Cir. 2014) (summary order) ("The challenged statements, viewed in context and with the jury instructions in mind, fail to overcome the strong presumption against reversing criminal verdicts because of a prosecutor's statements in summation.").

Sixth, Phillips argues that the Government presented "a patently misleading demonstrative through Bruno Salemme, an FBI agent who had absolutely no knowledge of any of the facts of the case." Dkt. No. 94 at 68. That demonstrative displayed a timeline of events in the 2017 ANC election, beginning with an excerpt from a Bloomberg chat message sent to Phillips that stated: "Just in, unconfirmed reports coming in that Cyril Ramaphosa is prevailing in all five positions except the deputy president position." Trial Tr. 899:5–8. But the demonstrative omitted the remainder of the message, which added: "they are recounting it." *Id.* at 899:8; *see* Gov. Ex. 407 at 19. Phillips challenges the demonstrative exhibit's omission of "any reference to the uncertainty that surrounded the 2017 election of Cyril Ramaphosa," particularly the "four words from the end of a sentence in a Bloomberg chat that indicated an election recount of high-level ANC positions was ongoing." Dkt. No. 94 at 68. As an initial matter, objections that "demonstrative exhibits 'do not fairly represent the underlying documents,'" go to an exhibit's "weight" rather than its "admissibility." *Cooper Crouse-Hinds, LLC v. City of Syracuse*, 2022 WL 976903, at *9 (N.D.N.Y. Mar. 31, 2022) (quoting *United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 163 (2d Cir. 1996)). And Phillips's objections to the demonstrative "were forcefully presented to the jury through the vigorous cross-examination[] . . . [by Phillips's] able trial counsel." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005). Although Phillips asserts that Salemme's

lack of personal knowledge thwarted the impact of his cross-examination, Dkt. No. 104 at 45, the Court believes that anyone present for that cross-examination—indeed, any reader of the trial transcript—will reach the opposition conclusion: that Salemme's lack of personal knowledge made the cross-examination exceptionally effective, *see* Trial Tr. 899:4–901:22.  Accordingly, the cross-examination of Salemme on the demonstrative exhibit "eliminated any potential prejudice from the incompleteness of the exhibit."  *United States v. McLaughlin*, 2018 WL 4854624, at *13 (D. Conn. Oct. 5, 2018), *aff'd*, 949 F.3d 780 (2d Cir. 2019); *see also United States v. McLeod*, 2023 WL 4750123, at *16 (S.D. Cal. July 24, 2023).

Phillips's seventh argument asserts that the Government improperly downplayed the political uncertainty in South Africa leading up to and on Boxing Day, 2017.  Dkt. No. 94 at 68. While Phillips may disagree with the Government's position at trial, "[t]he prosecutor was entitled to present to the jury the Government's interpretation of the evidence."  *United States v. Zodhiates*, 901 F.3d 137, 146 (2d Cir. 2018).  The parties' disagreement over how uncertain the political climate in South Africa was when Phillips placed his trades is precisely the kind of factual dispute that a jury should, and did, resolve based on competing evidence and arguments. *See United States v. Prada*, 2009 WL 10674082, at *1 (S.D. Fla. Feb. 4, 2009) ("[T]hese conflicts . . . were for the jury to resolve.").  That evidence was not so unequivocal that the Government's position amounted to prosecutorial misconduct.  *See, e.g.*, Gov. Exs. 807 (December 21, 2017 news article indicating that Ramaphosa and his allies held authority in the ANC), 849 (August 11, 2017 news article describing the Archbishop of Cape Town's criticism of the ruling faction that Ramaphosa opposed), 868 (same from April 16, 2017).  Thus, the Court will not "usurp the role of the jury in resolving conflicting evidence" on this issue.  *United States v. Ramsey*, 2021 WL 5022640, at *2 (2d Cir. Oct. 29, 2021) (summary order).

Finally, Phillips argues it would be a manifest injustice to allow the verdict to stand because he lacked adequate notice that his actions were illegal prior to this prosecution, contrary to both due process and the rule of lenity.  Dkt. No. 94 at 69.  Yet Phillips's notice argument does not hold water, because the Court instructed the Jury that to find Phillips liable for commodities fraud the Jury needed to find that he acted "willfully, and with the intent to defraud."  Trial Tr. 1353:15–16.  As for the former requirement, the Court explained: "'willfully' means to act voluntarily and with a wrongful purpose, that is, with a purpose to disobey or disregard the law.  It is not necessary that the defendant knew that he was violating a particular law.  It is enough if he was aware that what he was doing was, in general, unlawful."  *Id.* at 1353:19–23.  The Court then defined acting with an "intent to defraud" as "act[ing] knowingly and with an intent to deceive."  *Id.* at 1343:24–25; *see id.* at 1353:25–1354:4 ("Here, it is not sufficient that the defendant knew his transactions would affect the dollar-rand exchange rate; instead, he must have made those transactions for the purpose of affecting the exchange rate and defrauding a counterparty to the barrier option contract.").  Furthermore, the Court cautioned the Jury that "[a] defendant does not act willfully or with intent to defraud if he honestly believes that his actions were proper."  *Id.* at 1354:5–6.  Collectively, these instructions ensured that Phillips's conviction rested on a finding that he acted to violate the law and defraud a counterparty to the One Touch Option, and that he did not believe his conduct was proper.  And the evidence at trial supported that finding here.  Glen Point held compliance trainings on the prohibitions against fraud and manipulation.  Gov. Ex. 438 at 8–9.  Additionally, as part of his registration with the NFA, Phillips passed an examination in 2015 that covered *inter alia* the rules against fraud and manipulation.  Trial Tr. 848:3–849:2.  Phillips's explicit description of his purpose for trading in the Bloomberg messages to the Nomura salesperson, the structure and

timing of the Boxing Day Trades, and Phillips's comments on his calls with Coratti further supported the Jury's finding that Phillips acted willfully and with an intent to defraud.  Phillips's assertion that he lacked constitutionally adequate notice that his actions were unlawful is therefore unavailing.  *See United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996); *United States v. Riccio*, 43 F. Supp. 3d 301, 307 (S.D.N.Y. 2014); *United States v. Hassan*, 2005 WL 6222864, at *5 (E.D.N.Y. Oct. 12, 2005).

Nor is the rule of lenity applicable.  That rule "provides that ambiguities concerning legislative intent in criminal statutes should be resolved in favor of the accused," but the rule "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute."  *United States v. DiCristina*, 726 F.3d 92, 97 (2d Cir. 2013) (internal quotation marks omitted); *see Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring) (explaining a court must "employ[] all of the traditional tools of statutory interpretation" before resorting to the rule of lenity); *see also Moskal v. United States*, 498 U.S. 103, 108 (1990) ("[W]e have declined to deem a statute 'ambiguous' for purposes of lenity merely because it was *possible* to articulate a construction more narrow than that urged by the Government." (emphasis in original)).  Though the Court consulted several sources of legal authority in fashioning appropriate jury instructions in this case, those sources illuminated the meaning of the relevant statutes, so the Court was not left to "simply guess as to what Congress intended."  *United States v. Scott*, 990 F.3d 94, 121 (2d Cir. 2021) (en banc).  Consequently, the relevant statutes are not so grievously ambiguous as to implicate the rule of lenity.

The Court concludes that "none of the alleged errors, whether considered individually or collectively, resulted in a miscarriage of justice so as to warrant a new trial under Rule 33." *United States v. Shellef*, 732 F. Supp. 2d 42, 82 (E.D.N.Y. 2010) (Bianco, J.); *see United States*

*v. Perez*, 2021 WL 5999261, at *8 (D. Conn. Dec. 20, 2021).  Thus, because Phillips "has not

met his burden under Rule 33," his motion for a new trial is denied.  *United States v. Mendlowitz*,

2019 WL 6977120, at *2 (S.D.N.Y. Dec. 20, 2019), *aff'd*, 2023 WL 2317172 (2d Cir. Mar. 2,

2023).

**CONCLUSION**

For the foregoing reasons, Phillips's motion for a judgment of acquittal or, in the

alternative, a new trial, Dkt. No. 94, is DENIED.  The Clerk of Court is respectfully directed to

close Dkt. No. 94.

SO ORDERED.

Dated: March 27, 2024
       New York, New York                       _____
                                                       LEWIS J. LIMAN
                                                  United States District Judge